## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| **Students for Justice in Palestine, at the University of Houston**, et al, | Case No. 1:24-cv-00523-RP |
| Plaintiffs, | Hon. Judge Robert Pitman |
| v. | |
| **Greg Abbott**, in his official capacity only as the Governor of the State of Texas, et al. | **MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

    I.    Student groups criticize Israel and express support for Palestinians ............................................ 2

    II.    Governor Abbott issues GA 44 to suppress student groups' criticism of Israel and support for Palestinians ............................................................................................................................... 3

    III.    Campus officials follow Governor Abbott's executive order and begin to implement its terms.    3

ARGUMENT ..................................................................................................................................... 5

    I.    Plaintiffs have standing to challenge Defendant Abbott's executive order and the campus actions taken in furtherance of it. ................................................................................................... 5

        A.    Here, the executive order directly causes injuries-in-fact to the student groups Governor Abbott identifies by name and viewpoint. ............................................................................. 6

        B.    GA-44 also causes injury-in-fact from the tangible chill it creates, which arises from Governor Abbott's self-proclaimed resolve to enforce the executive order's terms against Plaintiffs ........................................................................................................................... 7

        C.    Plaintiffs' injuries are traceable and redressable to Defendants, who have taken specific actions against Plaintiffs and can be enjoined from doing so again ................................. 13

    II.    GA 44's content discrimination, viewpoint discrimination, and unlawful suppressive purpose make it a clear cut constitutional violation. ............................................................................... 14

    III.    There is no legitimate interest in GA 44's speech restrictions, because Plaintiffs' speech is common and typical political speech about a foreign country. ........................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amawi v. Paxton, 956 F.3d 816 (5th Cir. 2020)* ........................................................................14

*Amawi v. Pflugerville Indep. Sch. Dist., 373 F. Supp. 3d 717 (W.D. Tex. 2019)*.........................14

*Babbitt v. Farm Workers,* 442 U.S. 289 (1979) ...........................................................................11

*Boos v. Barry*, 485 U.S. 312 (1988) .............................................................................................20

*Braidwood Management, Inc. v. Equal Emp. Opportunity Comm'n,* 70 F.4th 914 (5th Cir. 2023) .................17

*Brown v. Ent. Merchants Ass'n,* 564 U.S. 786, 790–91 (2011)......................................................22

*Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir. 1981)................................9

*Elrod v. Burns*, 427 U.S. 347 (1976)...............................................................................................9

*Fairchild v. Liberty Independent School Dist.,* 597 F.3d 747 (5th Cir. 2010) ...............................10

*Garcia v. Jones*, 910 F.3d 188 (5th Cir. 2018)...............................................................................9

*Glass v. Paxton*, 900 F.3d 233 (5th Cir. 2018).............................................................................16

*Houston Chron. Pub. Co. v. City of League City, Tex.,* 488 F.3d 613 (5th Cir. 2007)....................12

*Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333 (1977) ...................................10

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ............................................................... 13, 16

*KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261 (11th Cir. 2006).........................................9

*Laird v. Tatum*, 408 U.S. 1 (1972).................................................................................................15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...........................................................................10

*Matal v. Tam*, 582 U.S. 218, 243–44 (2017) ................................................................................24

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .........21, 22, 24

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011)........................................................................20

*Morse v. Frederick*, 551 U.S. 393 (2007).....................................................................................24

*N.H. Right to Life PAC v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ............................................... 16, 18

New York Times Co. v. Sullivan, 376 U.S. 254 (1964).............................................................23, 24

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................................9

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,* 460 U.S. 37 (1983).......................................23

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ...................................................................20

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)................................21

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47 (2006) ...........................10

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) .....................................12, 13, 14, 15, 16, 17, 18

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ............................................12, 13, 14

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)...................................................................19

**Other Authorities**

Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the
Gaza Strip (South Africa v. Israel) Order, 2024 I.C.J. Rep. 192 (January 2024) ..............................23

## **INTRODUCTION**

With American weapons, Israel has destroyed Gaza. It has laid siege to millions, killing tens of thousands in the process. And with unbearable violence, Israel's military has deprived all Gazans of the basic conditions of civilization—water, shelter, food—which are now unreachable amidst endless piles of rubble.

Students at our public universities want to speak out about this grim state of affairs. And in a perfect world, all these students gathering together to speak out on a matter of conscience would be universally lauded, if not for the view they are expressing, for the fact that they are expressing it. *See Virginia v. Hicks, 539* U.S. 113, 119 (2003) ("[I]f would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'")

We, of course, do not live in a perfect world. But with the signing of Executive Order GA-44, Governor Abbott has gone too far. He has ordered campus officials to adopt special rules about criticizing one particular foreign country—Israel. Those special rules are broad and specific at the same time and violate the most basic commands of the First Amendment.

On one hand, GA 44 directs campus officials to ban and punish the use of a single political slogan—*from the river to the sea, Palestine will be free*—long associated with the viewpoints of the student groups suing here. On the other hand, GA 44 requires campus officials to adopt a definition of antisemitism that would transform all the common and typical criticisms people make about foreign countries—that they are racist, violent, led by war criminals—into prohibited hate speech when uttered about Israel.

While we do not live in a perfect world, we do live in a country with the First Amendment. And the Constitution protects even what Governor Abbott might not like.

## BACKGROUND

I.      **Student groups criticize Israel and express support for Palestinians**

Plaintiffs are established student groups that are recognized by public universities in Texas. *See* Exhibit B – UH-SJP Declaration; Exhibit C – UT-PSC Declaration; Exhibit D – UTD-SJP Declaration; and Exhibit F - UTSA-YDSA Declaration.  While they were all very engaged participants in the public debates about Palestine and Israel last school year, Plaintiffs' engagement on these issues is longstanding and predates even October 2023. *See cf.* Ex C at ¶ 9 ("During [Israel Apartheid Week] in the past, UT PSC protested…a celebration of the founding of Israel" that "erases the ethnic cleansing of Palestinians."); *See also* Exhibit G – Student Group Social Media Posts (announcing the theme for Spring 2023 Israel Apartheid Week as "Resilience in the Face of Oppression" in light of the what was then "intensified attacks on Palestinian families and communities.")

These student groups have been organizing on campus for years, with annual events they intend to repeat in the future. Ex B-D & F at ¶¶ 2-4; Ex. E at  ¶¶ 5-8. They have formed coalitions amongst themselves and others to advocate for boycotts, divestment, and sanctions against Israel to pressure the country into abandoning its abuse of Palestinians. *See cf* Exhibit G – Student Group Social Media Posts. Plaintiffs intend to do so next year as well. Ex B-D & F at ¶¶ 2-4; Ex. E at  ¶¶ 5-8

Plaintiffs all communicate similar messages about Palestine, Israel, and our country's role there. They each denounce Israel's ongoing slaughter of innocent civilians in Gaza and the apartheid conditions Israel has imposed for decades on Palestinians. *See generally* Ex. A-F. They do so through chants, some of which end with *Israel is a racist state.* Ex. B at ¶ 4 Ex. C at ¶ 3. They do so through events, holding an annual Israel Apartheid Week where the student groups educate their fellow students and the public about the numerous injustices that limit life for Palestinians. Ex. C at ¶ 9; Ex. G

– Student Group Social Media Posts.  And they also do so through historical comparisons between Israel's atrocities in Gaza and those committed during World War II by Nazi officials. Ex. C at ¶ 4.

The student groups also make collective calls for peace and justice for everyone in that region—*from the river to the sea, Palestine will be free.* Ex. B-F at ¶ 5. They make such calls at their protests, on their picket signs, and in their meetings. *Id.*

## II. Governor Abbott issues GA 44 to suppress student groups' criticism of Israel and support for Palestinians.

Governor Abbott issued GA 44 in response to the activities of the student groups now suing. In his March 27th order, Governor Abbott concluded that "some radical organizations have engaged in unacceptable actions on university campuses." Among the "unacceptable actions," Ex. A. – GA-44, Governor Abbott identifies are the "protests and walkouts…with students chanting… from the river to the sea, Palestine will be free." *Id.*

The order directs campus officials to "update free speech policies" to outlaw these kinds of expressions and then ensure that "groups such as the Palestine Solidarity Committee and Students for Justice in Palestine are disciplined for violating these policies." *Id.*

His March 27th order also directs campus officials to adopt a definition of antisemitism that imposes special rules for criticizing Israel—labeling as antisemitic any speech that calls Israel a "racist endeavor" or makes a comparison between "contemporary Israel policy" and Nazi Germany." *Id.*

## III. Campus officials follow Governor Abbott's executive order and begin to implement its terms.

Campus officials throughout Texas complied with GA 44 almost immediately. On April 2nd, campus officials in Austin cancelled UT-PSC's Israel Apartheid Week protest, which had occurred without incident in prior years. Ex. C at ¶ 9. Campus officials did the same on April 24th, when they forbade the walkout UT-PSC had planned. *Id.* And when UT-PSC proceeded with the event anyways,

Governor Abbott and campus officials sent in state police to disrupt the gathering with force and arrests. *Id.*

On April 22nd, campus officials removed UH SJP students gathering at the student center to express criticism of Israel and support for Palestinians. Ex. B at ¶ 8. Students there had featured a sign that had the banned slogan *from the river to the sea, Palestine will be free. Id.* On May 8th, campus officials also shut down a peaceful encampment UH SJP had organized. *Id.*

On May 1st, campus officials used police to shutdown a protest UTD-SJP helped organize, even though it took place within "the university's designated Free Speech Zone." Ex. D. at ¶ 8.

And in San Antonio, campus officials have repeatedly censored Plaintiff DSA's gatherings, directing a student to take down a sign that read *from the river to the sea, Palestine will be free* on April 23rd and commanding the student group to not use the chant during a May 1st protest. Ex. F at ¶ 8. On May 3, campus officials met with Plaintiff DSA and explained that the ban on the use of the phrase was due to the executive order and that violations of the rule would result in them being referred to law enforcement. *Id.*

At UH, officials modified their free speech policies to include special rules about criticizing Israel. *See* Exhibit G – UH Implementation of GA 44. Those rules, contained within the updated definition of antisemitism adopted by the UH Board of Regents, labels as antisemitic any criticism of Israel "as a racist endeavor" or through "comparisons between contemporary Israel policy and Nazi Germany." *See* Texas Code 448.001 (incorporating by reference "examples of antisemitism"—like calling Israel "a racist endeavor" or "drawing comparisons of contemporary Israeli policy to that of the Nazis"—that are included by the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism"). *See* IHRA, *Working Definition of Antisemitism,* May 26, 2016 (available at: https://holocaustremembrance.com/resources/working-definition-antisemitism).

## **ARGUMENT**

To receive a preliminary injunction, Plaintiffs must prove four things: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm, (3) that the injunction sought is in the public interest, and (4) the threat of injury outweighs any harm the injunction may cause. *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018). Here, adjudication of the first factor subsumes the next three.

That is because the injuries for which Plaintiffs seek the Court's help regard their right to free speech, irreparable harm is presumed so long as the constitutional injury is proven. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). "It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Similarly, the fact that the free speech claim is against the government means that "the third and fourth factors, harm to the opposing party and the public interest, merge." *Nken v. Holder*, 556 U.S. 418 (2009). And that is because "neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *See, e.g., KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

Thus, this motion turns on Plaintiffs' likelihood of success on the merits of their claims, which is extremely high. That analysis follows below.

### I.    **Plaintiffs have standing to challenge Defendant Abbott's executive order and the campus actions taken in furtherance of it.**

To challenge Governor Abbott's executive order and campus level actions taken in furtherance of it, Plaintiffs must prove an injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). When it comes to the First Amendment, "federal courts relax the prudential limitations and allow yet-unharmed litigants to attack potentially overbroad statutes." *Fairchild v. Liberty Independent School Dist.,* 597 F.3d 747, 754 (5th Cir. 2010)**.** Plaintiffs, however, need not rely on the relaxed standing the Supreme Court has established for First Amendment claims. Defendants have

already inflicted the injuries, they persist, and without the Court's intervention, these injuries will certainly metastasize when the fall semester begins.

While all Plaintiffs have standing independently, "[t]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Furthermore, Plaintiff DSA has organizational standing, because: (1) DSA members who are public university students in Texas would have standing to sue in their own right; (2) speaking out on Palestine is germane to the organization's purpose, see Ex. D at ¶ 6-7; and (3) the asserted claim and relief sought would not require the participation of individual DSA members or chapters. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).

### A.   Here, the executive order directly causes injuries-in-fact to the student groups Governor Abbott identifies by name and viewpoint.

The facts here make injury-in-fact obvious. Because the order targets the speech and activities of the student groups suing, Plaintiffs are themselves "an object of the action…at issue." *Lujan*, 504 U.S. at 561–62. In such situations, "there is ordinarily little question that the action…caused [them] injury." *Id.*

Governor Abbott's order is explicitly aimed at Plaintiffs. The order directs campus officials to punish "groups such as the Palestine Solidarity Committee and Students for Justice in Palestine." Ex. A. There is no ambiguity in GA-44's text, and campus officials have done exactly what Governor Abbott has asked.  On May 1st, for example, at a protest SJP-UTD started within the school's designated "Free Speech Zone," campus officials disrupted the lawful, peaceful event with force and arrests. See Ex. D at ¶ 8. On April 1st, campus officials cancelled Plaintiff UT-PSC's Israel Apartheid Week protest, a yearly protest that had taken place prior to the executive order without incident. *See* Ex. C. at ¶ 9. UH campus officials did the same on May 8th, when they used police and arrests to disrupt SJP-

UH's peaceful activities mere hours after students first gathered for a small, non-disruptive encamp-

ment SJP-UH helped organize. See Ex. B at ¶ 8.

Governor Abbott's executive order targets Plaintiffs, not only by name, but also by the things

they have already done and are expected to do again in the future. GA-44 concludes that Plaintiffs

have "engaged in unacceptable actions on university campuses" already. Ex. A. Those "unacceptable

actions" include gatherings Plaintiffs supported and helped organize, like "protests and walkouts"

during which students used the GA-44-prohibited political slogan *from the river to the sea, Palestine will be*

*free. Id.* These are things Plaintiffs have actually done and will do again in the future, making the injury

"actual" as well as "certainly impending." See *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979).

Though Governor Abbott's executive order is sweeping, Plaintiffs' injuries here are very spe-

cific and concrete. At UT San Antonio, for example, campus officials are censoring one particular

political slogan used by Plaintiffs and others who share their viewpoint. *See* Ex. F. This policy has been

enforced against Plaintiff DSA specifically, with a campus official requiring Plaintiff DSA's leadership

to make a student put away a placard with the slogan at a campus protest they helped organize. *Id.* at

¶ 8. Likewise, campus officials in Houston, Austin, San Antonio, and Dallas have all interfered with

Plaintiffs' gatherings on specific occasions. In each case, campus officials have acted against Plaintiffs

in the manner Governor Abbott's executive order instructs them to. *See* Exs. B, C, D, F.

**B.    GA-44 also causes injury-in-fact from the tangible chill it creates, which arises
        from Governor Abbott's self-proclaimed resolve to enforce the executive order's
        terms against Plaintiffs**

Although Plaintiffs have shown above how Governor Abbott's executive order directly caused

campus officials to interfere and censor Plaintiffs' activities, the Fifth Circuit has made clear that less

is enough. When it comes to the "highly sensitive area of public regulations governing bedrock polit-

ical speech," it is "not hard to sustain standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th

Cir. 2020), as revised (Oct. 30, 2020). Indeed, even "[c]hilling a plaintiff's speech" inflicts a

constitutional harm that sustains a litigant's standing. *Houston Chron. Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 618 (5th Cir. 2007).

So long as one is threatened by a law or regulation, actual enforcement is "not a prerequisite to challenging" it. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014). *See Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979) (allowing a preenforcement challenge whenever a "plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure.")

For this kind of injury-in-fact, Plaintiffs must prove three things: (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that the planned conduct is "arguably ... proscribed" by the challenged policy, and (3) the threat of future enforcement is "substantial." *Speech First*, 979 F.3d at 330–31.

Here, the single fact that has brought the sides to court proves all three. That fact is that the parties plan to repeat their past conduct, making future conflict inevitable.

Governor Abbott has not called off the phalanx of campus officials commanded by GA 44 to act against Plaintiffs. The student groups plan to do and say the same things about Israel and Palestine as they did last school year. And rather than repudiating any measures already taken against Plaintiffs, campus officials have closely followed Governor Abbott's instructions to "update free speech policies," explicitly prohibiting in Houston, for example, the very speech SJP-UH gathers to make. *See* Ex. G.

### 1. These student groups are at the center of a national debate about Palestinians and Israel and intend to continue participating in that public debate.

A plaintiff has an intention to engage in protected conduct if they have "concrete plans" to engage in conduct "affected with a constitutional interest." *See Speech First*, 979 F.3d at 331. Here, Plaintiffs are established student groups—all recognized by their universities, each with student leaders

already in place for the coming school year and plans to organize activities and events in the fall. *See* Ex. B; Ex. C; Ex. D; Ex. F. This evidence of "past enthusiastic participation" in free speech campus activities is the best evidence that Plaintiffs will act similarly in the future. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014).

Because they are student groups organized to express a viewpoint about Palestine, Israel, and our country's role there, Plaintiffs' conduct inherently "concerns political speech." *Susan B. Anthony List*, 573 U.S. at 162. That speech concerns the ongoing slaughter and starvation of Palestinians in Gaza, and what the United States can do to end it. *See* Ex. B; Ex. C; Ex. D; Ex. F. It regards the apartheid conditions the student groups opposed even before the industrial-scale destruction of Gaza commenced last year. *Id.* This is political speech at the core of what the First Amendment protects.

If there was any doubt that Plaintiffs' speech is inflected by a constitutional interest, the Fifth Circuit eliminated it in *Speech First*. There, the Fifth Circuit concluded that some of the exact same kind of speech at issue here—political messages "about . . . the BDS movement to end support for Israel"—were "affected with a constitutional interest." *Speech First*, 979 F.3d at 331. Plaintiff SJP-UH, for example, advocates for BDS by helping lead and organize coalitions to pressure their schools to divest from certain companies as an act of solidarity with Palestinians. *See* Ex. G. It is peaceful advocacy that strives to replicate the success of student actions in the 1980's against apartheid in South Africa.[1] Speech about boycotting a foreign country is prototypical political speech and is thus "affected with a constitutional interest." See *Susan B. Anthony List*, 573 U.S. at 161-164. There is no reason to revisit the Fifth Circuit's well-founded conclusion recognizing the constitutional interest in BDS

---

[1]Palestinian Civil Society Call for BDS, July 9, 2005, *available at* www.bdsmovement.net/call ("We, representatives of Palestinian civil society, call upon international society organizations and people of conscience all over the world to impose broad boycotts and implement divestment initiatives against Israel *similar to those applied to South Africa in the apartheid era*.") (emphasis added)

advocacy. *Id. See also Amawi v. Pflugerville Indep. Sch. Dist.,* 373 F. Supp. 3d 717, 745 (W.D. Tex. 2019), vacated and remanded sub nom. *Amawi v. Paxton,* 956 F.3d 816 (5th Cir. 2020) ("BDS boycotts are not only inherently expressive, but as a form of expression on a public issue, rest on the highest rung of the hierarchy of First Amendment values").

    **2.**    **GA 44 explicitly proscribes some of Plaintiffs' speech about Palestine and Israel and arguably proscribes other kinds.**

For pre-enforcement First Amendment claims, the jurisprudence acknowledges that the future is inherently unknowable and that, as a result, enforcement actions in the future cannot be predicted to a certainty. Thus, it is enough for Plaintiffs' course of conduct to be "arguably proscribed" by the challenged law. So, while "a direct prohibition against the exercise of First Amendment rights" is not required, such an explicit proscription would most clearly satisfy this prong. *Speech First*, 979 F.3d at 332 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

In this case, there are at least two "direct prohibitions." *Id.* First, Governor Abbott's executive order prohibits one specific political slogan—*from the river to the sea, Palestine will be free.* Ex. A. (labeling the slogan "antisemitic," directing "update[s] [to] free speech policies to address the sharp rise in antisemitic speech," and then calling for these new policies to be "enforced on campuses and that groups such as the Palestine Solidarity Committee and Students for Justice in Palestine are disciplined" for violating these new policies). This political slogan is explicitly forbidden, and Plaintiffs' future plans— which all include the use of this phrase—are thus at odds with GA 44's clearest command.

Second, Governor Abbott requires campus officials to adopt special rules about criticizing is Israel. The executive order does so by requiring campus officials to incorporate a definition of antisemitism that labels it bigoted to claim that Israel is "a racist endeavor" or "dra[w] comparisons of contemporary Israeli policy to that of the Nazis." *See* IHRA *See* IHRA, *Working Definition of Antisemitism,* May 26, 2016 (available at: https://holocaustremembrance.com/resources/working-definition-antisemitism). Plaintiffs express the viewpoint that Israel is an apartheid state committing genocide

against a group of people it subjugates. In doing so, the student groups make claims that Israel is "a racist endeavor" and compare the industrial-scale violence Israel has wrought in Gaza to Nazi-era atrocities and the historical figures who oversaw them. See Ex. B at ¶ 4; Ex. C at ¶ 8.

There is much more in Governor Abbott's executive order that, while not explicitly prohibited, is still "arguably proscribed." By describing Plaintiffs, for example, as "radical organizations" that have already engaged in "unacceptable actions on university campuses," Governor Abbott makes clear the kinds of student activities he expects campus officials to disrupt. See Ex. A. This includes the "protests and walkouts" that Plaintiffs themselves helped organize last school year and plan to organize again when the next school year begins. *Id.*

And the many efforts of campus officials to disrupt Plaintiffs' activities show that the chill here is more than "speculative apprehensiveness" about GA 44's consequences. *See Glass v. Paxton*, 900 F.3d 233, 238-39 (5th Cir. 2018); *Hosemann*, 771 F.3d at 291. Governor Abbott's instructions to take action against "groups such as Palestine Solidarity Committee and Students for Justice in Palestine" are clear, and the similar ways campus officials have implemented those instructions prove it. *See* Ex. A.

### 3. There is a substantial threat of future enforcement

Because GA 44's terms "facially restrict expressive activity," this Court can presume a threat of future enforcement. *Speech First*, 979 F.3d at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). As explained above, Governor Abbott's executive order imposes a policy of disruption and censorship against Plaintiffs. This includes a ban on the use of one specific phrase and a definition of antisemitism that prohibits the normal and typical criticisms people make about foreign countries—that they are racist, violent, or similar to Nazi Germany in some way—when made about Israel. Dictated by Governor Abbott's categorical approach in GA 44, the facial aspects of Plaintiffs' challenge establishes a presumption of future enforcement Defendants cannot rebut.

But beyond GA 44's text, Plaintiffs can also point to strong evidence that the executive order will be "applied to the plaintiff[s]" to prove a substantial threat of future enforcement. *Speech First*, 979 F.3d at 766. First, Governor Abbott has enthusiastically embraced his role as a suppressor of pro-Palestinian campus speech, loudly boasting about his own direct role on April 24th in shutting down Plaintiff UT-PSC's lawful, peaceful student protests. "Arrests being made right now & will continue until the crowd disperses," Governor Abbott bellowed online. *See* Ex. I – Abbott Tweet. His command over Texas State police and the public lands on which all Texas universities are located means that Governor Abbott can implement the terms of his executive order directly, just as he did in Austin on April 24th, without the need for an intermediary. This compounds the threat of future enforcement

Second, there is a history of prior enforcement that makes the threat of future enforcement substantial. While even just "one case" of prior enforcement is enough to prove "a history of enforcement," Plaintiffs can identify more than half a dozen instances since Governor Abbott issued his order. *Braidwood Management, Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 (5th Cir. 2023). In addition to the decision to disrupt Plaintiff UT-PSC's April 24th gathering in Austin, campus officials in San Antonio, Dallas, and Houston have interfered with Plaintiffs' events repeatedly in April and May. See Ex. B at ¶ 8a (April 22nd student protest in Houston disrupted); Ex. D at ¶ 8b (May 1st student protest in Dallas disrupted); Ex. F at ¶ 8a (April 23rd student protest in San Antonio disrupted).

Finally, and perhaps, most significantly, no defendant has done anything to disclaim an intent to act against Plaintiffs. In pre-enforcement challenges, "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (quoting *N.H. Right to Life PAC*, 99 F.3d at 15. There is no evidence that Defendant Governor Abbott will not enforce the terms of the executive order by compelling schools to comply. Nor is there any evidence that the Defendant schools will not comply with the executive order. UTD SJP, for example, has petitioned the administration at their school to disavow the executive order but the school has failed

to respond. See Ex. D. at ¶ 7. No defendant has chosen to disavow the executive order or its terms, creating a presumption of future enforcement.

### C.   Plaintiffs' injuries are traceable and redressable to Defendants, who have taken specific actions against Plaintiffs and can be enjoined from doing so again

The plain meaning of Governor Abbott's executive order makes causation and redressability similarly clear. GA 44 is not a toothless resolution. It is not government speech. It's an order requiring campus officials to take action. Those actions include preventing students from gathering to say certain things about Palestine and Israel.

Campus officials have followed Governor Abbott directions, repeatedly interfering with Plaintiffs' protests—in Austin on April 2nd and April 24th, in Dallas on May 1st, in Houston on May 8th, and in San Antonio on April 23rd and May 1st. See Ex. C at ¶ 9a and 9b; Ex. D at ¶ 8b; Ex. B at ¶ 8c; Ex. F at ¶ 8a and 8b. They have imposed a slogan-specific, for-one-country-only censorship regime campus officials have already applied to Plaintiffs. Having ordered campus officials he oversees to act, Governor Abbott cannot point to  "the independent act of a third party" to escape potential liability. *Texas v. United States*, 809 F.3d 134, 160 (5th Cir. 2015).

The evidence that the injuries inflicted on Plaintiffs by campus officials follow from Governor Abbott's executive order is overwhelming. When the UH Board of Regents made changes to its polices on freedom of expression and anti-discrimination, it made clear it was doing so by command. "Per Governor Abbott's Executive Order GA44…[Texas public universities] are required to review and update free speech policies. See Ex. H. – UH BoR 5.15 Minutes. Likewise, one campus official in San Antonio explained that the campus-level ban on the political slogan *from the river to the sea, Palestine will be free* originated in the text of Governor Abbott's executive order. *See* Ex. F. at ¶ 8a. In both Houston and San Antonio, the campus-level changes adopted establish special rules about criticizing Israel, which label as antisemitic the common and typical criticisms made about all countries—that

they are exploitative or unjust, racist or engaged in mass violence—when the message expressed regards Israel.

There is an absolute identity between cause and redress here. Governor Abbott's executive order and the campus-level actions taken in furtherance of it have caused Plaintiffs' injuries. An injunction mapped against the cause of those injuries would redress them.

## II.    GA 44's content discrimination, viewpoint discrimination, and unlawful suppressive purpose make it a clear cut constitutional violation.

The value of the First Amendment is that "it defends all viewpoints." *Morgan v. Swanson*, 659 F.3d 359, 401–02 (5th Cir. 2011). It is why the free speech clause gives Governor Abbott and campus officials "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015). GA 44 does so anyways—extensively.

The executive order directs campus officials to punish student groups that have criticized Israel, bans one particular political slogan used extensively by Plaintiffs, and imposes special rules about criticizing Israel. These restrictions are not "content-neutral," because they cannot be applied "without reference to the content of the regulated speech. *Boos v. Barry*, 485 U.S. 312, 320 (1988).

Governor Abbott's order requires campus officials to become entangled with the content of Plaintiffs' speech. The *from the river to the sea, Palestine will be free* ban already being enforced in San Antonio and GA 44's special rules about criticizing Israel elsewhere apply to Plaintiffs' speech *because* of the contents of that speech—it's viewpoint (UT-PSC has organized gatherings "to bring attention to the ongoing genocide of Palestinians"), the phrases students are using (UTSA-YDSA "commonly use[s] a chant that ends with 'Israel is a racist state'"), and the historical comparisons they are making (attendees at UT-PSC protests "have displayed signs comparing Benjamin Netanyahu…to Hitler"). See Ex. C; Ex. F.

14

But Plaintiffs' speech about Israel is similar to the common and typical messages students communicate about other foreign countries. Plaintiffs, for example, call Israel a "racist" state, a claim that is central to the message Plaintiffs gather to convey. See Ex. B; Ex. C; Ex. D; Ex. E; Ex. F. Indeed, UT PSC even holds a yearly event (Israel Apartheid Week) dedicated to educating fellow students and the public about apartheid conditions in Israel and Palestine.  See Ex. C.

Nevertheless, Plaintiffs are calling Israel "racist" much like others are calling countries besides Israel, including our own country, racist. But because Plaintiffs' speech regards Israel, Defendants' special rules about criticizing this foreign country apply—chilling speech in some cases, eliminating it entirely in others. *See* Ex. C ("This year, prior to [a yearly counterprotest], campus officials…inform[ed] us that we were not allowed" to gather for the event as they had previously); Ex. F (a campus official, "citing the executive order," commanded the student group's leaders to make a protestor "take down" a sign bearing the forbidden political slogan *from the river to the sea, Palestine will be free*).

The First Amendment does not allow this. By "regulat[ing] speech based on its substantive content [and] the message it conveys," Defendants commit an "axiomatic" violation of the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828–29 (1995).

Governor Abbott's intentions here also doom GA 44. The executive order is plainly motivated by the unlawful "desire to suppress support for…an unpopular cause." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). The executive order's suppressive aim emerges from GA 44's menacing text. Governor Abbott threatens expulsions and punishments against the student groups he targets. His executive order requires campus officials to mete out discipline and catalogue the carnage. This makes clear that Governor Abbott intended the campus crackdown that followed GA 44's issuance.

And Governor Abbott is transparent about the "unpopular cause" he is targeting. GA 44 identifies Plaintiffs by name and by the activities the student groups have already done. The order

directs campus officials to punish student groups "such as Palestine Solidarity Committee and Students for Justice in Palestine." See Ex. A. It labels as bigoted the "protests and walkouts" Plaintiffs helped organize last school year where the political slogan *from the river to the sea, Palestine will be free* was used. *Id.* In short, Governor Abbott targets Plaintiffs because of the content of their political speech.

The First Amendment forbids this. GA 44's suppressive purpose is "so plainly illegitimate" that this Court may "immediately invalidate the [executive order]." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

## III. There is no legitimate interest in GA 44's speech restrictions, because Plaintiffs' speech is common and typical political speech about a foreign country.

While the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," Plaintiffs' speech does not fit within the "well-defined and narrowly limited classes" of speech that can be regulated without violating the First Amendment. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790–91, 131 S. Ct. 2729, 2733, 180 L. Ed. 2d 708 (2011). There is no reasonable argument that Plaintiffs' speech is obscene, inciting, or tantamount to fighting words. *Id.* And absent such a finding, GA 44's viewpoint-conscious purpose cannot be squared with the First Amendment. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 61–62(1983) ("We have never held that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic");

Rather than pose a novel threat requiring unprecedented restrictions, Plaintiffs' speech  is consonant with the "profound national commitment" memorialized by the First Amendment: "that debate on public issues be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270–71 (1964). The student groups' expressions, in fact, are factually in line with the conclusions of major international institutions and mirror the emotional valence these staid institutional actors use in their official documents. There are arrest warrants for two Israeli leaders pending before the International Criminal Court for "[s]tarvation of civilians as a method of warfare," "extermination," and

"[i]ntentionally directing attacks against a civilian population," among other crimes.[2] A decision from the International Court of Justice aims to avoid what preliminary evidence indicates is a genocide. *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel) Order*, 2024 I.C.J. Rep. 192 (January 2024) ("the military operation conducted by Israel…has resulted in tens of thousands of deaths and injuries, and the destruction of homes, schools, medical facilities and other vital infrastructure, as well as displacement on a massive scale"). The crux of Plaintiffs' political message is not different than the messages conveyed by International Criminal Court's prosecutor or the International Court of Justice's panel of judges.

And while Plaintiffs' political speech might include "unpleasantly sharp attacks," the First Amendment's protections do not depend on a person's choice of words. *NY Times*, 376 U.S. at 271. The fact that Plaintiffs' political messages may be "offensive to some of their hearers" does not mean Defendants can censor them. *Matal v. Tam*, 582 U.S. 218, 243–44, 137 S. Ct. 1744, 1763, 198 L. Ed. 2d 366 (2017). That is not how the First Amendment works.

Plaintiffs are speaking out about an ongoing genocide—the categorical destruction of a group of people—done with American weapons and live-streamed to our phones. Plaintiffs' political messages are grim and upsetting to some, but that is a consequence of the subject matter itself rather than the time, place, or manner of the expression.  "Giving offense is a viewpoint." *Matal*, 582 U.S. at 220. Nothing about Plaintiffs' speech puts it within the "vanishingly small category of speech that can be prohibited because of its feared consequences." *Morse v. Frederick*, 551 U.S. 393, 438, 127 S. Ct. 2618, 2646, 168 L. Ed. 2d 290 (2007).

***

---

[2] https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-state.

Governor Abbott's executive order is best understood as an effort to confer a benefit on a foreign country by prohibiting people from criticizing it. That benefit, however, violates the First Amendment even on its face, because "a substantial number of [the law's] applications are unconstitutional." *Moody v. NetChoice*, LLC, No. 22-277, 2024 WL 3237685, at *8 (U.S. July 1, 2024). Those applications are discussed above but all arise from the executive order's near exclusive focus on rhetoric—exemplified by its conclusion that chanting *from the river to the sea, Palestine will be free* is "antisemitic" and its order that campus officials act to "address the sharp rise of antisemitic speech and acts." Ex. A.

And beyond a few words about graffiti, GA 44 has no "plainly legitimate sweep." *Moody,* at 8. It directs campus officials to adopt special rules about criticizing Israel. But criticizing Israel is protected by the First Amendment, and "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). Whatever Governor Abbott may think about Plaintiffs' speech, he is not free to deprive it of the First Amendment's protection.

Because the "unconstitutional applications" of Governor Abbott's executive order "substantially outweigh its constitutional ones," this Court can invalidate GA 44 and policies adopted in furtherance of it on their face. *Moody,* at 8. *See also United States v. Hansen,* 599 U.S. 762, 770 (2023) (once a litigant shows that a law "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep," then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid.").

Dated: July 2, 2024

Respectfully, Submitted,

/s/Lena Masri
Lena Masri
Gadeir Abbas*
Justin Sadowsky
CAIR LEGAL DEFENSE FUND
453 New Jersey Ave SE
Washington, D.C. 20003
T: (202) 488-8787
ldf@cair.com

*Licensed in VA; not in D.C., practice
limited to federal matters
John T. Floyd Law Firm
By: /s/ John T Floyd
 Texas Bar No. 00790700

/s/ Chris Choate
Texas Bar No. 24045655

River Oaks Tower
3730 Kirby Dr., Suite 750
Houston, TX 77098
 Tel: 713-224-0101
Fax: 713-237-1511

## <u>CERTIFICATE OF SERVICE</u>

I, Lena Masri, hereby certify that a true copy of this motion for a preliminary injunction was served on all defendants' counsel of record through the Court's electronic filing system.

/s/ Lena Masri
Lena Masri