IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE AT THE UNIVERSITY OF HOUSTON, et al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | No. 1:24-CV-523-RP |
| GREG ABBOTT, *in his official capacity only as the Governor of the State of Texas*, et al., | § § § § | |
| Defendants. | § | |

---

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

**RYAN WALTERS**
Chief, Special Litigation Division

**COLE P. WILSON**
Assistant Attorney General
Attorney-in-charge
Texas State Bar No. 24122856
Cole.Wilson@oag.texas.gov

**TODD DICKERSON**
Assistant Attorney General
Tex. State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

**JACOB E. PRZADA**
Special Counsel
Texas State Bar No. 24125371
Jacob.Przada@oag.texas.gov

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**COUNSEL FOR DEFENDANTS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................................iv

INTRODUCTION ...............................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................................3

I.  Pro-Palestinian Campus Protests Erupt across the Country. ........................................3

II.  NSJP Circulates "Escalation" Tactics for Students to Maximize Campus Disruption............6

III.  Governor Abbott Signs Executive Order GA-44. ..........................................................9

IV.  Students at Texas Public Universities Join NSJP's Campaign to Seize Universities and "Disrupt their Daily Functions." ............................................................................................10

    A.  The University of Texas at Austin. ...............................................................................11

    B.  The University of Texas at San Antonio. .....................................................................13

    C.  The University of Texas at Dallas. ...............................................................................14

    D.  The University of Houston. ..........................................................................................15

V.  Universities Across the Country Suspend SJP Chapters and Bring in Law Enforcement to End Encampments. ....................................................................................................................16

VI.  The University Defendants Revise their Campus Policies. ..........................................17

    A.  The University of Texas System. ...................................................................................18

    B.  The University of Houston System. .............................................................................19

VII.  Plaintiffs' Lawsuit. ........................................................................................................20

STANDARD OF REVIEW ...................................................................................................................23

RULE 12(B)(1) ARGUMENTS ...........................................................................................................24

I.  Plaintiffs Assert Claims Against Many Defendants with No Tangible Connection to Plaintiffs' Alleged Injuries. ......................................................................................................24

II.  Plaintiffs' Alleged Injuries Cannot be Redressed through a Lawsuit to GA-44 Alone. .........25

III.  Defendants' Sovereign Immunity Bars Plaintiffs' Claims. .........................................27

    A.  The University of Houston, the University of Houston System Board of Regents, and the UT System Board of Regents are Not Proper Defendants. ....................................28

    B.  Governor Abbott is Not a Proper Defendant. ............................................................28

    C.  The Remaining Official-Capacity Defendants are also Not Proper Defendants. ........29

    D.  Plaintiffs Cannot Recover Damages against the Official-Capacity Defendants. ....................33

IV.  Plaintiffs Lack Standing. ...............................................................................................33

    A.  GA-44 Did Not Cause Plaintiffs Alleged Injuries. ......................................................34

    B.  Plaintiffs Lack Standing to Assert a Claim Seeking Damages. ...................................36

        1.  Defendants Did Not Impair DSA's Mission to Establish Socialism in America.........37

        2.  PSC-UT Fails to Identify Any Member Who Can Sue in their Own Right.................37

V.  DSA Also Cannot Pursue its Standalone Claim Against President Eighmy. ...........................38

RULE 12(B)(6) ARGUMENTS ........................................................................................39

I.    Plaintiffs Ignore the Constitutional-Avoidance Canon in Interpreting GA-44. ......................40

II.   Plaintiffs Cannot Sue Many of the Defendants Under § 1983. ....................................41

III.  Plaintiffs' As-Applied and Facial Challenges to GA-44 Lack Merit. .........................43

    A.   Plaintiffs Fail to Plausibly Show that GA-44 Caused their Alleged Injuries. .........43

    B.   Even If the University Defendants Did Enforce GA-44 Against Plaintiffs, its Application Would Not Have Violated the First Amendment. ....................................44

        1.   Tinker Governs Plaintiffs' Challenge to GA-44. ...................................45

        2.   GA-44 is Constitutional Under Tinker's "Substantial Disruption" Prong. ...................47

        3.   GA-44 also is Constitutional Under Tinker's "Rights of Others" Prong. ....................52

        4.   A Facial Challenge is a High Bar; Plaintiffs Do Not Meet it Here. .............................56

IV.   PSC-UT's "Pretextual Cancellation" Claim Fails. ..........................................58

V.    Qualified Immunity Bars Plaintiffs' Individual-Capacity Claims. ...............................59

CONCLUSION ........................................................................................................60

CERTIFICATE OF SERVICE ...........................................................................................62

TABLE OF AUTHORITIES

**Federal Decisions**

*A.M. ex rel. McAllum v. Cash,*
  585 F.3d 214 (5th Cir. 2009) ................................................................ 48, 50, 51, 52

*Abdullah v. Paxton,*
  65 F.4th 204 (5th Cir. 2023) .......................................................................................34

*Aguilar v. Texas Dept. of Criminal Justice,*
  160 F.3d 1052 (5th Cir. 1998) ............................................................................. 28, 43

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
  851 F.3d 507 (5th Cir. 2017) ...........................................................................30, 33, 34

*Allen v. Wright,*
  468 U.S. 737 (1984) ....................................................................................................35

*Anderson* v. *Valdez,*
  845 F.3d 580 (5th Cir. 2016) .......................................................................................24

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................................. 24, 42

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) .......................................................................................37

*Babinski v. Sosnowsky,*
  79 F.4th 515 (5th Cir. 2023) .......................................................................................59

*Bailey v. Iles,*
  87 F.4th 275 (5th Cir. 2023) .......................................................................................57

*Barilla v. City of Houston, Texas,*
  13 F.4th 427 (5th Cir. 2021) .......................................................................................35

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
  481 U.S. 537 (1987) ......................................................................................................2

*Bd. of Trs. v. Fox,*
  492 U.S. 469 (1989) ....................................................................................................46

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ....................................................................................................24

*Bell v. Itawamba Cnty. Sch. Bd.,*
  799 F.3d 379 (5th Cir. 2015) ...............................................................................*passim*

*Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.,*
  435 F.3d 396 (3d Cir. 2006) .......................................................................................24

*Blackwell v. Issaquena Cnty. Bd. of Ed.,*
  363 F.2d 749 (5th Cir. 1966) .........................................................................48, 52, 53

*Block v. Tex. Bd. of Law Exam'rs,*
  952 F.3d 613 (5th Cir. 2020) .......................................................................................23

*Bowman v. White,*
  442 F.3d 967 (8th Cir. 2006) .......................................................................................45

*Brinsdon v. McAllen Indep. Sch. Dist.,*
  863 F.3d 338 (5th Cir. 2017) .......................................................................................53

*Brown v. Callahan,*
  623 F.3d 249 (5th Cir. 2010) .......................................................................................59

*C.R. v. Eugene Sch. Dist. 4J,*
  835 F.3d 1142 (9th Cir. 2016) .....................................................................................53

*Calhoun v. Collier,*
    78 F.4th 846 (5th Cir. 2023) ........................................................................28

*Canady v. Bossier Par. Sch. Bd.,*
    240 F.3d 437 (5th Cir. 2001) ........................................................................46

*Cantu Services, Inc. v. Roberie,*
    535 F.App'x. 342 (5th Cir. 2013) ................................................................33

*Chen Through Chen v. Albany Unified Sch. Dist.,*
    56 F.4th 708 (9th Cir. 2022) ........................................................................60

*Chhim v. Univ. of Tex. at Austin,*
    836 F.3d 467 (5th Cir. 2016) ........................................................................28

*Christian Legal Soc'y v. Martinez,*
    561 U.S. 661 (2010) ........................................................................................2

*City of Austin v. Paxton,*
    943 F.3d 993 (5th Cir. 2019) ................................................... 27, 29, 30, 32

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................35

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ......................................................................................41

*Coal. for Indep. Tech. Research v. Abbott,*
    No. 1:23-CV-783-DII, 2023 WL 8582597 (W.D. Tex. Dec. 11, 2023) .......... 30, 33

*Collier v. Montgomery,*
    569 F.3d 214 (5th Cir. 2009) ........................................................................59

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ........................................................................24

*Collins v. Yellen,*
    594 U.S. 220 (2021) ......................................................................................35

*Consumer Data Indus. Ass'n v. Tex. through Paxton,*
    No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023) .........................37

*Ctr. for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006) ................................................................. 27, 44

*Daves v. Dallas Cnty., Tex,*
    22 F.4th 522 (5th Cir. 2022) ........................................................................25

*Davis v. Fed. Election Comm'n,*
    554 U.S. 724 (2008) ......................................................................................34

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ........................................................................................2

*DeJohn v. Temple Univ.,*
    537 F.3d 301 (3d Cir. 2008) .........................................................................54

*Deutsch v. Annis Enterprises, Inc.,*
    882 F.3d 169 (5th Cir. 2018) ........................................................................35

*Dobbin Plantersville Water Supply Corp. v. Lake,*
    108 F.4th 320 (5th Cir. 2024) ......................................................................43

*Doe v. Harrell,*
    841 F.App'x. 663 (5th Cir. 2021) ................................................................28

*Doe v. Valencia Coll.,*
    903 F.3d 1220 (11th Cir. 2018) ...................................................................53

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) ........................................................................24

*El Paso Cnty., Tex. v. Trump,*
  982 F.3d 332 (5th Cir. 2020) ............................................................................................37

*Emory v. Texas State Bd. Of Med. Exam'rs,*
  748 F.2d 1023 (5th Cir. 1984) ..........................................................................................28

*Esfeller v. O'Keefe,*
  391 F.App'x. 337 (5th Cir. 2010) .....................................................................................46

*Ex parte Young,*
  209 U.S. 123 (1908) ....................................................................................................*passim*

*Fennell v. Marion Indep. Sch. Dist.,*
  804 F.3d 398 (5th Cir. 2015) ......................................................................................54, 55

*Frankel v. Regents of the Univ. of Cal.,*
  No. 2:24-cv-04702-MCS-PD, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024) .................6

*Harper v. Poway Unified Sch. Dist.,*
  445 F.3d 1166 (9th Cir. 2006) ....................................................................................53, 54

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ...........................................................................................................38

*Haverkamp v. Linthicum,*
  6 F.4th 662 (5th Cir. 2021) ....................................................................................29, 31, 32

*Healy v. James,*
  408 U.S. 169 (1972) ...........................................................................................41, 46, 52

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) .............................................................................................................58

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010).................................................................................................................2

*Hope v. Harris,*
  861 F.App'x. 571 (5th Cir. 2021) .....................................................................................33

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .....................................................................................................37, 38

*In re Abbott,*
  956 F.3d 696 (5th Cir. 2020) ............................................................................................28

*Jackson v. Wright,*
  82 F.4th 362 (5th Cir. 2023) .......................................................................................*passim*

*Jenkins v. Louisiana State Bd. of Ed.,*
  506 F.2d 992 (5th Cir. 1975) ............................................................................................52

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) ...........................................................................................................40

*Justice for All v. Faulkner,*
  410 F.3d 760 (5th Cir. 2005) ......................................................................................45, 47

*Justice v. Hosemann,*
  771 F.3d 285 (5th Cir. 2014) ......................................................................................35, 45

*Kestenbaum et al. v. Presidents and Fellows of Harvard College,*
  No. 1:24-cv-10092-RGS, 2024 WL 3658793 (D. Mass. Aug. 6, 2024) ...........................6

*Kitty Hawk Aircargo, Inc. v. Chao,*
  418 F.3d 453 (5th Cir. 2005) ............................................................................................24

*Kristofferson on behalf of R.R. v. Port Jefferson Union Free Sch. Dist.,*
  No. 23-7232-CV, 2024 WL 3385137 (2d Cir. July 12, 2024) ..........................................59

*Kuhlmeier v. Hazelwood Sch. Dist.,*
  795 F.2d 1368 (8th Cir. 1986) ....................................................................................53, 55

*L.M. v. Town of Middleborough, Massachusetts,*
103 F.4th 854 (1st Cir. 2024) ................................................................... 53, 60

*La. Env't Action Network v. U.S. E.P.A.,*
382 F.3d 575 (5th Cir. 2004) ................................................................... 39

*Lane v. Halliburton,*
529 F.3d 548 (5th Cir. 2008) ................................................................... 24

*Leal v. Becerra,*
No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022) ............................ 26

*Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.,*
82 F.4th 345 (5th Cir. 2023) ................................................................... 37

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................................... 34

*McCauley v. Univ. of the Virgin Islands,*
618 F.3d 232 (3d Cir. 2010) .................................................................. 60

*McNeal v. LeBlanc,*
90 F.4th 425 (5th Cir. 2024) .................................................................. 60

*MDPhysicians & Assoc., Inc. v. State Bd. of Ins.,*
957 F.2d 178 (5th Cir. 1992) .................................................................. 24

*Mi Familia Vota v. Abbott,*
977 F.3d 461 (5th Cir. 2020) ............................................................ 29, 30, 33

*Mi Familia Vota v. Ogg,*
105 F.4th 313 (5th Cir. 2024) .............................................................. 26, 39

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs,*
7 F.4th 1110 (Fed. Cir. 2021) ................................................................ 38

*Moody v. NetChoice, LLC,*
144 S.Ct. 2383 (2024) ........................................................................ 56

*Moore v. Bryant,*
853 F.3d 245 (5th Cir. 2017) .................................................................. 23

*Morgan v. Plano Indep. Sch. Dist.,*
589 F.3d 740 (5th Cir. 2009) .................................................................. 46

*Morgan v. Swanson,*
659 F.3d 359 (5th Cir. 2011) .................................................................. 46

*Morris v. Livingston,*
739 F.3d 740 (5th Cir. 2014) .................................................................. 30

*Morse v. Frederick,*
551 U.S. 393 (2007) ........................................................................... 47

*Murphy v. Kellar,*
950 F.2d 290 (5th Cir. 1992) .................................................................. 42

*Nelson v. Univ. of Tex. at Dallas,*
535 F.3d 318 (5th Cir. 2008) .................................................................. 33

*Nivelo Cardenas v. Garland,*
70 F.4th 232 (5th Cir. 2023) .................................................................. 32

*OCA-Greater Houston v. Tex.,*
867 F.3d 604 (5th Cir. 2017) .................................................................. 34

*Okpalobi v. Foster,*
244 F.3d 405 (5th Cir. 2001) .................................................................. 28

*Oliver v. Scott,*
276 F.3d 736 (5th Cir. 2002) .................................................................. 42

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*,
  899 F.3d 1081 (9th Cir. 2018) ...................................................................................24

*Planned Parenthood Ctr. for Choice v. Abbott*,
  141 S.Ct. 1261 (2021) ..............................................................................................28

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009) ..................................................................................................42

*Quern v. Jordan*,
  440 U.S. 332 (1979) ..................................................................................................28

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ..................................................................................................58

*Ramming v. United States*,
  281 F.3d 158 (5th Cir. 2001) ....................................................................................23

*Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, No.
  20-50125, 2021 WL 3484698 (5th Cir. Aug. 6, 2021) .............................................26

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..................................................................................................44

*Rhines v. Salinas Const. Techs., Ltd.*,
  No. CIV.A. C-11-262, 2011 WL 4688706 (S.D. Tex. Oct. 3, 2011) ........................24

*Richardson v. Flores*,
  28 F.4th 649 (5th Cir. 2022) .....................................................................................31

*Rocky v. King*,
  900 F.2d 864 (5th Cir. 1990) ....................................................................................39

*Runyon v. McCrary*,
  427 U.S. 160 (1976) ..................................................................................................58

*Sabri v. United States*,
  541 U.S. 600 (2004) ..................................................................................................56

*Salinas v. Tex. Workforce Comm'n*,
  573 F.App'x. 370 (5th Cir. 2014) ..............................................................................33

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) ...............................................................................47, 54

*Scott v. Sch. Bd. of Alachua Cnty.*,
  324 F.3d 1246, 1247 (11th Cir. 2003) ......................................................................49

*Self-Ins. Inst. of Am., Inc. v. Korioth*,
  53 F.3d 694 (5th Cir. 1995) ......................................................................................37

*Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning*,
  620 F.2d 516 (5th Cir. 1980) ...............................................................................46, 53

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ..................................................................................................38

*Simmons v. City of Columbus*,
  425 F.App'x. 282 (5th Cir. 2011) ..............................................................................44

*Smith v. Tarrant Cty. Coll. Dist.*,
  694 F. Supp.2d 610 (N.D. Tex. 2010) ..................................................................45, 46

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ....................................................................................35

*Spokeo, Inc. v. Robbins*,
  578 U.S. 330 (2016) ..................................................................................................34

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) ....................................................................................35

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................................................................38

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................................................35

*Tenth St. Residential Ass'n v. City of Dallas, Tex.*,
   968 F.3d 492 (5th Cir. 2020) .....................................................................34

*Tex. Democratic Party v. Abbott*,
   978 F.3d 168 (5th Cir. 2020) .....................................................................30

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) .....................................................................34

*Tex. Juvenile Justice Dep't*,
   646 F.App'x. 374 (5th Cir. 2016) ..............................................................33

*Tex. State LULAC v. Elfant*,
   52 F.4th 248 (5th Cir. 2022) ......................................................................26

*Texas All. for Retired Americans v. Scott*,
   28 F.4th 669 (5th Cir. 2022) .................................................................30, 32

*Texas v. Johnson*,
   491 U.S. 397 (1989) ...................................................................................53

*Thompkins v. Belt*,
   828 F.2d 298 (5th Cir. 1987) .....................................................................42

*Thompson v. Steele*,
   709 F.2d 381 (5th Cir. 1983) .....................................................................42

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ...........................................................................*passim*

*Trachtman v. Anker*,
   563 F.2d 512 (2d Cir. 1977) ......................................................................53

*Turner v. Driver*,
   848 F.3d 678 (5th Cir. 2017) .....................................................................42

*United States v. Raines*,
   362 U.S. 17 (1960) .....................................................................................56

*Wallace v. Performance Contractors, Inc.*,
   57 F.4th 209 (5th Cir. 2023) ......................................................................54

*West v. Derby Unified Sch. Dist. No. 260*,
   206 F.3d 1358 (10th Cir. 2000) ......................................................49, 50, 51

*Widmar v. Vincent*,
   454 U.S. 263 (1981) ...................................................................................46

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ...................................................................................58

## Constitutional Provisions, Rules, and Statutes

Fed. R. Civ. P. 12
   (b)(1) ..............................................................................................23, 24, 40
   (b)(6) ......................................................................................................*passim*

Fed. R. Evid. 201 ...............................................................................47, 52, 55

Tex. Gov. Code § 448.001(2) ................................................................*passim*

U.S. Const. amend I..............................................................................*passim*

20 U.S.C. § 1681(a) ......................................................................................2

42 U.S.C.
  § 1983 ...............................................................................................................................*passim*
  § 2000d .............................................................................................................................*passim*

**State Decisions**

*Hall v. McRaven*,
  508 S.W.3d 232 (Tex. 2017) ...................................................................................38

**Other Authorities**

Daniel B. Dreyfus, *A Common Judicial Standard for Student Speech Regulations*,
  102 Tex. L. Rev. 1059 (2024) ..................................................................................46

**INTRODUCTION**

Plaintiffs are nominally four separate organizations claiming student membership at several Texas public universities. They allege that Governor Greg Abbott's Executive Order addressing antisemitism in institutions of higher learning ("GA-44")[1] impermissibly burdens their First Amendment rights under the Free Speech Clause. They are wrong to think so. GA-44 does not apply to students. Rather, it applies to Texas public universities, and, aside from directing universities to define antisemitism consistent with Texas Government Code § 448.001(2), Governor Abbott left it to universities to exercise their own judgment on how to address antisemitism through their policies.

In response to GA-44, Texas public universities incorporated a definition of antisemitism into their policies, ensuring campus officials can identify antisemitism when they see it. Despite similar provisions at other universities, antisemitism has proven a challenging problem to solve precisely because it can be difficult to define, with the United States Department of Education Office for Civil Rights ("OCR") recently reminding universities that "Title VI's protections against discrimination based on race, color, and national origin encompass antisemitism[.]"[2] Notwithstanding those protections, antisemitism spiked by 321% year-over-year on college and university campuses between 2022 and 2023, most of which occurred after the October 7 terrorist attacks in Israel.[3]

In an apparent endeavor to hobble Governor Abbott's effort to fight antisemitism in Texas, Plaintiffs take aim at any attempt to define it. Plaintiffs claim that GA-44's instruction to universities to address antisemitism is instead a veiled constraint on their protests championing the cause of Palestinians and condemning Israel. But Plaintiffs and similar organizations throughout the country are not just engaging in peaceful protests consistent with university time-place-and-manner rules;

---

[1] ECF 21-1.

[2] Catherine E. Lhamon, *Dear Colleague Letter*, U.S. DEP'T OF ED. (May 7, 2024) [henceforth, "***2024 OCR Dear Colleague Letter***"], https://www.whitehouse.gov/wp-content/uploads/2024/05/colleague-202405-shared-ancestry.pdf.

[3] *Audit of Antisemitic Incidents 2023,* ANTI-DEFAMATION LEAGUE (Apr. 16, 2024), https://tinyurl.com/mpj7b4yc; *see also* Hannah Robinowitz, *FBI director: Antisemitism reaching 'historic level' in US,* CNN (Oct. 31, 2023), https://www.cnn.com/2023/10/31/politics/fbi-director-antisemitism-wray/index.html.

campus agitators across the country have established dangerous and disruptive encampments and have targeted Jewish students with a campaign of harassment, discrimination, and exclusion.

Nor does the fact that GA-44 addresses both antisemitic conduct and speech generate any conflict with the First Amendment. The Supreme Court has consistently rejected First Amendment challenges to anti-discrimination laws relating to race, religion, color, and national origin.[4] The Supreme Court has similarly rejected First Amendment challenges to Title IX's bar on discriminatory harassment so long as laws target behavior that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[5] There are indeed many constitutional applications of GA-44, but in bringing this facial challenge, Plaintiffs ignored them.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.* governs the First Amendment analysis in this context.[6] Some of the University Defendants ended Plaintiffs' Mid-2024 Protests because their encampments and other disruptive events contravened content-neutral time, place, and manner restrictions in place before GA-44, whereas others did not need to because protests complied with those policies. Even so, under *Tinker*, Defendants also *could have* restricted Plaintiffs' Mid-2024 Protests pursuant to GA-44 after forecasting disruption based in part on widespread disorder on campuses across the country,[7] or to protect Jewish students from a severe, pervasive, and objectively offensive environment that Defendants could reasonably expect to arise from Plaintiffs' own activities.

While Plaintiffs appear to suggest that any effort to address antisemitism by incorporating a definition into university anti-discrimination or anti-harassment policies runs headlong into the First Amendment, it cannot be that universities must choose between addressing severe and pervasive discrimination while risking liability under § 1983 for a First Amendment violation, and disregarding

---

[4] *See, e.g., Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 39 (2010); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 697–98 (2010).
[5] *See, e.g., Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).
[6] 393 U.S. 503, 513 (1969).
[7] *Infra*, note 345.

discrimination while risking liability under Title VI of the Civil Rights Act of 1964. Plaintiffs' lawsuit is meritless, and the Court should dismiss it.

## FACTUAL BACKGROUND

On October 7, 2023, Hamas, a Palestinian Sunni Islamist terrorist organization, launched a surprise attack from the Gaza Strip ("Gaza") into the central and southern regions of Israel, targeting and killing over 1,200 noncombatants.[8] Hamas took 253 men, women, and children from their homes and carried them back to Gaza as hostages,[9] including at least ten Americans.[10] During the rampage, Hamas militants decapitated children[11] and engaged in "sexualized torture" of women.[12] In response to one of the deadliest terror attacks in modern history,[13] Israel declared war on Hamas and began air strikes in Gaza.[14] Today, the conflict is ongoing, and its death toll continues to rise.[15]

## I.      Pro-Palestinian Campus Protests Erupt across the Country.

In the days that followed Hamas's October 7 attack, widespread unrest broke out on college and university campuses across the United States.[16] Some students immediately celebrated the attack, before Israel had even responded.[17] On October 8, National Students for Justice in Palestine ("NSJP"), of which several Plaintiffs here are campus chapters, published a "tool kit" celebrating the atrocity

---

[8]  Bill Hutchinson, *Israel-Hamas War: Timeline and key developments*, ABC NEWS (Nov. 22, 2023, 2:24 PM), https://abcnews.go.com/International/timeline-surprise-rocket-attack-hamas-israel/story?id=103816006.
[9]  *Id.*
[10] *Israel-Hamas War*, ENCYCLOPEDIA BRITANNICA (Jun. 13, 2024, 8:26 PM), https://tinyurl.com/2p647wan.
[11] Muhammad Darwish et al., *Children found 'butchered' in Israeli kibbutz, IDF says, as horror of Hamas' attacks near border begins to emerge*, CNN (Oct. 13, 2023), https://tinyurl.com/bdz37kvj.
[12] Edith M. Lederer, *A UN envoy says there are 'reasonable grounds' to believe Hamas committed sexual violence on Oct. 7*, AP NEWS (Mar. 4, 2024), https://tinyurl.com/5754m2kb.
[13] Daniel Byman et al., *Hamas's October 7 Attack: Visualizing the Data*, CENTER FOR STRATEGIC & INTERNATIONAL STUDIES (Dec. 19, 2023), https://www.csis.org/analysis/hamass-october-7-attack-visualizing-data (noting that "[t]he October 7 attack was the deadliest terrorist attack against Israel since the state's establishment in 1948, and the scale of the death toll was unprecedented in Israeli history").
[14] Betsy Reed, *Israel-Hamas war: what happened in the first few days and what caused the conflict?*, THE GUARDIAN (Oct. 8, 2023), https://theguardian.com/world/2023/oct/08/israel-hamas-gaza-palestinian-territories.
[15] *Israel-Hamas war latest: Netanyahu signals cease-fire deal could be shaping up as deaths top 39,000*, AP NEWS (July 23, 2024), https://apnews.com/article/israel-hamas-war-latest-23-july-2024-c3129ac8b77f731e00538e5659e107d0.
[16] Nadine El-Bawab, *How pro-Palestinian protests unfolded on college campuses across the US: A timeline*, ABC NEWS (May 4, 2024), https://tinyurl.com/29fn7kdn.
[17] Charles Hilu, *Columbia University Students Announce Event Celebrating Hamas's Oct. 7 Attack*, WASH. FREE BEACON (Dec. 4, 2023), https://tinyurl.com/yzm34jbz.

and providing guidance to campus chapters across the country:

> Today, we witness a historic win for the Palestinian resistance . . . reminding each of us that total return and liberation to Palestine is near. Catching the enemy completely by surprise, the Palestinian resistance has captured over a dozen settlements surrounding Gaza . . . . **This is what it means to Free Palestine: not just slogans and rallies, but armed confrontation with the oppressors.** [18]

NSJP's playbook called on its student members throughout the country to eschew peaceful resistance and "disrupt" college campuses, encouraging "armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary," since "[y]ou don't get freedom peacefully."[19] Some have leveled charges that NSJP is coordinating with the Iranian regime.[20]

NSJP planned a National Day of Resistance for October 12, 2023, to celebrate Hamas's unprovoked attack,[21] and students around the country quickly joined in calling for a "free Palestine, from the river to the sea."[22] Plaintiffs insist that this and similar slogans are shorthand for students' peaceful calls for dignity and freedom "for everyone in the geographic region."[23]

But most do not see this slogan as being the olive branch that Plaintiffs claim it is. The Anti-Defamation League has explained that "[t]his rallying cry has long been used by anti-Israel voices, including supporters of terrorist organizations such as Hamas and the [Popular Front for the Liberation of Palestine], which seek Israel's destruction through violent means."[24] The United States House of Representatives has similarly resolved with strong bipartisan support that this phrase "is an

---

[18] Spencer Dalke, *National Students for Justice in Palestine celebrates glider attack in 'call to action' image*, CAMPUS REFORM (Oct. 10, 2023, 12:35 PM), https://tinyurl.com/4tu3wm3x; Randy Kessler, *Language around 'Day of Resistance and Protest' leaves Jews fearful*, SEATTLE TIMES (Oct. 18, 2023, 3:34 PM), https://tinyurl.com/bd44sxnxh. NSJP has since removed this language from their publication: *see Day of Resistance Toolkit*, NSJP (last visited Aug. 16, 2024), https://docs.google.com/document/d/12IuQt1usUsyHWoHIcFYdAbpYK2H3bHJocPCrVyYT08s/edit.

[19] *Id.*

[20] Sam Westrop, *REVEALED: Iranian Regime Involvement with Texas Student Anti-Israel Protests*, MIDDLE EAST FORUM (Aug. 1, 2024), https://www.meforum.org/66013/revealed-iranian-regime-involvement-with-texas.

[21] Joseph Ax and Gabriella Borter, *US colleges become flashpoints for protests over Israel-Hamas war*, REUTERS (Oct. 14, 2023), https://www.reuters.com/world/us/us-colleges-become-flashpoints-protests-both-sides-israel-hamas-war-2023-10-13/.

[22] *Students for Justice in Palestine Endorses Terrorism and 'Dismantling Zionism;' Plans Day of resistance*, ANTI-DEFAMATION LEAGUE (Oct. 9, 2023), https://tinyurl.com/y63zputu.

[23] ECF 20, ¶¶ 44, 55, 66, 74.

[24] *Slogan: "From the River to the Sea Palestine Will be Free"*, ANTI-DEFAMATION LEAGUE (Oct. 26, 2023), https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free.

antisemitic call to arms with the goal of the eradication of the State of Israel, which is located between the Jordan River and the Mediterranean Sea," covering all of Israel.[25] Terrorist organizations "have used and continue to use this slogan as a rallying cry for action to destroy Israel and exterminate the Jewish people," not only referring to the State of Israel, but specifically Jewish persons, calling for death of Jews to liberate Palestine.[26]

Nor have protestors across American university campuses limited their antisemitism to rhetoric. Rather, protestors celebrating Hamas's invasion of Israel have taken to confronting Jewish students,[27] leading to a drastic increase in antisemitic incidents at universities over the past year.[28] Testifying before Congress, Kevin Rachlin, Washington Director of the Nexus Leadership Project, described that "a staggering 73% of Jewish college students reported experiencing or witnessing some form of antisemitism since the start of this [past] school year, and . . . two-thirds of students at the nation's top universities say antisemitism is a problem on campus."[29] Jewish students at some universities have even reported experiencing exclusion from educational events, assault, and incitement to violence since October 7th.

For example, at University of California, San Diego, Jewish students meeting together drew crowds of protestors "flying the Hamas flag" and who would "bang[] on the glass behind [Jewish students'] heads and miming shooting [them] down."[30] And at Harvard, "Jewish students were forced to hire private armed security for a concert in honor of Jewish students victimized by antisemitism;"

---

[25] H.Res. 883 – Expressing the sense of the House of Representatives that the slogan "from the river to the sea, Palestine will be free" is antisemitic and its use must be condemned, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/house-resolution/883/text.

[26] *Id.*; *Doctrine of Hamas*, THE WILSON CENTER, (Oct. 20, 2023) https://www.wilsoncenter.org/article/doctrine-hamas.

[27] *Campus Antisemitism Surges Amid Encampments and Related Protests and Other U.S. Colleges*, ANTI-DEFAMATION LEAGUE (Mar. 22, 2024), https://tinyurl.com/2s3ykay3.

[28] Testimony of Kevin Rachlin, Washington Director of the Nexus Leadership Project: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 1 [henceforth, "**Rachlin 2024 Congressional Testimony**"], https://tinyurl.com/27h6zt4t.

[29] *Id.*

[30] Written Testimony of Professor Brian Keating, Hearing before Committee on Education and the Workforce Subcommittee on Workforce Protections before the United States House of Representatives, 118th Cong. (2024), at 12 [henceforth, "**Keating 2024 Congressional Testimony**"], https://tinyurl.com/3wmapdk5.

and one student kept "armed security outside [his] house."[31] Some "students at Harvard[] do not wear their kippahs publicly anymore, have changed majors due to hostile anti-Israel environments, [and] have been spat on for their religious identity[.]"[32]

A federal district court recently denied Harvard's motion to dismiss a claim by students alleging violations of Title VI, expressing serious doubts that Harvard could claim that some of the pro-Palestinian or anti-Jewish activities were protected by the First Amendment.[33] And another federal district court entered an injunction in favor of Jewish students who earlier this year "were excluded from portions of the UCLA campus because they refused to denounce their faith" when crossing an academic quad on which pro-Palestinian protestors had set up an encampment.[34]

## II.     NSJP Circulates "Escalation" Tactics for Students to Maximize Campus Disruption.

After the winter break, rather than calming down, students intensified their efforts to foreground the Israel-Hamas conflict on campus and change university policies. Protestors also doubled down on their tactics, "commandeering campus quads and occup[ying] university buildings, . . . and creating an atmosphere of harassment, intimidation, and fear for Jewish students, faculty, and staff, and disrupting normal campus activities for all campus citizens, Jewish and non-Jewish alike."[35] These incidents followed NSJP's February 8, 2024 call for a "National Divestment Day of Action."[36]

NSJP targeted "[university] Administration" and "Board[s] of Regents" with "sustained, long-

---

[31] Testimony of Shabbos Kestenbaum: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 2–4 [henceforth, "***Kestenbaum 2024 Congressional Testimony***"], https://tinyurl.com/5ekfuduv.

[32] *Id.* at 4.

[33] Aaron Katersky and Julia Reinstein, *Harvard 'failed its Jewish students' and must face antisemitism lawsuit, judge says*, ABC NEWS (Aug. 7, 2024), https://tinyurl.com/yfx767ve; *see also* Memorandum and Order on Defendant's Motion to Dismiss, *Kestenbaum et al. v. Presidents and Fellows of Harvard College*, No. 1:24-cv-10092-RGS, 2024 WL 3658793, *6 (D. Mass. Aug. 6, 2024).

[34] Order Re: Motion for Preliminary Injunction (ECF 48), *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702-MCS-PD, 2024 WL 3811250, *1–3 (C.D. Cal. Aug. 13, 2024).

[35] Ted Deutch, *Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University Leadership*, 118 Cong. (2024), at 1, https://tinyurl.com/32cuwhtk.

[36] *National Student Day of Action for Divestment*, NSJP (Jan. 31, 2024), https://tinyurl.com/22y4sutr.

term campaigns to push our universities to end their complicity in the genocide of Palestinians."[37] NSJP's playbook also detailed "Escalation Tactics," which guides campus SJP chapters on methods for disruption and advises students on the level of response they could expect from university administrations and media.[38] NSJP's tactics ranged from "Level 1," for which students should expect "[n]o significant admin or media blowback" to "Level 4," for which students should prepare for "significant admin and media blowback, . . . [and] legal consequences."[39]

NSJP's "Level 4" tactics included (1) campus **occupations** and "sit-ins" where students should "[p]ick a heavily trafficked location and/or place with lots of significance; (2) **blockades** focused on "disrupt[ing] the function of a specific building or office," such as "an administrative building, the admissions office, the student center, or a recruitment event;" and (3) **creative disruption** of "high-profile university events or ceremonies," which could include "[w]alk-outs, standing up and turning backs, entering en masse with signs, [and] birddogging."[40]

Student agitators did not hesitate to implement NSJP's guidance for maximizing disruption of university campuses. For instance, throughout February at Cornell, students held weekly die-ins where crowds of 200 protestors would walk into libraries, lay on the floor, and yell genocidal slogans as students attempted to study.[41] Columbia saw "protests unprecedented in type and scale, a level of threats and harassment, specifically directed at[] Jewish students," and police involvement became immediately necessary to maintain the security of Jewish students.[42] And at University of California,

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* (NSJP defines "Bird-Dogging" as "a tactic in which participants pursue their target wherever they are in order to force the target to pay attention or respond to their issue. This usually involves gathering some information on where your target might be when . . . and/or familiarizing yourself with your targets' routines").

[41] Testimony of Talia Dror, Committee on Ways and Means, U.S. House of Representatives, 118th Cong. (2024), at 2, https://www.congress.gov/118/meeting/house/117430/witnesses/HHRG-118-WM00-Wstate-DrorT-20240613.pdf.

[42] Statement of Claire Shipman, Committee on Education and the Workforce, U.S. House of Representatives, 118th Cong. (2024), at 1 https://tinyurl.com/muezk2u5; *see also* Isha Banerjee, *Timeline: The 'Gaza Solidarity Encampment'*, COLUMBIA SPECTATOR (May 2, 2024), https://tinyurl.com/3dmecahw.

San Diego, encampments sprang up where agitators carried weapons and oil-soaked rags while shouting "antisemitic genocidal chants such as 'there is only one solution – intifada revolution' and 'murder the Jews' to an identifiably Jewish student."[43]

Since February, NSJP announced a "coordinated pressure campaign against university administrators and trustees."[44] NSJP made their goals explicit: "SJP chapters across the nation will seize the university and force the administration to divest . . . ."[45] NSJP openly called upon agitators to disrupt their universities' educational mission: "The Popular University for Gaza is a coordinated mass movement of students, faculty, and staff dedicated to preventing our universities from performing their daily functions."[46] Encampments sprang up across the country as students revolted against universities,[47] "violent[ly] protest[ing] and [setting up] illegal encampments [that] severely disrupted operations on over 100 campuses" across the country.[48] Such protests have even resulted in a breach of the White House and relocation of media and staff by the United States Secret Service.[49]

At the University of Pennsylvania, students set up an encampment for over two weeks[50] beginning on April 25.[51] Inside the encampment, students vandalized the Benjamin Franklin statue with Nazi and Hamas logos and graffiti reading "Zios get fuckt."[52] Students also "circulat[ed] documents with instructions for escalating [the situation further]—including through building

---

[43] *Keating 2024 Congressional Testimony*, p. 7.

[44] *National SJP Announces the Popular University for Gaza* (Apr. 20, 2024), https://nationalsjp.org/popular-university-for-gaza.

[45] *Id.* (emphasis in original).

[46] *Declaration of Katie McGee*, ¶ 30.

[47] Hadas Gold, *Student journalists assaulted, others arrested as protests on college campuses turn violent*, CNN (May 1, 2024), https://www.cnn.com/2024/05/01/media/college-protests-gaza-arrests-violence/index.html.

[48] Jonathan Pidluzny, *The Campus Antisemitism Complex at Elite U.S. Universities*, Committee on Ways and Means, U.S. House of Representatives, 118th Cong. (2024), at 1, https://tinyurl.com/2p8dawpv.

[49] Caroline Downey, *Pro-Palestinian Protesters Clash with Riot Police as They Breach White House Gate*, NATIONAL REVIEW, (Jan. 14, 2024, 9:56 AM), https://tinyurl.com/yu47k7dh.

[50] Testimony of Eyal Yakoby: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 1 [henceforth, "**Yakoby 2024 Congressional Testimony**"] https://tinyurl.com/2sj59vkm.

[51] Diamy Wang, *The Graduation Issue 2024: Penn's Gaza Solidarity Encampment, from beginning to end*, THE DAILY PENNSYLVANIAN (May 16, 2024), https://www.thedp.com/article/2024/05/penn-gaza-solidarity-encampment-recap.

[52] *Yakoby 2024 Congressional Testimony*, at 2.

occupations and violence," as well as "terroristic threats."[53] Campus officials later found weapons within the encampment.[54] While campus agitators found common cause with Ayatollah Khamenei of Iran, who praised them directly,[55] Jewish students have often lamented the inadequate responses from their universities.[56]

## III.     Governor Abbott Signs Executive Order GA-44.

On March 27, 2024, Governor Abbott issued GA-44 to address the rise in disruption and antisemitic violence on college campuses,[57] and to "ensure a safe learning environment for Jewish students and all Texans.[58] GA-44 includes two distinct sections: (1) a **_preamble_** recounting the harrowing events of October 7 and its impact on the Jewish community in Texas, and (2) **_operative clauses_** directing the State's higher-education institutions to address antisemitism on campuses.[59]

In the preamble to GA-44, Governor Abbott recognizes that some individuals have used "antisemitic phrases such as 'from the river to the sea, Palestine will be free,' which has long been used by Hamas supporters to call for the violent dismantling of the State of Israel and the destruction of the Jewish people who live there."[60] But GA-44 also emphasizes the importance of protected expression: "Texas supports free speech, especially on university campuses, but that freedom comes with responsibilities for both students and the institutions themselves."[61] Free speech "can never incite violence, encourage people to violate the law and harass other students or other Texans, or disrupt

---

[53] _Id._

[54] _Id._

[55] _Using antisemitic trope, Khamenei welcomes US student response to 'Resistance Front'_, THE TIMES OF ISRAEL (May 30, 2024), https://www.timesofisrael.com/using-antisemitic-trope-khamenei-welcomes-us-student-protesters-to-resistance-front/.

[56] _See Kestenbaum 2024 Congressional Testimony_, at 4 ("The response from Harvard? Nothing."); _Yakoby 2024 Congressional Testimony_, at 2 ("Penn, after 16 days finally disbanded the encampment, declaring, 'Our community has been under threat— for too long.' . . . So let me ask you this, what value is such an acknowledgment if action takes two weeks?").

[57] _Governor Abbott Fights Antisemitic Acts At Texas Colleges, Universities_, OFFICE OF THE TEXAS GOVERNOR (Mar. 27, 2024), https://gov.texas.gov/news/post/governor-abbott-fights-antisemitic-acts-at-texas-colleges-universities.

[58] ECF 21-1.

[59] _Id._

[60] _Id._

[61] _Id._

the core educational purpose of a university[.]"[62]

GA-44's operative clauses call on Texas public universities to:

1. Review and update free speech policies to address the sharp rise in antisemitic speech and acts on university campuses and establish appropriate punishments, including expulsion from the institution.

2. Ensure that these policies are being enforced on campuses and that groups such as the Palestine Solidarity Committee and Students for Justice in Palestine are disciplined for violating these policies.

3. Include the definition of antisemitism, adopted by the State of Texas in Section 448.001(2) of the Texas Government Code, in university free speech policies to guide university personnel and students on what constitutes antisemitic speech.[63]

GA-44 thus called on Texas public universities to implement the State's definition of antisemitism *to guide* university personnel and students on what constitutes antisemitic speech, but said nothing about prohibiting simple expression.[64] Nor did GA-44 restrict anti-Israel speech through "micromanaging the terms of the public debate by punishing students on one side of that debate."[65] Rather, GA-44 simply directs public universities to make their own judgements on how to address antisemitism through their policies, and to discipline student organizations that violate those policies.[66]

## IV. Students at Texas Public Universities Join NSJP's Campaign to Seize Universities and "Disrupt their Daily Functions."

As students disrupted universities across the United States with encampments, blockades of buildings, and other demonstrations, similar confrontations spread to universities in Texas. Public universities reacted out of a concern that campus agitators in Texas would attempt to replicate what was taking place across the country. That concern was not misplaced, as one of Plaintiffs' members admits directly that SJP chapters in Texas set up encampments "*as part of a larger nationwide movement.*"[67]

---

[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Compare* ECF 20, ¶ 34, *with* ECF 21-2.
[66] ECF 21-2.
[67] ECF 21-2, ¶ 8(c).

A.      The University of Texas at Austin.

Joining students from other universities, numerous agitators walked out of their classes at The University of Texas at Austin ("UT Austin") on April 24 in a "daylong protest[] organized by Palestin[e] Solidarity Committee."[68] Campus protestors marched through campus, blocking students from accessing class and studying for finals.[69] They ignored multiple commands by university officials and law enforcement for people to disperse, and later set up tents on the South Mall.[70] UT Austin asked for mutual aid from outside law enforcement because, among other reasons, "the Palestine Solidarity Committee had advertised that classes would be canceled."[71]

UT Austin's focus in responding to the protest was on ending "disruptions of campus activities or operations like we have seen at other campuses."[72] After all, the end of the year "is an important time in our semester with students finishing classes and studying for finals," and, campus officials expressed that they would "act first and foremost to allow those critical functions to proceed without interruption."[73] Following the undeniably disruptive demonstration on April 24, UT Austin President Hartzell issued a statement observing that the national trend of campus disruption had come to Texas:

> As the push to disrupt top universities spreads across the country, many campuses such as ours are facing similarly difficult challenges. . . . The University's decision to not allow yesterday's event to go as planned was made because we had credible indications that the event's organizers, whether national or local, **were trying** . . . **to severely disrupt a campus for a long period.** Consistent with this broader movement that is impacting so many, **problematic aspects of the planned protest were modeled after a national organization's protest playbook.** And notably, 26 of the 55 individuals arrested yesterday had no UT affiliation.
>
> Against this backdrop, I am reminded today that we have much to be thankful for. I'm

---

[68] Chelsey Zhu, Becky Fogel, *Students in San Antonio and Austin join nationwide protests supporting Palestinians*, Texas Public Radio (Apr. 24, 2024), https://tinyurl.com/86yv86rv.

[69] Jay Janner et al., *Pro-Palestinian protest held at UT-Austin, protesters arrested. Here's what it looked like*, Austin American Statesman (Apr. 24, 2024), https://tinyurl.com/4c4p7hbe; Aaron E Martinez and Jay Janner. *Whose lawn? Our lawn! Photos from Pro-Palestinian encampment protest held on UT campus*, Austin American Statesman (Apr. 29, 2024), https://tinyurl.com/2r8pz27v.

[70] *Supra*, note 68; *see also* PSC ATX (@psc_atx), Instagram, https://tinyurl.com/bdzfmfn5 (last visited August 18, 2024).

[71] *Id.*

[72] *April 24 Statement from UT's Division of Student Affairs*, UT News (Apr. 24, 2024), https://news.utexas.edu/2024/04/24/april-24-statement-from-uts-division-of-student-affairs/.

[73] *Id.*

thankful we live in a country where free expression is a fiercely protected Constitutional right. I'm grateful that our campus has seen 13 pro-Palestinian events take place during the past several months largely without incident — plus another one today[, April 25].[74]

UT Austin permitted pro-Palestinian protest events consistent with university speech rules, but campus agitators only continued escalating their demonstrations to maximize disruption.

On April 29, protestors "erected a tent encampment on the South Lawn, with a barricade enclosure of tables secured by metal chains, and strategically placed tools, tents, and rocks."[75] Police also intercepted a protestor with a handgun, unlawfully carried on campus without a license, shoved in his waistband, a round in the chamber, and extra magazines.[76] Protestors escalated things from there, "becoming physically and verbally combative with Dean of Students' staff."[77] After protestors refused to comply with directives from the Dean of Students staff, which violates campus rules, UT Austin asked for help from the Texas Department of Public Safety, Austin Police Department, and Travis County Sheriff's Office to protect the safety of the campus community and end the extremely disruptive event.[78] Protestors ultimately ignored UT Austin's efforts "to preserve a safe, conducive learning environment for our 53,000 students as they prepare for final exams."[79]

More than half of the approximately 79 people arrested on April 29 had no affiliation with the University.[80] "These numbers validate our concern that much of the disruption on campus over the past week has been orchestrated by people from outside the University, including groups with ties to escalating protests at other universities around the country."[81] Campus agitators armed themselves

---

[74] Jay Hartzell, *Balancing Speech, Safety and Our Mission*, UT AUSTIN OFFICE OF THE PRESIDENT, https://president.utexas.edu/2024-messages-speeches/balancing-speech-safety-and-our-mission.

[75] *University of Texas at Austin Statement Regarding Today's Protest Events*, UT NEWS (Apr. 29, 2024), https://news.utexas.edu/2024/04/29/university-of-texas-at-austin-statement-regarding-todays-protest-events/.

[76] Brianna Hollis, *Man arrested after carrying gun during UT protests, court documents say*, KXAN (May 10, 2024, 7:54 PM), https://tinyurl.com/4p7382jw.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *UT Statement Regarding Arrests from Monday's Protest and Confiscation of Weapons*, UT NEWS (Apr. 30, 2024), https://news.utexas.edu/2024/04/30/ut-statement-regarding-monday-arrests-and-confiscation-of-weapons/.

[81] *Id.*

with "guns, buckets of large rocks, bricks, steel enforced wood planks, mallets, and chains."[82] Staff were physically assaulted and threatened, and police have been hit with horse excrement, while their police cars have had tires slashed with knives.[83] Not only that but stacks of handouts containing Hamas propaganda were also found in the debris left behind by protestors.[84]

### B.     The University of Texas at San Antonio.

Also on April 24, dozens of protestors gathered at The University of Texas at San Antonio ("UTSA") for a "Gaza Solidarity Action."[85] In anticipation of the demonstration and what it could become, UTSA provided "a significantly increased presence of law enforcement."[86] UTSA President Taylor Eighmy said in anticipation of campus demonstrations "as part of a larger national campaign" that UTSA would "not tolerate disruptive behavior, vandalism, or antisemitism."[87]

Nor can Plaintiffs genuinely contest that UTSA permitted pro-Palestinian protests to go forward. Amanda Sellers, the co-chair of Young Democratic Socialists of America at UTSA, reportedly said that UTSA's treatment of protestors had been reasonable:

> We've been organizing for the past 16 weeks, we've had no pushback really from admin . . . If you look at what's going on at UT Dallas, if you look at what's going on at UT Austin, we get away with so much on this campus. And I think that's partly because we have a rapport with the dean of students. She's not the enemy.[88]

UTSA's response contextualized concerns about campus disruption and student safety against the backdrop of "protests and expressive activity across hundreds of campuses involving student groups. Outside groups have also been involved, and in many cases, causing disruptive activities, many of

---

[82] *Id.*

[83] *Id.*

[84] William La Jeunesse, *University of Texas anti-Israel encampment sees Hamas propaganda, weapons*, FOX NEWS (May 8, 2024), https://tinyurl.com/yc3p2n36.

[85] *Supra*, note 68.

[86] *Id.*

[87] *Id.*; *see also* Don Morgan, *UTSA President issues statement, warning about potential for demonstrations on campus*, SAN ANTONIO NEWS (Apr. 24, 2024), https://tinyurl.com/ytd6x99z.

[88] Isaac Windes, *Pro-Palestine advocates get face time with UTSA official as protests intensify*, SAN ANTONIO REPORT (May 3, 2024), https://sanantonioreport.org/pro-palestine-advocates-get-face-time-with-utsa-official-as-protests-intensify/.

which turned violent."[89] Ultimately, university officials permitted student protests to continue subject to the university's time, manner, place restrictions.[90]

### C.      The University of Texas at Dallas.

Protestors at The University of Texas at Dallas ("UTD") set up an encampment at Chess Plaza on May 1, "joining the nationwide demonstrations over the war in Gaza."[91] Demonstrators set up 10 tents and assembled about 100 students at the plaza[92] before law enforcement took down the encampment. Police instructed protestors to disperse, and only removed structures and made arrests after protestors refused to comply.[93] Campus agitators used drums, megaphones, and a speaker system to maximize disruption.[94] They later released a compilation of video recordings depicting their events and stating that "[w]e will continue to escalate and take action until the day Palestine is free."[95]

The encampment "violated institutional rules governing speech, expression and assembly, which prohibit tents, barricades and other structures," and arrests were made after protestors failed to remove their encampment despite a final warning according to UTD President Dr. Richard Benson.[96] University officials noted that "individuals who participated in the May 1 encampment . . . were not arrested for protesting [but instead] for criminal trespass after failing to comply with requests that they remove the barricaded encampment they erected[.]"[97]

---

[89] Taylor Eighmy, *President Eighmy provides end-of-semester message to the Roadrunner community*, UNIVERSITY OF TEXAS AT SAN ANTONIO (May 3, 2024), https://www.utsa.edu/today/2024/05/story/president-eighmy-end-of-semester-message.html.
[90] Gabriella Ybarra, *UTSA students call for cease-fire in Gaza, accuse university of being anti-free speech*, SAN ANTONIO EXPRESS-NEWS (Apr. 24, 2024), https://www.expressnews.com/news/education/article/utsa-campus-protest-19420191.php.
[91] Alejandra Martinez, *17 pro-Palestinian demonstrators arrested at UT-Dallas as police break up encampment*, THE TEXAS TRIBUNE (May 1, 2024), https://www.texastribune.org/2024/05/01/ut-dallas-palestinian-protest-arrests/.
[92] *Id.*
[93] Steven Rosenbaum et al., *Law enforcement removes encampments at UT Dallas campus, at least 17 arrested*, CBS NEWS (May 1, 2024), https://www.cbsnews.com/texas/news/gaza-protest-encampment-university-texas-dallas/.
[94] SJP UTD (@sjputd), INSTAGRAM, https://www.instagram.com/reel/C6jdZ2Dp_kh (last visited August 9, 2024).
[95] *See id.*
[96] *Id.*
[97] Marcela Rodrigues, *Back to school while banned from campus: UT Dallas protesters fight discipline*, THE DALLAS MORNING NEWS (Aug. 6, 2024), https://tinyurl.com/marydzpp.

Earlier this month, several UTD students spoke publicly about their arrests, bond conditions, and the campus rules they violated.[98] Rather than attribute to GA-44 any role in preventing their protests, at least one student blamed her bond conditions: "It's very clear that the bond conditions, no matter their interpretation, were designed in a way that we cannot organize on campus."[99]

### D.   The University of Houston.

On May 8, protestors gathered at the University of Houston ("UH"), setting up an encampment on the fields of Butler Plaza early in the morning hours.[100] People also surrounded the area with wooden barricades comprised of UH's wooden shipping pallets that had been stolen from the Student Center.[101] According to one student, "[w]e felt it was important to set up an encampment and to show our university that we're serious about our demands . . . ."[102] Protestors broadcasted their goals on social media: "the students . . . will do anything in their power to prevent the board of regents from functioning."[103] They also made explicit calls for a campus takeover to "shut it down," shouting: "No such thing as graduation, we will fight to liberation . . . we are all SJP . . . shut it down, shut it down, shut it down . . . shut another campus down . . . board of regents you can't hide . . . ."[104]

Campus officials attempted to negotiate with protestors to resolve the situation, but protestors responded by clarifying that they had no intention of stopping—disruption was apparently necessary to their goals.[105] Peace officers responded after protestors ignored requests to leave,[106] but protestors

---

[98] *Id.*

[99] *Id.*

[100] Sneha Dey and Alejandro Serrano, *Police dismantle pro-Palestinian encampment at University of Houston, arrest two students*, THE TEXAS TRIBUNE (May 8, 2024), https://www.texastribune.org/2024/05/08/university-houston-encampment-arrests/.

[101] *Id.*

[102] *Id.*

[103] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C6taGc4gpri (last visited August 9, 2024).

[104] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C66r-Agg4GW (last visited August 9, 2024); Houston TX PSL (@houstontxpsl), INSTAGRAM, https://www.instagram.com/reel/C6NOo9EJmkP (last visited August 9, 2024).

[105] *See id.*

[106] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C6t8cIzpAha (last visited August 9, 2024).

attempted to prevent officers from removing their encampment despite repeated warnings that the chapter had violated university policy.[107]

## V.   Universities Across the Country Suspend SJP Chapters and Bring in Law Enforcement to End Encampments.

Many universities have suspended student chapters of NSJP from operating on their campuses since last October, recently including, for example, student organizations at University of Wisconsin-Milwaukee.[108] The university suspended these student groups for their association with a social media post encouraging harassment and violence of Jewish students and campus organizations.[109] Arrests of campus agitators were not unique to Texas. Rather, since April 18, law enforcement agencies have arrested around 3,100 protestors nationwide for violating state and local law, and disrupting campus functions.[110] Depicted below is a map of campus arrests across the country:



---

[107] *See id.*

[108] Michael Starr, *UWM anti-Israel groups suspended for call to treat Jewish orgs as 'extremist criminals'*, THE JERUSALEM POST (Aug. 4, 2024), https://tinyurl.com/5aub6u9b.

[109] *Id.*

[110] *Where Protesters on U.S. Campuses Have Been Arrested or Detained*, THE NEW YORK TIMES (July 22, 2024), https://www.nytimes.com/interactive/2024/us/pro-palestinian-college-protests-encampments.html.

[111] Isabelle Taft et al., *Campus Protests Led to More than 3,100 Arrests, but Many Charges Have Been Dropped*, THE NEW YORK TIMES (July 21, 2024), https://www.nytimes.com/2024/07/21/us/campus-protests-arrests.html.

Several examples stand out. At Columbia, New York Police Department officers arrested nearly 100 people as they cleared the campus encampment.[112] The university asked police to maintain a presence on campus through at least May 17, two days after the scheduled graduation ceremony.[113] Columbia also began suspending students who refused to leave the encampment.[114] At Tulane, New Orleans Police activated SWAT and approached an encampment in the middle of the night "with guns drawn" to clear it.[115] Officers arrested 14 people, only two of whom were students at Tulane.[116] At the University of Southern California, over 100 police officers approached in riot gear to surround the campus encampment, arresting 93 people on April 24.[117] And at the UCLA, police arrested more than 200 protestors while ripping apart the encampment's barricade of plywood, pallets, metal fences and dumpsters.[118] Most were cited for unlawful assembly but some for assault with a deadly weapon.[119]

## VI.    The University Defendants Revise their Campus Policies.

Only after Plaintiffs disbanded their encampments and students left for the summer did the University Defendants begin revising their written policies in response to GA-44. The University Defendants each maintained content-neutral time, place, and manner policies regulating speech and

---

[112] *Nearly 100 people arrested at Columbia, NYPD says after clearing Hamilton Hall*, NBC NEWS (Apr. 30, 2024), https://tinyurl.com/yf7ykhvs.

[113] *Id.*

[114] Isa Farfan et al., *Protestors take over Columbia University building hours after school starts suspending student demonstrators*, NBC NEWS (Apr. 29, 2024), https://tinyurl.com/em4ysm2n.

[115] Anum Siddiqui, *SWAT, NOPD officers pour onto Tulane's campus overnight, move encampment*, WDSU NEWS (May 2, 2024), https://tinyurl.com/bp5zc97d.

[116] *Id.*

[117] Tim Caputo, *Police clear out pro-Palestinian encampment at USC after university issues warning to protesters*, ABC 7 (May 5, 2024), https://tinyurl.com/3794r92z.

[118] Marc Cota-Robles et al., *Police clear pro-Palestinian encampment at UCLA, arrest more than 200 protesters*, ABC 7 (May 2, 2024), https://tinyurl.com/2erunveu.

[119] *Id.*

assembly on campus prior to GA-44,[120] specific anti-disruption provisions,[121] and policies prohibiting harassment and discrimination.[122] The University Defendants overwhelmingly responded to GA-44 by incorporating a definition of antisemitism into their pre-existing policies.

### A.    The University of Texas System.

The University of Texas System Board of Regents ("UT System Board") holds plenary authority over all component institutions within the UT System, including UT Austin, UTSA, and UTD.[123] UT Austin President Jay Hartzell—like all university presidents within the UT System—holds general authority and responsibility for the administration of UT Austin under the supervision and direction of the Chancellor and Executive Vice Chancellor.[124] Similarly, UTSA President Taylor Eighmy holds general responsibility for, and control over, "[UTSA's] educational, administrative, and fiscal programs and services."[125]

The UT System Office of General Counsel directed all UT System institutions to amend their speech policies to comply with GA-44.[126] After receiving guidance from the UT System, UT Austin,[127] UTD,[128] and UTSA[129] revised their written campus policies to incorporate the definition of antisemitism provided by Texas Government Code § 448.001(2). None of these written policies

---

[120] *See generally* UT AUSTIN UNIVERSITY CATALOG, APPENDIX C: INSTITUTIONAL RULES ON STUDENT SERVICES AND ACTIVITIES [henceforth, "***UT Austin Institutional Rules***"], https://catalog.utexas.edu/general-information/appendices/appendix-c/, *Chapter 13. Speech, Expression, and Assembly*; UTD HANDBOOK OF OPERATING PROCEDURES [henceforth, "***UTD HOP***"], https://policy.utdallas.edu/, *Speech Expression and Assembly* - UTDSP5001; UTSA HANDBOOK OF OPERATING PROCEDURES [henceforth, "***UTSA HOP***"], https://www.utsa.edu/hop/, *Chapter 9.37 Peaceful Public Assembly*; UH MANUAL OF ADMINISTRATIVE POLICIES AND PROCEDURES [henceforth, "***UH MAPP***"], https://www.uh.edu/policies/mapps/, § 01.05.01 – Freedom of Expression.
[121] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15), 13-206, 13-301; *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.37(III.A); *UH MAPP*, §§ 01.D.15(3.4) & (4.1).
[122] *UT Austin Institutional Rules*, §§ 11-402(9), 13-204; *UTD HOP*, §§ UTDSP5003(C.9.6), UTDBP3090(C.1) & (C.2); *UTSA HOP*, §§ 9.01, 9.37(IV); *UH MAPP*, § 01.D.07.
[123] *University of Texas System Board of Regents Rule 10101: Board Authority and Duties* (Sep. 25, 2018) [henceforth, "***UT System Rules***"], https://www.utsystem.edu/board-of-regents/rules/10101-board-authority-and-duties.
[124] *UT System Rules*, § 20201(4),
[125] *UTSA HOP*, § 1.01.
[126] *Declaration of Katie McGee*, ¶ 47.
[127] *Declaration of Brenda Schumann*, ¶¶ 4–5; *see also UT Austin Institutional Rules*, §§ 13-206, 6-404(11), 11-402(9).
[128] *Declaration of Amanda Smith*, ¶¶ 5–10; *see also UTD HOP*, §§ UTDSP5001(A.3.20) (L.49.8), (L.49.9).
[129] *Declaration of LaTonya Robinson*, ¶¶ 8–16; *see also UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B).

prohibit students or student organizations from the simple expression of any message because of the content or viewpoint expressed.

UTSA's Dean of Students L.T. Robinson took the step of urging civility in discourse by asking students not to chant the slogan "from the river to the sea, Palestine will be free" prior to a protest. But UTSA never codified such a rule prohibiting students from the simple expression of their desired message, and indeed the revision to written campus policies in response to GA-44 that UTSA later published did not include such a statement.[130] And in any event, students' use of this slogan continued unabated, without any discipline by UTSA or referral to law enforcement.[131]

As of June 7, UTSA no longer requests that students refrain from using the phrase, never disciplined students for ignoring any such request, has no intention of doing so in the future, and acknowledges that GA-44 does not prohibit the simple use of the phrase or require universities to independently prohibit it.[132] UTSA's anti-disruption and anti-discrimination policies have simply never been enforced based upon the simple use of the phrase "From the River to the Sea, Palestine will be free."[133]

### B.    The University of Houston System.

The University of Houston System Board of Regents ("UH System Board") holds plenary authority over UH and its policy direction,[134] and Renu Khator, as President and Chancellor of UH, is responsible for the general management and operation of the university.[135] UH Vice Presidents, rather than President Khator, are specifically responsible for enforcing compliance with policies within

---

[130] *Id.,* ¶¶ 8, 15–16.
[131] *Id.*, ¶ 16.
[132] *Id.* ¶¶ 8, 15–16.
[133] *Id.* ¶ 9.
[134] §§ 01.01.3, 01.01.5, UNIVERSITY OF HOUSTON SYSTEM BOARD OF REGENTS POLICIES (Apr. 24, 2023) [henceforth, "**UH System Rules**"], https://uhsystem.edu/board-of-regents/policies/_files/bor-policies-8-24-23.pdf; *Section 1: Authority and Responsibility of Governing Board,* UNIVERSITY OF HOUSTON BOARD OF REGENTS BYLAWS (May 15, 2024) [henceforth, "**UH System Bylaws**"], https://uhsystem.edu/board-of-regents/bylaws/index.php.
[135] *UH System Rules,* §§ 02.01, 02.02.

their area of oversight.[136]

The UH System Board revised UH's Anti-Discrimination Policy on May 23,[137] and its Freedom of Expression policy on May 30,[138] incorporating Texas Government Code § 448.001(2)'s antisemitism definition.[139] UH's revised policies do not prohibit students or student organizations from the simple expression of any message because of the content or viewpoint expressed. Tents and encampments were not permitted on campus grounds under UH's polices, which also do not permit amplified sound at Butler Plaza.[140]

## VII.   Plaintiffs' Lawsuit.

Plaintiffs are nominally four separate organizations claiming membership at Texas universities: Students for Justice in Palestine at UH ("SJP-UH"), Students for Justice in Palestine at UTD ("SJP-UTD"), the Palestine Solidarity Committee at UT Austin ("PSC-UT"), and the Democratic Socialists of America ("DSA"). Plaintiffs sue Governor Abbott in his official capacity, UH, the UH System Board and its members in their individual and official capacities, UH President and Chancellor Khator in her individual and official capacity, the UT System Board and its members in their individual and official capacities, UTSA President Eighmy in his individual and official capacity, and UT Austin President Hartzell in his individual and official capacity pursuant to 42 U.S.C. § 1983.[141]

Plaintiffs bring three claims, each of which allege that Defendants impermissibly burdened Plaintiffs' (and their student members') rights under the Free Speech Clause of the First Amendment.[142] First, Plaintiffs collectively allege that GA-44 prohibits them from advocating for

---

[136] *UH MAPP*, § 01.01.01(VII.B).

[137] *UH MAPP*, § 01.D.07.

[138] § 01.D.15 (Freedom of Expression – System) UH SYSTEM ADMINISTRATIVE MEMORANDUMS [henceforth, "**UH SAM**"], https://uhsystem.edu/resources/compliance-ethics/uhs-policies/sams/index.php; *UH MAPP*, § 01.05.01.

[139] Meeting of the University of Houston System Board of Regents (May 15, 2024), 5:30:10 – 5:33:03, https://uh.edu/infotech/services/streaming-media/events/bor/2024-05/.

[140] *Declaration of Donell Young*, ¶¶ 5–6, 14; *see also UH SAM*, § 01.D.15, UH MAPP, § 01.05.01.

[141] *See generally* ECF 20.

[142] *Id.,* ¶¶ 81–97.

Palestinians, criticizing Israel, or using the phrase "from the river to the sea, Palestine will be free."[143] Second, DSA brings a standalone claim against UTSA President Eighmy, alleging that he established a rule at UTSA prohibiting the simple use of the phrase: "from the river to the sea, Palestine will be free."[144] Third, PSC-UT separately brings a claim against UT Austin President Hartzell, alleging that UT Austin cancelled a demonstration and suspended PSC-UT *solely* because of PSC-UT's viewpoints and the content expressed at demonstrations.[145]

Plaintiffs seek a judgment declaring that: (1) GA-44 is illegal viewpoint and content discrimination; (2) prohibiting individuals from saying "from the river to the sea, Palestine will be free" constitutes illegal viewpoint and content discrimination (regardless of the circumstances, apparently); and (3) canceling protests and suspending organizations for criticizing Israel and advocating for Palestinians is illegal viewpoint and content discrimination.[146]

Plaintiffs also seek broad injunctive relief.[147] They ask the Court to: (1) order Governor Abbott to withdraw GA-44; (2) enjoin the University Defendants from updating their campus speech policies in accordance with GA-44's first and second operative clauses, from taking any enforcement actions in furtherance of GA-44's second or third operative clauses, and from treating their favored expression as a per se violation of campus policies; and (3) order UT Austin President Hartzell to reinstate UT-PSC and revoke the group's interim suspension.[148]

Finally, Plaintiffs seek compensatory and punitive damages, as well as attorneys' fees and litigation expenses.[149] Plaintiffs ask much of the Court, but they do little to justify their prayer.

Regarding their first claim, Plaintiffs identify no language in GA-44's operative clauses that

---

[143] *Id.*
[144] *Id.*, ¶¶ 98–106.
[145] *Id.*, ¶¶ 107–114.
[146] *Id.*, p. 26.
[147] *Id.*, pp. 26–27.
[148] *Id.*
[149] *Id.* at p. 27.

explicitly regulates speech based on discussion of a particular topic or adoption of any viewpoint—rather, it only calls on universities to exercise their independent judgment on how best to address antisemitism on campus. Plaintiffs also do not explain how GA-44 applies to them—by its own terms, the order instructs universities to address antisemitism through their policies; not to apply GA-44 itself to any protestors. Nor do Plaintiffs point to any written policy adopted by any of the University Defendants which discriminates against students wishing to advocate for Palestinians or against Israel. Plaintiffs also fail to show that Texas public universities were not empowered to act reasonably to protect against substantial disruptions of their educational missions and operations given the national landscape, where other universities that permitted similar events to occur suffered the extreme disruptions that campus agitators intended, and widespread outbreaks of antisemitic conduct harassing those universities' Jewish students.

Plaintiffs also mischaracterize the International Holocaust Remembrance Alliance ("IHRA") examples of antisemitism to be precisely what they are not: "common and typical criticisms people make about foreign countries when those criticisms are made against Israel."[150] Rather, IHRA cautions that "criticism of Israel similar to that leveled against any other country *cannot be regarded as antisemitic*" under its definition and examples.[151] Plaintiffs' allegations are, at best, misleading.

Regarding DSA's claim against UTSA President Eighmy, Plaintiffs make no effort to acknowledge that UTSA revised its written campus policies on June 7, 2024, and that their written policies do not incorporate any rule prohibiting students from saying "from the river to the sea, Palestine will be free."[152] UTSA and its officials have no demonstrated willingness to enforce any prior requests to refrain from using Plaintiffs' favored slogan—a request which Plaintiffs did not observe,[153]

---

[150] ECF 20, ¶ 33(b).
[151] *Working definition of antisemitism*, INTERNATIONAL HOLOCAUST REMEMBRANCE ALLIANCE (May 26, 2016), https://holocaustremembrance.com/resources/working-definition-antisemitism.
[152] *UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B).
[153] *See Declaration of LaTonya Robinson*, ¶¶ 8-16.

and a "rule" (as Plaintiffs improperly call it) that UTSA has not incorporated into its written policies.[154]

And lastly, as to PSC-UT's claim against UT Austin President Hartzell, Plaintiffs do not allege a plausible claim entitling them to relief. They do not identify the "rules violations" at issue, explain why their intention not to violate university rules or policies matters when they did actually violate them (as they appear to concede), or allege any facts showing that UT Austin acted based on a disagreement with the content or viewpoint of their speech.[155]

## STANDARD OF REVIEW

***Federal Rule of Civil Procedure 12(b)(1)***. Plaintiffs' standing and Defendants' sovereign immunity from suit bear upon the Court's jurisdiction over this dispute and are properly raised in a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss.[156] "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."[157] "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."[158]

In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts.[159] On such a motion, the "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[160]

***Federal Rule of Civil Procedure 12(b)(6)***. The remaining issues are analyzed under Federal Rule of Civil Procedure 12(b)(6), under which a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."[161] To survive a motion under Rule 12(b)(6), a plaintiff must

---

[154] *Id.*
[155] *See generally* ECF 20, ¶¶ 71–79, 107–114.
[156] *See, e.g.*, *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 616–17 (5th Cir. 2020); *Moore v. Bryant*, 853 F.3d 245, 248–49 (5th Cir. 2017).
[157] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002).
[158] *Id.*
[159] *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).
[160] *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (internal quotations and citation omitted).
[161] *Anderson* v. *Valdez*, 845 F.3d 580, 589 (5th Cir. 2016).

assert facts "rais[ing] a right to relief above the speculative level."[162] In other words, such a motion

turns on whether a plaintiff pled a "plausible" claim for relief.[163] A claim has facial plausibility "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."[164]

In ruling on a Rule 12(b)(6) motion, the court can rely on: (1) the complaint; (2) the complaint's

attachments; (3) a defendant's attachments that were referenced in the complaint and central to the

plaintiff's claim; and (4) judicially-noticeable matters.[165]  "Government websites are presumptively

reliable and subject to judicial notice."[166] A court may also "take judicial notice of newspaper articles

for the fact of their publication without transforming the motion into one for summary judgment."[167]

### RULE 12(B)(1) ARGUMENTS

Defendants challenge the Court's jurisdiction both facially and factually. The key points here

are as follows: (1) because the University Defendants' policies independently caused Plaintiffs' claimed

injuries, Plaintiffs' lack standing to challenge GA-44 without also challenging those policies; (2)

Defendants' sovereign immunity bars Plaintiffs' official-capacity claims; (3) Plaintiffs lack standing

because GA-44 does not "arguably proscribe" their speech under *Driehaus*; and (4) DSA's claim against

UTSA President Eighmy fails because UTSA and its officials have no demonstrated willingness to

enforce any prior unwritten "rule" prohibiting the simple expression of Plaintiffs' favored slogan.

### I.  Plaintiffs Assert Claims Against Many Defendants with No Tangible Connection to Plaintiffs' Alleged Injuries.

Standing and sovereign immunity require each plaintiff to be able to trace their injuries to acts

---

[162] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[163] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[164] *Id.*

[165] *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

[166] *Rhines v. Salinas Const. Techs., Ltd.*, No. CIV.A. C-11-262, 2011 WL 4688706, at *2 n.2 (S.D. Tex. Oct. 3, 2011) (citing *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005)).

[167] *Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1087 n.2 (9th Cir. 2018).

by each defendant.[168] Plaintiffs ignored this rule when drafting their Amended Complaint, as they each appear to assert claims against Defendants with no remote connection to their alleged speech injuries. Below, Defendants summarize the only conceivably viable claims that Plaintiffs could have based on traceability:[169]

- *SJP-UH:* This organization is based at the University of Houston. It can only have justiciable claims against the University of Houston Board of Regents members and Rene Khator.

- *SJP-UTD:* This organization is based at UTD. It can only have claims against the UT System Board of Regents members.

- *DSA:* This organization only has chapters at UTSA and the University of Houston.[170] DSA alleges no facts showing that it was injured by any of the University of Houston Defendants.[171] Thus, DSA can only have claims against the UT System Board of Regents members and Taylor Eighmy.

- *PSC-UT Austin:* This organization is based at UT Austin. It can only have claims against Jay Hartzell and the UT System Board of Regents members.

As an initial matter, the Court must limit Plaintiffs' claims to only those described in the summary above. Any other claims are barred for lack of standing and on sovereign immunity grounds.

## II.   Plaintiffs' Alleged Injuries Cannot be Redressed through a Lawsuit to GA-44 Alone.

Plaintiffs' challenge to GA-44 is jurisdictionally flawed as they do not challenge the university policies that, so they say, independently restricted their conduct and thus separately caused their claimed injuries.[172] These policies were in place before any of the University Defendants made changes to implement GA-44, and they are the only possible source of any alleged injury to the Plaintiffs. This issue highlights Plaintiffs' traceability/redressability shortcomings, although it also reveals sovereign immunity problems inherent to Plaintiffs' GA-44 claim.[173]

---

[168] *Daves v. Dallas Cnty., Tex*, 22 F.4th 522, 542 (5th Cir. 2022).

[169] This summary excludes Plaintiffs' claims against (1) Governor Abbott, as he is not a proper enforcement officer under clear precedent and (2) the University of Houston, the University of Houston Board of Regents, and the UT System Board of Regents, as these are entities not suable under *Ex parte Young* or § 1983. *Infra*, 28–29, 42–43.

[170] ECF 20, ¶ 11.

[171] *See* ECF 20, ¶¶ 49–62.

[172] *See* ECF 20, ¶¶ 81–97 (contending that GA-44 is an impermissible viewpoint- and content-based regulation and seeking relief against that specific order).

[173] *See Mi Familia Vota v. Ogg*, 105 F.4th 313, 329 n.11 (5th Cir. 2024) (noting that the *Ex parte Young* enforcement analysis significantly overlaps with the traceability and redressability requirements for Article III standing).

Under Fifth Circuit precedent, "[w]hen multiple laws cause the same harm, that injury may not be traceable or redressable when only one of those laws is challenged."[174] In this context, plaintiffs generally cannot trace their injury to just the challenged law as there is another, unchallenged, law that validly outlaws the same activity.[175] Redressability is also an issue as "declaring one law unenforceable may not provide relief because a different law independently causes the same injury."[176]

Here, university officials swear under oath that they limited the Mid-2024 Protests for violating their content-neutral anti-disruption policies, or state law prohibiting camping on public property—not GA-44.[177] Plaintiffs' claims are nonjusticiable as they do not challenge university policies that independently caused the alleged injuries at issue (if they had, the Defendants still would prevail because they would satisfy the lower standard for content-neutral time, place, and manner regulations).

Second, in this context, Plaintiffs also needed to challenge the campus policies that the University Defendants actually applied to them, and not Governor Abbott's executive order, which they did not. These policies independently restrict antisemitic discrimination and harassment on campus.[178]

Finally, a plaintiff generally "cannot challenge a [rule] as-applied unless [it] has been applied to him."[179] Plaintiffs assume that the University Defendants relied on GA-44 to restrict their speech during the Mid-2024 Protests. While UTSA asked students to refrain from chanting one favored slogan as an interim measure before reviewing and finalizing revisions to written campus policies in response to GA-44,[180] the record shows that UTSA, UT Austin, UTD, and UH had not updated their

---

[174] *Leal v. Becerra*, No. 21-10302, 2022 WL 2981427, at *2 (5th Cir. July 27, 2022); *see also Tex. State LULAC v. Elfant*, 52 F.4th 248, 255–56 (5th Cir. 2022); *Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, No. 20-50125, 2021 WL 3484698, at *3 (5th Cir. Aug. 6, 2021); *id.* n.4 (collecting cases)

[175] *Leal*, 2022 WL 2981427, at *2.

[176] *Id.*

[177] *Declaration of Katie McGee*, ¶ 46; *Declaration of Donell Young*, ¶¶ 12–13; *Declaration of Amanda Smith*, ¶¶ 8–10.

[178] *UT Austin Institutional Rules*, §§ 11-402(9), 13-204; *UTD HOP*, §§ UTDSP5003(C.9.6), UTDBP3090(C.1) & (C.2); *UTSA HOP*, §§ 9.01, 9.37(IV); *UH MAPP*, § 01.D.07.

[179] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006).

[180] *Declaration of LaTonya Robinson*, ¶¶ 8, 15–16.

written policies per GA-44—meaning that the order had not been implemented when the relevant events took place.[181] Officials from these universities confirm they *did not* rely on GA-44 to restrict Plaintiffs' protests.[182]

In sum, Plaintiffs inexplicably focused only on GA-44, which was never "applied" to them. And they ignore the university policies applicable to them and relied upon by the University Defendants in their management of the underlying protest conduct at issue here. Plaintiffs' challenge to GA-44 is nonjusticiable due to these errors.

## III.   Defendants' Sovereign Immunity Bars Plaintiffs' Claims.

"In most cases, Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court."[183] The Supreme Court has further recognized that sovereign immunity extends to state officials or agencies where, as here, they are effectively suits against a state.[184] To overcome the state's sovereign immunity, Plaintiffs must show that Texas has waived its immunity or Congress has expressly abrogated it.[185] It is beyond dispute, however, that "[t]he Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983."[186] Indeed, "Section 1983 does not waive the states' sovereign immunity,"[187] and "Texas has not consented to this suit."[188]

To maintain their suit, Plaintiffs therefore must attempt to circumvent Defendants' immunity by application of *Ex parte Young*, in which the Supreme Court created a narrow exception to sovereign immunity permitting official-capacity suits against state officers.[189] *Ex parte Young* requires both that "a plaintiff must sue the right defendants and ask for the right remedy."[190] Specifically, this narrow

---

[181] *Supra*, notes 126–29, 137–40.
[182] *Supra*, note 177.
[183] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (citations omitted).
[184] *Id.* (citations omitted).
[185] *Id.*
[186] *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citation omitted).
[187] *Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 338 n.7 (1979)).
[188] *Id.* (citing *Emory v. Texas State Bd. Of Med. Exam'rs*, 748 F.2d 1023, 1025 (5th Cir. 1984)).
[189] 209 U.S. 123, 157 (1908); *see also Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001).
[190] *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023).

exception "allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law.[191] If there is no such connection to enforcement, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity."[192]

### A.   The University of Houston, the University of Houston System Board of Regents, and the UT System Board of Regents are Not Proper Defendants.

The *Ex parte Young* exception to sovereign immunity does not apply to suits against states or their agencies, such as the universities and boards of regents named here.[193] Thus, Plaintiffs' claims against University of Houston, the UH System Board of Regents, and the UT System Board of Regents are jurisdictionally barred.

### B.   Governor Abbott is Not a Proper Defendant.

The Fifth Circuit has explained that "a governor's role in promulgating an executive order alone is not sufficient" to satisfy *Ex parte Young*'s requirement for a connection to the enforcement of the challenged law or policy.[194] While this background principle alone justifies dismissing Plaintiffs' official-capacity suit against Governor Abbott, Plaintiffs' claim against the Governor do not get any closer to establishing the Court's jurisdiction upon inspection.

Under GA-44's plain terms, "higher education institutions" are responsible for enforcing its directives as they are tasked with: (1) "updat[ing]" their free speech policies to address antisemitic speech; (2) "establish[ing]" appropriate punishments for acts; and (3) "enforc[ing]" their antisemitism policies on campus.[195] Plaintiffs' claims against Governor Abbott are jurisdictionally barred under the

---

[191] *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S.Ct. 1261 (2021).
[192] *Id.* (citations omitted).
[193] *See Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023); *see also, e.g., Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (finding that UT Austin is a state entity protected by sovereign immunity); *Doe v. Harrell*, 841 F.App'x. 663, 668 (5th Cir. 2021) (finding that UT System's Board of Regents is a state entity protected by sovereign immunity).
[194] *Jackson*, 82 F.4th at 367.
[195] ECF 21-1, p. 2.

principle that, "[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends."[196]

In an attempt to bootstrap Governor Abbott's plenary authority over campuses into a specific enforcement connection, Plaintiffs also allege that Governor Abbott "has direct control over what occurs on public grounds of campuses in the state."[197] Regardless of what general authority Governor Abbott has over public grounds on state property, Plaintiffs does not identify any provision of law giving the Governor a specific duty to enforce GA-44.

This Court recently analyzed a similar situation—an executive order that required universities to enact certain TikTok bans—and rightfully found that Governor Abbott was not the proper enforcement officer in that context.[198] The same result is warranted here.

## C.   The Remaining Official-Capacity Defendants are also Not Proper Defendants.

To have the requisite enforcement connection, an official must have more than "the general duty to see that the laws of the state are implemented."[199] Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."[200] The analysis is "provision-by-provision": the officer must enforce "the particular statutory provision that is the subject of the litigation."[201] "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation."[202]

Plaintiffs' claims against all remaining official-capacity Defendants fail under the principle that

---

[196] *City of Austin*, 943 F.3d at 998; *see also Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) ("[F]ormulating and promulgating the [disputed] policy does not subject [the official] to suit under *Ex parte Young*."); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020) (finding that Governor Abbott was not the enforcement officer for his executive orders as the "statutory authority . . . to issue, amend or rescind an Executive Order is not the power to enforce it") (quotations omitted).

[197] ECF 20, ¶ 12.

[198] *Coal. for Indep. Tech. Research v. Abbott*, No. 1:23-CV-783-DII, 2023 WL 8582597, at *5 (W.D. Tex. Dec. 11, 2023).

[199] *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

[200] *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted); *Morris*, 739 F.3d at 746 (quotations omitted).

[201] *Id.* (citation omitted); *see also Mi Familia Vota*, 977 F.3d at 467–68.

[202] *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (citing *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

"[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends."[203] University policies often specify which university officials enforce each stated rule, or set up a process for hearing student conduct violations, but the named Defendants are not the listed enforcement officers for these policies.[204]

**Presidents Eighmy, Hartzell, and Khator do not enforce GA-44**. Plaintiffs do not plausibly allege that Presidents Eighmy and Khator are proper "enforcement officers" of GA-44 to bring an official-capacity suit against them. Plaintiffs do not cite any specific policy that the University Presidents are specifically tasked with enforcing, but it would not matter if they had, as University Presidents are not automatically proper enforcement officers for challenges to university actions merely because they are generally tasked with overseeing a university campus.

Consider two analogous cases. In *Haverkamp v. Linthicum*, the Fifth Circuit explained that Linthicum, the Texas Department of Criminal Justice's Director of Health Services, lacked a connection to specific decisions relating to plaintiff's care despite Linthicum's general oversight of medical and psychiatric services to inmates.[205] Rather, "in a system with approximately 130,000 inmates in custody, and absent any allegations tying Linthicum to the specific decisions at issue, it cannot be plausibly inferred that Linthicum played any role in the decisions Haverkamp challenges as unconstitutional."[206] Similarly, in *Richardson v. Flores*, the Court found that the Texas Secretary of State was not a proper enforcement officer even though she had broad authority over the administration of Texas's election laws: "More is needed—namely, a showing of the Secretary's connection to the enforcement of the particular statutory provision that is the subject of the litigation."[207]

---

[203] *City of Austin*, 943 F.3d at 998.
[204] *UT Austin Institutional Rules*, §§ 13-206, 6-404(11), 11-402(9); *UTD HOP*, §§ UTDSP5001(A.3.20) (L.49.8), (L.49.9); *UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B); *UH MAPP*, §§ 01.D.07, 15.
[205] 6 F.4th at 665, 671.
[206] *Id.* (footnote omitted).
[207] 28 F.4th 649, 654 (5th Cir. 2022) (quotations omitted).

*The individual members of the UH System and UT System Boards of Regents do not enforce GA-44*. Plaintiffs contend that the members of the UH System Board of Regents are proper Defendants because they revised UH campus speech policies in conformity with GA-44, and because they have management authority over UH.[208] Plaintiffs offer even less support in their Amended Complaint for their claim against the members of the UT System Board of Regents, alleging no facts at all to support their claim.[209] Defendants do not dispute that the UH System and UT System Boards of Regents are the governing bodies for UH and UTSA respectively, but that background fact does not create an enforcement connection. Indeed, as a general proposition, a committee's authority to formulate and promulgate a policy is not sufficient to establish a connection to the enforcement of the challenged law or policy.[210]

Recently, in *Jackson v. Wright*, the Fifth Circuit found that the University of North Texas's Board of Regents members could be sued under *Ex parte Young*, noting the board's "ultimate governance authority" and its "supervisory rule over the individuals who were allegedly violating constitutional rights."[211] However, as described below, *Jackson* should not be extended to encompass the case at bar.

First, *Jackson* did not address the specific issue here, namely: (1) the plaintiffs' injuries can be traced to a specific university policy and (2) the defendants sued were not the identified enforcement officers in that policy.[212] Under Fifth Circuit caselaw that preceded *Jackson*, the *Ex parte Young* analysis "ends" in this situation.[213] *Jackson* did not overrule this prior caselaw.[214]

Also, *Jackson* found the board members to be proper enforcement officers basically due to

---

[208] ECF 20, ¶ 33(b).
[209] *See generally* ECF 20.
[210] *Haverkamp*, 6 F.4th at 670.
[211] *Jackson*, 82 F.4th at 367–68 (quotations omitted).
[212] *Id.* at 365–69.
[213] *City of Austin*, 943 F.3d at 998.
[214] *See Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023) ("To the extent two panel decisions conflict, the earlier decision controls.").

their general authority over UNT, not because of any specific connection they had to the alleged unlawful acts at issue. But it is well-settled principle in this Circuit that *Ex parte Young* cannot be satisfied merely by looking to an official's general duties.[215] Indeed, in *Haverkamp, supra*, Linthicum, the TDCJ Director of Health Services, had broad supervisory authority akin to UNT's board members in *Jackson*.[216] The Fifth Circuit still found that Linthicum was not a proper *Ex parte Young* defendant, noting the "absen[ce] [of] any allegations tying Linthicum to the specific decisions at issue."[217]

While the *Jackson* court found the board's "authority to countermand the decisions of the subordinate UNT officials" was relevant to its *Ex parte Young* analysis,[218] the court in *Mi Familia Vota v. Abbott* found that Governor Abbott was not a proper *Ex parte Young* defendant despite his ability to countermand the enforcement officers with his unfettered right to "amend or rescind" the disputed executive order.[219]

Finally, *Jackson* is distinguishable from this case for other reasons. For one thing, *Jackson* found it relevant that the plaintiff wrote to UNT's Board about his grievances, and the Board "ignored" this letter.[220] This fact is not present here.[221] For another thing, *Jackson* involved a professor's claim for reinstatement.[222] The Fifth Circuit has historically analyzed *Ex parte Young* more leniently when an employee seeks reinstatement to a prior job or role.[223] A similar principle is found in the context of

---

[215] *See, e.g., Scott*, 28 F.4th at 672.
[216] *See Haverkamp*, 6 F.4th at 669–71; *see also Health Services Division*, TDCJ, https://tinyurl.com/47x2dcm3; *Health Services Division Organizational Chart*, TDCJ, https://tinyurl.com/yzedhcnp; *Health Services Division: Central Administration*, TDCJ, https://tinyurl.com/3z9tu2ky.
[217] *Haverkamp*, 6 F.4th at 671.
[218] *Jackson*, 82 F.4th at 368.
[219] *Mi Familia Vota*, 977 F.3d at 467–68.
[220] *Jackson*, 82 F.4th at 368.
[221] *See Air Evac EMS, Inc.*, 851 F.3d at 518 (noting that an "*Ex parte Young* analysis can turn on subtle distinctions in the complaint").
[222] *See Jackson*, 82 F.4th at 366, 369.
[223] *See Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) ("[T]his circuit has always treated *Ex parte Young* as an appropriate vehicle for pursuing reinstatement to a previous job position."); *see also Jones v. Tex. Juvenile Justice Dep't*, 646 F.App'x. 374, 376 (5th Cir. 2016) ("A request for reinstatement is sufficient to bring a case within the *Ex parte Young* exception . . . .") (quotations and brackets omitted); *Cantu Services, Inc. v. Roberie*, 535 F.App'x. 342, 345 (5th Cir. 2013) (noting that there were "special considerations" in the employment/reinstatement context that did not apply to an *Ex parte Young* claim concerning "an award process for a public contract").

institutional litigation involving state prisons, where the *Ex parte Young* exception "is so well established" that courts "often do not even mention [it]."[224] Here, Plaintiffs are not employees seeking reinstatement to prior roles.

In sum, *Jackson* is not binding here due to the rule of orderliness, and separately because the case is distinguishable. Either way, this Court should find that the official-capacity Defendants lack the requisite enforcement connection needed under *Ex parte Young*.[225]

### D.   Plaintiffs Cannot Recover Damages against the Official-Capacity Defendants.

The *Ex parte Young* exception does not cover suits for monetary damages against state officials.[226] Thus, sovereign immunity bars Plaintiffs' claims for damages against the official-capacity Defendants.

## IV.   Plaintiffs Lack Standing.

For Article III standing, Plaintiffs must show that they suffered: (1) an injury in fact, (2) that is fairly traceable to the Defendants' actions, and (3) that is likely to be redressed by a favorable outcome.[227] "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[228] The standing and *Ex parte Young* analyses "significant[ly] overlap."[229]

Plaintiffs bring this pre-enforcement challenge to enjoin executive order GA-44 because they believe it constitutes an "illegal instruction to campus officials to rid public universities in Texas of a viewpoint critical of Israel."[230] As the Court can see for itself, GA-44 does no such thing, and Plaintiffs have suffered no injury establishing the Court's jurisdiction. It is also unclear whether Plaintiffs assert

---

[224] *Hope v. Harris*, 861 F.App'x. 571, 578 (5th Cir. 2021).
[225] For transparency's sake, Your Honor rejected similar *Ex parte Young* arguments in *Coal. for Indep. Tech. Research*, 2023 WL 8582597, at *4–5. There, this Court did not analyze how *Jackson* would apply in a situation like this one—where an underlying policy names enforcement officers, and the plaintiffs sued different school administrators. At the least, Defendants wish to preserve their argument that *Jackson* is distinguishable or otherwise wrongfully decided.
[226] *See, e.g.*, *Salinas v. Tex. Workforce Comm'n*, 573 F.App'x. 370, 373 (5th Cir. 2014).
[227] *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023).
[228] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quotations omitted).
[229] *Air Evac EMS, Inc.*, 851 F.3d at 513–14.
[230] ECF 20, ¶ 33.

standing in their organizational[231] or associational[232] capacity—or perhaps both—but it does not matter. Under both organizational and associational standing, Plaintiffs must show that they or one of their members have satisfied Article III's standing requirements.[233] Plaintiffs have not done so.[234]

### A.    GA-44 Did Not Cause Plaintiffs Alleged Injuries.

To establish an injury in fact, Plaintiffs must show that they or at least one of each organizations' members "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[235] Because Plaintiffs also seek prospective relief, they must also allege "a continuing (*i.e.*, ongoing) or 'imminent' future injury to establish standing."[236] Where, as here, Plaintiffs seek both prospective and retrospective relief, they must establish both the stricter standing test applied to "imminent" injuries on their official-capacity claims, as well as identifying an "actual" injury to support their request for compensatory damages.[237]

In pre-enforcement cases such as this one[238] where Plaintiffs allege a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing.[239] Defendants recognize that "[a] plaintiff bringing such a challenge need not have experienced an actual arrest, prosecution, or other enforcement action

---

[231] *See, e.g., OCA-Greater Houston v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017) ("[An] organization can establish standing in its own name if it meets the same standing test that applies to individuals.") (internal quotations and citations omitted).

[232] *See, e.g., Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) ("Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members.").

[233] *See OCA-Greater Houston*, 867 F.3d at 610; *Benkiser*, 459 F.3d at 587.

[234] *See, e.g., Tenth St. Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 499 (5th Cir. 2020).

[235] *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[236] *Jackson*, 82 F.4th at 369 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." (internal quotation omitted))).

[237] *See, e.g., Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); *Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 173 (5th Cir. 2018).

[238] Defendants except UTSA from this statement.

[239] *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2021) (citations omitted); *see also, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 155 (2014); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020), *as revised* (Oct. 30, 2020); *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014).

to establish standing."[240] Plaintiffs' alleged chilling injuries are not traceable to any "'allegedly unlawful conduct' of the defendant[s]," as opposed "to the provision of law that is challenged."[241]

Though it is likely that Plaintiffs will point to *Driehaus* to suggest that their pre-enforcement challenge raises a cognizable injury,[242] *Driehaus* is of no help to them. To establish a cognizable injury under *Driehaus*, a plaintiff must show: (1) an intent to engage in a course of conduct arguably affected with a constitutional interest; (2) that conduct is arguably proscribed by the challenged provision; and (3) there exists a credible threat of prosecution under that provision.[243]

Plaintiffs first claim fails most conspicuously because GA-44 does not arguably proscribe their conduct. Governor Abbott adopted GA-44 in response to Hamas's horrific attack on October 7, 2023 and a proliferating climate of antisemitism on college campuses.[244] GA-44 calls upon Texas higher education institutions to review and update their free speech policies to address the rise in antisemitic speech and acts on campuses, to reflect the definition of antisemitism adopted by the State in Texas Government Code § 448.001(2), and to establish appropriate procedures for enforcement and disciplinary proceedings under campus speech polices.[245]

Plaintiffs ask the Court to conflate Governor Abbott's laudable effort to address antisemitism at universities with viewpoint discrimination directed against them and their members. Contrary to GA-44's plain language, Plaintiffs contend that "[their] activities are forbidden by Governor Abbott's Order, and the slogans, rhetoric, and objectives are labeled as per se antisemitic by the order."[246] It is true that GA-44 directs universities to define antisemitism consistent with Texas Government Code § 448.001(2), but GA-44 does not direct universities to prohibit students from using any particular

---

[240] *Barilla*, 13 F.4th at 431 (citations and internal quotation marks omitted).
[241] *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (remaining citations omitted).
[242] *Driehaus*, 573 U.S. at 159.
[243] *Id.* at 159, 161–66.
[244] ECF 21-1; *see also supra* note 57.
[245] *Id.*
[246] ECF 20, p. 11.

words, and none of the University Defendants have incorporated into written campus speech policies any rule prohibiting Plaintiffs' proposed expression and activities.

It is thus also of no significance that, as Plaintiffs complain,[247] GA-44 specifically names "Palestine Solidarity Committee" and "Students for Justice in Palestine" as but two examples of student groups whose members operate at some of Texas's university campuses. After all, the mere fact that GA-44 calls upon Texas higher education institutions to punish student groups *if* they violate the free speech policies those universities choose to adopt does not constitute direction that universities must do so based solely on the content of a speaker's message or in the absence of a genuine violation of campus policy.

### B.      Plaintiffs Lack Standing to Assert a Claim Seeking Damages.

Plaintiffs lack standing to assert claims for damages on their individual-capacity claims. There are two routes for Article III standing, and neither works in this context.

First is organizational standing. "An organization can establish standing in its own name if it meets the same standing test that applies to individuals."[248] Plaintiffs allege no facts suggesting that they, as organizations, suffered any pecuniary, emotional, or reputational harm that could feasibly justify an award of damages in their favor.[249] Thus, they lack organizational standing to seek damages.

The second is associational standing. This theory allows an association to sue on behalf of its members when (1) "its members would otherwise have standing to sue in their own right; [(2)] the interests it seeks to protect are germane to the organization's purpose; and [(3)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[250] Yet Fifth Circuit precedent holds that claims for damages generally cannot be brought via an

---

[247] *Id.*, ¶ 87.
[248] *Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 351 (5th Cir. 2023) (internal quotations and citation omitted).
[249] *See generally* ECF 20.
[250] *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

associational standing theory as they typically require "individualized proof" specific to the association's members.[251]

1.    Defendants Did Not Impair DSA's Mission to Establish Socialism in America.

Organizational standing requires a showing that the challenged law or policy "perceptibly impaired the organization's ability to carry out its mission."[252] DSA did not make this showing.

In short, DSA describes its mission as "establishing an openly democratic socialist presence in American communities and politics," with the ultimate goal being to "end . . . capitalism."[253] DSA fails to provide any basis to conclude that international affairs, or in particular, "advocacy for Palestine" are germane to DSA's mission to establish socialism in American communities. Lacking such a connection to its mission, DSA can seemingly only assert an "abstract social interest" in the Israel/Palestine debate. This is not enough to create organizational standing.[254] DSA cannot satisfy the second element for associational standing for the same reason.[255]

2.    PSC-UT Fails to Identify Any Member Who Can Sue in their Own Right.

An organization seeking to establish associational standing to bring claims on behalf of its members must allege how its members have standing by "identify[ing] members who have suffered the requisite harm"[256] PSC-UT failed to do so, instead offering an affidavit of Jena Homsi,[257] who says

---

[251] *Self-Ins. Inst. of Am., Inc. v. Korioth*, 53 F.3d 694, 695–96 (5th Cir. 1995); *see also Consumer Data Indus. Ass'n v. Tex. through Paxton*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010).

[252] *El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (internal quotations and citation omitted); *see also Louisiana Fair Hous. Action Ctr., Inc.*, 82 F.4th at 353 ("[T]he perceptible impairment to an organization's ability to carry out its mission . . . is the concrete and demonstrable injury for organizational standing.") (cleaned up).

[253] *About Us*, DSA, https://www.dsausa.org/about-us/; *see also* ECF. 20, ¶¶ 51, 58.

[254] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (noting that "a setback to the organization's abstract social interests" is insufficient to create organizational standing); *Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) ("[The organization's] injury . . . cannot be merely ideological, meaning that damage to the 'special interest' of an organization does not qualify as an injury in fact; otherwise, 'there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived.'") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

[255] *See Hunt*, 432 U.S. at 343 (requiring an organization to show, among other things, that "the interests it seeks to protect are germane to the organization's purpose").

[256] *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

[257] ECF 21-3 ("I ***was*** a student . . . .") (emphasis added).

that she was a student during the 2023-2024 academic year.[258] However, officials have confirmed that Homsi was not a current student at the time of PSC-UT's April 2024 demonstrations and interim action and is not enrolled for the 2024-2025 term.[259]

UT System Board of Regents' Rules and Regulations, which hold the force of law,[260] require registered student organizations to restrict membership to students of the institution to which they are registered."[261] UT Austin did not place PSC-UT on an interim action or cancel any disruptive protests until after Homsi was no longer a student member of PSC-UT. PSC-UT failed to identify any student who was a member when the organization was suspended to support its claim for retrospective relief.[262] For the same reasons, PSC-UT fails to establish associational standing for prospective injunctive relief, which requires it to identify a *current* member.

## V.      DSA Also Cannot Pursue its Standalone Claim Against President Eighmy.

Plaintiffs say that an unnamed campus official at UTSA "state[d] explicitly that [students] are not allowed to say *from the river to the sea, Palestine will be free*."[263] While it is true that Dean of Students Robinson *asked* students to refrain from using this particular slogan,[264] students largely ignored the request. Further, UTSA since revised its campus peaceful assembly policy on June 7, 2024, and the updated policy plainly does not bar Plaintiffs from speaking their desired slogan.[265]

DSA's claim against President Eighmy fails on official-capacity grounds because UTSA officials will not enforce any prior "rule" (as Plaintiffs improperly label it) barring the simple expression of Plaintiffs' favored slogan.[266] UTSA has not reiterated this request, acknowledges that

---

[258] *Declaration of Katie McGee*, ¶ 4, note 1.
[259] *Id.*
[260] *Hall v. McRaven*, 508 S.W.3d 232, 235 (Tex. 2017) (citation omitted).
[261] *UT System Rules*, § 40201.
[262] ECF 20, ¶ 80.
[263] ECF 20, ¶¶ 59–61, 98–106 (emphasis in original).
[264] *Declaration of LaTonya Robinson*, ¶ 8.
[265] *UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B).
[266] *Declaration of LaTonya Robinson*, ¶¶ 8–16.

GA-44 does not prohibit Plaintiffs' favored political slogans or require public universities to do so, will not reiterate this request to students again in the future, and enforces its revised peaceful assembly policy equally against all individuals and organizations regardless of their affiliation, or the viewpoint or content of their expression.[267] The Fifth Circuit has found a more limited statement indicating an official had no willingness to enforce a rule defeated jurisdiction on an official-capacity claim in *Mi Familia Vota v. Ogg*.[268] And because UTSA has revised its written policies,[269] DSA's claim is also moot.[270]

## RULE 12(B)(6) ARGUMENTS

Plaintiffs contend that GA-44 constitutes both content and viewpoint discrimination, and that it compels Texas public universities to implement and enforce similarly unlawful policies themselves.[271] To do so, they misconstrue GA-44 to maintain that Governor Abbott's executive order—and the University Defendants' written policies—prohibit Plaintiffs' protest activities. The Court need not accept Plaintiffs' atextual interpretations as true even at this stage because GA-44 and campus policies are central to Plaintiffs' claims and Plaintiffs reference them directly in their Amended Complaint.[272] As such, the Court may consider the *actual* contents of GA-44 and campus policies in deciding Defendants' Rule 12(b)(6) motion, and not just Plaintiffs' misleading rendition.

Nor must the Court confine itself to Plaintiffs' misleading factual allegations about what was happening at college campuses in Texas or ignore the national context in ruling on Defendants' merits challenge. Two key indisputable public facts stand out: (1) Plaintiffs were part of a larger nationwide

---

[267] *Id.*

[268] 105 F.4th at 330–31.

[269] *Declaration of LaTonya Robinson*, ¶¶ 8–16.

[270] *See Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990) ("The mootness doctrine requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process."); *see also La. Env't Action Network v. U.S. E.P.A.*, 382 F.3d 575, 580 (5th Cir. 2004) ("It is well-settled, that mootness is a threshold jurisdictional inquiry.").

[271] ECF 20, ¶¶ 81–97.

[272] *See generally* ECF 20. Should the Court disagree with Defendants that it may consider any particular evidence they submit in conjunction with this motion, then Defendants ask that the Court limit its consideration of that evidence to their factual attack under Rule 12(b)(1) rather than convert their 12(b)(6) challenge into a motion seeking summary judgment.

movement of college students intent on maximally disrupting campuses, and (2) antisemitism is not just pervasive at many colleges and universities as noted above—it has dramatically spiked since October 7 due in no small part to the conduct of pro-Palestinian protestors across the country.[273]

## I.   Plaintiffs Ignore the Constitutional-Avoidance Canon in Interpreting GA-44.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."[274] Plaintiffs' challenge to GA-44 runs headfirst into this canon as they eschew alternative interpretations of GA-44 that would avoid any constitutional issues. In short, Plaintiffs base their challenge to GA-44 on their interpretation that it (1) has been, and will be, enforced against them and (2) contains content- and viewpoint-based speech restrictions. Yet GA-44 does not itself restrict the students' speech; nor is it independently enforceable.

Rather, GA-44 merely requires universities to "[r]eview and update" their speech policies due to the rise in antisemitism and "[e]nsure that these policies are being enforced on campus."[275] There are various ways this can be done without touching the First Amendment's guardrails. One obvious choice would be to ensure that content-neutral policies, such as those regulating disruptive activity on campus (like encampments and blockades),[276] are being evenly enforced.[277] Another would be to enforce university policies covering non-protected speech, such as speech that incites violence or imminent lawless action.[278]

---

[273] *Supra*, notes 2–3.
[274] *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).
[275] ECF 21-1.
[276] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15); *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.36(III.A); *UH SAM*, §§ 01.D.15(3.4) & (4.1).
[277] *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297 (1984) ("We have difficulty . . . in understanding why the prohibition against camping, with its ban on sleeping overnight, is not a reasonable time, place, or manner regulation that withstands constitutional scrutiny."); *Healy v. James*, 408 U.S. 169, 188–89 (1972) ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").
[278] *See, e.g.*, *UT Austin Institutional Rules*, §§ 13-203, 13-206(b).

Plaintiffs make hay out of the fact that GA-44 focuses on antisemitism. But nothing in GA-44 says that universities should *only* protect Jewish students, to the exclusion of all other protected classes, on their campuses. That would be ridiculous. And to be clear, Jewish students faced the overwhelming brunt of attacks following October 7. Public facts support this.[279] There is nothing constitutionally unsound with Governor Abbott focusing on the community most suffering during this trying period, just as there is nothing wrong with the fire department driving by your lightly singed yard to put out a fire raging at your neighbor's house. Some things are more urgent than others.

This leaves GA-44's provision that universities must include a "definition of antisemitism" in their free speech policies.[280] This is not independently enforceable. Indeed, GA-44 specifies that this definition is merely meant as a "guide" to students and faculty "on what constitutes antisemitic speech."[281] The First Amendment does not bar government from teaching others about what state law has to say about antisemitism.[282] And this new definition of antisemitism did not bring in any speech not otherwise covered by the University Defendants' pre-existing policies which, of course, already restricted harassment and discrimination, and imposed content-neutral anti-disruption rules.[283]

In sum, Plaintiffs challenge to GA-44 is dead on arrival due to the constitutional-avoidance canon. Thus, this claim should be dismissed. Below, Defendants detail the numerous factual and legal problems with Plaintiffs' claims, which are equally fatal to this lawsuit.

## II.   Plaintiffs Cannot Sue Many of the Defendants Under § 1983.

Plaintiffs must establish a causal connection between an alleged constitutional deprivation and each Defendant: "each Government official, his or her title notwithstanding, is only liable for his or

---

[279] *Supra*, pp. 5–9.
[280] ECF 21-2, p. 3.
[281] *Id.*
[282] *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).
[283] *Supra*, notes 120–22.

her own misconduct."[284] General allegations of a constitutional deprivation will not do;[285] to be liable under § 1983, an official "must have been personally involved in the alleged constitutional deprivation or have engaged in wrongful conduct that is causally connected to the constitutional violation."[286] General allegations of a constitutional deprivation will not do.[287]

**The Board of Regents Members:** The board of regents members cannot be sued under § 1983 due to their lack of personal involvement in the alleged constitutional violations.[288] Plaintiffs appear to rely on the fact that the UH System board members were involved with updating their universities' policies per GA-44's directives.[289] Yet "individual officials may be liable only for implementing a policy that is itself a repudiation of constitutional rights and the moving force of the constitutional violation."[290] The clear record shows that the University Defendants did not update their written policies until *after* Plaintiffs' Mid-2024 Protests.[291] Thus, these revised policies could not have been the moving force behind the alleged constitutional violations. And it is hard to see how these revised policies—which treat antisemitic, anti-Palestinian, and other unprotected discriminatory speech equally[292]—can be considered a "repudiation" of Plaintiffs' constitutional rights.

As for the UT System Board of Regents members, Plaintiffs allege that other university officials—namely, UTSA President Eighmy and UT Austin President Hartzell—effectively had "sole authority" to take the disputed acts.[293] Plaintiffs do not allege that the UT System Board members were even aware of Eighmy's and Hartzell's alleged conduct, much less that they directed, authorized,

---

[284] *Iqbal*, 556 U.S. at 677; *see also Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).

[285] *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).

[286] *Turner v. Driver*, 848 F.3d 678, 695–96 (5th Cir. 2017); *accord Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of any civil rights cause of action.").

[287] *Murphy*, 950 F.2d at 292.

[288] *See Thompson*, 709 F.2d at 382 ("Personal involvement is an essential element of a civil rights cause of action.").

[289] ECF 20, ¶ 33.

[290] *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

[291] *Supra*, pp. 17–20.

[292] *Id.*

[293] *See* ECF 20, ¶¶ 102, 112.

or participated in these acts.

**Renu Khator (UH's Chancellor and President):** Plaintiffs also do not allege any facts showing Renu Khator's personal involvement here. Rather, they merely listed her as a defendant in the caption and then did not mention her any further after that.[294]

**The University of Houston, the University of Houston System Board of Regents, and the UT System Board of Regents:** These entities are not "persons" under § 1983, and thus they cannot be sued under this statute.[295] For the same reason, Plaintiffs also cannot assert § 1983 claims for damages against any Defendant in their official capacities.[296]

## III. Plaintiffs' As-Applied and Facial Challenges to GA-44 Lack Merit.

There are two prongs to Plaintiffs' claim against GA-44. First, Plaintiffs contend that GA-44 was applied against them to limit their Mid-2024 Protests[297] and will be used against them if they engage in similar protests in the future.[298] Second, Plaintiffs argue that GA-44 violates the First Amendment "on its face."[299] Whether the Court finds that GA-44 applies to Plaintiffs or not, Plaintiffs' as-applied and facial challenges to GA-44 are meritless.

### A. Plaintiffs Fail to Plausibly Show that GA-44 Caused their Alleged Injuries.

Plaintiffs claim that Governor Abbott "aimed to extinguish from public campuses a viewpoint critical of Israel and supportive of Palestinians" and that he "wage[s] a more than half decade long effort to suppress viewpoints critical of one particular foreign country."[300] In an effort to prop up this claim, Plaintiffs reference some of Governor Abbott's past efforts to address antisemitism,[301] but to

---

[294] *Id.*
[295] *See Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 328 (5th Cir. 2024).
[296] *Aguilar*, 160 F.3d at 1054.
[297] ECF 21, pp. 9–13, 15; ECF 21-2, ¶ 8; 21-3, ¶ 9; 21-4, ¶ 9.
[298] *Id.*, pp.14–16.
[299] *Id.*, pp. 21.
[300] ECF 20, p. 4, ¶¶ 13, 35, 75.
[301] *Id.*, ¶¶ 13-31.

prevail on their as-applied challenge, Plaintiffs must establish that GA-44, on its face,[302] was the "moving force" behind the alleged constitutional violations.[303] Plaintiffs fail to allege facts supporting this point. GA-44 did not "cause" Plaintiffs' injuries stemming from the Mid-2024 Protests and could not have because it is only enforceable through university policies.

Plaintiffs' as-applied challenge raises a broader question: How exactly can GA-44 be "applied" against them in any meaningful way? The order carries no penalties. And no student or organization can be disciplined for violating "GA-44." A university could sanction a student for violating its restriction on antisemitic harassment. But in that scenario, the university would enforce its own policies, not GA-44. And any as-applied First Amendment challenges in this context would be fact-specific, turning on the policy's language, how the university interpreted it, and what exactly the plaintiffs intended to say and do.

Plaintiffs were required to lay a foundation detailing how GA-44 would be applied to them to sustain an as-applied claim.[304] Yet here, Plaintiffs make no allegations showing that GA-44 has been, or ever will be, applied to them. Their as-applied claim fails as a result.

### B. Even If Any University Defendant Did Enforce GA-44 Against Plaintiffs, its Application Would Not Have Violated the First Amendment.

Even if the Court were to find that one or more University Defendant did apply GA-44 to act in a content- or viewpoint-based manner, such University Defendant's actions still would not violate the First Amendment under the *Tinker* standard. Plaintiffs say the University Defendants reacted to their protests how Governor Abbott asked them to by ending Plaintiffs' "peaceful" events with force and arrests. Plaintiffs thus insinuate that it is irrelevant precisely when the University Defendants

---

[302] *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) ("[T]his analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face.").

[303] *See, e.g., Simmons v. City of Columbus*, 425 F.App'x. 282, 284 (5th Cir. 2011); *see also Ctr. for Individual Freedom*, 449 F.3d at 659.

[304] *See Justice*, 771 F.3d at 294–95 (noting the fact-specific nature of an as-applied inquiry and dismissing the plaintiffs' as-applied claims for lack of a factual foundation).

revised their written policies, or even whether those policies were content-neutral time, place, and manner regulations, because—so Plaintiffs say—Defendants *applied* GA-44 itself to end their protests.

This is plainly untrue, but it would not matter if it were not. As discussed in detail below, *Tinker* governs the First Amendment analysis here. Even entertaining for the sake of argument Plaintiffs' allegations that the University Defendants applied GA-44 when they ended their protests (they did not), Defendants were within their rights under *Tinker* to restrict those protests because the events were substantially disruptive. Also, Defendants could have restricted Plaintiffs' Mid-2024 Protests to protect Jewish students from severe and pervasive discrimination that might arise.

1. *Tinker* Governs Plaintiffs' Challenge to GA-44.

When it comes to speech on campus, the government has "a significant interest in preserving the campuses of public colleges and universities for the use of students."[305] Preventing disturbances and disruptions to the school's educational goals are significant interests.[306] And like with preventing disturbances and disruptions, maintaining student safety on campus and order are substantial interests as well.[307] Courts have also explained that school administrators may restrict speech and that the campus officials have an interest in avoiding speech that "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students."[308] After all, "[a] university's mission is education," and the Supreme Court "has never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."[309]

In *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the Supreme Court held that school officials may

---

[305] *Justice for All v. Faulkner*, 410 F.3d 760, 770 (5th Cir. 2005).
[306] *Smith v. Tarrant Cty. Coll. Dist.*, 694 F. Supp.2d 610, 627 (N.D. Tex. 2010); *Bowman v. White*, 442 F.3d 967, 980 (8th Cir. 2006) (noting that public safety on a university campus is a significant interest because without safety, "the desire to speak one's mind becomes moot").
[307] *Smith*, 694 F. Supp.2d at 627 (citing *Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989) (stating that student safety was a substantial interest justifying a university's restriction on commercial speech); *Healy*, 408 U.S. at 180 (noting the "acknowledged need for order" on campus)).
[308] *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 442 (5th Cir. 2001) (citing *Tinker*, 393 U.S. at 508).
[309] *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).

prohibit student speech upon showing "facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school activities."[310] The Court also stated that acts constituting an "invasion of the rights of others is . . . not immunized by the [First Amendment]."[311] *Tinker* governs a school's content- or viewpoint-based restrictions.[312] The Fifth Circuit and many other courts have applied *Tinker* to First Amendment cases involving college students.[313]

*Tinker's* standard is relatively lenient. A school official prevails under *Tinker* so long as he could reasonably forecast that the restricted speech would disrupt the school or invade others' rights.[314] A school official's decision on this point must be afforded deference under *Tinker.*[315] The reasoning is that "schools can be places of special danger."[316] And school officials need leeway so they can "react quickly and efficiently to protect students and faculty from threats, intimidation, and harassment intentionally directed at the school community."[317] To name one example, "[p]ublic universities can and typically do restrict access to campus facilities."[318]

*Tinker* is best thought of as having two independent prongs. The first allows speech restrictions that could reasonably lead to a substantial disruption at the school (the "substantial disruption" prong). The second authorizes speech restrictions that could reasonably lead to the invasion of rights of others (the "rights of others" prong). As applied here, GA-44 is constitutional under both prongs, though

---

[310] 393 U.S. 503, 514 (1969).

[311] *Id.* at 503, 513.

[312] *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009) ("We have made plain that 'time, place, and manner' is the proper standard for evaluating content and viewpoint neutral regulations of student speech and that when a school imposes content or viewpoint based restrictions the court will apply *Tinker.*") (citation omitted); *see also Esfeller v. O'Keefe*, 391 F.App'x. 337, 341 (5th Cir. 2010); *Morgan v. Swanson*, 659 F.3d 359, 402 (5th Cir. 2011); *Canady*, 240 F.3d at 442.

[313] *See Esfeller*, 391 F.App'x. at 341–42; *Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning*, 620 F.2d 516, 521–24 (5th Cir. 1980); *see also* Daniel B. Dreyfus, *A Common Judicial Standard for Student Speech Regulations*, 102 Tex. L. Rev. 1059, 1075 (2024) (citing circuit court cases that applied or confirmed *Tinker's* applicability to First Amendment cases involving universities).

[314] *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015).

[315] *Id.*

[316] *Id.* at 392 (quoting *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring)).

[317] *Bell*, 799 F.3d at 393.

[318] *Justice for All*, 410 F.3d at 765.

46

Plaintiffs offer no allegations on either set of points.

    2.    GA-44 is Constitutional Under Tinker's "Substantial Disruption" Prong.

To justify a speech restriction under *Tinker*, the school official must be able to point to "a specific and significant fear of disruption, not just some remote apprehension of disturbance."[319] And the official cannot restrict a student's speech merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[320] As described above, it is beyond reasonable dispute that university campuses across the country experienced disruption throughout the spring semester of 2024 stemming from student encampments, blockades, and occupations of buildings.[321]

Plaintiffs offer no allegations suggesting that pro-Palestinian protests did not substantially disrupt the University Defendants' educational functions or, at the least, that the University Defendants were wrong to believe that Plaintiffs' protests would lead to such disruption. The Fifth Circuit and other courts have upheld school speech restrictions based on weaker "disruption" evidence than that present in this case, and this Court should find that GA-44, as applied to Plaintiffs' Mid-2024 Protests, was constitutional under *Tinker's* "substantial disruption" prong.

***Tinker's "Substantial Disruption" Prong.*** Defendants explore four cases below that upheld schools' speech regulations under *Tinker's* "substantial disruption" prong. Most of the pertinent caselaw comes from bans on the Confederate flag, but the Court should apply the same general principles here.

In *Blackwell v. Issaquena Cnty. Bd. of Ed.*, the Fifth Circuit analyzed a high school's ban on the wearing of "freedom buttons."[322] The Court noted that these buttons led to: (1) students noisily talking in the hall; (2) students trying to pin the buttons on others who did not want them; (3) a general

---

[319] *Bell*, 799 F.3d at 397 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)).
[320] *Id.* (quotations omitted).
[321] Fed. R. Evid. 201(b)(1) & (2).
[322] *Blackwell v. Issaquena Cnty. Bd. of Ed.*, 363 F.2d 749, 750 (5th Cir. 1966).

disruption of classroom instruction; (4) one bus driver entering a class without permission to offer buttons to the students; (5) some students throwing the buttons into the building through the windows; and (6) one student being deliberately absent from class without permission.[323] The Court found the school could constitutionally ban these buttons under the circumstances: "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine. This is not only proper in our opinion but is necessary."[324]

In *A.M. ex rel. McAllum v. Cash*, a high school banned displays of the Confederate flag due to instances of racial strife among students at the school.[325] The Fifth Circuit found the policy constitutional under *Tinker*.[326] In doing so, the Fifth Circuit focused on the "racial hostility and tension" present at the school.[327] The Court found that the following provided "ample" evidence supporting the school's decision to ban the Confederate flag: (1) racially hostile graffiti and vandalism; (2) multiple disciplinary referrals involving racial epithets; (3) a physical confrontation between white students from the school and African-American students of another high school; (4) a student waiving the Confederate flag in the direction of an opposing school's African-American volleyball team; (5) Confederate flags being flown on the school's flagpole on Martin Luther King Jr. Day; and (6) a white student simulating the lynching of an African-American student.[328]

In *West v. Derby Unified Sch. Dist. No. 260*, the Tenth Circuit upheld a middle school's suspension of a student for drawing a Confederate flag in class.[329] The court found the following evidence sufficient under *Tinker's* "substantial disruption" prong: (1) some students at the middle school drew the Confederate flag on their notebooks and arms; (2) some students from the local high

---

[323] *Id.* at 750–53.

[324] *Id.* at 753. The *Tinker* Court based its analysis on *Blackwell* and a companion Fifth Circuit decision issued that same day. *See Tinker*, 393 U.S. at 505 n.1, 513. Thus, it is irrelevant that *Blackwell* predated *Tinker*.

[325] *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 217 (5th Cir. 2009).

[326] *Id.* at 221–24.

[327] *Id.* at 222.

[328] *Id.*

[329] *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1365–68 (10th Cir. 2000).

school wore shirts bearing the Confederate flag; (3) members of the Aryan Nation and the Ku Klux Klan distributed materials to high school students off campus that encouraged racism; (4) there was graffiti at the high school that contained racial slurs; and (5) there were some reports of racial incidents on high school buses and at football games.[330]

And lastly, in *Scott v. Sch. Bd. of Alachua Cnty.*, the Eleventh Circuit upheld a high school's suspension of two students for displaying a Confederate flag on school premises.[331] The court found the following "disruption" evidence sufficed to support the school's conduct: (1) there were fights which appeared to be racially based; and (2) any reasonable consumer of "the evening news" would "understand the concern school administrators had regarding the disruption, hurt feelings, emotional trauma and outright violence which the display of the symbols involved in this case could provoke."[332]

There are four key takeaways from the cases above. *First*, none of these cases involved First Amendment activity that actually led to the school cancelling class, or even imminently would lead to such a disruption. The courts still upheld the First Amendment restriction under *Tinker*.

*Second*, much of the evidence presented was, by itself, relatively mild. Yet schools could still use this evidence to justify their First Amendment restriction. The Fifth Circuit specifically addressed this point in *A.M. ex rel. McAllum*: "Even if these events do not rise to the level of a 'substantial disruption' under *Tinker* (thus justifying the ban based on past actual disruption), they serve as a factual basis for administrators' forecast that disruptions might occur if students were allowed to display racially charged symbols such as the Confederate flag."[333]

*Third*, schools were not required to directly link their disruption evidence to the activity being regulated. *A.M. ex rel. McAllum* and *West* are good examples of this point. These cases involved

---

[330] *Id.* at 1362.
[331] 324 F.3d 1246, 1247, 1249 (11th Cir. 2003).
[332] *Id.* at 1246, 1249.
[333] *A.M. ex rel. McAllum*, 585 F.3d at 222.

Confederate flag bans, yet some of the incidents of racial hostility cited by the schools did not involve the Confederate flag.[334] That did not stop the Fifth and Tenth Circuits from finding this evidence relevant to a *Tinker* analysis.

*Finally*, schools can regulate speech that could inflame racial tensions even though some students might view that speech innocently, or even admirably. The Confederate flag caselaw highlights this. As the Fifth Circuit acknowledged, only "some" people view the Confederate flag "as a symbol of racism and intolerance"; others might view it differently.[335] The Fifth Circuit still upheld the school's ban on the Confederate flag, despite these competing interpretations.

The last point directly undercuts one of Plaintiffs' key arguments. Plaintiffs suggest that each of the University Defendants have or will adopt rules prohibiting their desired chant of "from the river to the sea, Palestine will be free," which they classify as an innocent call "for peace and dignity for all people."[336] But *Plaintiffs'* interpretation of this phrase is irrelevant to a *Tinker* analysis. What is relevant is that at least *some* people view the "from the river to the sea" statement as antisemitic. This includes most Congressional members and the Anti-Defamation League, among others.[337] This is all that is needed under *Tinker*.[338]

Below, Defendants outline evidence that the Court may properly consider on a motion under Fed. R. Civ. P. 12(b)(6) showing that Plaintiffs' Mid-2024 Protests were, or at least reasonably could have ended up being, substantially disruptive to Texas public universities.[339] This evidence is more than adequate to satisfy *Tinker's* "substantial disruption" prong, as considered through the framework established by the four cases cited above.

---

[334] *Id.*; *West*, 206 F.3d at 1362.

[335] *A.M. ex rel. McAllum*, 585 F.3d at 222; *id.* at 222 n.5.

[336] ECF 20, ¶ 38; ECF 21, 6.

[337] *Supra*, p. 5.

[338] *See, e.g.*, *A.M. ex rel. McAllum*, 585 F.3d at 222; *id.* at 222 n.5.

[339] Should the court disagree that it may consider any particular evidence, then Defendants withdraw it from consideration on this motion rather than suggest that the Court convert Defendants' motion into a one seeking summary judgment.

***Plaintiffs' Mid-2024 Protests were Substantially Disruptive.*** The "substantial disruption" analysis here is simple. Plaintiffs admitted on their social media accounts that they *intended* to disrupt school activity.[340] That was the whole point of their mass protests: we will shut your schools down until you give into our demands.[341] Plaintiffs now try to reclassify their protests as "peaceful" events,[342] but this misses the point because the focus is on the event's disruptive nature, not its peacefulness or lack thereof. Plaintiffs' refusal to acknowledge the reality of their protests confirms just how weak their position is.

Were this not enough, ample judicially noticeable sources showed that the University Defendants forecasted that Plaintiffs' protests could be substantially disruptive, and that those protests, in fact, did disrupt campuses.[343] Many schools around the country shut down as a result of campus demonstrations for Palestine.[344] *Tinker's* deferential standard gives administrators ample leeway to respond to threats that could feasibly shut down their schools.[345]

On top of this, Defendants' challenged actions cannot be divorced from their context. It is beyond reasonable dispute that antisemitism had begun to overwhelm colleges across the nation around the time of Plaintiffs' Mid-2024 Protests.[346] Jewish students were physically assaulted; called horrific slurs; and many other things.[347] Many of these horrible events occurred at, or were otherwise

---

[340] *Supra*, note 70.

[341] *Supra*, pp. 4–9.

[342] *See* ECF 20, ¶¶ 35–36, 90–91; ECF 21, 7, 9–10, 12, 15.

[343] *Supra*, pp. 5–9.

[344] *Id.* The Fifth Circuit has found that incidents occurring at other schools can be relevant to a *Tinker* analysis. *See Bell*, 799 F.3d at 399 (finding that the school official's speech restriction was justified in part due to "examples of school violence" at other schools); *see also West*, 206 F.3d at 1362 (upholding the Derby *Middle School's* ban on the Confederate flag was constitutional largely due to the existence of racial tension at the Derby *High School*).

[345] *See Tinker*, 393 U.S. at 513 ("[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—*materially disrupts classwork* or involves substantial disorder or invasion of the rights of others is, of course, *not immunized by the constitutional guarantee of freedom of speech*.") (emphasis added); *see also Healy*, 408 U.S. at 189 ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education."); *see also Jenkins v. Louisiana State Bd. of Ed.*, 506 F.2d 992, 1003 (5th Cir. 1975) (finding that the First Amendment did not prevent a school from disciplining a group of students who went "about the campus shouting the chanting 'organize,' 'unite,' and 'student power'" and who "subjected the teaching and learning atmosphere of the college to disruption, distraction, and destruction").

[346] Fed. R. Evid. 201(b)(1) & (2).

[347] *Supra*, pp. 5–6.

51

connected with, SJP protests.[348] The four cases discussed above—*Blackwell*, *A.M. ex rel. McAllum*, *West*, and *Scott*—show that Defendants could try to stop this deluge of antisemitism by regulating expression on campus without violating the First Amendment.

Finally, many other schools outside of Texas limited SJP's protests in largely the same manner as the University Defendants did. The fact that many other officials had similar responses to similar protests highlights the reasonableness of the University Defendants' conduct. Any other conclusion is irreconcilable with the deferential nature of a *Tinker* analysis.[349]  In short, it is beyond reasonable dispute that Plaintiffs' protests were substantially disruptive, or at least could have been expected to be substantially disruptive. Plaintiffs fail to plead facts plausibly showing that the University Defendants' alleged conduct was unlawful under *Tinker's* "substantial disruption" prong.

      3.    <u>GA-44 also is Constitutional Under Tinker's "Rights of Others" Prong.</u>

Defendants could have also restricted Plaintiffs' Mid-2024 Protests under *Tinker's* "rights of others" prong. This prong is less established than *Tinker's* "substantial disruption" prong, yet most federal circuits to consider the issue have found that the "rights of others" prong[350] may independently justify a school's speech restriction without any showing that the expression would substantially disrupt the school's activities.[351] The Fifth Circuit appears sided with the majority, at least in dicta.[352]

---

[348] *Supra*, pp. 4–9.

[349] *See Bell*, 799 F.3d at 397–98.

[350] *Tinker*, 393 U.S. at 513 ("[C]onduct by the student, . . . which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves *substantial disorder or invasion of the rights of others* is, of course, *not immunized* by the constitutional guarantee of freedom of speech.") (emphasis added) (citing *Blackwell*, *supra* note 324).

[351] *Doe v. Valencia Coll.*, 903 F.3d 1220, 1229–31 (11th Cir. 2018); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152–53 (9th Cir. 2016); *Kuhlmeier v. Hazelwood Sch. Dist.*, 795 F.2d 1368, 1371 (8th Cir. 1986), *rev'd on other grounds*, 484 U.S. 260 (1988); *Trachtman v. Anker*, 563 F.2d 512, 516–20 (2d Cir. 1977); *but see L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854, 873–74 (1st Cir. 2024).

[352] *Brinson v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 351–52 (5th Cir. 2017) (citing *Tinker's* "rights of other" language to justify a school's speech restriction, without performing a "substantial disruption" analysis); *Bell*, 799 F.3d at 397 (noting that "[a]rguably, a student's threatening, harassing, and intimidating a teacher inherently portends a substantial disruption, making feasible a *per se* rule in that regard," which is another way of saying there are some instances where a court may not need to perform a full "substantial disruption" analysis); *Shamloo*, 620 F.2d at 522 (finding that the lower court erred in its *Tinker* analysis as the court did not find that the students' conduct "involved substantial disorder *or invasion of the rights of others*") (emphasis added).

Two questions arise from the "rights of others" analysis here. First, how should this prong be analyzed in the context of a university's restriction on discriminatory speech? Second, does GA-44, as applied here, satisfy the appropriate standard? Defendants answer both questions below.

***Tinker Permits Schools to Regulate Severe and Pervasive Discrimination.*** The Fifth Circuit has not specified how courts should analyze *Tinker's* "rights of others" prong, but two competing principles govern a school's ability to restrict discriminatory speech under this prong of *Tinker*. On one hand, every student has a right "to be secure and to be let alone."[353] Invidious discrimination not only invades this right, but it can also lead to severe negative consequences for the students being harassed.[354] On the other hand, a bedrock principle of the First Amendment is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[355] The question is how best to balance between these opposing values.

One option, which Defendants do not endorse, can be found in *Harper v. Poway Unified Sch. Dist.* There, the Ninth Circuit ruled that high schools can restrict any "derogatory and injurious remarks directed at students' minority status such as race, religion, and sexual orientation."[356] The scope of that ruling and its focus on a student's "minority status,"[357] leaves it constitutionally suspect.

A second option, which Defendants recommend, would place a "severe and pervasive" limit on a school's ability to restrict discriminatory speech. This finds support in *Saxe v. State Coll. Area Sch. Dist.* There, the Third Circuit found a school's "hostile environment" policy overbroad as it did not "require any threshold showing of severity or pervasiveness," which meant it "could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which

---

[353] *Tinker*, 393 U.S. at 508.
[354] *See, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178–79 (9th Cir. 2006) (discussing the negative effects of anti-gay discrimination), *cert. granted, judgment vacated sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).
[355] *Texas v. Johnson*, 491 U.S. 397, 414 (1989).
[356] *Harper*, 445 F.3d at 1183.
[357] *See id.* at 1183 n.28 (finding a "a difference between a historically oppressed minority group that has been the victim of serious prejudice and discrimination and a group that has always enjoyed a preferred social, economic and political status").

offends someone."[358] In *DeJohn v. Temple Univ.*, the Third Circuit extended this principle to the university setting.[359]

Tethering a school's ability to restrict discriminatory speech that reasonably could be "severe and pervasive" makes sense for three reasons. *First*, these guideposts limit a school's power to regulate discriminatory speech to the more pressing situations calling for such an intrusion. Thus, this restriction tracks *Tinker's* statement that schools cannot restrict speech merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[360]

*Second*, a "severe and pervasive" requirement can be easily understood by schools and courts. There is significant caselaw guiding how to analyze harassment in the Title VI and Title VII contexts.[361] This precedent would guide future First Amendment analyses on schools' speech restrictions.

*Finally*, an overly strict standard would leave schools unable to avoid potential Title VI lawsuits. Under Title VI, schools can be liable for student-on-student harassment if, among other things, "the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school."[362] An overly strict First Amendment standard in this context leaves universities in an impossible situation. Do they correct severe and pervasive discrimination and risk a § 1983 lawsuit for a First Amendment violation? Or do they disregard the discrimination and risk liability under Title VI? Defendants' proposed rule avoids this Sophie's choice. And the Eighth Circuit found similar reasoning persuasive when it held that *Tinker's* "rights of others" prong allows schools to regulate "speech [that] could result in tort liability for the school."[363]

---

[358] *Saxe*, 240 F.3d at 217.
[359] 537 F.3d 301, 314–20 (3d Cir. 2008).
[360] *Tinker*, 393 U.S. at 509.
[361] *See, e.g., Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 222–23 (5th Cir. 2023); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408–10 (5th Cir. 2015).
[362] *Fennell*, 804 F.3d at 408.
[363] *Kuhlmeier*, 795 F.2d at 1376.

Putting these points together, the "rights of others" analysis should turn on whether Defendants could reasonably have forecasted that Plaintiffs' Mid-2024 Protests might create a severe and pervasive discriminatory environment for Jewish students. The answer is yes.

**Nationwide and in Texas, SJP and PSC Attempted to Create a Severe and Pervasive Discriminatory Environment.** The University Defendants reasonably believed that the Mid-2024 Protests could create a severe and pervasive discriminatory environment for Jewish students—after all, it is beyond reasonable dispute[364] that antisemitism exploded at university campuses after Hamas's October 7 attack on Israel.[365] Considering the well-documented rise in antisemitism over the last year, Defendants could lawfully restrict Plaintiffs' protests, and protect their Jewish students, under *Tinker's* "rights of others" prong.

Defendants cited dozens, if not hundreds, of instances of antisemitism following October 7— many featuring the worst racial epithets imaginable and horrific acts of violence.[366] A significant portion of these instances related directly to SJP protests.[367] At the least, Plaintiffs' protests would only further inflame the antisemitism that had engulfed college campuses around this time. These protests could easily rise to the level of creating a severe and pervasive environment for Jewish students. But Plaintiffs pay this concern no mind, perhaps because it was the point.

Possibly the best background evidence of widespread, severe, and pervasive antisemitism on college campuses over the past year are the facts that (1) the federal government has drawn special attention to the proliferation of antisemitism at universities over the last year,[368] (2) Governor Abbott also identified the same worrying trend: "[a]cross the country, acts of antisemitism have grown in number, size, and danger to the Jewish community since Hamas' deadly attack on October 7th";[369]

---

[364] Fed. R. Evid. 201(b)(1) & (2).
[365] *Rachlin 2024 Congressional Testimony*, p. 1.
[366] *Supra*, notes 2–3, pp. 5–6.
[367] *Supra*, pp. 4–9.
[368] *See 2024 OCR Dear Colleague Letter*.
[369] *Supra* note 57.

and (3) numerous universities have been sued under Title VI because they did not timely and responsibly stop the antisemitism that flared up following October 7.[370] *Tinker* gives the University Defendants leeway to protect their Jewish students in this situation. The Court should find that GA-44, as applied to Plaintiffs' Mid-2024 Protests, was lawful under *Tinker's* "rights of others" prong.

    4.    <u>A Facial Challenge is a High Bar; Plaintiffs Do Not Meet it Here.</u>

Plaintiffs also challenge GA-44 facially, but "facial challenges [are] hard to win."[371] A facial challenge in the First Amendment context turns on whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[372] Put differently, a law is facially invalid "only if [its] unconstitutional applications substantially outweigh its constitutional ones."[373]

GA-44 offers little or no direction for what speech or conduct universities may regulate or under what circumstances they ought to do so, and such facial uncertainty is reason alone to reject Plaintiffs' pre-enforcement facial challenge.[374] Even so, there are at least five constitutional applications of GA-44.

*First*, universities could apply GA-44 to ensure their pre-existing policies are evenly enforced. Under Plaintiffs' theory of the case, it is hard to see how GA-44 is unconstitutional by telling the University Defendants to treat all persons and groups the same (treating anti-Jewish protestors in the same manner as anti-Palestinian (or any other) protestors).

*Second*, along the same lines, universities could apply GA-44 by ensuring that their content-neutral "anti-disruption" policies are properly enforced.[375] Plaintiffs do not contend that these policies

---

[370] *Governor Abbott Fights Antisemitic Acts At Texas Colleges,* Universities, *supra* note 56.
[371] *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2397 (2024).
[372] *Id.* (cleaned up).
[373] *Id.*
[374] *See, e.g., Sabri v. United States*, 541 U.S. 600, 608–10 (2004); *United States v. Raines*, 362 U.S. 17, 24–25 (1960).
[375] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15), 13-206, 13-301; *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.36(III.A); *UH MAPP*, §§ 01.D.15(3.4) & (4.1).

violate the First Amendment.

*Third*, "advocacy that is directed to inciting or producing imminent lawless action and is likely to incite or produce such action is not protected by the First Amendment."[376] Universities could constitutionally apply GA-44 to restrict speech falling within this category.[377]

*Fourth*, *Tinker* allows schools to regulate speech, including discriminatory speech, that is reasonably forecasted to create a substantial disruption.[378] Universities could constitutionally apply GA-44 to restrict speech falling within this category.

*Fifth*, *Tinker* allows schools to regulate speech that is reasonably forecasted to invade the rights of others.[379] Universities could constitutionally apply GA-44 to restrict antisemitism on campus where that antisemitism is creating a severe and pervasive environment for Jewish students.[380]

In sum, there are numerous, obvious constitutional applications of GA-44. At the least, these applications are not *substantially* outweighed by any perceived unconstitutional applications of this order. After all, "[w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."[381] The Supreme Court has repeatedly applied these principles in rejecting First Amendment challenges to anti-discrimination statutes.[382]  Plaintiffs' facial challenge to GA-44 fails.

---

[376] *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (quotations and brackets omitted).

[377] *See, e.g.*, *UT Austin Institutional Rules*, §§ 13–206(b) (banning discriminatory speech that incites violence or an imminent violation of law).

[378] *Supra*, pp. 47–51.

[379] *Supra*, pp. 52–55.

[380] *Supra*, p. 54; *see also, e.g.*, *UT Austin Institutional Rules*, § 13–204(b) (restricting "harassing" speech that is (1) "sufficiently severe, pervasive, and objectively offensive to create an objectively hostile or threatening environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University" and (2) "personally describes or is personally directed to one or more specific individuals").

[381] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992).

[382] *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting the argument "that application of Title VII . . . would infringe constitutional rights of expression" because "invidious private discrimination . . . has never been accorded affirmative constitutional protections") (alteration adopted) (internal quotation marks omitted)); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (explaining that although "parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, . . . it does not follow that the *practice* of excluding racial minorities from such institutions is also protected").

## IV.      PSC-UT's "Pretextual Cancellation" Claim Fails.

PSC-UT contends that UT Austin President Hartzell cancelled a PSC-UT demonstration and suspended the organization due to the content and viewpoint of speech at their events and that the university's reliance on content-neutral time, place, and manner regulations was a mere pretext.[383] Plaintiffs do not appear to dispute that UT Austin permitted "13 pro-Palestinian events [to] take place during the past several months" preceding April 25,[384] so it is unclear how they can plausibly say that UT Austin canceled their demonstration *because* of the content and viewpoint expressed. Even so, PSC-UT's claim turns on an alleged "rules violation." Specifically, PSC-UT alleges that:

(1)  "University of Texas officials . . . preemptively cancelled a PSC-UT organized demonstration under the pretext of rules violations";

(2)  "PSC-UT did not intend to violate any school rules or policies at the demonstration and communicated this to officials prior to the protest"; and

(3)  "University of Texas officials . . . suspended [PSC-UT] ostensibly because of rule violations but, in reality, for the viewpoint of UT-PSC and the content of its events and demonstrations."[385]

PSC-UT's claim is inadequately pled for two sets of reasons.

*First*, PSC-UT did not do the minimum necessary to make its claim plausible. For instance, PSC-UT did not: (1) identify the "rules violations" at issue or otherwise explain why their application would be "pretextual" in this context;[386] (2) explain why its "intent" not to violate these rules should matter in this context; (3) allege any facts showing that Defendant Hartzell ever disagreed with the content or viewpoint of PSC-UT's speech, or that he otherwise had strong viewpoints about the Israel/Palestine conflict; and (4) allege any facts showing that UT Austin treated similarly situated

---

[383] ECF 20, ¶¶ 107–14.

[384] *Supra*, note 74.

[385] ECF 20, ¶¶ 79–80; *see also id.* at ¶¶ 107–14.

[386] PSC-UT leaves out that it proceeded with its event even though they were told multiple times not to do so. This raises serious questions about what effect, if any, the pre-event cancellation letter had on PSC-UT.

groups, acting in a similar manner, different than PSC-UT.[387]

*Second*, PSC-UT's events around this time were disruptive and UT Austin had good reason to believe the planned protest would cause substantial disruption on campus.[388] Thus, even if the Court were to conclude that a content-based restriction was at play, *Tinker* supports UT Austin's response.[389]

## V.      Qualified Immunity Bars Plaintiffs' Individual-Capacity Claims.

All of Plaintiffs' individual-capacity claims are barred by qualified immunity. "The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation."[390] To be clearly established, "there must be a 'high degree of specificity' between the alleged misconduct and the caselaw purporting to clearly establish the violation."[391] It is the plaintiff's burden to negate a properly raised qualified immunity defense.[392]

Against President Hartzell, PSC-UT admits that its event was canceled because UT Austin believed it intended to violate the time, place, and manner rules. Proactively preventing planned rule violations intended to cause a substantial disruption is allowed under a plain reading of *Tinker*. PSC-UT tries to avoid this dispositive outcome by alleging that an unnamed person told UT Austin the group did *not intend* to violate the rules. Yet, no court has addressed the contours of a "substantial disruption" *Tinker* analysis in a scenario like this one. And the Fifth Circuit has not clearly defined *Tinker's* "rights of others" prong at all.[393]

Indeed, the First Circuit recently noted that the Supreme Court "has not addressed the vexing

---

[387] *See Kristoffersson on behalf of R.R. v. Port Jefferson Union Free Sch. Dist.*, No. 23-7232-CV, 2024 WL 3385137, at *3–4 (2d Cir. July 12, 2024) (finding that the plaintiff did not plead a plausible First Amendment claim as her "complaint offer[ed] no factual matter to support the assertion that the defendants discriminated against [the plaintiff] because of her viewpoint").
[388] *Supra*, pp. 4–9.
[389] *Supra*, pp. 47–55.
[390] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).
[391] *Babinski v. Sosnowsky*, 79 F.4th 515, 524 (5th Cir. 2023).
[392] *Collier v. Montgomery*, 569 F.3d 214, 217–18 (5th Cir. 2009).
[393] *Supra*, pp. 52–55.

question of when (if ever) public-school students' First Amendment rights must give way to school administrators' authority to regulate speech that . . . assertedly demeans characteristics of personal identity, such as race, sex, religion, or sexual orientation."[394] Thus, there is no conceivable argument that Defendants had the requisite "fair warning" to be liable here on Plaintiffs' individual-capacity claims based on these facts,[395] and the Court should find that qualified immunity bars those claims.

**CONCLUSION**

SJP and PSC will not be the last student organizations to try to shut down a college to make a point. But if universities are to have any hope of preserving their core educational function, then they must be able to respond to disruptive acts like Plaintiffs'. To affirm public universities' capacity to do so, the Court should dismiss this lawsuit in its entirety.

Date:  August 19, 2024
        Austin, Texas

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

**RYAN WALTERS**
Chief, Special Litigation Division

*/s/ Cole P. Wilson*
**COLE P. WILSON**
Attorney-in-charge
Texas State Bar No. 24122856
Cole.Wilson@oag.texas.gov

**TODD DICKERSON**
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

**JACOB E. PRZADA**
Special Counsel
Texas State Bar No. 24125371
Jacob.Przada@oag.texas.gov

---

[394] *L.M.*, 103 F.4th at 860; *see also Chen Through Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 717 (9th Cir. 2022) (finding *Tinker's* "rights of others" prong to be "unclear"); *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 251 (3d Cir. 2010) (same).
[395] *See McNeal v. LeBlanc*, 90 F.4th 425, 433 (5th Cir. 2024) ("The touchstone at this prong is 'fair warning' to the official that his conduct deprived his victim of a constitutional right.") (quotations omitted).

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**CERTIFICATE OF SERVICE**

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on August 19, 2024, using the Federal Court CM/ECF system.

*/s/ Cole P. Wilson*