IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE AT THE UNIVERSITY OF HOUSTON, et al., | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | No. 1:24-CV-523-RP |
| GREG ABBOTT, *in his official capacity only as the Governor of the State of Texas*, et al., | § § § § | |
| Defendants. | § | |

---

**DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

RYAN WALTERS
Chief, Special Litigation Division

COLE P. WILSON
Assistant Attorney General
Attorney-in-charge
Texas State Bar No. 24122856
Cole.Wilson@oag.texas.gov

TODD DICKERSON
Assistant Attorney General
Tex. State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
Jacob.Przada@oag.texas.gov

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**COUNSEL FOR DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iii

FACTUAL BACKGROUND ......................................................................................................... 3

    I.    Pro-Palestinian Campus Protests Erupt across the Country. ...................................... 4

    II.    NSJP Circulates "Escalation" Tactics for Students to Maximize Campus Disruption. ...........................7

    III.    Governor Abbott Signs Executive Order GA-44. ..................................................... 10

    IV.    Students at Texas Public Universities Join NSJP's Campaign to Seize Universities and "Disrupt their Daily Functions." ................................................................................. 11

        A.    The University of Texas at Austin. ................................................................. 12

        B.    The University of Texas at San Antonio. ........................................................ 15

        C.    The University of Texas at Dallas. ................................................................. 18

        D.    The University of Houston. ........................................................................... 20

    V.    Universities Across the Country Suspend SJP Chapters and Bring in Law Enforcement to End Encampments. ................................................................................ 21

    VI.    The University Defendants Revise their Campus Policies. ........................................ 23

        A.    The University of Texas System. ................................................................... 23

        B.    The University of Houston System. ............................................................... 25

    VII.    Plaintiffs' Request for Injunctive Relief. ............................................................... 25

STANDARD OF REVIEW ......................................................................................................... 28

ARGUMENT .......................................................................................................................... 29

    I.    Plaintiffs are Unlikely to Succeed Because Their Claims are Nonjusticiable. ............. 30

    II.    Plaintiffs Did Not Assert a Viable First Amendment Challenge. .............................. 31

        A.    Plaintiffs' Ignore the Constitutional-Avoidance Canon in Interpreting GA-44. ........ 32

        B.    Plaintiffs' As-Applied and Facial Challenges to GA-44 Lack Merit. .................... 33

            1.    Plaintiffs Cannot Succeed on their As-Applied Challenge. .......................... 34

            2.    A Facial Challenge is a High Bar; Plaintiffs do not Meet it Here. ................ 41

    III.    The Other Preliminary Injunction Factors Favor Denying the Motion. ....................... 46

    IV.    The Court Should Not Enjoin Enforcement of Constitutional Applications of GA-44. ...................... 47

CONCLUSION ........................................................................................................................ 48

CERTIFICATE OF SERVICE ..................................................................................................... 49

TABLE OF AUTHORITIES

**Federal Decisions**

*A.M. ex rel. McAllum v. Cash,*
 585 F.3d 214 (5th Cir. 2009) ............................................................................ 38, 39
*Alaska Airlines, Inc. v. Brock,*
 480 U.S. 678 (1987) ............................................................................................... 47
*Ayotte v. Planned Parenthood of Northern New England,*
 546 U.S. 320 (2006) ............................................................................................... 47
*Bailey v. Iles,*
 87 F.4th 275 (5th Cir. 2023) .................................................................................. 42
*Bell v. Itawamba Cnty. Sch. Bd.,*
 799 F.3d 379 (5th Cir. 2015) .......................................................... 38, 40, 41, 43
*Blackwell v. Issaquena Cnty. Bd. of Ed.,*
 363 F.2d 749 (5th Cir. 1966) ........................................................................ 38, 43
*Brinsdon v. McAllen Indep. Sch. Dist.,*
 863 F.3d 338 (5th Cir. 2017) ................................................................................ 43
*C.R. v. Eugene Sch. Dist. 4J,*
 835 F.3d 1142 (9th Cir. 2016) .............................................................................. 43
*Canady v. Bossier Par. Sch. Bd.,*
 240 F.3d 437 (5th Cir. 2001) ................................................................................ 37
*Clark v. Community for Creative Non-Violence,*
 468 U.S. 288 (1984) ........................................................................................ 31, 32
*Clarke v. Commodity Futures Trading Comm'n,*
 74 F.4th 627 (5th Cir. 2023) ................................................................................. 29
*Ctr. for Individual Freedom v. Carmouche,*
 449 F.3d 655 (5th Cir. 2006) ......................................................................... 30, 36
*Dahnke-Walker Milling Co. v. Bondurant,*
 257 U.S. 282 (1921) ............................................................................................... 47
*DeJohn v. Temple Univ.,*
 537 F.3d 301 (3d Cir. 2008) ................................................................................. 44
*Doe v. Valencia Coll.,*
 903 F.3d 1220 (11th Cir. 2018) ............................................................................ 43
*Eccles v. Peoples Bank,*
 333 U.S. 426 (1948) ............................................................................................... 28
*El Paso Cnty., Tex. v. Trump,*
 982 F.3d 332 (5th Cir. 2020) ................................................................................ 31
*Elrod v. Burns,*
 427 U.S. 347 (1976) ..................................................................................... 3, 29, 46
*Embarcadero Tech., Inc. v. Redgate Software, Inc.,*
 No. 1:17-cv-444-RP, 2017 WL 5588190 (W.D. Tex. Nov. 20, 2017) ............ 29
*Esfeller v. O'Keefe,*
 391 F.App'x. 337 (5th Cir. 2010) ......................................................................... 37
*Federal Sav. & Loan Inss. Corp. v. Dixon,*
 835 F.2d 554 (5th Cir. 1987) ................................................................................ 27
*Fennell v. Marion Indep. Sch. Dist.,*
 804 F.3d 398 (5th Cir. 2015) ................................................................................ 44

*Frankel v. Regents of the Univ. of Cal.,*
   No. 2:24-cv-04702-MCS-PD, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024) ...................................7

*Hafer v. Melo,*
   502 U.S. 21 (1991) ...................................35

*Harper v. Poway Unified Sch. Dist.,*
   445 F.3d 1166 (9th Cir. 2006) ...................................43

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ...................................31

*Healy v. James,*
   408 U.S. 169 (1972) ...................................32, 40

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984) ...................................46

*Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.,*
   88 F.3d 274 (5th Cir. 1996) ...................................29

*Jenkins v. Louisiana State Bd. of Ed.,*
   506 F.2d 992 (5th Cir. 1975) ...................................40

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) ...................................32

*Johnson v. Rodriguez,*
   110 F.3d 299 (5th Cir. 1997) ...................................35

*Kentucky v. Graham,*
   473 U.S. 159 (1985) ...................................35

*Kestenbaum et al. v. Presidents and Fellows of Harvard College,*
   No. 1:24-cv-10092-RGS, 2024 WL 3658793 (D. Mass. Aug. 6, 2024) ...................................7

*Kuhlmeier v. Hazelwood Sch. Dist.,*
   795 F.2d 1368 (8th Cir. 1986) ...................................43, 44

*L.M. v. Town of Middleborough, Massachusetts,*
   103 F.4th 854 (1st Cir. 2024) ...................................43

*Leal v. Becerra,*
   No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022) ...................................30

*Los Angeles County, Cal. v. Humphries,*
   562 U.S. 29 (2010) ...................................35

*Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.,*
   82 F.4th 345 (5th Cir. 2023) ...................................31

*Machete Prods., L.L.C. v. Page,*
   809 F.3d 281 (5th Cir. 2015) ...................................28

*Mi Familia Vota v. Abbott,*
   977 F.3d 461 (5th Cir. 2020) ...................................30

*Mi Familia Vota v. Ogg,*
   105 F.4th 313 (5th Cir. 2024) ...................................31

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs,*
   7 F.4th 1110 (Fed. Cir. 2021) ...................................31

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
   760 F.2d 618 (5th Cir. 1985) ...................................28

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ...................................29

*Moody v. NetChoice, LLC,*
   144 S.Ct. 2383 (2024) ...................................41

*Morgan v. Plano Indep. Sch. Dist.,*
  589 F.3d 740 (5th Cir. 2009) ..................................................................37

*Morgan v. Swanson,*
  659 F.3d 359 (5th Cir. 2011) ..................................................................37

*Munaf v. Geren,*
  553 U.S. 674 (2008) ..............................................................................28

*NAACP v. Tindell,*
  95 F.4th 212 (5th Cir. 2024) ............................................................29, 30

*Nken v. Holder,*
  556 U.S. 418 (2009) ..............................................................................29

*Pleasant Grove City, Utah v. Summum,*
  555 U.S. 460 (2009) ..............................................................................33

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ..............................................................................46

*Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park,*
  No. 20-50125, 2021 WL 3484698 (5th Cir. Aug. 6, 2021) ......................30

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ..............................................................................36

*Rivera v. Houston Indep. Sch. Dist.,*
  349 F.3d 244 (5th Cir. 2003) ..................................................................35

*Runyon v. McCrary,*
  427 U.S. 160 (1976) ..............................................................................46

*Sabri v. United States,*
  541 U.S. 600 (2004) ..............................................................................42

*Saxe v. State Coll. Area Sch. Dist.,*
  240 F.3d 200 (3d Cir. 2001) ..............................................................38, 44

*Scott v. Sch. Bd. of Alachua Cnty.,*
  324 F.3d 1246 (11th Cir. 2003) ..............................................................38

*Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning,*
  620 F.2d 516 (5th Cir. 1980) ............................................................37, 43

*Sierra Club v. Morton,*
  405 U.S. 727 (1972) ..............................................................................31

*Simmons v. City of Columbus,*
  425 F.App'x. 282 (5th Cir. 2011) ............................................................36

*Tennessee v. Lane,*
  541 U.S. 509 (2004) ..............................................................................42

*Tex. Democratic Party v. Abbott,*
  978 F.3d 168 (5th Cir. 2020) ..................................................................31

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) ..................................................................30

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
  732 F.3d 535 (5th Cir. 2013) ..................................................................29

*Texas v. Johnson,*
  491 U.S. 397 (1989) ..............................................................................43

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ........................................................................passim

*Trachtman v. Anker,*
  563 F.2d 512 (2d Cir. 1977) ..................................................................43

*United States v. Booker,*
    543 U.S. 220 (2005) ............................................................................................47
*United States v. Raines,*
    362 U.S. 17 (1960) ...................................................................................... 42, 47
*Wallace v. Performance Contractors, Inc.,*
    57 F.4th 209 (5th Cir. 2023) .............................................................................44
*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .............................................................................................1
*West v. Derby Unified Sch. Dist. No. 260,*
    206 F.3d 1358 (10th Cir. 2000) ................................................................. 38, 40
*Will v. Michigan Dep't of State Police,*
    491 U.S. 58 (1989) .............................................................................................35
*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993) ...........................................................................................46

## Constitutional Provisions, Rules, and Statutes

Fed. R. Evid. 602 ......................................................................................................27
Fed. R. Evid. 901 ......................................................................................................27
U.S. Const. amend 1 ............................................................................................*passim*
42 U.S.C.
    § 1983 ............................................................................................... 26, 35, 44
    § 2000e-2(a)(1) ................................................................................... 44, 46
Tex. Educ. Code § 51.9315(c)(2) .............................................................................37
Tex. Gov. Code § 448.001(2) ...................................................................2, 24, 25, 27

## Other Authorities

Daniel B. Dreyfus, *A Common Judicial Standard for Student Speech Regulations,*
    102 Tex. L. Rev. 1059 (2024) ...........................................................................37
11A Wright & Miller, *Federal Prac. & Proc. Civ.*
    § 2949 (3d ed.) ..................................................................................................27

## INTRODUCTION

Defendants showed in their motion to dismiss[1] that Plaintiffs do not have jurisdiction to bring this challenge and that their allegations otherwise fail to establish a plausible claim. But here, with the more complete evidentiary picture available on consideration of a motion for a preliminary injunction, the Court can see for itself that many of Plaintiffs' core factual allegations are not just baseless or misleading—they are flatly untrue. Among Plaintiffs' many false contentions, four play a central role in ostensibly supporting the likelihood of success on the merits.

**First**, Plaintiffs say "campus officials followed Governor Abbott directions [*sic*], repeatedly interfering with Plaintiffs' protests" in Mid-2024, based on the fact that the University Defendants' revised their campus policies pursuant to GA-44.[2] But the University Defendants did not revise their written campus policies until Summer 2024—after the spring protests ended. And where the University Defendants did end pro-Palestinian encampments and disruptive protests, they did so under time, place, and manner policies predating revisions enacted in response to GA-44.[3] Plaintiffs can show no causal link between actions taken by the University Defendants and the enactment of GA-44. No doubt aware of the uphill battle they would face in challenging those content-neutral rules,[4] Plaintiffs did not bother to do so.

**Second**, Plaintiffs say the University Defendants followed Governor Abbott's directions by *applying* GA-44 and ending Plaintiffs' "peaceful" events with force and arrests,[5] insinuating that it is irrelevant precisely when the University Defendants revised their written policies. However

---

[1] Defendants' Factual Background, *infra*, repeats the same background facts that the Court can find in Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF 31), but also includes new evidence that was not relevant to Defendants' jurisdictional arguments under Rule 12(b)(1) or proper for the Court to consider on Defendants' Rule 12(b)(6) arguments.
[2] ECF 21, p. 13.
[3] *Infra*, note 233.
[4] *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 (1989) ("[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.").
[5] ECF 21, p. 6.

implausible this allegation, Plaintiffs do nothing to support it in their motion. GA-44 plainly does not instruct universities to make any arrests or to end "peaceful" protests.[6]

**Third**, Plaintiffs say Governor Abbott can implement the terms of his executive order directly, citing the Texas Department of Public Safety's (DPS) response to the Palestine Solidarity Committee's protest on April 24.[7] But Plaintiffs give the Court no evidence showing that DPS made arrests in furtherance of GA-44, that DPS made arrests to silence the protestors' message, or even that Governor Abbott ordered DPS to arrest protestors. In reality, the University Defendants requested mutual aid from outside law enforcement, including DPS, while responding to protestors who persistently refused to comply with lawful commands by peace officers to disperse after breaking content-neutral time, place, and manner regulations or laws that prohibit public camping.[8]

**Fourth**, Plaintiffs say the University Defendants modified their policies "to include special rules about criticizing Israel,"[9] but Plaintiffs cannot identify even one sentence in one University policy supporting that contention. So, Plaintiffs direct the Court back to GA-44, which they say includes "a definition of antisemitism that prohibits the normal and typical criticisms people make about foreign countries."[10] But GA-44 does not create a new definition; it references the definition in Texas Government Code § 448.001(2), which was promulgated in 2021 and which the Plaintiffs have not challenged.[11] And in any event, Plaintiffs' characterization of the International Holocaust Remembrance Alliance (IHRA) standard incorporated into § 448.001(2) says the opposite of what Plaintiffs say it does: that document explicitly states that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic."[12]

---

[6] ECF 21-1, p. 3.
[7] ECF 21, p. 12.
[8] *Infra*, pp. 12–20.
[9] ECF 21, pp. 4, 6.
[10] *Id*, p. 11.
[11] *See generally* ECF 21-1.
[12] *Working definition of antisemitism*, INTERNATIONAL HOLOCAUST REMEMBRANCE ALLIANCE (May 26, 2016), https://holocaustremembrance.com/resources/working-definition-antisemitism.

With these contentions set aside, what remains of Plaintiffs' argument? Plaintiffs claim GA-44 creates speech restrictions that cannot be applied without reference to the content of the regulated speech, and thus entails a straightforward First Amendment violation.[13] GA-44 does no such thing because it does not apply to Plaintiffs' speech—it applies to Texas public universities.[14] Moreover, *Tinker* confirms that the University Defendants did not violate the First Amendment when they ended protests they reasonably expected would cause substantial disruption to their campuses or collide with the rights of others.[15]

For all the foregoing reasons, Plaintiffs do not have a substantial likelihood of succeeding on the merits of their claim. Because Plaintiffs rely on their supposed likelihood of success in proving a First Amendment violation to satisfy the remaining prongs of the preliminary injunction standard,[16] they did not offer separate arguments relating to the other prongs, and their failure to satisfy the first prong is thus fatal to their motion. Moreover, without a strong showing on the merits of their First Amendment claim, it becomes clear that the Plaintiffs have not shown irreparable harm or that the public interest would favor granting the injunction. The court should deny Plaintiffs' motion.

## FACTUAL BACKGROUND

On October 7, 2023, Hamas, a Palestinian Sunni Islamist terrorist organization, launched a surprise attack from the Gaza Strip ("Gaza") into the central and southern regions of Israel, targeting and killing over 1,200 noncombatants.[17] Hamas took 253 men, women, and children from their homes and carried them back to Gaza as hostages,[18] including at least ten Americans.[19] During the rampage,

---

[13] ECF 21, p. 14.
[14] ECF 21-1, p. 3.
[15] *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).
[16] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).
[17] Bill Hutchinson, *Israel-Hamas War: Timeline and key developments*, ABC NEWS (Nov. 22, 2023, 2:24 PM), https://abcnews.go.com/International/timeline-surprise-rocket-attack-hamas-israel/story?id=103816006.
[18] *Id.*
[19] *Israel-Hamas War*, ENCYCLOPEDIA BRITANNICA (Jun. 13, 2024, 8:26 PM), https://tinyurl.com/2p647wan.

Hamas militants decapitated children[20] and engaged in "sexualized torture" of women.[21] In response to one of the deadliest terror attacks in modern history,[22] Israel declared war on Hamas and began air strikes in Gaza.[23] Today, the conflict is ongoing, and its death toll continues to rise.[24]

## I.      Pro-Palestinian Campus Protests Erupt across the Country.

In the days that followed Hamas's October 7 attack, widespread unrest broke out on college and university campuses across the United States.[25] Some students immediately celebrated the attack, before Israel had even responded.[26] On October 8, National Students for Justice in Palestine ("NSJP"), of which several Plaintiffs here are campus chapters, published a "tool kit" celebrating the atrocity and providing guidance to campus chapters across the country:

> Today, we witness a historic win for the Palestinian resistance . . . reminding each of us that total return and liberation to Palestine is near. Catching the enemy completely by surprise, the Palestinian resistance has captured over a dozen settlements surrounding Gaza . . . . **This is what it means to Free Palestine: not just slogans and rallies, but armed confrontation with the oppressors.**[27]

NSJP's playbook called on its student members throughout the country to eschew peaceful resistance and "disrupt" college campuses, encouraging "armed struggle, general strikes, and popular

---

[20] Muhammad Darwish et al., *Children found 'butchered' in Israeli kibbutz, IDF says, as horror of Hamas' attacks near border begins to emerge*, CNN (Oct. 13, 2023), https://tinyurl.com/bdz37kvj.

[21] Edith M. Lederer, *A UN envoy says there are 'reasonable grounds' to believe Hamas committed sexual violence on Oct. 7*, AP NEWS (Mar. 4, 2024), https://tinyurl.com/5754m2kb.

[22] Daniel Byman et al., *Hamas's October 7 Attack: Visualizing the Data*, CENTER FOR STRATEGIC & INTERNATIONAL STUDIES (Dec. 19, 2023), https://www.csis.org/analysis/hamass-october-7-attack-visualizing-data (noting that "[t]he October 7 attack was the deadliest terrorist attack against Israel since the state's establishment in 1948, and the scale of the death toll was unprecedented in Israeli history").

[23] Betsy Reed, *Israel-Hamas war: what happened in the first few days and what caused the conflict?*, THE GUARDIAN (Oct. 8, 2023), https://theguardian.com/world/2023/oct/08/israel-hamas-gaza-palestinian-territories.

[24] *Israel-Hamas war latest: Netanyahu signals cease-fire deal could be shaping up as deaths top 39,000*, AP NEWS (July 23, 2024), https://apnews.com/article/israel-hamas-war-latest-23-july-2024-c3129ae8b77f731e00538e5659e107d0.

[25] Nadine El-Bawab, *How pro-Palestinian protests unfolded on college campuses across the US: A timeline*, ABC NEWS (May 4, 2024), https://tinyurl.com/29fn7kdn.

[26] Charles Hilu, *Columbia University Students Announce Event Celebrating Hamas's Oct. 7 Attack*, WASH. FREE BEACON (Dec. 4, 2023), https://tinyurl.com/yzm34jbz.

[27] Spencer Dalke, *National Students for Justice in Palestine celebrates glider attack in 'call to action' image*, CAMPUS REFORM (Oct. 10, 2023, 12:35 PM), https://tinyurl.com/4tu3wm3x; Randy Kessler, *Language around 'Day of Resistance and Protest' leaves Jews fearful*, SEATTLE TIMES (Oct. 18, 2023, 3:34 PM), https://tinyurl.com/bd44xnxh. NSJP has since removed this language from their publication: *see Day of Resistance Toolkit*, NSJP (last visited Aug. 16, 2024), https://docs.google.com/document/d/12IuQt1usUsyHWoHIcFYdAbpYK2H3bHJocPCrVyYT08s/edit.

demonstrations. All of it is legitimate, and all of it is necessary," since "[y]ou don't get freedom peacefully."[28] Some have leveled charges that NSJP is coordinating with the Iranian regime.[29]

NSJP planned a National Day of Resistance for October 12, 2023, to celebrate Hamas's unprovoked attack,[30] and students around the country quickly joined in calling for a "free Palestine, from the river to the sea."[31] Plaintiffs insist that this and similar slogans are shorthand for students' peaceful calls for dignity and freedom "for everyone in the geographic region."[32]

But most do not see this slogan as being the olive branch that Plaintiffs claim it is. The Anti-Defamation League has explained that "[t]his rallying cry has long been used by anti-Israel voices, including supporters of terrorist organizations such as Hamas and the [Popular Front for the Liberation of Palestine], which seek Israel's destruction through violent means."[33] The United States House of Representatives has similarly resolved with strong bipartisan support that this phrase "is an antisemitic call to arms with the goal of the eradication of the State of Israel, which is located between the Jordan River and the Mediterranean Sea," covering all of Israel.[34] Terrorist organizations "have used and continue to use this slogan as a rallying cry for action to destroy Israel and exterminate the Jewish people," not only referring to the State of Israel, but specifically Jewish persons, calling for death of Jews to liberate Palestine.[35]

Nor have protestors across American university campuses limited their antisemitism to

---

[28] *Id.*

[29] Sam Westrop, *REVEALED: Iranian Regime Involvement with Texas Student Anti-Israel Protests*, MIDDLE EAST FORUM (Aug. 1, 2024), https://www.meforum.org/66013/revealed-iranian-regime-involvement-with-texas.

[30] Joseph Ax and Gabriella Borter, *US colleges become flashpoints for protests over Israel-Hamas war*, REUTERS (Oct. 14, 2023), https://www.reuters.com/world/us/us-colleges-become-flashpoints-protests-both-sides-israel-hamas-war-2023-10-13/.

[31] *Students for Justice in Palestine Endorses Terrorism and 'Dismantling Zionism;' Plans Day of resistance*, ANTI-DEFAMATION LEAGUE (Oct. 9, 2023), https://tinyurl.com/y63zputu.

[32] ECF 20, ¶¶ 44, 55, 66, 74.

[33] *Slogan: "From the River to the Sea Palestine Will be Free"*, ANTI-DEFAMATION LEAGUE (Oct. 26, 2023), https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free.

[34] H.Res. 883 – Expressing the sense of the House of Representatives that the slogan "from the river to the sea, Palestine will be free" is antisemitic and its use must be condemned, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/house-resolution/883/text.

[35] *Id.*; *Doctrine of Hamas*, THE WILSON CENTER, (Oct. 20, 2023) https://www.wilsoncenter.org/article/doctrine-hamas.

rhetoric. Rather, protestors celebrating Hamas's invasion of Israel have taken to confronting Jewish students,[36] leading to a drastic increase in antisemitic incidents at universities over the past year.[37] Testifying before Congress, Kevin Rachlin, Washington Director of the Nexus Leadership Project, described that "a staggering 73% of Jewish college students reported experiencing or witnessing some form of antisemitism since the start of this [past] school year, and . . . two-thirds of students at the nation's top universities say antisemitism is a problem on campus."[38] Jewish students at some universities have even reported experiencing exclusion from educational events, assault, and incitement to violence since October 7th.

For example, at University of California, San Diego, Jewish students meeting together drew crowds of protestors "flying the Hamas flag" and who would "bang[] on the glass behind [Jewish students'] heads and miming shooting [them] down."[39] And at Harvard, "Jewish students were forced to hire private armed security for a concert in honor of Jewish students victimized by antisemitism;" and one student kept "armed security outside [his] house."[40] Some "students at Harvard[] do not wear their kippahs publicly anymore, have changed majors due to hostile anti-Israel environments, [and] have been spat on for their religious identity[.]"[41]

A federal district court recently denied Harvard's motion to dismiss a claim by students alleging violations of Title VI, expressing serious doubts that Harvard could claim that some of the pro-

---

[36] *Campus Antisemitism Surges Amid Encampments and Related Protests and Other U.S. Colleges*, Anti-Defamation League (Mar. 22, 2024), https://tinyurl.com/2s3ykay3.

[37] Testimony of Kevin Rachlin, Washington Director of the Nexus Leadership Project: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 1 [henceforth, "**Rachlin 2024 Congressional Testimony**"], https://tinyurl.com/27h6zt4t.

[38] *Id.*

[39] Written Testimony of Professor Brian Keating, Hearing before Committee on Education and the Workforce Subcommittee on Workforce Protections before the United States House of Representatives, 118th Cong. (2024), at 12 [henceforth, "**Keating 2024 Congressional Testimony**"], https://tinyurl.com/3wmapdk5.

[40] Testimony of Shabbos Kestenbaum: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 2–4 [henceforth, "**Kestenbaum 2024 Congressional Testimony**"], https://tinyurl.com/5ekfuduv.

[41] *Id.* at 4.

Palestinian or anti-Jewish activities were protected by the First Amendment.[42] And another federal district court entered an injunction in favor of Jewish students who earlier this year "were excluded from portions of the UCLA campus because they refused to denounce their faith" when crossing an academic quad on which pro-Palestinian protestors had set up an encampment.[43]

## II.   NSJP Circulates "Escalation" Tactics for Students to Maximize Campus Disruption.

After the winter break, rather than calming down, students intensified their efforts to foreground the Israel-Hamas conflict on campus and change university policies. Protestors also doubled down on their tactics, "commandeering campus quads and occup[ying] university buildings, . . . and creating an atmosphere of harassment, intimidation, and fear for Jewish students, faculty, and staff, and disrupting normal campus activities for all campus citizens, Jewish and non-Jewish alike."[44] These incidents followed NSJP's February 8, 2024 call for a "National Divestment Day of Action."[45]

NSJP targeted "[university] Administration" and "Board[s] of Regents" with "sustained, long-term campaigns to push our universities to end their complicity in the genocide of Palestinians."[46] NSJP's playbook also detailed "Escalation Tactics," which guides campus SJP chapters on methods for disruption and advises students on the level of response they could expect from university administrations and media.[47] NSJP's tactics ranged from "Level 1," for which students should expect "[n]o significant admin or media blowback" to "Level 4," for which students should prepare for "significant admin and media blowback, . . . [and] legal consequences."[48]

---

[42] Aaron Katersky and Julia Reinstein, *Harvard 'failed its Jewish students' and must face antisemitism lawsuit, judge says*, ABC NEWS (Aug. 7, 2024), https://tinyurl.com/yfx767ve; *see also* Memorandum and Order on Defendant's Motion to Dismiss, *Kestenbaum et al. v. Presidents and Fellows of Harvard College*, No. 1:24-cv-10092-RGS, 2024 WL 3658793, *6 (D. Mass. Aug. 6, 2024).

[43] Order Re: Motion for Preliminary Injunction (ECF NO. 48), *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702-MCS-PD, 2024 WL 3811250, *1–3 (C.D. Cal. Aug. 13, 2024).

[44] Ted Deutch, *Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University Leadership*, 118 Cong. (2024), at 1, https://tinyurl.com/32cuwhtk.

[45] *National Student Day of Action for Divestment*, NSJP (Jan. 31, 2024), https://tinyurl.com/22y4sutr.

[46] *Id.*

[47] *Id.*

[48] *Id.*

NSJP's "Level 4" tactics included (1) campus **occupations** and "sit-ins" where students should "[p]ick a heavily trafficked location and/or place with lots of significance; (2) **blockades** focused on "disrupt[ing] the function of a specific building or office," such as "an administrative building, the admissions office, the student center, or a recruitment event;" and (3) **creative disruption** of "high-profile university events or ceremonies," which could include "[w]alk-outs, standing up and turning backs, entering en masse with signs, [and] birddogging."[49]

Student agitators did not hesitate to implement NSJP's guidance for maximizing disruption of university campuses. For instance, throughout February at Cornell, students held weekly die-ins where crowds of 200 protestors would walk into libraries, lay on the floor, and yell genocidal slogans as students attempted to study.[50] Columbia saw "protests unprecedented in type and scale, a level of threats and harassment, specifically directed at[] Jewish students," and police involvement became immediately necessary to maintain the security of Jewish students.[51] And at University of California, San Diego, encampments sprang up where agitators carried weapons and oil-soaked rags while shouting "antisemitic genocidal chants such as 'there is only one solution – intifada revolution' and 'murder the Jews' to an identifiably Jewish student."[52]

Since February, NSJP announced a "coordinated pressure campaign against university administrators and trustees."[53] NSJP made their goals explicit: "SJP chapters across the nation will seize the university and force the administration to divest . . . ."[54] NSJP openly called upon agitators

---

[49] *Id.* (NSJP defines "Bird-Dogging" as "a tactic in which participants pursue their target wherever they are in order to force the target to pay attention or respond to their issue. This usually involves gathering some information on where your target might be when . . . and/or familiarizing yourself with your targets' routines").

[50] Testimony of Talia Dror, Committee on Ways and Means, U.S. House of Representatives, 118th Cong. (2024), at 2, https://www.congress.gov/118/meeting/house/117430/witnesses/HHRG-118-WM00-Wstate-DrorT-20240613.pdf.

[51] Statement of Claire Shipman, Committee on Education and the Workforce, U.S. House of Representatives, 118th Cong. (2024), at 1 https://tinyurl.com/muezk2u5; *see also* Isha Banerjee, *Timeline: The 'Gaza Solidarity Encampment'*, COLUMBIA SPECTATOR (May 2, 2024), https://tinyurl.com/3dmecahw.

[52] *Keating 2024 Congressional Testimony*, p. 7.

[53] *National SJP Announces the Popular University for Gaza* (Apr. 20, 2024), https://nationalsjp.org/popular-university-for-gaza.

[54] *Id.* (emphasis in original).

to disrupt their universities' educational mission: "The Popular University for Gaza is a coordinated mass movement of students, faculty, and staff dedicated to preventing our universities from performing their daily functions."[55] Encampments sprang up across the country as students revolted against universities,[56] "violent[ly] protest[ing] and [setting up] illegal encampments [that] severely disrupted operations on over 100 campuses" across the country.[57] Such protests have even resulted in a breach of the White House and relocation of media and staff by the United States Secret Service.[58]

At the University of Pennsylvania, students set up an encampment for over two weeks[59] beginning on April 25.[60] Inside the encampment, students vandalized the Benjamin Franklin statue with Nazi and Hamas logos and graffiti reading "Zios get fuckt."[61] Students also "circulat[ed] documents with instructions for escalating [the situation further]—including through building occupations and violence," as well as "terroristic threats."[62] Campus officials later found weapons within the encampment.[63] While campus agitators found common cause with Ayatollah Khamenei of Iran, who praised them directly,[64] Jewish students have often lamented the inadequate responses from their universities.[65]

---

[55] *Declaration of Kelly Soucy*, ¶¶ 8, 13–17; *Declaration of Katie McGee*, ¶ 30.

[56] Hadas Gold, *Student journalists assaulted, others arrested as protests on college campuses turn violent*, CNN (May 1, 2024), https://www.cnn.com/2024/05/01/media/college-protests-gaza-arrests-violence/index.html.

[57] Jonathan Pidluzny, *The Campus Antisemitism Complex at Elite U.S. Universities*, Committee on Ways and Means, U.S. House of Representatives, 118th Cong. (2024), at 1, https://tinyurl.com/2p8dawpv.

[58] Caroline Downey, *Pro-Palestinian Protesters Clash with Riot Police as They Breach White House Gate*, NATIONAL REVIEW, (Jan. 14, 2024, 9:56 AM), https://tinyurl.com/yu47k7dh.

[59] Testimony of Eyal Yakoby: Hearing before the House Committee on the Judiciary, Subcommittee on the Constitution and Limited Government, 118th Cong. (2024), at 1 [henceforth, "**Yakoby 2024 Congressional Testimony**"] https://tinyurl.com/2sj59vkm.

[60] Diamy Wang, *The Graduation Issue 2024: Penn's Gaza Solidarity Encampment, from beginning to end*, THE DAILY PENNSYLVANIAN (May 16, 2024), https://www.thedp.com/article/2024/05/penn-gaza-solidarity-encampment-recap.

[61] *Yakoby 2024 Congressional Testimony*, at 2.

[62] *Id.*

[63] *Id.*

[64] *Using antisemitic trope, Khamenei welcomes US student response to 'Resistance Front'*, THE TIMES OF ISRAEL (May 30, 2024), https://www.timesofisrael.com/using-antisemitic-trope-khamenei-welcomes-us-student-protesters-to-resistance-front/.

[65] *See Kestenbaum 2024 Congressional Testimony*, at 4 ("The response from Harvard? Nothing."); *Yakoby 2024 Congressional Testimony*, at 2 ("Penn, after 16 days finally disbanded the encampment, declaring, 'Our community has been under threat— for too long.' . . . So let me ask you this, what value is such an acknowledgement if action takes two weeks?").

### III.    Governor Abbott Signs Executive Order GA-44.

On March 27, 2024, Governor Abbott issued GA-44 to address the rise in disruption and antisemitic violence on college campuses,[66] and to "ensure a safe learning environment for Jewish students and all Texans.[67] GA-44 includes two distinct sections: (1) a **preamble** recounting the harrowing events of October 7 and its impact on the Jewish community in Texas, and (2) **operative clauses** directing the State's higher-education institutions to address antisemitism on campuses.[68]

In the preamble to GA-44, Governor Abbott recognizes that some individuals have used "antisemitic phrases such as 'from the river to the sea, Palestine will be free,' which has long been used by Hamas supporters to call for the violent dismantling of the State of Israel and the destruction of the Jewish people who live there."[69] But GA-44 also emphasizes the importance of protected expression: "Texas supports free speech, especially on university campuses, but that freedom comes with responsibilities for both students and the institutions themselves."[70] Free speech "can never incite violence, encourage people to violate the law and harass other students or other Texans, or disrupt the core educational purpose of a university[.]"[71]

GA-44's operative clauses call on Texas public universities to:

1. Review and update free speech policies to address the sharp rise in antisemitic speech and acts on university campuses and establish appropriate punishments, including expulsion from the institution.

2. Ensure that these policies are being enforced on campuses and that groups such as the Palestine Solidarity Committee and Students for Justice in Palestine are disciplined for violating these policies.

3. Include the definition of antisemitism, adopted by the State of Texas in Section 448.001(2) of the Texas Government Code, in university free speech policies to guide university personnel

---

[66] *Governor Abbott Fights Antisemitic Acts At Texas Colleges, Universities*, OFFICE OF THE TEXAS GOVERNOR (Mar. 27, 2024), https://gov.texas.gov/news/post/governor-abbott-fights-antisemitic-acts-at-texas-colleges-universities.
[67] ECF 21-1.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*

and students on what constitutes antisemitic speech.[72]

GA-44 thus called on Texas public universities to implement the State's definition of antisemitism *to guide* university personnel and students on what constitutes antisemitic speech, but said nothing about prohibiting simple expression.[73] Nor did GA-44 restrict anti-Israel speech through "micromanaging the terms of the public debate by punishing students on one side of that debate."[74] Rather, GA-44 simply directs public universities to make their own judgements on how to address antisemitism through their policies, and to discipline student organizations that violate those policies.[75]

## IV. Students at Texas Public Universities Join NSJP's Campaign to Seize Universities and "Disrupt their Daily Functions."

As students disrupted universities across the United States with encampments, blockades of buildings, and other demonstrations, similar confrontations spread to universities in Texas. Public universities reacted out of a concern that campus agitators in Texas would attempt to replicate what was taking place across the country. That concern was not misplaced, as one of Plaintiffs' members admits directly that SJP chapters in Texas set up encampments "*as part of a larger nationwide movement*."[76] The movement broadcast its intention[77] to seize control of campuses:



---

[72] *Id.*
[73] *Id.*
[74] *Compare* ECF 20, ¶ 34, *with* ECF 21-2.
[75] ECF 21-2.
[76] ECF 21-2, ¶ 8(c).
[77] *Declaration of Kelly Soucy*, pp. 7–8; *Declaration of Levi Fox*, ¶ 8.

A.   The University of Texas at Austin.

Joining students from other universities, numerous agitators walked out of their classes at The University of Texas at Austin ("UT Austin") on April 24 in a "daylong protest[] organized by Palestin[e] Solidarity Committee."[78] The Palestine Solidarity Committee had advertised that "class is cancelled" and that they would "occupy the South Lawn.[79]



Campus protestors marched through campus, blocking students from accessing class and studying for finals.[80] Afterwards, university officials sent out a form to collect student identification information to ensure that students who could not attend class would not be punished.[81] Protestors ignored multiple commands by university officials and law enforcement for people to disperse, and

---

[78] Chelsey Zhu, Becky Fogel, *Students in San Antonio and Austin join nationwide protests supporting Palestinians*, TEXAS PUBLIC RADIO (Apr. 24, 2024), https://tinyurl.com/86yv86rv. Plaintiffs' motion (at p. 13) also asserts that UT-Austin campus officials cancelled an Israel Apartheid Week protest on April 2 (incorrectly stated as April 1 at page 6). The facts are to the contrary. University officials worked with PSC to ensure their counterprotest could occur consistent with university time, place, and manner rules and PSC leadership afterward praised campus officials to the media for "understand[ing] that we want to demonstrate" and expressed that "we're thankful that rather than serve as a hindrance, they actually have served to streamline that process." *See Declaration of Katie McGee*, ¶¶ 13-15.

[79] *Declaration of Katie McGee*, ¶ 38; *Declaration of Shane Streepy*, ¶¶ 13–17; *Declaration of Kelly Soucy*, p. 7; *Declaration of Barri Seitz*, ¶ 12; *see also* PSC ATX (@psc_atx), INSTAGRAM, https://tinyurl.com/bdzfmfn5 (last visited August 18, 2024).

[80] Jay Janner et al., *Pro-Palestinian protest held at UT-Austin, protesters arrested. Here's what it looked like*, AUSTIN AMERICAN STATESMAN (Apr. 24, 2024), https://tinyurl.com/4c4p7hbe; Aaron E Martinez and Jay Janner. *'Whose lawn? Our lawn!' Photos from Pro-Palestinian encampment protest held on UT campus*, AUSTIN AMERICAN STATESMAN (Apr. 29, 2024), https://tinyurl.com/2r8pz27v.

[81] *Declaration of Kelly Soucy*, ¶ 45; *Declaration of Levi Fox*, ¶ 10; *Declaration of Katie McGee*, ¶ 45 (stating that the Dean of Students office received approximately 498 student requests for class accommodations).

later set up tents on the South Mall.[82] At least one protestor punched a peace officer in the face, causing the officer to need gauze to stop the bleeding.[83] UT Austin asked for mutual aid from DPS and the Austin Police Department because, given the modest size of the UTPD and the large size of the anticipated protest, UTPD needed assistance "in case things devolved."[84]

UT Austin's focus in responding to the protest was on ending "disruptions of campus activities or operations like we have seen at other campuses."[85] After all, the end of the year "is an important time in our semester with students finishing classes and studying for finals," and, campus officials expressed that they would "act first and foremost to allow those critical functions to proceed without interruption."[86] Following the undeniably disruptive demonstration on April 24, UT Austin President Hartzell issued a statement observing that the national trend of campus disruption had come to Texas:

> As the push to disrupt top universities spreads across the country, many campuses such as ours are facing similarly difficult challenges. . . . The University's decision to not allow yesterday's event to go as planned was made because we had credible indications that the event's organizers, whether national or local, **were trying** . . . **to severely disrupt a campus for a long period.** Consistent with this broader movement that is impacting so many, **problematic aspects of the planned protest were modeled after a national organization's protest playbook.** And notably, 26 of the 55 individuals arrested yesterday had no UT affiliation.
>
> Against this backdrop, I am reminded today that we have much to be thankful for. I'm thankful we live in a country where free expression is a fiercely protected Constitutional right. I'm grateful that our campus has seen 13 pro-Palestinian events take place during the past several months largely without incident — plus another one today[, April 25].[87]

UT Austin permitted pro-Palestinian protest events consistent with university speech rules, but campus agitators only continued escalating their demonstrations to maximize disruption.

---

[82] *Declaration of Kelly Soucy*, ¶¶ 18–22, 24–25, 27, 30; *Declaration of Shane Streepy*, ¶¶ 23–32.

[83] *Declaration of Levi Fox*, ¶ 11.

[84] *Declaration of Shane Streepy*, ¶ 13-17.

[85] *April 24 Statement from UT's Division of Student Affairs*, UT NEWS (Apr. 24, 2024), https://news.utexas.edu/2024/04/24/april-24-statement-from-uts-division-of-student-affairs/.

[86] *Id.*

[87] Jay Hartzell, *Balancing Speech, Safety and Our Mission*, UT AUSTIN OFFICE OF THE PRESIDENT, https://president.utexas.edu/2024-messages-speeches/balancing-speech-safety-and-our-mission.

In the days following April 24, more protests involving PSC occurred, but because they were orderly, non-disruptive, and followed Institutional Rules, neither officials from the Dean of Students office nor law enforcement officials became involved."[88] On April 29, protestors "erected a tent encampment on the South Lawn, with a barricade enclosure of tables secured by metal chains, and strategically placed tools, tents, and rocks."[89] Police also intercepted a protestor with a handgun, unlawfully carried on campus without a license, shoved in his waistband, a round in the chamber, and extra magazines.[90] Protestors escalated things from there, "becoming physically and verbally combative with Dean of Students' staff."[91] After protestors refused to comply with directives from the Dean of Students staff, which violates campus rules, UT Austin requested mutual aid from the Texas Department of Public Safety, Austin Police Department, and Travis County Sheriff's Office to protect the safety of the campus community and end the extremely disruptive event.[92] Protestors ultimately ignored UT Austin's efforts "to preserve a safe, conducive learning environment for our 53,000 students as they prepare for final exams."[93]

More than half of the approximately 79 people arrested on April 29 had no affiliation with the University.[94] As the University explained, that level of outside involvement "validate[s] our concern that much of the disruption on campus over the past week has been orchestrated by people from outside the University, including groups with ties to escalating protests at other universities around the country."[95]

---

[88] *Declaration of Kelly Soucy,* ¶ 37; *Declaration of Shane Streepy,* ¶ 33.
[89] *University of Texas at Austin Statement Regarding Today's Protest Events*, UT NEWS (Apr. 29, 2024), https://news.utexas.edu/2024/04/29/university-of-texas-at-austin-statement-regarding-todays-protest-events/; *see also Declaration of Barri Seitz,* ¶¶ 17–20.
[90] Brianna Hollis, *Man arrested after carrying gun during UT protests, court documents say*, KXAN (May 10, 2024, 7:54 PM), https://tinyurl.com/4p7382jw.
[91] *Id.*; *see also Declaration of Kelly Soucy,* ¶ 34.
[92] *Supra*, note 89; *see also Declaration of Share Streepy,* ¶¶ 13–17.
[93] *Id.*
[94] *UT Statement Regarding Arrests from Monday's Protest and Confiscation of Weapons*, UT NEWS (Apr. 30, 2024), https://news.utexas.edu/2024/04/30/ut-statement-regarding-monday-arrests-and-confiscation-of-weapons/.
[95] *Id.*

Campus agitators armed themselves with "guns, buckets of large rocks, bricks, steel enforced wood planks, mallets, and chains."[96] Staff were physically assaulted and threatened, and police have been hit with horse excrement, while their police cars have had tires slashed with knives.[97] Not only that but stacks of handouts containing Hamas propaganda were also found in the debris left behind by protestors.[98]

Some Jewish students have described their own interactions with pro-Palestinian protestors on campus since October 7.[99] On November 9, some pro-Palestinian protestors held an event on the anniversary of Kristallnacht, a day of mourning when Nazis attacked the Jewish people and their property in Germany.[100] In January, Yaron Brook, a prominent Israeli-American business speaker, held an event at the McCombs School of Business where pro-Palestinian protestors screamed violent and disruptive phrases while he spoke.[101] And during the April 29 protest, masked pro-Palestinian protestors explicitly said "we don't want Jews on campus."[102] Those students observed firsthand that the April 24 and 29 protests were disruptive of academic programming, and believed that UT Austin took reasonable steps to respond to these events.[103]

### B.     The University of Texas at San Antonio.

Also on April 24, dozens of protestors gathered at The University of Texas at San Antonio ("UTSA") for a "Gaza Solidarity Action."[104] In anticipation of the demonstration and what it could become, UTSA provided "a significantly increased presence of law enforcement."[105] UTSA President

---

[96] *Id.*
[97] *Id.*; *Declaration of Barri Seitz*, ¶ 15.
[98] William La Jeunesse, *University of Texas anti-Israel encampment sees Hamas propaganda, weapons*, FOX NEWS (May 8, 2024), https://tinyurl.com/yc3p2n36.
[99] *See generally Declaration of Levi Fox; Declaration of Barri Seitz.*
[100] *Declaration of Levi Fox*, ¶ 4.
[101] *Declaration of Barri Seitz*, ¶ 4–5.
[102] *Declaration of Levi Fox*, ¶ 13.
[103] *Declaration of Levi Fox*, ¶¶ 11, 15–16; *Declaration of Barri Seitz*, ¶¶ 22–23.
[104] *Supra*, note 78.
[105] *Id.*

Taylor Eighmy said in anticipation of campus demonstrations "as part of a larger national campaign" that UTSA would "not tolerate disruptive behavior, vandalism, or antisemitism."[106]

Nor can Plaintiffs genuinely contest that UTSA permitted pro-Palestinian protests to go forward. Amanda Sellers, the co-chair of Young Democratic Socialists of America at UTSA, reportedly said that UTSA's treatment of protestors had been reasonable:

> We've been organizing for the past 16 weeks, we've had no pushback really from admin . . . If you look at what's going on at UT Dallas, if you look at what's going on at UT Austin, we get away with so much on this campus. And I think that's partly because we have a rapport with the dean of students. She's not the enemy.[107]

UTSA's response contextualized concerns about campus disruption and student safety against the backdrop of "protests and expressive activity across hundreds of campuses involving student groups. Outside groups have also been involved, and in many cases, causing disruptive activities, many of which turned violent."[108] Ultimately, university officials permitted student protests to continue subject to the university's time, manner, place restrictions.[109]

Earlier this year, UTSA also grappled with acts of vandalism from pro-Palestinian protestors.[110] For example, on April 8, a student vandalized Sombrilla Plaza by spray-painting anti-Israel statements and inverted red triangles over the faces of students on various posters, some of which promoted inclusion, depicted below.[111]

---

[106] *Id.*; *see also* Don Morgan, *UTSA President issues statement, warning about potential for demonstrations on campus*, SAN ANTONIO NEWS (Apr. 24, 2024), https://tinyurl.com/ytd6x99z.
[107] Isaac Windes, *Pro-Palestine advocates get face time with UTSA official as protests intensify*, SAN ANTONIO REPORT (May 3, 2024), https://sanantonioreport.org/pro-palestine-advocates-get-face-time-with-utsa-official-as-protests-intensify/.
[108] Taylor Eighmy, *President Eighmy provides end-of-semester message to the Roadrunner community*, UNIVERSITY OF TEXAS AT SAN ANTONIO (May 3, 2024), https://www.utsa.edu/today/2024/05/story/president-eighmy-end-of-semester-message.html.
[109] Gabriella Ybarra, *UTSA students call for cease-fire in Gaza, accuse university of being anti-free speech*, SAN ANTONIO EXPRESS-NEWS (Apr. 24, 2024), https://www.expressnews.com/news/education/article/utsa-campus-protest-19420191.php.
[110] *See generally Declaration of LaTonya Robinson.*
[111] *Id.*, p. 7.



The inverted red triangle has been used by Hamas to identify Israeli military targets, and by Nazis to identify prisoners in death camps during the Holocaust.[112] The responsible student attempted to justify his actions by stating that UTSA had not made a strong enough statement for support of Palestine, but he later accepted responsibility.[113] UTSA appropriately sanctioned the student for his actions.[114]

---

[112] *Id.*, p. 7 (citing Natalie Stechyson, *What does the inverted red triangle sued by some pro-Palestinian demonstrators symbolize?*, CBC (JUN. 4, 2024 9:00 AM), https://www.cbc.ca/news/canada/gaza-red-triangle-meaning-1.7216788).
[113] *Declaration of LaTonya Robinson*, p. 7.
[114] *Id.*

### C.      The University of Texas at Dallas.

Protestors at The University of Texas at Dallas ("UTD") set up an encampment at Chess Plaza on May 1, "joining the nationwide demonstrations over the war in Gaza."[115] During the encampment on May 1, demonstrators set up 10 tents and assembled about 100 students at the plaza[116] before law enforcement took down the encampment, partially depicted below.[117]



Police instructed protestors to disperse, and only removed structures and made arrests after protestors refused to comply.[118] Campus agitators used drums, megaphones, and a speaker system to maximize disruption.[119] They later released a compilation of video recordings depicting their events and stating

---

[115] Alejandra Martinez, *17 pro-Palestinian demonstrators arrested at UT-Dallas as police break up encampment*, THE TEXAS TRIBUNE (May 1, 2024), https://www.texastribune.org/2024/05/01/ut-dallas-palestinian-protest-arrests/.
[116] *Id.*
[117] *Declaration of Amanda Smith*, p. 6.
[118] Steven Rosenbaum et al., *Law enforcement removes encampments at UT Dallas campus, at least 17 arrested*, CBS NEWS (May 1, 2024), https://www.cbsnews.com/texas/news/gaza-protest-encampment-university-texas-dallas/.
[119] SJP UTD (@sjputd), INSTAGRAM, https://www.instagram.com/reel/C6jdZ2Dp_kh (last visited August 9, 2024).

that "[w]e will continue to escalate and take action until the day Palestine is free."[120] Video footage reflects these accounts.[121]

Earlier this year, on April 23, pro-Palestinian protestors held a rally in a common area of campus and later they marched into the campus Administration Building, blocking access to elevators.[122] After protesting for hours, they voluntarily agreed to leave the building in exchange for a meeting with university officials.[123] Several days later, the protestors again held a rally before and while meeting with university officials, using a bullhorn and drum inside the Administration Building.[124] The protest disrupted staff as they attempted to carry out their work-related duties, classes that were in session, and students with disabilities were using the AccessAbility Resource Center for assistance.[125] After the meeting, protestors left the building and continued their protest outside.[126]

During the May 1 encampment, Dean Smith issued a written notice to protestors, informing them that university policy did not permit the encampment.[127] The encampment "violated institutional rules governing speech, expression and assembly, which prohibit tents, barricades and other structures," and arrests were made after protestors failed to remove their encampment despite a final warning according to UTD President Dr. Richard Benson.[128] University officials noted that "individuals who participated in the May 1 encampment . . . were not arrested for protesting [but instead] for criminal trespass after failing to comply with requests that they remove the barricaded

---

[120] *See id.*
[121] *Declaration of Adam Perry*, Exs. C & D.
[122] *Declaration of Amanda Smith*, ¶ 14.
[123] *Id.*, ¶ 14(f).
[124] *Id.*, ¶ 16.
[125] *Id.*
[126] *Id.*
[127] *Id.*, ¶¶ 20–21; *Declaration of Adam Perry*, ¶¶ 8–10.
[128] *Declaration of Amanda Smith*, ¶¶ 20–21.

encampment they erected[.]"[129] After the encampment was cleared,[130] protestors *continued* their protest nearby for over an hour.[131]

Earlier this month, several UTD students spoke publicly about their arrests, bond conditions, and the campus rules they violated.[132] Rather than attribute to GA-44 any role in preventing their protests, at least one student blamed her bond conditions: "It's very clear that the bond conditions, no matter their interpretation, were designed in a way that we cannot organize on campus."[133]

### D.     The University of Houston.

On May 8, protestors gathered at the University of Houston ("UH"), setting up an encampment on the fields of Butler Plaza early in the morning hours.[134] People also surrounded the area with wooden barricades comprised of UH's wooden shipping pallets that had been stolen from the Student Center.[135] According to one student, "[w]e felt it was important to set up an encampment and to show our university that we're serious about our demands . . . ."[136] Protestors broadcasted their goals on social media: "the students . . . will do anything in their power to prevent the board of regents from functioning."[137] They also made explicit calls for a campus takeover to "shut it down," shouting: "No such thing as graduation, we will fight to liberation . . . we are all SJP . . . shut it down, shut it down, shut it down . . . shut another campus down . . . board of regents you can't hide . . . ."[138]

---

[129] Marcela Rodrigues, *Back to school while banned from campus: UT Dallas protesters fight discipline*, THE DALLAS MORNING NEWS (Aug. 6, 2024), https://tinyurl.com/marydzpp.

[130] *See generally Declaration of Adam Perry.*

[131] *Id.*, ¶ 19.

[132] *Id.*

[133] *Id.*

[134] Sneha Dey and Alejandro Serrano, *Police dismantle pro-Palestinian encampment at University of Houston, arrest two students*, THE TEXAS TRIBUNE (May 8, 2024), https://www.texastribune.org/2024/05/08/university-houston-encampment-arrests/.

[135] *Id.*

[136] *Id.*

[137] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C6taGc4gpri (last visited August 9, 2024).

[138] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C66r-Agg4GW (last visited August 9, 2024); Houston TX PSL (@houstontxpsl), INSTAGRAM, https://www.instagram.com/reel/C6NOo9EJmkP (last visited August 9, 2024).

Campus officials attempted to negotiate with protestors to resolve the situation, but protestors responded by clarifying that they had no intention of stopping—disruption was apparently necessary to their goals.[139] Peace officers responded after protestors ignored requests to leave,[140] but protestors attempted to prevent officers from removing their encampment despite repeated warnings that the chapter had violated university policy.[141]

Although pro-Palestinian protestors held numerous events in the Spring of 2024, they often contravened UH's existing content-neutral anti-disruption policies.[142] Similarly, when students set up an encampment on May 8, campus officials explained that state laws prohibited camping on state property.[143] Video footage shows protestors' encampment at Butler Plaza, peace officers dissembling that encampment while protestors continued to shout in support of Palestinians, and several protestors huddled, arms linked, resisting lawful commands to disperse.[144]

## V.    Universities Across the Country Suspend SJP Chapters and Bring in Law Enforcement to End Encampments.

Many universities have suspended student chapters of NSJP from operating on their campuses since last October, recently including, for example, student organizations at University of Wisconsin-Milwaukee.[145] The university suspended these student groups for their association with a social media post encouraging harassment and violence of Jewish students and campus organizations.[146] Arrests of campus agitators were not unique to Texas. Rather, since April 18, law enforcement agencies have arrested around 3,100 protestors nationwide for violating state and local law, and disrupting campus

---

[139] *See id.*

[140] SJP HTX (@sjphtx), INSTAGRAM, https://www.instagram.com/reel/C6t8cIzpAha (last visited August 9, 2024).

[141] *See id.*

[142] *Declaration of Paul Kittle*, ¶¶ 6–10.

[143] *Id.*, ¶ 12.

[144] *Id.*, Ex. A.

[145] Michael Starr, *UWM anti-Israel groups suspended for call to treat Jewish orgs as 'extremist criminals'*, THE JERUSALEM POST (Aug. 4, 2024), https://tinyurl.com/5aub6u9b.

[146] *Id.*

functions.[147] Depicted below is a map of campus arrests across the country:



*148*

Several examples stand out. At Columbia, New York Police Department officers arrested nearly 100 people as they cleared the campus encampment.[149] The university asked police to maintain a presence on campus through at least May 17, two days after the scheduled graduation ceremony.[150] Columbia also began suspending students who refused to leave the encampment.[151] At Tulane, New Orleans Police activated SWAT and approached an encampment in the middle of the night "with guns drawn" to clear it.[152] Officers arrested 14 people, only two of whom were students at Tulane.[153] At the

---

[147] *Where Protesters on U.S. Campuses Have Been Arrested or Detained*, THE NEW YORK TIMES (July 22, 2024), https://www.nytimes.com/interactive/2024/us/pro-palestinian-college-protests-encampments.html.

[148] Isabelle Taft et al., *Campus Protests Led to More than 3,100 Arrests, but Many Charges Have Been Dropped*, THE NEW YORK TIMES (July 21, 2024), https://www.nytimes.com/2024/07/21/us/campus-protests-arrests.html.

[149] *Nearly 100 people arrested at Columbia, NYPD says after clearing Hamilton Hall*, NBC NEWS (Apr. 30, 2024), https://tinyurl.com/yf7ykhvs.

[150] *Id.*

[151] Isa Farfan et al., *Protestors take over Columbia University building hours after school starts suspending student demonstrators*, NBC NEWS (Apr. 29, 2024), https://tinyurl.com/em4ysm2n.

[152] Anum Siddiqui, *SWAT, NOPD officers pour onto Tulane's campus overnight, move encampment*, WDSU NEWS (May 2, 2024), https://tinyurl.com/bp5zc97d.

[153] *Id.*

University of Southern California, over 100 police officers approached in riot gear to surround the campus encampment, arresting 93 people on April 24.[154] And at the UCLA, police arrested more than 200 protestors while ripping apart the encampment's barricade of plywood, pallets, metal fences and dumpsters.[155] Most were cited for unlawful assembly but some for assault with a deadly weapon.[156]

## VI.    The University Defendants Revise their Campus Policies.

Only after Plaintiffs disbanded their encampments and students left for the summer did the University Defendants begin revising their written policies in response to GA-44. The University Defendants each maintained content-neutral time, place, and manner policies regulating speech and assembly on campus prior to GA-44,[157] specific anti-disruption provisions,[158] and policies prohibiting harassment and discrimination.[159] The University Defendants overwhelmingly responded to GA-44 by incorporating a definition of antisemitism into their pre-existing policies.

### A.    The University of Texas System.

The University of Texas System Board of Regents ("UT System Board") holds plenary authority over all component institutions within the UT System, including UT Austin, UTSA, and UTD.[160] UT Austin President Jay Hartzell—like all university presidents within the UT System—holds general authority and responsibility for the administration of UT Austin under the supervision and

---

[154] Tim Caputo, *Police clear out pro-Palestinian encampment at USC after university issues warning to protesters*, ABC 7 (May 5, 2024), https://tinyurl.com/3794r92z.

[155] Marc Cota-Robles et al., *Police clear pro-Palestinian encampment at UCLA, arrest more than 200 protesters*, ABC 7 (May 2, 2024), https://tinyurl.com/2erunveu.

[156] *Id.*

[157] *See generally* UT AUSTIN UNIVERSITY CATALOG, APPENDIX C: INSTITUTIONAL RULES ON STUDENT SERVICES AND ACTIVITIES [henceforth, "***UT Austin Institutional Rules***"], https://catalog.utexas.edu/general-information/appendices/appendix-c/, *Chapter 13. Speech, Expression, and Assembly*; UTD HANDBOOK OF OPERATING PROCEDURES [henceforth, "***UTD HOP***"], https://policy.utdallas.edu/, *Speech Expression and Assembly* - UTDSP5001; UTSA HANDBOOK OF OPERATING PROCEDURES [henceforth, "***UTSA HOP***"], https://www.utsa.edu/hop/, *Chapter 9.37 Peaceful Public Assembly*; UH MANUAL OF ADMINISTRATIVE POLICIES AND PROCEDURES [henceforth, "***UH MAPP***"], https://www.uh.edu/policies/mapps/, § 01.05.01 – Freedom of Expression.

[158] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15), 13-206, 13-301; *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.37(III.A); *UH MAPP*, §§ 01.D.15(3.4) & (4.1).

[159] *UT Austin Institutional Rules*, §§ 11-402(9), 13-204; *UTD HOP*, §§ UTDSP5003(C.9.6), UTDBP3090(C.1) & (C.2); *UTSA HOP*, §§ 9.01, 9.37(IV); *UH MAPP*, § 01.D.07.

[160] *University of Texas System Board of Regents Rule 10101: Board Authority and Duties* (Sep. 25, 2018) [henceforth, "***UT System Rules***"], https://www.utsystem.edu/board-of-regents/rules/10101-board-authority-and-duties.

direction of the Chancellor and Executive Vice Chancellor.[161] Similarly, UTSA President Taylor Eighmy holds general responsibility for, and control over, "[UTSA's] educational, administrative, and fiscal programs and services."[162]

The UT System Office of General Counsel directed all UT System institutions to amend their speech policies to comply with GA-44.[163] After receiving guidance from the UT System, UT Austin,[164] UTD,[165] and UTSA[166] revised their written campus policies to incorporate the definition of antisemitism provided by Texas Government Code § 448.001(2). None of these written policies prohibit students or student organizations from the simple expression of any message because of the content or viewpoint expressed.

UTSA's Dean of Students L.T. Robinson took the step of urging civility in discourse by asking students not to chant the slogan "from the river to the sea, Palestine will be free" prior to a protest. But UTSA never codified such a rule prohibiting students from the simple expression of their desired message, and indeed the revision to written campus policies in response to GA-44 that UTSA later published did not include such a statement.[167] And in any event, students' use of this slogan continued unabated, without any discipline by UTSA or referral to law enforcement.[168]

As of June 7, UTSA no longer requests that students refrain from using the phrase, never disciplined students for ignoring any such request, has no intention of doing so in the future, and acknowledges that GA-44 does not prohibit the simple use of the phrase or require universities to independently prohibit it.[169] UTSA's anti-disruption and anti-discrimination policies have simply never

---

[161] *UT System Rules*, § 20201(4),
[162] *UTSA HOP*, § 1.01.
[163] *Declaration of Katie McGee*, ¶ 47.
[164] *Declaration of Brenda Schumann*, ¶¶ 4–5; *see also UT Austin Institutional Rules*, §§ 13-206, 6-404(11), 11-402(9).
[165] *Declaration of Amanda Smith*, ¶¶ 5–10; *see also UTD HOP*, §§ UTDSP5001(A.3.20) (L.49.8), (L.49.9).
[166] *Declaration of LaTonya Robinson*, ¶¶ 8-16; *see also UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B).
[167] *Id.,* ¶¶ 8, 15–16.
[168] *Id.,* ¶ 16.
[169] *Id.* ¶¶ 8, 15–16.

been enforced based upon the simple use of the phrase "from the river to the sea, Palestine will be free."[170]

## B.    The University of Houston System.

The University of Houston System Board of Regents ("UH System Board") holds plenary authority over UH and its policy direction,[171] and Renu Khator, as President and Chancellor of UH, is responsible for the general management and operation of the university.[172] UH Vice Presidents, rather than President Khator, are specifically responsible for enforcing compliance with policies within their area of oversight.[173]

The UH System Board revised UH's Anti-Discrimination Policy on May 23,[174] and its Freedom of Expression policy on May 30,[175] incorporating Texas Government Code § 448.001(2)'s antisemitism definition.[176] UH's revised policies do not prohibit students or student organizations from the simple expression of any message because of the content or viewpoint expressed. Tents and encampments were not permitted on campus grounds under UH's polices, which also do not permit amplified sound at Butler Plaza.[177]

## VII.    Plaintiffs' Request for Injunctive Relief.

Plaintiffs are nominally four separate organizations claiming membership at Texas universities: Students for Justice in Palestine at UH ("SJP-UH"), Students for Justice in Palestine at UTD ("SJP-UTD"), the Palestine Solidarity Committee at UT Austin ("PSC-UT"), and the Democratic Socialists

---

[170] *Id.* ¶ 9.
[171] §§ 01.01.3, 01.01.5, UNIVERSITY OF HOUSTON SYSTEM BOARD OF REGENTS POLICIES (Apr. 24, 2023) [henceforth, "**UH System Rules**"], https://uhsystem.edu/board-of-regents/policies/_files/bor-policies-8-24-23.pdf; *Section 1: Authority and Responsibility of Governing Board*, UNIVERSITY OF HOUSTON BOARD OF REGENTS BYLAWS (May 15, 2024) [henceforth, "**UH System Bylaws**"], https://uhsystem.edu/board-of-regents/bylaws/index.php.
[172] *UH System Rules*, §§ 02.01, 02.02.
[173] *UH MAPP*, § 01.01.01(VII.B).
[174] *UH MAPP*, § 01.D.07.
[175] § 01.D.15 (Freedom of Expression – System) UH SYSTEM ADMINISTRATIVE MEMORANDUMS [henceforth, "**UH SAM**"], https://uhsystem.edu/resources/compliance-ethics/uhs-policies/sams/index.php; *UH MAPP*, § 01.05.01.
[176] Meeting of the University of Houston System Board of Regents (May 15, 2024), 5:30:10 – 5:33:03, https://uh.edu/infotech/services/streaming-media/events/bor/2024-05/.
[177] *Declaration of Donell Young*, ¶¶ 5–6, 14; *see also UH SAM*, § 01.D.15, UH MAPP, § 01.05.01.

of America ("DSA"). Plaintiffs sue Governor Abbott in his official capacity, UH, the UH System Board and its members in their individual and official capacities, UH President and Chancellor Khator in her individual and official capacity, the UT System Board and its members in their individual and official capacities, UTSA President Eighmy in his individual and official capacity, and UT Austin President Hartzell in his individual and official capacity pursuant to 42 U.S.C. § 1983.[178]

Plaintiffs allege that GA-44 impermissibly prohibits them from advocating for Palestinians, criticizing Israel, or using the phrase "from the river to the sea, Palestine will be free,"[179] and ask the Court to enjoin Defendants from enforcing GA-44 and any practice or policies adopted in furtherance of it,[180] apparently including lawful applications of the order.

Plaintiffs specifically ask the Court to enjoin Defendants from adopting any rule or policy that (a) forbids students from using the phrase "from the river to the sea, Palestine will be free;" (b) "define[s] as bigoted the typical criticisms and historical comparisons students make about foreign countries when those criticisms are made about Israel;" and (c) "singl[es] out for punishment [SJP], [PSC], or any organization that is critical of Israel and supports the rights of Palestinians."[181] Plaintiffs also ask the Court to enjoin President Eighmy from enforcing any policy at UTSA forbidding students from simple use of the expression "from the river to the sea, Palestine will be free," and Chancellor and President Khator from enforcing UH's "new policies that seek to comport with GA-44, including the changes made to UH Systems' free expression policies by the Board of Regents."[182]

Plaintiffs provide inadequate support for their motion. Their affiants claim that Plaintiffs' protests and encampments did not violate university anti-disruption policies, but provide no basis for their supposed knowledge on these points.[183] While Defendants do not dispute that the Court may

---

[178] *See generally* ECF 20.
[179] ECF 21, pp. 1, 18.
[180] ECF 21-10.
[181] *Id.*, pp. 1–2.
[182] *Id.*, p. 2.
[183] *See generally* ECF 21-2 through ECF 21-6.

consider evidence at the preliminary injunction stage that would be inadmissible at later stages,[184] including affidavits which do not measure up to the standards required under Fed. R. Civ. P. 56(c)(4),[185] it cannot be that a party may rely on evidence or testimony lacking any foundation at all.[186] And if Plaintiffs' affiants have a foundation for many of their contentions, they certainly have not shown it. Thus, while Plaintiffs' claims never made much sense as allegations, they are even more incoherent when considering the factual record of what actually occurred this past spring on university campuses across the country and at the University Defendants' campuses.

Plaintiffs identify no language in GA-44's operative clauses requiring universities to regulate speech based on discussion of a particular topic or adoption of any viewpoint—rather, it only calls on universities to exercise their independent judgment on how best to address antisemitism on campus. Plaintiffs also do not explain how GA-44 applies to them. By its own terms, the order instructs universities to address antisemitism through their policies; not to apply GA-44 itself to any protestors. It is true that GA-44 instructs universities to incorporate the definition of antisemitism in Texas Government Code § 448.001(2), but federal law has required universities to consider IHRA's working definition of antisemitism and contemporary examples since 2019.[187]

Nor do Plaintiffs point to a written policy adopted by any of the University Defendants which discriminates against students wishing to advocate for Palestinians or against Israel. Plaintiffs say they challenge both "[Governor] Abbott's executive order and the campus actions taken in furtherance of it,"[188] but they did not separately challenge the University Defendants' written polices in their Amended Complaint. Plaintiffs also do not provide any basis in their motion for claiming that those

---

[184] *Federal Sav. & Loan Inss. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987).
[185] 11A Wright & Miller, *Federal Prac. & Proc. Civ.* § 2949 at 471 (3d ed.).
[186] *See* Fed. R. Evid. 901(a) & (b); *see also* Fed. R. Evid. 602.
[187] *Executive Order 13899 (Combating Anti-Semitism)*, 84 Fed. Reg. 68779 (Dec. 11, 2019), https://www.federalregister.gov/documents/2019/12/16/2019-27217/combating-anti-semitism; *see also Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964*, Congressional Research Service (Mar. 22, 2024), https://crsreports.congress.gov/product/pdf/LSB/LSB11129.
[188] ECF 21, p. 5.

written policies are themselves unconstitutional, or that the policies must cease to function in the event that the Court enjoined any official from enforcing GA-44. Plaintiffs single out UTSA, but its policies include no provision prohibiting students from saying "from the river to the sea, Palestine will be free."[189] and its officials have no demonstrated willingness to enforce any prior "rule" (as Plaintiffs improperly call it) to that effect.[190]

Ultimately, even had Plaintiffs come forward with evidence supporting their outlandish contention that any of the University Defendants *applied* GA-44 to end their Mid-2024 Protests, Plaintiffs still fail to establish a likelihood of success on the merits of their claims of First Amendment violations. Under *Tinker*, it was reasonable for the University Defendants to forecast substantial disruption to their educational missions and operations given the national landscape, where other universities that permitted similar events suffered the extreme disruptions that campus agitators intended. Therefore, the University Defendants did not violate the First Amendment.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy,"[191] and "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[192] "[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'"[193]

To obtain a preliminary injunction, the moving party must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4)

---

[189] *Declaration of LaTonya Robinson*, ¶¶ 8-16; *see also UTSA HOP* §§ 9.37(IV.B), (IV.C), & (XIX.B).
[190] *Declaration of LaTonya Robinson*, ¶¶ 8-16.
[191] *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *see also Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) ("The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance.").
[192] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[193] *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).

that granting the injunction is in the public interest."[194] In the First Amendment context, if a plaintiff shows that the challenged action "represents a substantial threat to his First Amendment rights," then the "substantial threat of irreparable injury" prong is satisfied.[195] Likewise, a strong showing on the merits of a First Amendment claim will satisfy the "public interest" prong.[196] As against government defendants, the third and fourth factors merge.[197]

### ARGUMENT

This Court has found that an even shorter delay than that of Plaintiffs' in seeking a preliminary injunction justified denying such a request.[198] Nevertheless, whether a preliminary injunction is warranted here turns first and foremost on which side is likely to succeed on the merits.[199] The merits inquiry implicates both the jurisdictional deficiencies in Plaintiffs' Amended Complaint[200] and the "substance" of Plaintiffs' challenge to GA-44.[201] To this end, Defendants provided the Court considerable evidence showing that SJP and PSC protests violated the University Defendants' own content-neutral time, place, and manner rules, and were disruptive and likely to create a severe, pervasive, and objectively offensive discriminatory environment toward Jewish students. But by comparison, Plaintiffs gave the Court little to work with. Three factual deficiencies stand out.

*First*, Plaintiffs offer no evidence showing that the University Defendants enforced GA-44 against them to end their Mid-2024 Protests.[202] Rather, they ask the Court to simply take their word

---

[194] *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023).

[195] *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *see Elrod*, 427 U.S. at 373.

[196] *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

[197] *Nken v. Holder*, 556 U.S. 418 (2009).

[198] *See Embarcadero Tech., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 WL 5588190, *3–4 (W.D. Tex. Nov. 20, 2017) (Pitman, J.) (denying a request for a preliminary injunction where plaintiffs learned all facts forming the basis for their claims by April 2017, filed a complaint on May 11, but did not apply for a preliminary injunction until June 12).

[199] *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) ("The government's and the public's interests merge when the government is a party.").

[200] *NAACP v. Tindell*, 95 F.4th 212, 216 (5th Cir. 2024) (explaining that the Court cannot enter an injunction if it lacks jurisdiction).

[201] *Infra*, pp. 31–46.

[202] Defendants contend that Plaintiffs cannot show that GA-44 was the moving force behind any of the University Defendants' responses to Plaintiffs' protests, but do not dispute that UTSA officials previously interpreted GA-44 to

29

for it that the University Defendants' responses were improperly motivated by a desire to silence pro-Palestinian or anti-Israel speech.[203] *Second*, Plaintiffs do nothing to show that the University Defendants were wrong to think that Plaintiffs intended to disrupt their campuses. In fact, disruption was the point.[204] *Third*, although the University Defendants based their campus responses on the application of content-neural time, place, and manner university rules and protestors' disruption of campus, Plaintiffs also do nothing to show that the University Defendants would have been wrong to believe that protestors might create a severe, pervasive, and objectively offensive antisemitic environment. After all, the University Defendants were aware of the environment protestors created elsewhere and had previously responded to antisemitic incidents on their own campuses.[205]

## I.     Plaintiffs are Unlikely to Succeed Because Their Claims are Nonjusticiable.

As an initial matter, the Court cannot enter an injunction if it lacks jurisdiction.[206] Plaintiffs' claims are nonjusticiable for the reasons explained in Defendants' motion to dismiss,[207] which is filed alongside this response. Even before addressing the merits, it is obvious that Plaintiffs cannot succeed because they lack standing and because sovereign immunity bars their official-capacity claims.

Five jurisdictional defects undermine Plaintiffs' request for injunctive relief: (1) Plaintiffs' focus on GA-44, which has no connection to their alleged injuries;[208] (2) Plaintiffs did not challenge the university policies that independently were applied;[209] (3) the Defendants that Plaintiffs sued are

---

require UTSA to prohibit Plaintiffs from saying "from the river to the sea, Palestine will be free." *See generally Declaration of LaTonya Robinson.*
[203] ECF 21, pp. 3–4.
[204] *Supra*, pp. 7–9.
[205] *See, e.g., Declaration of Kelly Soucy*, ¶ 12; *Declaration of Paul Kittle*, ¶ 4; *Declaration of Adam Perry*, ¶ 13; *Declaration of LaTonya Robinson*, ¶¶ 7(q), 8.
[206] *Tindell*, 95 F.4th at 216.
[207] ECF 31.
[208] *See, e.g., Leal v. Becerra*, No. 21-10302, 2022 WL 2981427, at *2 (5th Cir. July 27, 2022); *see also Tex. State LULAC v. Elfant*, 52 F.4th 248, 255–56 (5th Cir. 2022); *Reagan Nat'l Advert. of Austin, Inc. v. City of Cedar Park*, No. 20-50125, 2021 WL 3484698, at *3 (5th Cir. Aug. 6, 2021).
[209] *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006).

not proper enforcement officers under *Ex parte Young*;[210] (4) DSA cannot establish standing because its mission of establishing socialism in America has nothing to with armed conflict in the Middle East between Israel and Hamas;[211] and (5) as to UTSA, campus officials at UTSA have no demonstrated willingness to enforce a prior unwritten "rule" (as Plaintiffs improperly call it) barring simple expression of Plaintiffs' preferred slogan.[212] Taken together, these issues defeat jurisdiction.

## II. Plaintiffs Did Not Assert a Viable First Amendment Challenge.

Plaintiffs commit four main errors on the merits in their preliminary injunction motion. *First*, they overlook alternative interpretations of GA-44 that would avoid any constitutional issues.[213] *Second*, none of the University Defendants ever *applied* GA-44 to restrict their speech.[214] *Third*, Plaintiffs' First Amendment claims relate only to the application of GA-44 by University Defendants, and they did not bring any stand-alone First Amendment claim relating to what the University Defendants actually did—apply their content-neutral time, place, and manner policies to end campus disruption.[215] And *finally*, even if the Court were to construe any of the University Defendants' policies or actions as

---

[210] *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020) (finding that Governor Abbott was not the enforcement officer for his executive orders as the "statutory authority . . . to issue, amend or rescind an Executive Order is not the power to enforce it") (quotations omitted); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

[211] *El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (quotations omitted); *see also Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) ("[T]he perceptible impairment to an organization's ability to carry out its mission . . . is the concrete and demonstrable injury for organizational standing.") (cleaned up); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (noting that "a setback to the organization's abstract social interests" is insufficient to create organizational standing); *Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) ("[The organization's] injury . . . cannot be merely ideological, meaning that damage to the 'special interest' of an organization does not qualify as an injury in fact; otherwise, 'there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived.'") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

[212] *Compare Declaration of LaTonya Robinson*, ¶¶ 8–16, *with Mi Familia Vota v. Ogg*, 105 F.4th 313, 330–31 (5th Cir. 2024) (finding no demonstrated willingness to enforce a law where the defendant stipulated that she would not do so).

[213] *Infra*, pp. 31–33.

[214] *Supra*, pp. 12–20.

[215] Such a claim does not appear on the face of the complaint or in the briefing submitted on the motions. But out of an abundance of caution, were the court to construe the Amended Complaint to include such a claim, the University Defendants did not violate the First Amendment because their policies are content-neutral time, place, and manners regulations and satisfy the lower standard for such rules. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293–94 (1984) (merging time, place, and manner inquiry and inquiry under *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). And moreover, even if the Court were to find that any of the University Defendants' applications of their rules were content-based, those actions nonetheless would be valid under *Tinker*'s "substantial disruption" and "rights of others" tests. *See Tinker*, 393 U.S. at 513.

content-based applications of GA-44, or in any other respect, the *Tinker* standard applies, under which the universities actions did not violate the First Amendment under that standard because they reasonably expected substantial disruption.[216]

### A.    Plaintiffs' Ignore the Constitutional-Avoidance Canon in Interpreting GA-44.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."[217] Plaintiffs' challenge to GA-44 runs headfirst into this canon as they eschew alternative interpretations of GA-44 that would avoid any constitutional issues. In short, Plaintiffs base their challenge to GA-44 on their interpretation that it (1) has been, and will be, enforced against them[218] and (2) contains content- and viewpoint-based speech restrictions.[219] Yet GA-44 does not restrict the content or viewpoint of students' speech. Nor is it independently enforceable.

Rather, GA-44 merely requires universities to "[r]eview and update" their speech policies due to the rise in antisemitism and "[e]nsure that these policies are being enforced on campus."[220] There are various ways this can be done without touching the First Amendment's guardrails. One obvious choice would be to ensure that content-neutral policies, such as those regulating disruptive activity on campus (like encampments and blockades),[221] are being evenly enforced.[222] Another would be to

---

[216] *Infra*, pp. 36–41.

[217] *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

[218] *See, e.g.*, ECF 21, pp. 7, 14–15.

[219] *Id.*, p. 14.

[220] ECF 21-1.

[221] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15); *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.36(III.A); *UH SAM*, §§ 01.D.15(3.4) & (4.1).

[222] *See, e.g.*, *Clark*, 468 U.S. at 297 ("We have difficulty . . . in understanding why the prohibition against camping, with its ban on sleeping overnight, is not a reasonable time, place, or manner regulation that withstands constitutional scrutiny."); *Healy v. James*, 408 U.S. 169, 188–89 (1972) ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

enforce current university policies that cover non-protected speech, such as speech that incites violence or imminent lawless action.[223]

Plaintiffs make hay out of the fact that GA-44 focuses on antisemitism. But nothing in GA-44 says that universities should *only* protect Jewish students, to the exclusion of all other protected classes, on their campuses. That would be ridiculous. And to be clear, Jewish students faced the overwhelming brunt of attacks following October 7. Public facts support this.[224] There is nothing constitutionally unsound with Governor Abbott focusing on the community most suffering during this trying period, just as there is nothing wrong with the fire department driving by your lightly singed yard to put out a fire raging at your neighbor's house. Some things are more urgent than others.

This leaves GA-44's provision that universities must include a "definition of antisemitism" in their free speech policies.[225] This is not independently enforceable. Indeed, GA-44 specifies that this definition is merely meant as a "guide" to students and faculty "on what constitutes antisemitic speech."[226] The First Amendment does not bar government from teaching others about what state law has to say about antisemitism.[227] And this new definition of antisemitism did not bring in any speech not otherwise covered by the University Defendants' pre-existing policies which, of course, already restricted a wide array of discriminatory speech.[228]

In sum, Plaintiffs challenge to GA-44 is dead on arrival due to the constitutional-avoidance canon. Thus, this claim should be dismissed. Below, Defendants detail the numerous factual and legal problems with Plaintiffs' challenge to GA-44, which are equally fatal to this lawsuit.

### B.      Plaintiffs' As-Applied and Facial Challenges to GA-44 Lack Merit.

There are two prongs to Plaintiffs' challenge to GA-44. First, Plaintiffs contend that GA-44

---

[223] *See, e.g., UT Austin Institutional Rules*, §§ 13-203, 13-206(b).
[224] *Supra*, pp. 4–9.
[225] ECF 21-2, p. 3.
[226] *Id.*
[227] *See, e.g., Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).
[228] *Supra*, notes 157–59.

was applied against them to limit their Mid-2024 Protests[229] and will be used against them if they engage in similar protests in the future.[230] The facts indisputably show that the University Defendants did not apply GA-44 to campus protests.[231] And second, Plaintiffs argue that GA-44 violates the First Amendment "on its face."[232] But whether the Court finds that GA-44 applies to Plaintiffs or not, Plaintiffs' as-applied and facial challenges to GA-44 are meritless.

       1.   <u>Plaintiffs Cannot Succeed on their As-Applied Challenge.</u>

Officials at each of the University Defendants gave sworn statements showing that they did not apply GA-44 to end Plaintiffs' Mid-2024 protests.[233] Plaintiffs do not assert any evidence supporting their contrary view for UT Austin, UTD, or UH. Plaintiffs lean on the fact that, at UTSA, Dean Robinson previously asked students to refrain from using a favored slogan, but even they appear to recognize that, when she did so, she was not *applying* GA-44. After all, DSA brought a standalone claim against President Eighmy relating to UTSA's prior request to students.[234]

Plaintiffs also do not dispute that the University Defendants revised their written campus policies *after* Plaintiffs' Mid-2024 Protests ended. They nonetheless ask the Court to find, against the weight of evidence, that the University Defendants' did not apply content-neutral time, place, and manner policies to Plaintiffs' protests but rather applied GA-44 itself.[235] Plaintiffs offer the Court no evidence[236] to support their conjecture.

---

[229] ECF 21, pp. 9–13, 15; ECF 21-2, ¶ 8; 21-3, ¶ 9; 21-4, ¶ 9.

[230] ECF 21, pp.14–16.

[231] *Supra*, pp. 12-20.

[232] ECF 21, pp. 21.

[233] *Declaration of Kelly Soucy*, ¶¶ 36, 44; *Declaration of Amanda Smith*, ¶¶ 9, 18–20, Ex. C; *Declaration of Adam Perry*, ¶¶ 9–11, 20; *Declaration of Donell Young*, ¶¶ 12–15; *Declaration of Paul Kittle*, ¶¶ 6–12; *Declaration of LaTonya Robinson*, ¶¶ 8–16.

[234] ECF 20, ¶¶ 98–106.

[235] ECF 21, pp. 6–7.

[236] Plaintiffs exhibits provide no factual basis for concluding that the University Defendants actions to enforce their campus anti-disruption policies relates to GA-44. *See generally* ECF 21-2 through 21-9.

      a.     *GA-44 is Not the Moving Force behind any of Plaintiffs' Alleged Injuries.*

To sustain an official-capacity claim under 42 U.S.C. § 1983, Plaintiffs were required to establish that a law or policy was the moving force behind a First Amendment deprivation.[237] This issue turns on the complicated relationship between § 1983 and state officials/entities.

§ 1983 provides a cause of action against a "person" who, acting "under color of any statute, ordinance, regulation, custom, or usage," deprives another of "any rights privileges, or immunities secured by the Constitution and laws."[238] When a state official is sued in his official capacity for prospective relief, courts consider him to be "a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"[239] Although the state official is considered a "person" under this legal fiction, the real person in interest is the state itself.[240] As the Supreme Court explained in *Hafer v. Melo*: "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'"[241]

Plaintiffs claim that Governor Abbott "aimed to extinguish from public campuses a viewpoint critical of Israel and supportive of Palestinians" and that he "wages a more than half decades long effort to suppress viewpoints critical of one particular foreign country."[242] In an effort to prop up this claim, Plaintiffs reference some of Governor Abbott's past efforts to address antisemitism,[243] but to

---

[237] *See Johnson v. Rodriguez*, 110 F.3d 299, 312 (5th Cir. 1997) ("Because this is an official capacity lawsuit, it is a condition precedent to liability under section 1983 that the challenged conduct of the individual Board members be tied to an official Board custom or policy, formal or informal."); *see also Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 31 (2010) (reaffirming that § 1983's "'policy or custom' requirement . . . applies when plaintiffs seek prospective relief, such as an injunction or a declaratory judgment"); *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (identifying § 1983's causation element as requiring the policy or custom to be the "moving force" behind the alleged violation of constitutional rights).

[238] 42 U.S.C. § 1983.

[239] *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, at 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

[240] *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

[241] *See id.* (quoting *Graham*, 473 U.S. at 166) (quotations omitted).

[242] Dkt. 1, ¶¶ 13, 35, 75.

[243] *Id.*, ¶¶ 16-33.

prevail on their as-applied challenge, Plaintiffs must establish that GA-44, on its face,[244] was the "moving force" behind the alleged constitutional violations.[245] Plaintiffs fail to support this point. GA-44 did not "cause" Plaintiffs' injuries stemming from the Mid-2024 Protests and could not have because it does not apply to them—it applies to Texas public universities only.

Plaintiffs' as-applied challenge raises a broader question: How exactly could GA-44 be "applied" against them in any meaningful way? The order carries no penalties. And no student or organization can be disciplined for violating "GA-44." Any sanctions imposed on a student by a university would be based on its own policies. And any as-applied First Amendment challenges in this context would be fact-specific, turning on the policy's language, how the university interpreted it, and what exactly the plaintiffs intended to say and do.

Plaintiffs needed to lay a foundation detailing how Defendants applied GA-44 to them to sustain their as-applied claim. Yet, they provide no competent evidence showing that GA-44 has been applied to them, and no basis for believing it ever will be. Their as-applied claim fails.

     b.     *Even if any University Defendant had Applied Content- or Viewpoint-Based Policies, It Would Not Have Violated the First Amendment under Tinker.*

While the University Defendants reiterate that it was their content-neutral time, place, and manner restrictions that drove their responses, even if the Court were to agree with Plaintiffs that one or more University Defendants did apply GA-44 to act in a content- or viewpoint-based manner, such University Defendant's actions can be upheld under the *Tinker* standard.

Plaintiffs say the University Defendants reacted to their protests how Governor Abbott asked them to by ending Plaintiffs' "peaceful" events with force and arrests. Plaintiffs thus insinuate that it is irrelevant precisely when the University Defendants revised their written policies, or even whether

---

[244] *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) ("[T]his analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face.").
[245] *See, e.g.*, *Simmons v. City of Columbus*, 425 F.App'x. 282, 284 (5th Cir. 2011); *see also Ctr. for Individual Freedom*, 449 F.3d at 659.

those policies were content-neutral time, place, and manner regulations, because—so Plaintiffs say—Defendants *applied* GA-44 itself to end their protests.

As shown above, this is plainly untrue, but it would not matter if it were not. *Tinker* governs the First Amendment analysis here—as explained in more detail in Defendants' motion to dismiss.[246] In *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the Supreme Court held that school officials may prohibit student speech upon showing "facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school activities."[247] The Court also stated that acts constituting an "invasion of the rights of others is . . . not immunized by the [First Amendment]."[248] The Fifth Circuit and many other courts have applied *Tinker* to First Amendment cases involving college students.[249]

Even entertaining for the sake of argument Plaintiffs' allegations that one or more of the University Defendants applied a content- or viewpoint-based rule or policy when ending their protests (they did not), Defendants were within their rights under *Tinker* to restrict those protests because the events were substantially disruptive. Also, the University Defendants *could have* restricted Plaintiffs' Mid-2024 Protests to protect Jewish students from severe and pervasive discrimination interfering with their rights, which is separately discussed below when addressing Plaintiffs' facial challenge.

       *i.*       *GA-44 is Constitutional Under Tinker's "Substantial Disruption" Prong.*

To justify a speech restriction under *Tinker*, the school official must be able to point to "a

---

[246] ECF 31; *see Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009) ("We have made plain that 'time, place, and manner' is the proper standard for evaluating content and viewpoint neutral regulations of student speech and that when a school imposes content or viewpoint based restrictions the court will apply *Tinker*.") (citation omitted); *see also Esfeller v. O'Keefe*, 391 F.App'x. 337, 341 (5th Cir. 2010); *Morgan v. Swanson*, 659 F.3d 359, 402 (5th Cir. 2011); *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 442 (5th Cir. 2001).

[247] 393 U.S. at 514.

[248] *Tinker*, 393 U.S. at 513. Texas law also requires that an institution of higher education shall permit expression so long as it is not unlawful and "does not materially and substantially disrupt the functioning of the institution." Tex. Educ. Code § 51.9315(c)(2).

[249] *See Esfeller*, 391 F.App'x. at 341–42; *Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning*, 620 F.2d 516, 521–24 (5th Cir. 1980); *see also* Daniel B. Dreyfus, *A Common Judicial Standard for Student Speech Regulations*, 102 Tex. L. Rev. 1059, 1075 (2024) (citing circuit court cases that applied on confirmed *Tinker's* applicability to First Amendment cases involving universities).

specific and significant fear of disruption, not just some remote apprehension of disturbance."[250] And the official cannot restrict a student's speech merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[251] Defendants explored four cases in their motion dismiss where courts upheld schools' speech regulations under *Tinker's* "substantial disruption" prong.[252] There are four key takeaways from those cases.

*First*, none of these cases involved First Amendment activity that actually led to the school cancelling class, or even imminently would lead to such a disruption. The courts still upheld the First Amendment restriction under *Tinker*.

*Second*, much of the evidence presented was, by itself, relatively mild. Yet schools could still use this evidence to justify their First Amendment restriction. The Fifth Circuit specifically addressed this point in *A.M. ex rel. McAllum:* "Even if these events do not rise to the level of a 'substantial disruption' under *Tinker* (thus justifying the ban based on past actual disruption), they serve as a factual basis for administrators' forecast that disruptions might occur if students were allowed to display racially charged symbols such as the Confederate flag."[253]

*Third*, schools were not required to directly link their disruption evidence to the activity being regulated. *A.M. ex rel. McAllum* and *West* are good examples of this point. These cases involved Confederate flag bans, yet some of the incidents of racial hostility cited by the schools did not involve the Confederate flag.[254] That did not stop the Fifth and Tenth Circuits from finding this evidence relevant to a *Tinker* analysis.

---

[250] *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015) (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)).

[251] *Id.* (quotations omitted).

[252] *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 217 (5th Cir. 2009); *Blackwell v. Issaquena Cnty. Bd. of Ed.*, 363 F.2d 749 (5th Cir. 1966); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1247, 1249 (11th Cir. 2003); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000). The *Tinker* Court based its analysis on *Blackwell* and a companion Fifth Circuit decision issued that same day. *See Tinker*, 393 U.S. at 505 n.1, 513. Thus, it is irrelevant that *Blackwell* predated *Tinker*.

[253] *A.M. ex rel. McAllum*, 585 F.3d at 222.

[254] *Id.*; *West*, 206 F.3d at 1362.

*Finally*, schools can regulate speech that could inflame racial tensions even though some students might view that speech innocently, or even admirably. The Confederate flag caselaw highlights this. As the Fifth Circuit acknowledged, only "some" people view the Confederate flag "as a symbol of racism and intolerance"; others might view it differently.[255] The Fifth Circuit still upheld the school's ban on the Confederate flag, despite these competing interpretations.

The last point directly undercuts one of Plaintiffs' key arguments. Plaintiffs classify their desired chant of "from the river to the sea, Palestine will be free" as an innocent call "for peace and dignity for all people."[256] But *Plaintiffs'* interpretation of this phrase is irrelevant to a *Tinker* analysis. What is relevant is that at least *some* people view the "from the river to the sea" statement as antisemitism. This includes most Congressional members and the Anti-Defamation League, among others.[257] This is all that is needed under *Tinker*.[258]

The Court should apply the same general principles from the above cases to the facts here. Shown above, there was significant evidence that Plaintiffs' Mid-2024 protests either did substantially disrupt the University Defendants' activities or, at the least, that they could reasonably lead to such disruptions.[259] Indeed, the Fifth Circuit and other courts have upheld school speech restrictions based on weaker "disruption" evidence than that present here. This Court should find that had GA-44 been applied to Plaintiffs' Mid-2024 Protests, its application would have been constitutional under *Tinker's* "substantial disruption" prong.

Plaintiffs admitted, on their social media accounts, that they *intended* to disrupt school activity.[260] That was the whole point of their mass protests: We will shut your schools down until you

---

[255] *A.M. ex rel. McAllum*, 585 F.3d at 222; *id.* at 222 n.5.
[256] ECF 20, ¶ 38; ECF 21, 6.
[257] *Supra*, p. 5.
[258] *See, e.g.*, *A.M. ex rel. McAllum*, 585 F.3d at 222; *id.* at 222 n.5.
[259] *Supra*, pp. 4–23.
[260] *Supra*, pp. 11–20.

give into our demands. Plaintiffs now try to reclassify their protests as "peaceful" events.[261] But that characterization is belied by the stark difference in both messaging and actions between the Mid-2024 Protests (which involved encampment attempts, threats to administrators and police, and other disruptive actions) that the University Defendants shut down, versus the other protests the campuses saw both before and after those contested days, which were not shut down because they followed campus rules and were not disruptive.

Were this not enough, ample other evidence showed that Plaintiffs' protests could be substantially disruptive. Most notably, Plaintiffs' protests were, in fact, disruptive. UT Austin had to significantly adjust some classes due to these incidents.[262] Many other schools shut down as well.[263] The Fifth Circuit has found that incidents occurring at other schools can be relevant to a *Tinker* analysis. For example, in *Bell*, the Court found that the school official's speech restriction was justified in part due to "examples of school violence" at other schools.[264] And in *West*, the Tenth Circuit upheld a *middle school's* ban on the Confederate flag largely due to the existence of racial tension at the *high school*.[265] *Tinker*'s deferential standard gives administrators ample leeway to respond to threats that could feasibly shut down their schools.[266]

Further, Plaintiffs' protests were disruptive for various other reasons. For example, Plaintiffs forcibly occupied certain university buildings.[267] They set up blockades and encampments that

---

[261] *See* ECF 20, ¶¶ 35–36, 90–91; ECF 21, 7, 9–10, 12, 15.
[262] *Declaration of Katie McGee*, ¶ 45 (stating that the Dean of Students office received approximately 498 student requests for class accommodations).
[263] *Supra*, pp. 8–9, 21–23.
[264] *Bell*, 799 F.3d at 399.
[265] *West*, 206 F.3d at 1362.
[266] *See Tinker*, 393 U.S. at 513 ("[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—*materially disrupts classwork* or involves substantial disorder or invasion of the rights of others is, of course, *not immunized by the constitutional guarantee of freedom of speech*.") (emphasis added); *see also Healy*, 408 U.S. at 189 ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education."); *see also Jenkins v. Louisiana State Bd. of Ed.*, 506 F.2d 992, 1003 (5th Cir. 1975) (finding that the First Amendment did not prevent a school from discipling a group of students who went "about the campus shouting the chanting 'organize,' 'unite,' and 'student power'" and who "subjected the teaching and learning atmosphere of the college to disruption, distraction, and destruction").
[267] *Supra*, pp. 6–9.

interfered with others' ability to reach key areas of the university or that otherwise created fire hazards.[268] Plaintiffs' stockpiled weapons during some of these protests, adding to the threat of violence during these tense events.[269] And so on.

Finally, many other schools outside of Texas limited Plaintiffs' protests in largely the same manner as the University Defendants. The fact that many other officials had similar responses to similar protests highlights the reasonableness of the University Defendants' conduct under the deferential *Tinker* standard.[270]

In short, Defendants have evidence that Plaintiffs' protests were, or reasonably could be, substantially disruptive. Because Defendants' conduct was lawful under *Tinker's* "substantial disruption" prong, the Court should thus conclude that Plaintiffs will not prevail on the merits.

2.      A Facial Challenge is a High Bar; Plaintiffs do not Meet it Here.

"[F]acial challenges [are] hard to win."[271] A facial challenge in the First Amendment context turns on whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[272] Put differently, a law is facially invalid "only if [its] unconstitutional applications substantially outweigh its constitutional ones."[273]

Plaintiffs claim that GA-44 will operate in practice as a content-based regulation of speech.[274] They also say "there is no ambiguity in GA-44's text,"[275] but can point to no language in the executive order where Governor Abbott tells Texas public universities how to address antisemitism. Indeed, Plaintiffs also ignore the fact that GA-44 sets no specific requirements on precisely how Texas public

---

[268] *See, e.g., Declaration of Shane Streepy*, ¶ 17; *Declaration of Adam Perry*, ¶¶ 8–10.
[269] *Declaration of Shane Streepy*, ¶¶ 39–41.
[270] *See Bell*, 799 F.3d at 397–98.
[271] *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2397 (2024).
[272] *Id.* (cleaned up).
[273] *Id.*
[274] Dkt. 1, ¶ 74.
[275] ECF 21, p. 6.

universities will address antisemitism on campus. Such facial uncertainty is reason alone to reject Plaintiffs' facial challenge.[276]

Even so, there are at least five sets of constitutional applications of GA-44 that outweigh the singular, interpretation that Plaintiffs' provide the Court to support their request for facial invalidation.

*First*, universities could apply GA-44 to ensure that their pre-existing policies are evenly enforced. Under Plaintiffs' theory of the case, it is hard to see how GA-44 is unconstitutional if the University Defendants treated anti-Jewish protestors in the same manner as anti-Palestinian (or any other) protests.

*Second*, along the same lines, universities could apply GA-44 by ensuring that their content-neutral "anti-disruption" policies are properly enforced.[277] Plaintiffs do not contend that these policies violate the First Amendment.

*Third*, "advocacy that is directed to inciting or producing imminent lawless action and is likely to incite or produce such action is not protected by the First Amendment."[278] Universities could constitutionally apply GA-44 to restrict speech falling within this category.

*Fourth*, shown below in assessing Plaintiffs' as-applied challenge, *Tinker* allows schools to regulate speech, including discriminatory speech, that is reasonably forecasted to create a substantial disruption.[279] Universities could constitutionally apply GA-44 to restrict speech falling within this category.

*Fifth*, *Tinker* also allows schools to regulate speech that is reasonably forecasted to invade the rights of others, and universities could constitutionally apply GA-44 to restrict antisemitism on campus where that antisemitism is severe and pervasive such that it creates an objectively hostile

---

[276] *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 608–10 (2004); *Tennessee v. Lane*, 541 U.S. 509, 530–34 (2004); *United States v. Raines*, 362 U.S. 17, 24–25 (1960).
[277] *UT Austin Institutional Rules*, §§ 6-404(18), 11-402(15), 13-206, 13-301; *UTD HOP*, §§ UTDSP5001(C.10), UTDSP5003(C.9.14) & (C.9.18); *UTSA HOP*, § 9.36(III.A); *UH MAPP*, §§ 01.D.15(3.4) & (4.1).
[278] *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (quotations and brackets omitted).
[279] *Supra*, pp. 37–41.

environment for Jewish students under *Tinker*'s "rights of others" prong.[280] This prong is less established than *Tinker's* "substantial disruption" prong, yet most federal circuits to consider the issue have found that *Tinker's* "rights of others" prong[281] can independently justify a school's speech restriction—meaning, without any showing that the expression would substantially disrupt the school's activities.[282] The Fifth Circuit appears sided with the majority, at least in dicta.[283]

In Defendants' motion to dismiss, they briefed how they propose the Court should analyze this prong based on two competing principles that govern a school's ability to restrict discriminatory speech.[284] On one hand, every student has a right "to be secure and to be let alone."[285] Invidious discrimination not only invades this right, but it can also lead to severe negative consequences for the students being harassed.[286] On the other hand, a bedrock principle of the First Amendment is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[287] Defendants recommend that the Court balance these principles by placing a "severe and pervasive" limit on a school's ability to restrict discriminatory speech, as the

---

[280] *See, e.g., UT Austin Institutional Rules*, § 13–204(b) (restricting "harassing" speech that is (1) "sufficiently severe, pervasive, and objectively offensive to create an objectively hostile or threatening environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University" and (2) "personally describes or is personally directed to one or more specific individuals").

[281] *Tinker*, 393 U.S. at 513 ("[C]onduct by the student, . . . which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves *substantial disorder or invasion of the rights of others* is, of course, *not immunized* by the constitutional guarantee of freedom of speech.") (emphasis added) (citing *Blackwell, supra*, note 252).

[282] *Doe v. Valencia Coll.*, 903 F.3d 1220, 1229–31 (11th Cir. 2018); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152–53 (9th Cir. 2016); *Kuhlmeier v. Hazelwood Sch. Dist.*, 795 F.2d 1368, 1371 (8th Cir. 1986), *rev'd on other grounds*, 484 U.S. 260 (1988); *Trachtman v. Anker*, 563 F.2d 512, 516–20 (2d Cir. 1977). *But see L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854, 873–74 (1st Cir. 2024).

[283] *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 351–52 (5th Cir. 2017) (citing *Tinker's* "rights of other" language to justify a school's speech restriction, without performing a "substantial disruption" analysis); *Bell*, 799 F.3d at 397 (noting that "[a]rguably, a student's threatening, harassing, and intimidating a teacher inherently portends a substantial disruption, making feasible a *per se* rule in that regard," which is another way of saying there are some instances where a court may not need to perform a full "substantial disruption" analysis); *Shamloo*, 620 F.2d at 522 (finding that the lower court erred in its *Tinker* analysis as the court did not find that the students' conduct "involved substantial disorder *or invasion of the rights of others*") (emphasis added).

[284]

[285] *Tinker*, 393 U.S. at 508.

[286] *See, e.g., Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178–79 (9th Cir. 2006) (discussing the negative effects of anti-gay discrimination), *cert. granted, judgment vacated sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

[287] *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Third Circuit did in *Saxe v. State Coll. Area Sch. Dist.*[288] and *DeJohn v. Temple Univ.*[289] Tethering a school's ability to restrict discriminatory speech that reasonably could be "severe and pervasive" makes sense for three reasons.

First, these guideposts limit a school's power to regulate discriminatory speech to the more pressing situations calling for such an intrusion. Thus, this restriction tracks *Tinker's* statement that schools cannot restrict speech merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[290]

Second, a "severe and pervasive" requirement can be easily understood by schools and courts. There is significant caselaw guiding how to analyze harassment in the Title VI and Title VII contexts.[291] This precedent would guide future First Amendment analyses on schools' speech restrictions.

Finally, an overly strict standard would leave schools unable to avoid potential Title VI lawsuits. Under Title VI, schools can be liable for student-on-student harassment if, among other things, "the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school."[292] An overly strict First Amendment standard in this context leaves universities in an impossible situation. Do they correct severe and pervasive discrimination and risk a § 1983 lawsuit for a First Amendment violation? Or do they disregard the discrimination and risk liability under Title VI? Defendants' proposed rule avoids this Sophie's choice. And the Eighth Circuit found similar reasoning persuasive when it held that *Tinker's* "rights of others" prong allows schools to regulate "speech [that] could result in tort liability for the school."[293]

---

[288] *Saxe*, 240 F.3d at 217.
[289] 537 F.3d 301, 314–20 (3d Cir. 2008).
[290] *Tinker*, 393 U.S. at 509.
[291] *See, e.g.*, *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 222–23 (5th Cir. 2023); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408–10 (5th Cir. 2015).
[292] *Fennell*, 804 F.3d at 408.
[293] *Kuhlmeier*, 795 F.2d at 1376, rev'd, 484 U.S. 260 (1988).

Putting these points together, the "rights of others" analysis should turn on whether the University Defendants could reasonably have forecasted that Plaintiffs' Mid-2024 Protests might create a severe and pervasive discriminatory environment for Jewish students. The factual record shows that they could.

To this end, antisemitism was starting to overwhelm colleges across the nation around the time of Plaintiffs' Mid-2024 Protests. Jewish students faced brutal antisemitic attacks at other universities, and those schools responded to reports that Jewish students were physically assaulted; and reports that Jewish students were called horrific slurs.[294] Many of these horrible events occurred at, or were otherwise connected with, SJP protests.[295] Defendants could try to stop this antisemitic tsunami by regulating expression through application of a content- or viewpoint-based rule without violating the First Amendment.

Defendants cited dozens, if not hundreds, of instances of antisemitism following October 7—many featuring the worst racial epithets imaginable and horrific acts of violence.[296] A significant portion of these instances related directly to SJP protests.[297] At the least, Plaintiffs' protests would only further inflame the antisemitism that had engulfed college campuses around this time. These protests could easily rise to the level of creating a severe and pervasive environment for Jewish students.

Perhaps the best evidence of this is the fact that numerous universities have been sued under Title VI because they did not timely and responsibly stop the antisemitism that flared up following October 7.[298] *Tinker* gives the University Defendants more than enough leeway to protect themselves and their students in this situation. This Court should find that GA-44, as applied to Plaintiffs' Mid-

---

[294] *Supra*, pp. 5–7.

[295] *Supra*, pp. 5–9.

[296] *Supra*, pp. 5–7; *see also Audit of Antisemitic Incidents 2023,* ANTI-DEFAMATION LEAGUE (Apr. 16, 2024), https://tinyurl.com/mpj7b4yc; *see also* Hannah Robinowitz, *FBI director: Antisemitism reaching 'historic level' in US,* CNN (Oct. 31, 2023), https://www.cnn.com/2023/10/31/politics/fbi-director-antisemitism-wray/index.html.

[297] *Supra*, pp. 4–9.

[298] *Governor Abbott Fights Antisemitic Acts At Texas Colleges,* Universities, *supra* note 66.

2024 Protests, was lawful under *Tinker's* "rights of others" prong.

In sum, there are numerous, obvious constitutional applications of GA-44. At the least, these applications are not *substantially* outweighed by any perceived unconstitutional applications of this order. After all, "[w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."[299] The Supreme Court has repeatedly applied these principles in rejecting First Amendment challenges to anti-discrimination statutes.[300]  Plaintiffs' facial challenge to GA-44 fails.

## III.    The Other Preliminary Injunction Factors Favor Denying the Motion.

Because Plaintiffs rely, as they must, on their likelihood of success in proving a First Amendment violation to also satisfy the remaining prongs of the preliminary injunction standard,[301] they did not offer separate arguments relating to the other prongs, and their failure to satisfy the first prong is thus fatal to their motion. Moreover, without a strong showing on the merits of their First Amendment claim, it becomes clear that the Plaintiffs have not shown irreparable harm or that the public interest would favor granting the injunction. In short, among other problems, the lack of a causal link between the complained-of GA-44 and actions taken by the University Defendants shows that GA-44 has not caused irreparable harm to the Plaintiffs.[302] And the public interest is served when universities are permitted to apply their content-neutral time, place, and manner restrictions that allow campuses to operate safely.[303]

---

[299] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992).

[300] *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting the argument "that application of Title VII ... would infringe constitutional rights of expression" because "invidious private discrimination ... has never been accorded affirmative constitutional protections" (alteration adopted) (internal quotation marks omitted)); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (explaining that although "parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, ... it does not follow that the *practice* of excluding racial minorities from such institutions is also protected").

[301] *Elrod*, 427 U.S. at 373.

[302] *Supra*, pp. 35–36.

[303] *Declaration of Katie McGee*, ¶ 60.

**IV.    The Court Should Not Enjoin Enforcement of Constitutional Applications of GA-44.**

Plaintiffs are unlikely to prevail on the merits of any of their challenges. However, if the Court holds otherwise on a challenge to any distinct provision of GA-44, then the Court should craft a narrow remedy and sever only the particular applications of the particular clause the Court finds is constitutionally invalid rather than preliminarily enjoining the order and all its applications.

"It is axiomatic that 'a statute may be invalid as applied to one state of facts and yet valid as applied to another.'"[304] "[W]hen confronting a constitutional flaw in a statute," this Court should "try to limit the solution to the problem."[305] It is preferable for courts "to enjoin only the unconstitutional applications of a statute while leaving other applications in force," or "sever its problematic portions while leaving the remainder intact."[306] The severability doctrine thus instructs that "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."[307] The focus is on "whether the statute will function in a *manner* consistent with the [Legislature's intent]."[308]

Here, GA-44 contains three operative clauses, each of which can function independent of the others. For instance, universities can:

(1)    review and update their policies to address antisemitic speech without including GA-44's definition of antisemitism;

(2)    ensure their pre-existing polices are enforced against PSC and SJP for code violations without updating their policies to specifically address antisemitism; and

(3)    update their policies to include GA-44's definition of antisemitism without ensuring that they are enforced them against any specific group.

Put simply, each of GA-44's three operative clauses independently fulfills the order's core mission: to

---

[304] *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006) (citing *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

[305] *Id.* at 328.

[306] *Id.* at 329 (citing *Raines*, 362 U.S. at 20–22, and *United States v. Booker*, 543 U.S. 220, 227–29 (2005)).

[307] *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (quotations omitted).

[308] *Id.* at 685.

protect universities from disruption and their students from harassment following October 7. Thus,

the invalidation of one of GA-44's provisions should not lead this Court to enjoin the entire order.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary

injunction. But if the Court disagrees with Defendants' arguments, then Defendants ask in the

alternative that the Court stay all district court proceedings pending resolution of an appeal.

Date:  August 19, 2024
      Austin, Texas

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

RYAN WALTERS
Chief, Special Litigation Division

*/s/ Cole P. Wilson*
COLE P. WILSON
Attorney-in-charge
Texas State Bar No. 24122856
Cole.Wilson@oag.texas.gov

TODD DICKERSON
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
Jacob.Przada@oag.texas.gov

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**CERTIFICATE OF SERVICE**

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on August 19, 2024, using the Federal Court CM/ECF system.

*/s/ Cole P. Wilson*