# EXHIBIT A

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE AT THE UNIVERSITY OF HOUSTON, ET AL., *Plaintiffs,* v. GREG ABBOTT, ET AL., *Defendants.* | Civil Action No. 1:24-cv-00523 Hon. Judge Robert Pitman |

**BRIEF OF LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND DEFENDANTS' RESPONSE TO <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

## CORPORATE DISCLOSURE STATEMENT

Counsel for *amicus curiae*, the Louis D. Brandeis Center for Human Rights Under Law (the "Brandeis Center"), certifies that *amicus curiae* has no parent corporation and that no publicly held corporation owns 10% or more of any stock in the Brandeis Center.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTEREST OF AMICUS CURIAE ........................................................................................... 1

INTRODUCTION ..................................................................................................................... 2

I.     RELEVANT BACKGROUND ........................................................................................ 4

     A.    Campus Anti-Semitism and its Roots .................................................................. 5

     B.    Anti-Semitic Conduct Directed at Jewish Students Has Increased
           Significantly Since October 7 ............................................................................... 6

     C.    The Adoption of GA-44 and the IHRA Definition .............................................. 10

II.    ARGUMENT ................................................................................................................... 10

     A.    The IHRA Definition Was Created to Address Misunderstandings About
           Anti-Semitism and Help Evaluate the Motivation of Conduct Directed at
           Jews ....................................................................................................................... 11

     B.    The IHRA Definition Narrowly Defines Anti-Semitism and Provides
           Clear Examples to Differentiate Between Discriminatory Conduct and
           Political Speech Criticizing Israel ........................................................................ 14

     C.    The IHRA Definition Has Received Broad Bipartisan Support and Is Core
           to Government Policies and Laws Designed to Protect Jewish Students ............. 16

     D.    The IHRA Definition Protects Jewish Students and Supports Free Speech ........ 18

CONCLUSION ........................................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Frankel v. Regents of the Univ. of Cal.*,
    24-cv-04702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024) ...............................................3, 8

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)...............................................................................................................10

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989).............................................................................................................10

*United States v. Boerner*,
    508 F.2d 1064 (5th Cir. 1975) ...........................................................................................10

*Whitney v. California*,
    274 U.S. 357 (1927)........................................................................................................1, 19

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993).........................................................................................................4, 10

**Statutes**

42 U.S.C. § 2000d.....................................................................................................................1, 17

Texas Gov. Code § 448.001(2) ....................................................................................................10

**Other Authorities**

3 C.F.R. §§ 68779-68780 (2019) .................................................................................................17

Exec. Order 13899 ....................................................................................................13, 16, 17, 18

Am. Jewish Comm., *5 Facts About the Jewish People's Ancestral Connection to
    the Land of Israel* (Feb. 26, 2024), https://www.ajc.org/news/5-facts-about-
    the-jewish-peoples-ancestral-connection-to-the-land-of-israel .................................................5

Am. Jewish Comm., *AJC Praises Biden Administration for Support for IHRA
    Working Definition of Anti-Semitism* (Feb. 2, 2021),
    https://www.ajc.org/news/ajc-praises-biden-administration-support-for-ihra-
    working-definition-of-anti-Semitism...................................................................................16

Anti-Defamation League, Campus Antisemitism: A Study of Campus Climate
    Before and After the Hamas Terrorist Attacks (Nov. 29, 2023),
    https://www.adl.org/resources/report/campus-antisemitism-study-campus-
    climate-and-after-hamas-terrorist-attacks ..............................................................................7

Anti-Defamation League, Pyramid of Hate (2018),
    https://www.adl.org/sites/default/files/documents/pyramid-of-hate.pdf ..................................8

*Anti-Semitism Across Borders: Hearing on H.R. 115-10 Before the Subcomm. on
    Afr., Glob. Health, Glob. Hum. Rts., & Int'l Orgs. Of the H. Comm. on
    Foreign Affs.*, 115th Cong. (2017),
    https://www.govinfo.gov/content/pkg/CHRG-115hhrg24753/html/CHRG-
    115hhrg24753.htm ...................................................................................................12

Avi Mayer, *The State of Antisemitism in America 2020: Insights and Analysis*,
    Am. Jewish Comm. (Oct. 26, 2020),
    https://www.ajc.org/sites/default/files/pdf/2020-
    11/The_State_of_Antisemitism_in_ America_2020.pdf .........................................12

Combat Antisemitism Movement, *CAM Information Hub Database of IHRA
    Antisemitism Definition Adoptions by US States* (June 23, 2023),
    https://combatantisemitism.org/government-and-policy/cam-information-hub-
    database-of-ihra-antisemitism-definition-adoptions-by-us-states-2/ ...................4, 17

Combat Antisemitism Movement, *Countries That Have Adopted the IHRA
    Working Definition of Anti-Semitism* (Jan. 17, 2023), https://combatanti-
    Semitism.org/studies-reports/ahead-of-international-holocaust-remembrance-
    day-cam-encouraged-by-more-than-1000-entities-including-majority-of-us-
    states-adopting-ihra-working-definition-of-anti-Semitism/................................13, 18

*Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University
    Leadership: Hearing Before the H. Comm. on Ways & Means*, 118th Cong.
    (2024) (testimony of Talia Dror, Cornell University), *available at*
    https://waysandmeans.house.gov/2024/06/18/six-key-moments-hearing-on-
    anti-Semitism-on-college-campuses .........................................................................9

*Examining Antisemitism on College Campuses: Hearing Before the H. Comm. on
    the Judiciary*, 115th Cong. (2017) (statement of Paul Clement), *available at*
    https://judiciary.house.gov/sites/evo-subsites/republicans-
    judiciary.house.gov/files/legacy_files/wp-content/uploads/2017/10/Clement -
    Testimony-11.07.17.pdf...........................................................................................10

*From Ivory Towers to Dark Corners: Investigating the Nexus Between Anti-
    Semitism, Tax-Exempt Universities, and Terror Financing: Hearing Before
    the H. Comm. on Ways & Means*, 118th Cong. (2023) (testimony of Talia
    Dror, Cornell University), *available at* https://gop-
    waysandmeans.house.gov/wp-content/uploads/2023/11/Dror-Testimony.pdf........9

Int'l Holocaust Remembrance All. (IHRA), Working definition of antisemitism,
    https://holocaustremembrance.com/resources/working-definition-antisemitism
    (last visited Aug. 20, 2024)............................................................................. *passim*

iv

Letter from Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., U.S. Dep't of Educ. (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/anti-Semitism-dcl.pdf ..........................13, 18

Letter from Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., U.S. Dep't of Educ. (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf; ...............................................13, 18

Letter from Virginia Foxx, Chairwoman, H. Comm. on Educ. & the Workforce Chairwoman to Minouche Shafik, President, Columbia University et al. (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_foxx_letter_to_columbia_university.pdf........................................................................9

Louis D. Brandeis Ctr., Statement from U.S. Assistance Secretary for Civil Rights on Title VI Protection from Discrimination Based on Shared Ancestry or Ethnic Characteristics (Jan. 4, 2023), https://brandeiscenter.com/statement-from-u-s-assistant-secretary-for-civil-rights-on-title-vi-protection-from-discrimination-based-on-shared-ancestry-or-ethnic-characteristics/ .................................13, 18

Louis D. Brandeis Ctr., The Louis D. Brandeis Center for Human Rights Under Law, FAQs About Defining Anti-Semitism, https://brandeiscenter.com/wp-content/uploads/2024/03/guide_faqs_anti-Semitism-2022c.pdf (last visited Aug. 20, 2024) ..............................................................................................................13

Mark Goldfeder, Defining Antisemitism, 52 Seton Hall L. Rev. 119 (2021) ..............................19

Marvin Hurst, *UT Dallas Jewish students struck by fear, hundreds of protesters flood downtown streets*, CBS News Tex. (May 7, 2024), https://www.cbsnews.com/texas/news/ut-dallas-jewish-students-struck-by-fear-protesters-flood-downtown-dallas/...............................................................................7

Natan Sharansky, *3D Test of Antisemitism: Demonization, Double Standards, Delegitimization*, Jerusalem Ctr. for Pub. Affs. (Oct. 21, 2004), https://jcpa.org/article/3d-test-of-antisemitism-demonization-double-standards-delegitimization/ ....................................................................................14

Off. of Governor Greg Abbott, Exec. Order No. GA-44, at 1 (Mar. 27, 2024) (ECF 21-1) ...................................................................................................... *passim*

Pew Rsch. Ctr., *U.S. Jews' connections with and attitudes toward Israel*, *in* Jewish Americans in 2020, at 137 (May 11, 2021), https://www.pewresearch.org/wp-content/uploads/sites/20/2021/05/PF_05.11.21_Jewish.Americans.pdf....................................5

Press Release, The White House, Fact Sheet: Biden-Harris Administration Takes
  Landmark Step to Counter Antisemitism (Sept. 28, 2023),
  https://www.whitehouse.gov/briefing-room/statements-
  releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-
  step-to-counter-anti-Semitism/ ................................................................................17

Regents of the Univ. of Cal., Final Report of the Regents Working Group on
  Principles Against Intolerance 2 (2016),
  https://regents.universityofcalifornia.edu/regmeet/mar16/e1attach.pdf ...................5

*Roundtable with Jewish Students Impacted by Antisemitism Before the H. Comm.
  on Educ.*, 118th Cong. (2024) (written statement of Joe J. Gindi, Rutgers
  University), *available at*
  https://edworkforce.house.gov/uploadedfiles/joe_j._gindi_testimony.pdf..............9

*Roundtable with Jewish Students Impacted by Antisemitism Before the H. Comm.
  on Educ.*, 118th Cong. (2024) (written testimony of Eden Yadegar, Columbia
  University), *available a*t
  https://edworkforce.house.gov/uploadedfiles/yadegar_updated_written_statem
  ent.pdf .......................................................................................................................9

U.S. Comm'n on C.R., Findings and Recommendations of the United States
  Commission on Civil Rights Regarding Campus Antisemitism (2006),
  https://www.usccr.gov/files/pubs/docs/050306FRUSCCRRCAS.pdf ...................16

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., "Working Definition" of
  Antisemitism (2007), https://2001-2009.state.gov/g/drl/rls/56589.htm. ...............16

U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., Defining Antisemitism
  (2010), https://2009-2017.state.gov/j/drl/rls/fs/2010/122352.htm....................14, 16

U.S. Dep't of State, Off. Special Envoy to Monitor & Combat Antisemitism,
  Report on Policies, Programs, and Actions Across the Globe to Combat Anti-
  Semitism (2023), https://www.state.gov/report-on-policies-programs-and-
  actions-across-the-globe-to-combat-anti-Semitism/.................................................13

U.S. Dep't of State, Off. of the Special Envoy to Monitor and Combat
  Antisemitism, Defining Antisemitism (last visited Aug. 20, 2024),
  https://www.state.gov/defining-antisemitism/ (31 member states at adoption)................12, 16

Valeria Olivares, *Jewish students call on UTD to condemn antisemitism, say they
  feel unsafe on campus*, Dallas Morning News (May 8, 2024)...................................7

The White House, Executive Order on Combatting Antisemitism (Dec. 11, 2019),
  https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-
  201900859.pdf ........................................................................................................16

The White House, The U.S. National Strategy to Counter Anti-Semitism 2, 13
(2023), https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-
National-Strategy-to-Counter-Anti-Semitism.pdf ............................................................6, 17

The Louis D. Brandeis Center for Human Rights Under Law (the "Brandeis Center") respectfully submits this brief as *amicus curiae* in support of the motion to dismiss and opposition filed by Defendants Greg Abbott, the University of Houston, the UH System Board of Regents and its members, Rene Khator, and the University of Texas System Board of Regents and its members (collectively, "the Texas Defendants") in response to Plaintiffs' amended complaint and motion for a preliminary injunction, respectively.

## INTEREST OF AMICUS CURIAE

The Brandeis Center is an independent, non-partisan institution for public interest advocacy, research, and education that seeks to advance the civil and human rights of the Jewish people and to promote justice for all.  The Brandeis Center's education, research, and advocacy focus specifically, though not exclusively, on the spread of anti-Semitism on college and university campuses.  The Brandeis Center encourages the adoption of clear, comprehensive, specific, and lawful anti-discrimination policies and publishes guidance documents for organizations seeking to adopt uniform definitions of anti-Semitism.  Brandeis Center attorneys also advise and represent college and university students and professors who have been victims of anti-Semitic conduct that violates Title VI of the Civil Rights Act of 1964 (codified as amended at 42 U.S.C. §§ 2000d to 2000d-4a) ("Title VI") and other anti-discrimination laws.

The Brandeis Center firmly upholds the First Amendment right to freedom of speech.  As its namesake, Justice Louis D. Brandeis, wrote in *Whitney v. California*: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).  Speech is one thing; discriminatory conduct is another.  The Brandeis Center seeks to safeguard the right of all citizens to be free from discrimination, including on the basis of race, national origin, shared ancestry, ethnicity, and religion.

1

The Brandeis Center has a significant interest in this case because Plaintiffs challenge policies implemented by the Texas Defendants to combat anti-Semitism on college campuses. In particular, Plaintiffs contend that these policies improperly define "anti-Semitism" despite the fact that they rely on the widely-accepted working definition of anti-Semitism set forth by the International Holocaust Remembrance Alliance (the "IHRA Definition"). Plaintiffs' position, if accepted, would make it substantially more difficult for the Texas Defendants to fulfill their legal obligation to protect Jewish students from the rampant anti-Semitic harassment and discriminatory conduct they are presently experiencing on public campuses across the state. The Brandeis Center respectfully presents this brief to provide essential context for the Court in evaluating Plaintiffs' claims, including information regarding the IHRA Definition and its role in battling anti-Semitic conduct targeting Jewish students on college campuses, without infringing on free speech rights.

## **INTRODUCTION**

Anti-Semitism is a growing scourge in America that has recently broken out on U.S. college campuses with unusual and dangerous ferocity. After October 7, 2023, when Hamas slaughtered, maimed, and took hostage over 1,200 civilians including men, women, children and the elderly in Israel, anti-Semitism exploded on many campuses. To quell the threat of violence against Jewish students and faculty at Texas colleges and universities, Governor Abbott issued executive order GA-44 (the "Executive Order" or "GA-44").[1] Had the Governor not taken this step, Texas universities might be seeing the kind of conduct a California federal judge expressed shock over in a ruling issued just last week:

> Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith.

---

[1] Off. of Governor Greg Abbott, Exec. Order No. GA-44, at 1 (Mar. 27, 2024) (ECF 21-1).

*Frankel v. Regents of the Univ. of Cal.*, 24-cv-04702, 2024 WL 3811250, at *1 (C.D. Cal. Aug. 13, 2024) (emphasis omitted).

As Governor Abbott recognized in promulgating GA-44, Jewish students are targeted not just on account of their faith, but also on account of their ethnicity and shared ancestry. Most Jews, whether they are religious or not, see Israel as the ancestral homeland of the Jewish people. They recognize that Jews are descended from and share the same language, culture, and traditions as the ancient Hebrews. The history of Jews in the land of Israel is over 3,000 years old. For most Jews, therefore, "Zionism" represents the historic fact that the Jews are a people with an ancestral connection to Israel. It is not an opinion or a viewpoint, but an integral component of how most Jews define themselves as Jews.

Title VI protects beneficiaries of federally assisted programs and activities, including Jews, when they face discrimination on the basis of their "actual or perceived shared ancestry or ethnic characteristics." It is on this basis that Title VI protects Jewish students from harassment and discrimination that targets them on the basis of the shared ancestry that connects them to the land of Israel. GA-44 similarly recognizes that universities have an obligation to speak out against conduct that threatens students on the basis of their shared ancestry. But as GA-44 also recognizes, protections for Jewish students cannot infringe on free speech rights.

To serve these dual aims of protecting Jewish students and honoring free speech rights, GA-44, like applicable Title VI guidance, defines anti-Semitism using the IHRA Definition, which provides a number of contemporary examples of anti-Semitism while cautioning that "criticism of Israel similar to that leveled against any other country" is not anti-Semitic. GA-44 requires that the IHRA Definition—which reflects a studied consensus on how to define anti-Semitism and has

3

been adopted by the U.S. federal government and is used by a majority of states[2]—be integrated into "university free speech policies to guide university personnel and students on what constitutes antisemitic speech."[3]  The IHRA Definition guides universities on how to evaluate whether or not discrimination or harassment is motivated by anti-Semitic animus.  When it is, it can and should be policed.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that government can police conduct that rises to the level of harassment when it is undertaken on a discriminatory basis and can consider speech as evidence of discriminatory intent).

GA-44 directs universities to update their free speech policies using the IHRA Definition as a guide to ensure that the current anti-Semitism crisis is addressed within the context of the State's commitment to freedom of speech.  This Court should construe the Executive Order in a manner that not only ensures its consistency with the Constitutions of the United States and the State of Texas, but that also reflects GA-44's explicit interest in protecting free speech.  Properly understood, GA-44 supports the First Amendment and does not punish speech.  The Executive Order's directive that universities integrate the IHRA Definition into their free speech policies supports speech as well as equal protection.

# I.    RELEVANT BACKGROUND

As detailed below, GA-44 and the IHRA Definition cannot be properly evaluated without understanding (i) the roots of anti-Semitism and the many forms it takes today; (ii) the various ways in which anti-Semitic conduct has been directed at Jewish students recently on college campuses, in the wake of October 7; and (iii) GA-44's role in protecting Jewish students from this

---

[2] Combat Antisemitism Movement, *CAM Information Hub Database of IHRA Antisemitism Definition Adoptions by US States*, combatantisemitism.org (June 23, 2023), https://combatantisemitism.org/government-and-policy/cam-information-hub-database-of-ihra-antisemitism-definition-adoptions-by-us-states-2/ (noting that 37 states that have adopted or endorsed the IHRA Definition).
[3] GA-44, *supra* note 1, at 2.

conduct, while reaffirming the need to protect free speech.

### A.    Campus Anti-Semitism and its Roots

Jewish identity is defined by more than religious practice.  Jews share more than a common faith.  They share a history and heritage deeply rooted in the land of Israel.[4]  According to a Pew Research Center survey, eight in ten Jews report that caring about Israel is an essential or important part of what being Jewish means to them.[5]  For the majority of Jews, therefore, "Zionism" is an integral component of their Jewish identity.  It is not a mere viewpoint or political opinion; Zionism represents their Jewish ancestry, namely, the historic reality that the Jews as a people originated in ancient Israel.  This ancestral connection to Israel constitutes, for most Jews, an integral component of their Jewish identity.  When Israel is treated as the "collective Jew" and demonized, delegitimized, or subjected to double standards, that constitutes anti-Semitism.[6]

The fundamental challenge in identifying campus anti-Semitism is that, unlike other forms of discrimination, it is often concealed or "coded."  As the Regents of the University of California have explained:

> [H]istoric manifestations of anti-Semitism have changed over time, and expressions of anti-Semitism are more coded and difficult to identify.  In particular, opposition to Zionism often is expressed in ways that are not simply statements of disagreement over politics and policy, but also assertions of prejudice and intolerance toward Jewish people and culture.[7]

---

[4] Am. Jewish Comm., *5 Facts About the Jewish People's Ancestral Connection to the Land of Israel* (Feb. 26, 2024), https://www.ajc.org/news/5-facts-about-the-jewish-peoples-ancestral-connection-to-the-land-of-israel.

[5] Pew Rsch. Ctr., *U.S. Jews' connections with and attitudes toward Israel*, *in* Jewish Americans in 2020, at 137 (May 11, 2021), https://www.pewresearch.org/wp-content/uploads/sites/20/2021/05/PF_05.11.21_Jewish.Americans.pdf.

[6] *See* Int'l Holocaust Remembrance All. (IHRA), Working definition of antisemitism, https://holocaustremembrance.com/resources/working-definition-antisemitism (last visited Aug. 20, 2024).

[7] Regents of the Univ. of Cal., Final Report of the Regents Working Group on Principles Against Intolerance 2 (2016), https://regents.universityofcalifornia.edu/regmeet/mar16/e1attach.pdf.

Some individuals and groups target Jewish students who support Israel's existence as a homeland for the Jewish people—subjecting them to smear tactics, bullying, and outright harassment. These groups are often well-organized and well-funded and have a concerted strategy to marginalize Jewish students on campus and make them feel unwelcome. The U.S. National Strategy to Counter Antisemitism ("National Strategy"), released in May 2023, recognizes that "Jewish students and educators are targeted for derision and exclusion on college campuses, often because of their real or perceived views about the State of Israel."[8]

Yet many university administrators consider themselves to be in a bind when confronting this kind of harassment. On the one hand, criticism of Israeli policies is generally protected by the First Amendment and the doctrine of academic freedom. On the other hand, administrators at federally-funded institutions have a legal obligation under Title VI and other laws to eliminate "hostile environments" for Jewish students when they arise and to ensure that Jewish and pro-Israel students are not silenced, muted, or prevented from expressing their identities and opinions. Without appropriate guidance and resources concerning the difference between criticism of Israel and anti-Semitic harassment, too many administrators err on the side of silence.

### B.    Anti-Semitic Conduct Directed at Jewish Students Has Increased Significantly Since October 7

In the aftermath of the October 7, Jewish students on campuses across the country have been increasingly targeted due to the Jewish people's connection to Israel. Students report being shunned, harassed and marginalized as "Zionists." A survey published in the months after the attack found that nearly three-quarters of Jewish college students experienced or witnessed anti-Semitism since the start of the school year, half felt physically unsafe because of their Jewish

---

[8] The White House, The U.S. National Strategy to Counter Anti-Semitism 9 (2023), https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Anti-Semitism.pdf.

identity, and one-third felt compelled to conceal their Jewish identity on campus. Indeed, a majority of all students—Jewish and non-Jewish—feel that their university has not done enough to address anti-Jewish prejudice on campus.[9]

The survey data on campus anti-Semitism and countless recent anti-Semitic incidents reflect the harrowing experiences of Jewish students who have spoken out about their experiences on campus, often inviting targeted threats against them. For example, at the University of Texas at Dallas ("UTD")—whose Students for Justice in Palestine ("SJP") chapter is one of the plaintiffs in this action—one student reported "receiving threats via social media and text messages," "see[ing] swastikas and the number '666' next to a Jewish star," and "be[ing] followed on campus, yelled at and called a Nazi."[10] Another Jewish student at UTD reported receiving threats of physical violence such as, "if you aren't killed by Hamas, then we will kill you."[11] Jewish students report that the threats are increasing and are connected to the protests on UTD campus.[12] The protests at UTD have escalated to the point that Jewish students at UTD now "choose to stay home" on protest days and "many Jewish groups have opted to host events off-campus" due to harassment and safety concerns.[13] Jewish students at UTD report that "[t]he culture at UTD has deteriorated to the point where Jewish students no longer feel welcome or safe on campus."[14] In an op-ed,

---

[9] Anti-Defamation League, Campus Antisemitism: A Study of Campus Climate Before and After the Hamas Terrorist Attacks (Nov. 29, 2023), https://www.adl.org/resources/report/campus-antisemitism-study-campus-climate-and-after-hamas-terrorist-attacks.

[10] Valeria Olivares, *Jewish students call on UTD to condemn antisemitism, say they feel unsafe on campus*, Dallas Morning News (May 8, 2024), https://www.dallasnews.com/news/education/2024/05/08/jewish-students-call-on-utd-to-condemn-anti-Semitism-say-they-feel-unsafe-on-campus/.

[11] Marvin Hurst, *UT Dallas Jewish students struck by fear, hundreds of protesters flood downtown streets*, CBS News Tex. (May 7, 2024), https://www.cbsnews.com/texas/news/ut-dallas-jewish-students-struck-by-fear-protesters-flood-downtown-dallas/.

[12] *Id.*

[13] Olivares, *supra* note 10.

[14] *Id.*

UTD President Richard Benson observed that while the protests were noisy and antagonistic, the University did not interfere with any that occurred before May 2024, reiterating the University's staunch support and protection of the rights of free speech and free assembly.[15]

As emphasized by the Anti-Defamation League,[16] shunning and exclusion do not occur in a vacuum. When biased attitudes are not addressed or challenged, they frequently escalate to biased and discriminatory conduct. At UTD, the protests crossed the line from speech to unlawful conduct on May 1, 2024, when

> protesters constructed a barricaded encampment in the middle of [UTD's] campus—an action that violated university rules and was done without advance notice or approval. In addition to tents, the barricade included wooden pallets, tires and other impediments to movement across a main walkway on campus. It was a well-planned, intentionally provocative operation, and it soon became apparent, as food and water were delivered throughout the day, that the organizers were planning to be there for days or weeks, rather than hours."[17]

As noted in *Frankel*, attempts to block Jewish students from accessing facilities on campus impedes their right to equal access to educational opportunities and equal protection.

Congressional testimony and lawsuits filed by students from campuses across the country demonstrate that UTD's experience is far from anecdotal. Below are just a few notable examples where a school's failure to call out, or delay in calling out, antisemitic speech has encouraged escalation in unlawful anti-Semitic conduct—the very thing GA-44 is designed to prevent:

- **SJP UCLA**. At an SJP protest on the UCLA campus, protesters yelled "beat that fucking Jew" through a megaphone while bashing a piñata bearing an image of Israeli Prime Minister Benjamin Netanyahu. *See* Complaint ¶ 67, *Frankel v. Regents of Univ. of Cal.*, 24-CV-4702 (C.D. Cal. June 5, 2024). Soon after, these protesters blocked Jewish students from accessing campus facilities. *Id.* ¶ 108 (protestors established the so-called "Jew Exclusion Zone."). And as noted above, just last week, the U.S. District Court for the

---

[15] Richard C. Benson, *UTD president: No one was arrested for protesting*, Dallas Morning News (May 8, 2024), https://www.dallasnews.com/opinion/commentary/2024/05/08/utd-president-protecting-free-speech-and-safety/.

[16] Anti-Defamation League, Pyramid of Hate (2018), https://www.adl.org/sites/default/files/documents/pyramid-of-hate.pdf.

[17] Benson, *supra* note 15.

Central District of California issued an injunction against UCLA for failing to protect its Jewish students. *See Frankel*, 2024 WL 3811250, at \*1, \*7.

- ***SJP Rutgers***. A Jewish student at Rutgers University testified before Congress about the takeover of a student center by SJP, forcing "Jewish students caught inside . . . to flee." During the takeover, protesters shouted "murderer" at a student wearing a yarmulke as he walked through the building.[18]

- ***SJP Columbia***. A Jewish student at Columbia University testified before Congress to a litany of antisemitic conduct that had occurred on campus after the October 7 terrorist attack. Her testimony documents brazen attempts to intimidate and threaten Jewish students, such as defacement of the coffeemaker in the campus Hillel with a sticker reading: "LONG LIVE the PALESTINIAN ***ARMED STRUGGLE***." [19]  These threats were accompanied by other acts to harass and marginalize Jewish students. Following a rally, a crowd of protesters moved toward the university's center for Jewish life, causing the building to be locked down and Jewish students to shelter inside.[20]

- ***SJP Cornell***. A Jewish student at Cornell University testified before Congress about Cornell SJP's sponsorship of a resolution justifying Hamas's attack and blaming Israel for the murders of its own people. She further testified that she has been called a "Nazi" just for being Jewish.[21]  She also testified that other Jewish students received gruesome, antisemitic threats, including the following message: "If I see another Jew on campus I will stab you and slit your throat. If I see another pig female [J]ew [I] will drag you away, rape you, and throw you off a cliff. Jews are human animals and deserve pigs' death. Liberation by any means, from the river to the sea, Palestine will be free."[22]

---

[18] *Roundtable with Jewish Students Impacted by Antisemitism Before the H. Comm. on Educ.*, 118th Cong. (2024) (written statement of Joe J. Gindi, Rutgers University), *available at* https://edworkforce.house.gov/uploadedfiles/joe_j._gindi_testimony.pdf.

[19] *Roundtable with Jewish Students Impacted by Antisemitism Before the H. Comm. on Educ.*, 118th Cong. (2024) (written testimony of Eden Yadegar, Columbia University), *available a*t https://edworkforce.house.gov/uploadedfiles/yadegar_updated_written_statement.pdf.

[20] Letter from Virginia Foxx, Chairwoman, H. Comm. on Educ. & the Workforce Chairwoman to Minouche Shafik, President, Columbia University et al., (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_foxx_letter_to_columbia_university.pdf.

[21] *Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University Leadership: Hearing Before the H. Comm. on Ways & Means*, 118th Cong. (2024) (testimony of Talia Dror, Cornell University), *available at* https://waysandmeans.house.gov/2024/06/18/six-key-moments-hearing-on-anti-Semitism-on-college-campuses (detailing "eight months of being called a Nazi because [of her] belie[f] in the existence of the state of Israel").

[22] *From Ivory Towers to Dark Corners: Investigating the Nexus Between Antisemitism, Tax-Exempt Universities, and Terror Financing: Hearing Before the H. Comm. on Ways & Means*, 118th Cong. (2023) (testimony of Talia Dror, Cornell University), *available at* https://gop-waysandmeans.house.gov/wp-content/uploads/2023/11/Dror-Testimony.pdf.

**C.      The Adoption of GA-44 and the IHRA Definition**

In issuing GA-44, Governor Abbott recognized and sought to address this upswell in campus anti-Semitism by directing all Texas higher education institutions to take three steps: (i) to update free speech policies to establish "appropriate punishments" for anti-Semitism; (ii) to "enforce[]" the policies and "discipline" those who violate the policies; and (iii) to "[i]nclude the definition of antisemitism, adopted by the State of Texas in Section 448.001 of the Texas Government Code, in university free speech policies to guide university personnel and students on what constitutes antisemitic speech."[23]   The definition of anti-Semitism adopted in Section 448.001 incorporates the IHRA Definition, including its examples.  And GA-44 also recognizes that the current anti-Semitism crisis must be addressed in a manner that is consistent with the State's commitment to freedom of speech.

**II.    ARGUMENT**[24]

The government can legitimately police discriminatory harassing conduct.  *Mitchell*, 508 U.S. at 489. And even protected speech can be considered evidence of discriminatory intent.  *Id.*[25]

---

[23] GA-44, *supra* note 1, at 2.

[24] As set forth in the Texas Defendants' opposition to Plaintiffs' Motion, any ambiguities in GA-44 "must be construed, wherever fairly possible, to avoid constitutional infirmities." *United States v. Boerner*, 508 F.2d 1064, 1067–68 (5th Cir. 1975) (citing, *inter alia*, *United States ex rel. Atty. Gen. v. Delaware & H. Co.*, 213 U.S. 366 (1909)).  The Brandeis Center agrees that the provisions of GA-44 should be construed as regulating discriminatory conduct, not speech.

[25] The Supreme Court has repeatedly explained that speech—even constitutionally protected speech—may be offered as evidence of unlawful discrimination.  For example, the Court has held that sexist speech that may not be banned based on its content may nevertheless "produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) (Scalia, J.); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (Brennan, J.) (plurality opinion); *Examining Antisemitism on College Campuses: Hearing Before the H. Comm. on the Judiciary*, 115th Cong. (2017) (statement of Paul Clement), *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/legacy_files/wp-content/uploads/2017/10/Clement -Testimony-11.07.17.pdf.  In other words, the speech itself is protected, but it may be evidence of actions that are discriminatory.  This is an elementary principle and one that underlies GA-44.

Ascertaining whether conduct is motivated by anti-Semitic animus is particularly challenging given the long-standing misunderstandings about what "anti-Semitism" means—and the forms it takes—as detailed in Section I.A., *supra*.

GA-44 solves that challenge by directing universities to adopt the IHRA Definition of anti-Semitism into their free speech policies. The IHRA Definition facilitates compliance with the First Amendment by guiding universities on how to differentiate between lawful First Amendment activity concerning Israel and discriminatory activity motivated by anti-Semitic animus. As discussed below, the IHRA Definition (i) arose out of a need to understand and develop a common definition for anti-Semitism given the peculiar forms it takes; (ii) draws careful distinctions between what is anti-Semitic and what is not, so as to avoid making "anti-Semitism" an overbroad and thus overinclusive label; and (iii) has been widely accepted and used in a variety of contexts—including by each of the four past Presidential administrations—to help protect Jewish students from discrimination without restricting First Amendment rights.

### A. The IHRA Definition Was Created to Address Misunderstandings About Anti-Semitism and Help Evaluate the Motivation of Conduct Directed at Jews

In recent years, the primary means of addressing anti-Semitism has been through development and application of a standard definition of anti-Semitism. Before the IHRA Definition was adopted, university administrators and government officials were repeatedly stymied in their efforts to ensure compliance with anti-discrimination law.[26] Adopting clear definitions improves prevention by increasing consistency, facilitating comparison across data collection systems, and enabling the comparison of research on intervention and prevention programs. More importantly, clarifying documents like the IHRA Definition improve free speech and rule-of-law values by providing greater clarity, foreseeability, and standardization rather than

---

[26] *See generally* Kenneth L. Marcus, The Definition of Anti-Semitism (Oxford, 2015).

leaving enforcement to ad hoc decision-making.  With respect to anti-Semitism, the need for a uniform definition is especially acute.  Misunderstandings about what anti-Semitism means—and the forms it takes—have long plagued efforts to address anti-Semitic conduct.

The IHRA was formed in 1998 by former Swedish Prime Minister Göran Persson and is committed to preserving the memory of those killed in the Holocaust by working collaboratively to fight against anti-Semitism, xenophobia, racism, ethnic cleansing, and genocide.  The Alliance originally comprised 31 countries that included numerous heads of state.[27]  The IHRA Definition emerged amid concern about growing anti-Semitism at the turn of the millennium.  Calls to address this problem began with an understanding that in order to combat anti-Semitism, it is necessary to understand what anti-Semitism is.[28]  In 2005, the European Monitoring Centre on Racism and Xenophobia ("EUMC") was formed to draft a working definition and, in 2005, published a new Working Definition of Anti-Semitism (the "EUMC Working Definition").[29]  In developing this new definition, the EUMC was specifically concerned about avoiding problems with the agency's prior anti-Semitism definition, which focused on the perpetrators' mindset in ways that were both controversial and difficult to apply.  When a Montreal Jewish elementary school was firebombed,

---

[27] *See* U.S. Dep't of State, Off. of the Special Envoy to Monitor and Combat Antisemitism, Defining Antisemitism (last visited Aug. 20, 2024), https://www.state.gov/defining-antisemitism/ (31 member states at adoption); *see also* Int'l Holocaust Remembrance All. (IHRA), About the International Holocaust Remembrance Alliance, https://holocaustremembrance.com/who-we-are (last visited Aug. 20, 2024).  Today, the IHRA has 35 member countries, including the United States.

[28] Indeed, even today, surveys have found that roughly half of the United States population—and more than half of Americans ages 18 to 29—do not know the meaning of the word.  *See* Avi Mayer, *The State of Antisemitism in America 2020: Insights and Analysis*, Am. Jewish Comm. (Oct. 26, 2020),    https://www.ajc.org/sites/default/files/pdf/2020-11/The_State_of_Antisemitism_in_America_2020.pdf.

[29] *Anti-Semitism Across Borders: Hearing on H.R. 115-10 Before the Subcomm. on Afr., Glob. Health, Glob. Hum. Rts., & Int'l Orgs. Of the H. Comm. on Foreign Affs.*, 115th Cong. (2017), https://www.govinfo.gov/content/pkg/CHRG-115hhrg24753/html/CHRG-115hhrg24753.htm.

and the perpetrator's note indicated that the explosion was intended to avenge actions of the state of Israel. the old definition proved useless in categorizing the attack.  The new EUMC Working Definition was distinguished by its focus on *conduct*, considering speech as evidence of intent, as prosecutors long have done.[30]  In 2016, the IHRA adapted a substantially similar version of the EUMC Working Definition, leading to its adoption by over 30 IHRA-member countries.[31]

Since then, over 1,100 separate governments, non-governmental organizations ("NGOs"), and other key institutions have followed suit.[32]  The IHRA Definition has also been endorsed by numerous world leaders and U.S. Presidents of both parties and is used by numerous departments and agencies within the U.S. federal government, including the State Department[33] and—as particularly relevant here—the Office of Civil Rights in the Department of Education.[34]

---

[30] Marcus, *supra* note 26, at 17-19.

[31] Louis D. Brandeis Ctr., The Louis D. Brandeis Center for Human Rights Under Law, FAQs About Defining Anti-Semitism, https://brandeiscenter.com/wp-content/uploads/2024/03/guide_faqs_anti-Semitism-2022c.pdf (last visited Aug. 20, 2024).

[32] *See* Combat Antisemitism Movement, *Countries That Have Adopted the IHRA Working Definition of Antisemitism* (Jan. 17, 2023), https://combatantisemitism.org/studies-reports/ahead-of-international-holocaust-remembrance-day-cam-encouraged-by-more-than-1000-entities-including-majority-of-us-states-adopting-ihra-working-definition-of-anti-Semitism/

[33] *See* U.S. Dep't of State, Off. Special Envoy to Monitor & Combat Antisemitism, Report on Policies, Programs, and Actions Across the Globe to Combat Antisemitism (2023), https://www.state.gov/report-on-policies-programs-and-actions-across-the-globe-to-combat-anti-Semitism/ (emphasizing that battling anti-Semitism requires being able to define it and noted that the IHRA Definition fulfills this needed function).

[34] *See* Louis D. Brandeis Ctr., Statement from U.S. Assistance Secretary for Civil Rights on Title VI Protection from Discrimination Based on Shared Ancestry or Ethnic Characteristics (Jan. 4, 2023), https://brandeiscenter.com/statement-from-u-s-assistant-secretary-for-civil-rights-on-title-vi-protection-from-discrimination-based-on-shared-ancestry-or-ethnic-characteristics/. In a statement, Assistant Secretary for Civil Rights Catherine Lhamon, noted that "Additional resources, including a Questions and Answers guide released in January 2021 that affirms OCR's commitment to complying with Executive Order 13899 on Combatting Anti-Semitism are available on the Shared Ancestry or Ethnic Characteristics page of OCR's website." *Id.*; Letter from Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., U.S. Dep't of Educ. (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf; Letter from Catherine E. Lhamon, Assistant Sec'y

**B.    The IHRA Definition Narrowly Defines Anti-Semitism and Provides Clear Examples to Differentiate Between Discriminatory Conduct and Political Speech Criticizing Israel**

The IHRA Definition is designed to draw careful distinctions between what is anti-Semitic and what is not, so as to avoid making "anti-Semitism" an overbroad and thus overinclusive label. The IHRA Definition expressly states that mere "criticism of Israel similar to that leveled against any other country" is not anti-Semitic.  But *delegitimizing*, *demonizing*, and/or subjecting Israel to *double standards*—such as by denying Jews the right to self-determination, dehumanizing the Jewish collective through stereotypical allegations of Jewish power and control, blaming Jews for real or imagined wrongdoing, or holding all Jews collectively responsible for the actions of the State of Israel—are classic hallmarks of anti-Semitism.  These concepts are commonly known as the "Three Ds," a term coined by Soviet Union dissident Natan Sharansky.[35]  The "Three Ds" are incorporated not only into the IHRA Definition, but into the U.S. State Department's 2010 definition of anti-Semitism.[36]

The IHRA Definition is comprised of a general statement followed by a series of examples. The general statement provides that "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[37] The examples include the following:

---

for Civ. Rts., Off. for Civ. Rts., U.S. Dep't of Educ. (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/anti-Semitism-dcl.pdf.

[35] Natan Sharansky, *3D Test of Antisemitism: Demonization, Double Standards, Delegitimization*, Jerusalem Ctr. for Pub. Affs. (Oct. 21, 2004), https://jcpa.org/article/3d-test-of-antisemitism-demonization-double-standards-delegitimization/.

[36] U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., Defining Antisemitism (2010), https://2009-2017.state.gov/j/drl/rls/fs/2010/122352.htm.

[37] *See* IHRA, Working definition of antisemitism, *supra* note 6.

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g.[,] gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II ([i.e.,] the Holocaust).

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the State of Israel.[38]

GA-44's adoption of the IHRA Definition provides Texas universities and their administrators with another tool that they can use in determining whether certain conduct on campus—such as conduct that targets Jewish students on the basis of their shared ancestral heritage connected to Israel or that denies them equal access to a university's programming—should be

---

[38] *Id.*

punished, while also ensuring that legitimate First Amendment activity is respected and encouraged.

### C. The IHRA Definition Has Received Broad Bipartisan Support and Is Core to Government Policies and Laws Designed to Protect Jewish Students

Governor Abbott is hardly the first government official to endorse the IHRA Definition as a tool to protect Jews and the First Amendment. In the United States, the IHRA Definition or the EUMC version from which it was adapted has been employed by each presidential administration since the inception of the EUMC Working Definition in 2005. The Bush administration adopted the IHRA Definition as a guide for the United States Commission on Civil Rights in 2006,[39] and for the United States State Department in 2007.[40] Similarly, the Obama administration used the IHRA Definition to develop the State Department's official working definition published in 2010,[41] and the State Department later adopted the current version of the IHRA Definition when it was updated in 2016.[42] The Trump administration continued the use of the IHRA Definition by the State Department[43] and issued Executive Order 13899 ("EO 13899"), requiring that the IHRA Definition be considered by agencies enforcing Title VI.[44] The Biden administration has likewise reaffirmed the use of the IHRA Definition.[45] The IHRA Definition has also been adopted by 37

---

[39] *See* U.S. Comm'n on C.R., Findings and Recommendations of the United States Commission on Civil Rights Regarding Campus Anti-Semitism (2006), https://www.usccr.gov/files/pubs/docs/050306FRUSCCRRCAS.pdf.

[40] *See* U.S. Dep't of State, Bureau of Democracy, H.R. & Lab., "Working Definition" of Anti-Semitism (2007), https://2001-2009.state.gov/g/drl/rls/56589.htm.

[41] U.S. Dep't of State, Defining Antisemitism, *supra* note 27.

[42] U.S. Dep't of State, Off. Special Envoy to Monitor & Combat Antisemitism, Defining Anti-Semitism, https://www.state.gov/defining-antiSemitism/ (last visited Aug. 20, 2024).

[43] *See id.*

[44] The White House, Executive Order on Combatting Antisemitism (Dec. 11, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-201900859.pdf.

[45] Am. Jewish Comm., *AJC Praises Biden Administration for Support for IHRA Working Definition of Anti-Semitism* (Feb. 2, 2021), https://www.ajc.org/news/ajc-praises-biden-administration-support-for-ihra-working-definition-of-anti-Semitism.

states from states across the political spectrum, such as the Dakotas and Texas on the one hand to New York and Massachusetts on the other hand.[46]

On May 25, 2023, the Biden administration announced the National Strategy confirming the U.S. commitment to the IHRA Definition in the wake of numerous attacks on Jewish Americans that had occurred in the six years since "Neo-Nazis marched from the shadows through Charlottesville, Virginia, chanting, 'Jews will not replace us.'"[47]  In a September 27, 2023 report, the State Department emphasized that battling anti-Semitism requires being able to define it and noted that the IHRA Definition fulfills this needed function.[48]  Further, on September 28, 2023, as part of the National Strategy, eight federal agencies (the U.S. Departments of Agriculture, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Labor, Treasury, and Transportation) clarified that although Title VI does not include "religion" as a protected category, it protects members of faith-based communities when they are targeted on the basis of their actual or perceived shared ancestry or ethnicity.[49]

The IHRA Definition continues to play a critical role in enforcing Title VI's protections of Jewish and Israeli students from harassment.[50]  In January 2023, when the U.S. Department of Education issued a factsheet on anti-Semitic discrimination, the Assistant Secretary for Civil Rights explicitly affirmed the commitment of the Office for Civil Rights ("OCR") to EO 13899

---

[46] *See* Combat Antisemitism Movement, States, *supra* note 2.

[47] The White House, The U.S. National Strategy to Counter Antisemitism, *supra* note 8 at 2, 13.

[48] *See* U.S. Dep't of State, Report on Policies, Programs, and Actions, *supra* note 33.

[49] *See* Press Release, The White House, Fact Sheet: Biden-Harris Administration Takes Landmark Step to Counter Antisemitism (Sept. 28, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-anti-Semitism/.

[50] 42 U.S.C. § 2000d *et seq.*; Executive Order 13899, Combating Antisemitism, 3 C.F.R. §§ 68779-68780 (2019), *available at* https://www.federalregister.gov/documents/2019/12/16/2019-27217/combating-anti-Semitism ("EO 13899").

(which incorporates the IHRA Definition).[51]   To date, the OCR maintains a document with "Questions and Answers on Executive Order 13899" on its website, which it has included as a recommended resource in guidance letters issued in May 2023 and November 2023.  The U.S. Department of Education has also reaffirmed its commitment to EO 13899, both before and after the October 7 Hamas attack.[52]

### D.    The IHRA Definition Protects Jewish Students and Supports Free Speech

GA-44 was an appropriate and measured response by Governor Abbott to the disturbing outbreak of anti-Semitic harassment and discrimination occurring on college campuses throughout Texas and the country more broadly in the wake of October 7.  It is well-settled that the government can—and should—police discriminatory and harassing conduct.  GA-44 ensures that such conduct will be policed appropriately and consistently—without violating the First Amendment—by directing university administration to consider the highly-regarded and long-standing IHRA Definition when evaluating whether the conduct was motivated by anti-Semitic animus.  That is why the IHRA Definition has received widespread support and acceptance across the political spectrum and has been employed by the federal government under each of the past four presidential administrations, the majority of the states in this country, many other countries, and countless organizations domestically and abroad.[53]

In serving the dual aims of protecting Jewish students without infringing on free speech rights, the IHRA Definition is wholly consistent with—and core to—the Brandeis Center's mission and the beliefs of its namesake and storied jurist.  As U.S. Supreme Court Justice Brandeis wrote:

---

[51] *See* Louis D. Brandeis Ctr., Statement from U.S. Assistance Secretary for Civil Rights, *supra* note 34.

[52] *See* Letter from Catherine E. Lhamon (Nov. 7, 2023), *supra* note 34; Letter from Catherine E. Lhamon (May 25, 2023), *supra* note 34.

[53] *See* Combat Antisemitism Movement, Countries, *supra* note 29.

"If there be a time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."  *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring).  But additional speech is not sufficient where, as here, particularly with respect to Jewish students, "one side is intimidated into silence."[54]  Indeed, one of the "purpose[s] of an anti-discrimination bill or policy that adopts a definition of antisemitism is to provide for equality in the free speech arena by removing illegal harassing conduct motivated by definitional antisemitism" that, among other things, intimidates Jewish students into hiding their identities and silence.[55]  GA-44 promotes equality in free speech and protect Jewish students through the adoption of the IHRA Definition.

In short, the IHRA Definition protects speech while also protecting Jewish students, enabling university administrators to provide a safe, welcoming campus for all students.

## CONCLUSION

For the foregoing reasons, and those set forth in the Texas Defendants' response to Plaintiffs' motion for a preliminary injunction and motion to dismiss Plaintiffs' amended complaint, Plaintiffs' motion for a preliminary injunction should be denied and their amended complaint dismissed.

---

[54] Mark Goldfeder, Defining Antisemitism, 52 Seton Hall L. Rev. 119, 141 (2021).
[55] *Id.*

Dated: August 20, 2024

Respectfully submitted,

LYNN PINKER HURST & SCHWEGMANN LLP

*/s/ Jared Eisenberg*
Michael P. Lynn, P.C.
Texas Bar No. 12738500
mlynn@lynnllp.com
Jared Eisenberg
Texas Bar No. 24092382
jeisenberg@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel: (214) 981-3800

OF COUNSEL:

ROPES & GRAY LLP

David B. Hennes
david.hennes@ropesgray.com
Gregg L. Weiner
gregg.weiner@ropesgray.com
Lisa H. Bebchick
lisa.bebchick@ropesgray.com
Alexander B. Simkin
alexander.simkin@ropesgray.com
Andrew S. Todres
andrew.todres@ropesgray.com
Judith Faktorovich
judy.faktorovich@ropesgray.com
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000

Logan D. Hovie
logan.hovie@ropesgray.com
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 508-4600

*Attorneys for The Louis D. Brandeis Center for Human Rights Under Law*