## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| **Students for Justice in Palestine, at the University of Houston**, et al, | Case No. 1:24-cv-00523-RP |
| Plaintiffs, | Hon. Judge Robert Pitman |
| v. | |
| **Greg Abbott**, in his official capacity only as the Governor of the State of Texas, et al. | |
| Defendants. | |

## PLAINTIFFS' REPLY TO DEFENDANTS' PRELIMINARY INJUNCTION OPPOSITION

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.    No defendant is immune from suit because all Defendants are doing their part to enforce GA-44's Israel-specific speech code. ............................................................. 2

        a.    The Governor's enforcement efforts make him a proper defendant............ 4

        b.    The Boards of Regents Defendants are proper, because they adopted a definition of antisemitism that punishes pure political speech. ..................................... 6

        c.    School Presidents are proper defendants, because they administer GA-44's speech code. ............................................................................................................... 8

    II.    Plaintiffs' have standing ...................................................................................... 10

        a.    Defendants can't interpret away the conflict between Plaintiffs' planned conduct and the speech code GA-44 imposes ........................................................... 11

        b.    The threat of future enforcement is extreme.............................................. 15

        c.    DSA Has Associational Standing because Advocating for Palestine is Germane to DSA's Purpose. ........................................................................................ 19

    III.    Defendants' decision to stop prohibiting Plaintiffs' from using their favorite slogan does not moot any of Plaintiffs' claims .............................................................. 21

    IV.    Defendants don't meaningfully reckon with the obvious content and viewpoint discrimination embraced by Defendants here ...................................................... 25

        a.    Tinker does not apply in the university setting. ........................................ 25

        b.    Even if *Tinker* applied in the university setting, viewpoint-discriminatory speech code restrictions are unconstitutional. ........................................................... 28

        c.    The Government's *Tinker*-based cases are inapplicable here. ................... 29

        d.    Texas leaves out that a 2019 law defines the outdoor area of the State's public campuses as traditional public forums, with the only permissible speech restrictions being in furtherance of a "significant interest" Defendants do not possess .......................... 31

        e.    The challenged policies are unconstitutional viewpoint discrimination. ... 34

CONCLUSION ............................................................................................................. 36

CERTIFICATE OF SERVICE ...................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*A.M. ex rel. McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009) ...........................................27, 28

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ................................................................. 20

*Ass'n of Amer. Physicians & Surgeons, Inc.*, 627 F.3d 547 (5th Cir. 2010)............................. 18

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138 (2nd Cir. 2006) .......................................................................................................................... 18

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019).................................................2, 4, 5

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).............................................................. 21

*Clark v. Martinez*, 543 U.S. 371 (2005).......................................................................... 10

*Coalition for Ind. Tech. Research v. Abbott*, 2023 WL 8582597 (W.D. Tex. 2023) ............3, 4, 5

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)......................... 31

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008)......................................................... 31

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)................................................ 10

*FBI v. Fikre*, 601 U.S. 234 (2024) ................................................................................ 20

*Fennell v. Marion Indep. Sch. Dist.,* 804 F.3d 398 (5th Cir. 2015) ...................................23, 30

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000)........20, 23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)....................................................... 19

*Haverkamp v. Linthicum*, 6 F.4th 662 (5th Cir. 2021) .....................................................7, 8

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .................................................. 25

*Healey v. James*, 408 U.S. 169 (1972) ........................................................................... 26

*Hobbs v. Hawkins*, 968 F.2d 471 (5th Cir. 1992) ............................................................ 27

*Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023) ........................................................passim

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).............................................................. 24

*Libertarian Party of Los Angeles Cnty. v. Bowen,* 709 F.3d 867 (9th Cir. 2013)....................... 17

*Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038, (2021)............................................. 24

*Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986)............................................................... 25

*Matal v. Tam*, 582 U.S. 218 (2017)............................................................................... 32

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) ...................... 24, 25, 26

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993)..................................................................................................................... 24

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ..................................................................... 26

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir.2001) .............................................................. 2

*Richardson v. Flores*, 28 F. 4th 649 (5th Cir. 2022) ........................................................8, 9

*Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004). .............................................. 29

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)..........................27, 32

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ....................................................... 17

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016)......................................................... 11

*Sessions v. Dimaya*, 584 U.S. 148 (2018)....................................................................... 11

*Smith v. Tarrant Cnty. College Dist.*, 694 F. Supp. 2d 610 (N.D. Tex. 2010)....................28, 29

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ......................................... 13

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020)...........................................passim

*St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531 (1978)............................................ 21

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...................................................................... 17

*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957)................................................... 25

iii

*Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503 (1969) .................................. 26

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2012) ........................ 21, 30

*U.S. v. W. T. Grant*, 345 U.S., 629 (1953) ................................................................. 21

*United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023).............................................. 2, 3

*United States v. Menasche*, 348 U.S. 528 (1955) .................................................. 13

*United States v. Stevens,* 559 U.S. 460 (2010) ................................................... 10, 11

*West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358 (2000) ........................... 28

*Widmar v. Vincent*, 454 U.S. 263 (1981) .......................................................... 24

*Young Conservatives of Texas Found. v. Univ. of N. Texas,* 597 F. Supp. 3d 1062 (E.D. Tex. 2022) ................................................................................. 7, 8

## Statutes

Tex. Educ. Code Ann. § 111.20(c) .................................................................... 5

Tex. Educ. Code Ann. § 67.02 ........................................................................ 5

Tex. Educ. Code Ann. § 70.01 ........................................................................ 5

Tex. Educ. Code Ann. § 71.02 ........................................................................ 5

TX GOVT § 448.001 (West 2021) ................................................................. 12

## Other Authorities

*"Guide"*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/guide ................................................................. 13

IHRA, *Working Definition of Antisemitism*, May 26, 2016 (available at: https://holocaustremembrance.com/resources/working-definition-antisemitism) ... 12, 33

Policies of the Board of Regents, University of Houston System, at § 2.2(A)..................... 7

Policies of the Board of Regents, University of Houston System, at § 2.2(B) ..................... 5

Policies of the Board of Regents, University of Texas, at § 4.9........................................... 6

UT Regents Rule 20201 § 2.2 ........................................................................ 5

## INTRODUCTION

The viewpoint discrimination of Governor Abbott's executive order is all there in plain English. Organizing "protests and walkouts" where students used slogans, "such as *from the river to the sea Palestine will be free"* to communicate their political message was "antisemitic." Texas universities would be required to address this "sharp rise in antisemitic speech" via what GA-44 menacingly describes as "appropriate punishments."

And when students organized just such a protest and walkout on April 24, 2024 in Austin, Governor Abbott and his co-defendants followed the policy memorialized by GA-44 exactly. Even before the event, Governor Abbott and campus officials in Austin worked together to aggregate dozens of police officers and positioned them on campus to be deployed against Plaintiff UT-PSC. They did so despite Plaintiff UT-PSC repeatedly telling campus officials that they were not gathering for an encampment and intended to comply with all relevant rules.

But Defendants decided to make a spectacle out of shutting down the protest. Rather than follow the examples of so many universities—Brown University, University of California, Riverside, Syracuse University, Northwestern University, Harvard University, among others—who brought an end to student protests via negotiation, Defendants chose force. After making 56 arrests for trespass on April 24th and another 79 on April 29th, however, not a single charge remains. Travis county prosecutors dropped each charge, because "the legal burden to prove these 79 criminal trespass cases" could not be met.[1]

---

[1] Criminal trespass charges against 79 UT Austin protestors dismissed. Tan Radford, Fox 7 Austin (June 26, 2024) available at: https://www.fox7austin.com/news/ut-austin-palestine-protesters-criminal-trespassing. (On the first day of protests, there were 56 arrests made. The criminal trespassing charges were dropped the next day. During another protest, 79 others were arrested…[but] the criminal trespassing charges have now been dismissed.")

There is an irrational zeal to what Defendants are doing. It's what led one campus official to mistake the triangle of a Palestinian flag with a Nazi symbol and another campus official to label a Jewish group's press statement as "Hamas propaganda." It is why Defendants are so willing to take unprecedented, viewpoint conscious measures against Plaintiffs.

With GA-44 and the actions Defendants have taken in furtherance of it, Defendants have become unmoored from the First Amendment's core principles. They have banned a specific phrase, imposed a speech code applicable to just one foreign country, and admit that they took action against Plaintiffs, not because of what they did or said they planned to do, but because Defendants were frightened by what they read on the internet about other students in other states.

An injunction here will guide Defendants back to the First Amendment's trusty, time-tested shores. It is needed, perhaps this year more than any other so far this century.

## ARGUMENT

### I.     No defendant is immune from suit because all Defendants are doing their part to enforce GA-44's Israel-specific speech code.

For Defendants to successfully invoke sovereign immunity, they must put distance between themselves and the practices Plaintiffs challenge. That is because, to defeat Defendants' immunity argument, "[a]ll that is required is a mere scintilla of enforcement by the relevant state official with respect to the challenged law." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (cleaned up). It is why Defendants' protestations that Governor Abbott and his executive order have "no connection to their alleged injuries" are made so vigorously, despite conclusive evidence proving the opposite. Defs' PI Opp., Dkt. 32 at 30.

That conclusive evidence is from Defendants themselves. All the defendants—the Governor and those he ordered to act—admit to the same basic relationship between them and the Israel-specific speech code outlined by GA-44. In short, Governor Abbott required his co-defendants to operationalize his plan, and then in concert, Governor Abbott worked directly to shut down many of Plaintiffs' protests.[2]

Defendants acknowledge that "UTSA officials previously interpreted GA-44 to require UTSA to prohibit Plaintiffs from saying "from the river to the sea, Palestine will be free." Defs.' PI Opp., Dkt. 32 at 30, fn. 202. They acknowledge that the UT System's Office of General Counsel "directed all UT System institutions to amend their speech policies to comply with GA-44." *Id.* at 24. And they admit that upon receiving that direction to "comply with GA-44," four UT campuses "revised their written campus policies to incorporate the definition of antisemitism provided by Texas Government Code 448.001(2)." *See also* Schuman Declaration ("After receiving guidance from the University of Texas System on how to comply with GA-44, my office updated Chapter 13 of the Institutional Rules on Student Services and Activities to include a definition of antisemitism provided by Texas Government Code § 448.001(2)."). Defendants admit that UH did the same. And when UH Board of Regents did so, they admitted that it was "Governor Abbot's Executive Order" that "required [them] to review and update free speech policies."[3] *Id.* at 25.

These facts are fatal to Defendants' *Ex Parte Young* arguments. Sovereign immunity does not protect Defendants who are acting, threatening to act, or who at least may act to

---

[2] The direct involvement of Defendants that Plaintiffs prove here also shows each Defendants' personal involvement, which is what makes them liable under Section 1983.
[3] *Agenda, Board of Trustees, Austin Independent School District, July 24, 2023.* Accessed August 26, 2024. https://meetings.boardbook.org/Public/Agenda/685?meeting=636562.

enforce an unconstitutional state act. *Okpalobi v. Foster*, 244 F.3d 405, 421 (5th Cir.2001). If the Court finds that "an official can act" and that there is a "significant possibility that he or she will act to harm a plaintiff," the *Young* exception applies. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).

### a.  The Governor's enforcement efforts make him a proper defendant.

The Governor qualifies as a proper *Ex Parte Young* defendant because Governor Abbott has the legal capacity and a demonstrated willingness to suppress Plaintiffs' expressive conduct.  And while the Governor's "mere issuance of an executive order is not enough" to make him a defendant, the facts show Governor Abbott to be willing and able to enforce the terms of GA-44 directly by ordering state police to arrest protesting students.

Earlier this year, to the shock of the world, the Governor "silently invoked" his Section 411.012 authority over the Department of Public Safety and "commandeered" that agency to end protests in Austin on April 24th and April 29th. *United States v. Abbott*, 85 F.4th 328, 338. (5th Cir. 2023); *See also* ("if the plaintiffs want to show that the Governor silently invoked [a legal authority] and implicitly commandeered a state agency, they must plead facts to support that inference."). In this case, Defendants have done "more than promulgate" an executive order; they have each taken steps to enforce it against Plaintiffs. *Id.* at 337.

While Defendants submit a variety of declarations that claim they had viewpoint-neutral time, place, and manner reasons that justify the shutdown of those protests, what matters for sovereign immunity purposes is whether Governor Abbott had engaged in "the requisite scintilla of enforcement.". *Coalition for Ind. Tech. Research v. Abbott*, 2023 WL 8582597, at *4 (W.D. Tex. 2023). The evidence shows that he did, and Defendants do not claim otherwise. As numerous media outlets noted, the Texas Department of Public Safety

released a statement that it had deployed officers to disrupt Plaintiff PSC's gathering on April 24th "at the direction of Texas Governor Greg Abbott."[4] Governor Abbott also announced this effort on Twitter: "arrests being made right now & will continue until the crowd disperses." Pls.' PI Motion Ex. I, Dkt 21-9. And Defendants' declarations corroborate the role that Governor Abbott's Department of Public Safety played in shutting down Plaintiffs' protests. *See* Streepy Declaration (Prior to the start of either April 24th and before any purported time, place, and manner violations occurred, UTPD already "request[ed] assistance from the Texas Department of Public Safety"). Perry Declaration, Dkt. 32-1 (UTD "requested mutual aid from…the Texas Department of Public Safety.").

As the University of Texas at Austin's own Committee of Counsel on Academic Freedom and Responsibility detailed in a July 17, 2024 report, the Governor's actions "strongly imply that the University's decision to order the police presence and actions on April 24 and April 29 was influenced by the Governor, for the specific purpose of suppressing" speech. Ex. A – CCAFR Report. This view was echoed by Travis County Attorney Delia Garza who, at a press conference announcing the dismissal of charges related to campus arrests, commented that it is not their role "to assist our governor in efforts to suppress nonviolent and peaceful demonstrations."[5]

Defendants, for their part, deny that their actions were influenced by GA-44, but that is different from saying that they played no part in enforcing GA-44's speech code. And

---

[4] *The Texas Tribune,* "UT Austin Faces Backlash Over Response to Israel-Hamas War," April 24, 2024. Accessed August 26, 2024. https://www.texastribune.org/2024/04/24/ut-austin-israel-hamas-war-palestine-student-arrests/.
[5] *KVUE News,* "UT Austin Protest Leads to Arrests, Raises Questions About Law Enforcement Actions," April 24, 2024. Accessed August 26, 2024. https://www.kvue.com/article/news/crime/ut-austin-protest-arrests-travis-county-attorney-delia-garza/269-33ca0637-acf0-48a5-9702-58401c7ae475.

therein lies the rub. If Governor Abbott has involved himself with the enforcement of rules against student protestors in the past, he is likely to do it again, particularly given that he has issued an executive order on that very subject. This history constitutes the "scintilla of enforcement" necessary to overcome immunity under *Ex Parte Young. Jackson*, 82 F.4th at 367 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)). It is this history of active involvement in enforcement, and the absence of any constraints on Governor Abbott's ability to order police onto campuses again, that distinguishes this case from *Coal. for Indep. Tech. Rsch. v. Abbott*, No. 1:23-CV-783-DII, 2023 WL 8582597, at *5 (W.D. Tex. Dec. 11, 2023), cited by Defs.' MTD, Dkt. 31 at 29 (finding that certain executive officials were not proper *Ex Parte Young* defendants because the Governor specifically denied them the ability to enforce the policy in the challenged directive).

   b.  **The Boards of Regents Defendants are proper, because they adopted a definition of antisemitism that punishes pure political speech.**

   The Board of Regents Defendants are also proper *Ex Parte Young* defendants. The members of the "Board of Regents 'have direct governing authority over the … official[s] that [are] allegedly continuing to violate the [Plaintiffs'] First Amendment rights." *CITR,* 2023 WL 8582597, at *4 (quoting *Jackson*, 82 F.4th at 368). *See* Tex. Educ. Code Ann. § 71.02 ("The organization and control of The University of Texas at San Antonio is vested in the Board of Regents of The University of Texas System"); Tex. Educ. Code Ann. § 70.01 ("The Board of Regents of The University of Texas System shall establish and maintain a state-supported general academic institution of higher education to be known as The University of Texas at Dallas"); Tex. Educ. Code Ann. § 67.02 (UT-Austin "is under the management and control of the board of regents of The University of Texas System"); Tex. Educ. Code Ann. § 111.20(c) ("The governance, control, jurisdiction, organization, and management of the

University of Houston System is hereby vested in the present Board of Regents of the University of Houston").

Likewise, the rules of both Boards of Regents establish that the presidents of each university under its control reports to and is responsible to the Board and/or the Board's Chancellor. *See* UT Regents Rule 20201 § 2.2 ("The president reports to and is responsible to the Chancellor. The president is expected to consult with the Chancellor and the appropriate Executive Vice Chancellor on significant issues as needed.")[6];  Policies of the Board of Regents, University of Houston System, at § 2.2(B) ("The Board is responsible for the employment, evaluation, and dismissal of the Executive Officers").[7]

As a result, the members of the Board "have the requisite 'scintilla of enforcement.'" *CITR*, 2023 WL 8582597, at \*4 (quoting *Austin*, 943 F.3d at 1002). They "have direct governing authority over the [] officials that are allegedly continuing" the challenged conduct. *Jackson*, 82 F.4th at 368. They are thus proper defendants under *CITR* and *Jackson*.

The Boards of Regents' attempts to distinguish *Jackson* is an exercise in grasping at straws that do not exist. The Boards point to the fact that, in *Jackson*, "the Board defendants themselves ignored a letter Jackson wrote to the Chair." 82 F.4th at 368; *see* Motion to Dismiss at 32. But, putting aside that ignoring a letter is not evidence of having authority over something—indeed, it is what you would expect to occur when an entity does not have authority over something—the Court only cited that fact to provide yet another reason to distinguish that case from those in which "the sued state officials had no role whatsoever in

---

[6] Available at https://www.utsystem.edu/board-of-regents/rules/20201-presidents.
[7] Available at https://uhsystem.edu/board-of-regents/policies/_files/bor-policies-8-24-23.pdf.

the alleged constitutional violations—not even a supervisory role over the individuals who were allegedly violating constitutional rights." *Jackson*, 82 F.4th at 367-68. Not so here.

Here, the Boards of Regents adopted a definition of antisemitism that Plaintiffs challenge. They decided how this definition would be embedded into existing campus policies. And by incorporating the definition as they have, the Boards of Regents have directly acted to put Plaintiffs' political speech outside the bounds of permissible campus discourse.

### c. School Presidents are proper defendants, because they administer GA-44's speech code.

Finally, the School Presidents claim that they, too, are not proper *Ex Parte Young* Defendants. Apparently, nobody has authority to enforce GA-44's speech restrictions against the students. Unfortunately for them, that's not true. The University of Texas school Presidents have the authority to both "[d]evelop ***and administer*** the rules and regulations for the governance of the institution and any related amendments." Policies of the Board of Regents, University of Texas, at § 4.9 (emphasis added). This includes the "Handbook of Operating Procedures," the very set of policies that each school amended to conform to GA-44.[8] The University of Houston similarly gives the University President the "responsib[ility] for the management and operation of the university to which they are appointed." Policies of the Board of Regents, University of Houston System, at § 2.2(A).

---

[8] **UTDallas**: *See* Dkt. 32-2 at Exhibit A, UTDSP50001 (effective June 24, 2024); *available at* https://policy.utdallas.edu/utdsp5001, *see also* https://policy.utdallas.edu/ ("The UT Dallas Policy Navigator: Handbook of Operating Procedures"); **UTAustin**: *See* Dkt. 32-4 (GA-44 amendments contained in "Chapter 13 of the Institutional Rules on Student Services and Activities"); *see also* UTAustin HOP 3-3020(IV)(B) (defining "Harassment" in violation of policy as "governed by Chapter 13 of the Institutional Rules"); UTSA: *See* Dkt. 32-8 at ¶ 9 (revised HOP 9.37 to conform with GA-44);

As the various declarations submitted by Defendants show, shutting down and punishing previous pro-Palestinian speech involved action and coordination from a wide range of government officials—from police to provosts to presidents. But *Ex Parte Young* lawsuits do not require Plaintiffs to figure out an array of subofficials and individuals with delegated authority to sue in order to protect themselves from the various individuals in the university setting who can target them with an unconstitutional law. Suing the agency head with the enforcement authority that has been delegated by that head to those various officers—here, at minimum, the Presidents at the various universities—is enough. *See also Young Conservatives of Texas Found. v. Univ. of N. Texas,* 597 F. Supp. 3d 1062, 1077 (E.D. Tex. 2022) (university President was proper *Ex Parte Young* defendants to challenge to University tuition policies), *rev'd and vacated on other grounds*, 73 F.4th 304 (5th Cir. 2023). Otherwise, government agencies can avoid responsibility for their enforcement activities just by delegating that authority low and wide enough.

Undeterred, the Presidents cite to cases that are entirely different in both scale and scope. *Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021), involved a pro se[9] prisoner suing, among others, Texas Department of Criminal Justice's Director of Health Services Lanette Linthicum for the denial of a decision to deny him a medical procedure. *Haverkamp* did not find that Linthicum had sovereign immunity, or dismissed Linthicum from the case; rather it remanded for better pleading because of the lack of any "allegation [in the Complaint] plausibly linking allegation plausibly linking Linthicum with the challenged decisions." The government, for its part, identified specific individuals who were involved in the specific

---

[9] Pro se below, as she had appellate counsel.

decision to deny his health care or who had the authority to grant him the relief he sought, *id.* at 671, *see also* Brief of Appellants, 20-40337, Dkt. 97 at 13 (suggesting that the proper defendants were a doctor who made the decision to deny surgery, Dr. Owen Murphy, as well as the committee members who had the authority to change the challenged policy); *but see* 6 F.4th at 670 (stating the committee members were not proper defendants).

*Hoverkamp* was a case involving a challenge to an action that already occurred. This case, however, includes a pre-enforcement challenge. As shown above, here, Defendants both have the authority to enforce or not-enforce the challenged policies against Plaintiffs, and can effectively provide the relief he seeks both by staying enforcement (through their direct subordinates) and by changing the policies in question. *Compare with Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) (pre-enforcement challenge to speech code brought against University of Texas President with nary a concern about *Ex Parte Young*); *Young Conservatives,* 597 F. Supp. 3d at 1077. And *Jackson*, for its part, distinguished *Haverkamp* as a case where the defendants did not have "even a supervisory role over the individuals who were allegedly violating constitutional rights." 82 F.4th at 367-68.

*Richardson v. Flores*, 28 F. 4th 649 (5th Cir. 2022), is even further afield. That case said that the Texas Secretary of State was not a proper defendant in challenging election rules that could only be enforced by local election boards, which are entirely different, independent entities under Texas law. *Id.* at 654. This would be the equivalent of if Plaintiffs sued Commissioner of Education Mike Morath in this case. Because Plaintiffs did not, *Richardson* has no application here.

## II.    Plaintiffs' have standing

Defendants make a major error by not addressing Plaintiffs' pre-enforcement challenge in their opposition. As Defendants themselves admit, the University Defendants did not formally adopt GA-44's Israel-specific speech code until after Plaintiffs filed their lawsuit. Defs.' PI Opp, Dkt 32 at 23-25. Having failed to even cite to *Speech First v. Fenves* or any other case that delineates the Fifth Circuit's three-part test for pre-enforcement First Amendment challenges, Defendants have missed their chance. The Court can grant Plaintiffs their preliminary injunction on the basis of the pre-enforcement challenge Defendants leave untouched.

Defendants do variously argue that GA-44 is "not independently enforceable," that the definition of antisemitism Defendants adopted "is merely meant as a "guide," and that in any case, "this new definition of antisemitism did not bring in any speech not otherwise covered by…pre-existing policies." Defs.' PI Opp, Dkt. 32 at 33. Giving these arguments their most favorable gloss, they boil down to Defendants' assertion that Plaintiffs' future conduct is not "arguably proscribed" by Defendants and that the threat of future enforcement is not "substantial." *Speech First*, 979 F.3d at 330–31. *See also* Defs.' MTD, Dkt 31 at 35-36 ("GA-44 does not direct universities to prohibit students from using any particular words, and none of the University Defendants have incorporated into written campus speech policies any rule prohibiting Plaintiffs' proposed expression and activities."). Plaintiffs deal with each in turn below.

### a. Defendants can't interpret away the conflict between Plaintiffs' planned conduct and the speech code GA-44 imposes

The Government suggests a convenient panacea for its legal problems: the Court can simply interpret the GA-44-amended speech codes to have a lawful meaning.  Defs.' MTD, Dkt 31 at 40-41; Defs.' PI Opp, Dkt. 32 at 32-33. But constitutional avoidance only "comes

into play when, after the application of the ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). When a text's meaning is unambiguous, the canon of constitutional avoidance has no place in interpreting the text.

Beyond atextual platitudes about how GA-44 could be interpreted merely to mandate that "preexisting policies are evenly enforced," Defs.' PI Opp, Dkt. 31 at 42, the Government does not wrestle with GA-44's text at all and provides no proposed interpretation of Defendants' speech restrictions that would be constitutional. There is no circumstance where Defendants can lawfully prohibit students from using core political speech to call Israel a racist endeavor, compare Israel's conduct to Nazi-era Germany's, or use the phrase *from the river to the sea, Palestine will be free*. Nor can Defendants rely on discretion or post-enforcement review to properly cabin these restrictions to constitutional application. *See United States v. Stevens,* 559 U.S. 460, 480 (2010) ("But the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (First Amendment requires "fair notice of what is prohibited").

Instead, it must be the "plain text" which "limits the sweep" of laws which might impinge on First Amendment rights. *Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016). Courts, mindful of the Supreme Court's decision not to 'rely upon' the canon of constitutional avoidance in the overbreadth context, should not give an overbroad or vague speech restriction an "additional extra-textual limiting construction in a frantic attempt to rescue it." *Id.* (quoting *Stevens*, 559 U.S. at 481) (other citations omitted). Otherwise, the canon of

constitution avoidance "would merely ping-pong us from one constitutional issue to another." *Sessions v. Dimaya*, 584 U.S. 148, 164 (2018)

Here, much of what GA-44 requires campus officials to do is unambiguous. With words that permit no alternative interpretation, GA-44 requires campus officials to treat the use of the slogan "from the river to the sea" as antisemitic. GA-44 defines it as antisemitic explicitly.

GA-44 is, in fact, so unambiguous in defining "from the river to the sea" as antisemitic, that campus officials at UTSA adopted a rule forbidding students from uttering the phrase immediately. Ex. E – YDSA and UTSA Meeting Recording Transcript pp 23-24. Contrary to Defendants' assertion that Robinson "was not applying GA-44," Defs.' PI Opp, Dkt. 31 at 34, Robinson *explicitly* invoked GA-44 when she told students they were no longer allowed to utter the phrase. Ex. E – YDSA and UTSA Meeting Recording pp 23-24. Robinson stated that UTSA adopted the rule because "*it was written in the Order.*" *Id.* Robinson had no choice but to believe this because GA-44 unambiguously states it seeks to address "students chanting antisemitic phrases such as 'from the river to the sea, Palestine will be free'" and directs universities to "establish appropriate punishments" for antisemitic speech. GA-44.

While Defendants now suggest that using the prohibited slogan is not a speech code violation, Dkt. 32-8, they do so contrary to the text of the executive order. Under GA-44, *from the river to the sea, Palestine will be free* is an "antisemitic phrase[]," without any qualifiers, context, or permissive language. And Defendants have already taken steps to enforce it. *See* Dkt. 21-6; Ex. B – Kira Sutter Reply Declaration.

GA-44 also unambiguously requires campus officials to adopt a definition of antisemitism that encompasses the future speech of Plaintiffs. Even Defendants acknowledge

that GA-44 is the reason why "universities must include a "definition of antisemitism in their free speech policies." Opp to PI at 33. Defendants also acknowledge that, to date, the UT and UH systems have adopted the GA-44 definition of antisemitism contained in Section 448.001 of the Texas Government code. *Id.*

Section 448.001, however, includes pure political speech within its definition of antisemitism. It does so by incorporating, not just a definition of antisemitism, but also a specific list of "examples of antisemitism." TX GOVT § 448.001 (West 2021). These examples are found in the International Holocaust Remembrance Alliance's definition of antisemitism, and they define pure political speech as antisemitic. Thus, GA-44 requires Defendants to treat as antisemitic students who "claim that the existence of a state of Israel is a racist endeavor" or that "draw comparisons of contemporary Israeli policy to that of the Nazis." *See* IHRA, *Working Definition of Antisemitism*, May 26, 2016 (available at: https://holocaustremembrance.com/resources/working-definition-antisemitism). These are all things Plaintiffs have done already and plan to do again in the future. Pls.' Mot. for PI, Dkt 21-2, 3, 4, and 6.

Defendants' arguments that Section 448.001's definition and its examples are ambiguous rest on the claim that they are "merely meant as a guide." Defs.' PI Opp, Dkt 32 at 33. But a review of the definition of "guide" demonstrates that the word cannot bear the weight Defendants place on it. "Guide" means "to direct, supervise, or influence usually to a particular end," and thus even if Section 448.001's "examples of antisemitism" is "merely meant as a guide," Defendants' adoption of the definition still "arguably proscribes" Plaintiffs' future conduct. *See "Guide"*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/guide ("to direct, supervise, or influence usually to a particular

end"). That is because, even if Defendants are right and the examples are "merely meant as a guide," these examples still "direct, supervise, or influence" what speech and acts Defendants consider antisemitic. *See also United States v. Menasche*, 348 U.S. 528, 538-539 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal citations omitted).

* * *

In assessing Plaintiffs' standing to bring their First Amendment claim, the "fundamental question" is whether Defendants' conduct "objectively chills protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121 (11th Cir. 2022) (citing *Speech First*, 979 F.3d at 330-35 (5th Cir. 2020)). Separately and taken together, Defendants' conduct does. With written and unwritten policies, what Defendants have done "would cause a reasonable would-be speaker to self-censor" due to a "reasonable student fear that his speech would get him crossways with the university." *Id.* at 1122. Indeed, it is this fear that still deters Plaintiff DSA's leaders, members, and supporters in San Antonio from using the phrase *from the river to the sea, Palestine will be free.* Ex. B – Kira Sutter Reply Declaration. This is enough to prove standing.

### b. The threat of future enforcement is extreme

While Defendants submitted their declarations with the hope of proving their actions lawful, their contents provide more evidence that Defendants are in a state of hysteria that makes future illegal conduct very likely. Campus officials, following GA-44's lead, really believe that Plaintiffs and the students who help lead and support their efforts are dangerous bigots conspiring with other dangerous bigots across the country. *See* Dkt. 32-2, Decl. Amanda Smith (expressing concern Plaintiff SJP-UTD's "assemblies and rallies" would

become infused by a "widespread and growing antisemitism."); Dkt. 32-3, Decl. Barri Seitz (falsely claiming that "PSC members painted their hands red in reference to a lynching of Jewish people in Ramallah"); Dkt. 32-6, Decl. of Katie McGee (relying on Plaintiff UT-PSC's "wholesale adoption of the national SJP's terminology and tactics" to conclude—against what UT-PSC specifically told her—that they were planning an encampment); Dkt. 32-7, Decl. of Kelly Soucy (describing Plaintiff UT-PSC's organizing efforts as "part of a coordinated effort to prevent universities from functioning for political gain."); Dkt. 32-8, Decl. of Robinson (confusing the red triangle in a Palestinian flag with a symbol used "by Nazis to identify prisoners in death camps during the Holocaust"); Dkt. 32-9, Decl. of Levi Fox (falsely claiming that Plaintiff UT-PSC's use of the slogan *from the river to the sea, Palestine will be free* was a call "for the genocide of the Jewish people"); Dkt. 32-11, Decl. of Shane Streepy (basing his professional analysis on someone called CrimethInc, who is described as helping a "loose network of anarchist groups"); Dkt. 32-11, Decl. of Shane Streepy (falsely claiming that he found what he believed to be "stacks of authenticated and actual Hamas propaganda pamphlets" at Plaintiff UT-PSC's protests, among them a statement from the Austin chapter of Jewish Voices for Peace about Defendants' conduct— "As Jewish members of the Austin community, we wholeheartedly condemn UT Austin's repression of pro-Palestine students").

The Homsi Declaration explains the extent of Defendants' problems here. First, UT-PSC has no formal relationship with NSJP, and its occasional reference to lawful, peaceful material NSJP shares online does not make UT-PSC responsible for everything they do and say. Ex. C – Jenna Homsi Reply Affidavit. Any of Defendants' attempts to characterize NSJP and UT-PSC as one in the same thus fail.

Second, Defendants' claims about the nature and intention of protests range from exaggerated to entirely fabricated. For example, Streepy's claim that he found "Hamas propaganda" is entirely imagined. *Id.* That so-called "Hamas propaganda" included a statement that Jewish Voices for Peace made against Defendants' crackdown in Austin. *See* Dkt. 32-11 at 58. It includes a toolkit that encourages student groups "to host demonstrations on campus/in their community," to organize "teach-ins," "write a local statement of solidarity," or "[p]rint flyers to put up around your campus." *Id.* at 60. Seitz's claim that students gave themselves "red hands" to reference a lynching of from a quarter century ago rather than the obvious meaning that Israel has blood on its hands is similarly imagined.[10] Seitz' additional claim that UT-PSC chants "from the river to the sea" as a call for Jewish genocide is another lie. *Id.* These declarations do nothing more than make assumptions based on racist stereotypes about Arabs and Muslims.

Third, the nature and intention of protests range from exaggerated to entirely fabricated. UT-PSC is not some determined rule-breaker; it is a longstanding, highly active student group that has substantial experience navigating Defendants' policies. *See* Ex. C. – Homsi Reply Affidavit**.** In direct contrast to Defendants' suggestions, UT administration specifically found that UT-PSD did not violate rules at its counter protest to the "Israel block party." *Id.* ("[O[ur office has determined that the organization will not be found in violation of the Institutional Rules at this time."). Additionally, in response to UT's notice cancelling UT-PSC's April 24th protest because of alleged *future* rules violations, UT-PSC communicated

---

[10] The iconic use of "red hands" amidst this past year's protests was at a congressional hearing at which Secretary Blinken testified: Althea Legaspi, *Protesters Disrupt Blinken's Senate Testimony, Demand Ceasefire in Gaza*, Rolling Stone (Oct. 31, 2023), https://www.rollingstone.com/politics/politics-news/blinken-senate-testimony-protesters-ceasefire-1234866990/.

directly to UT administration that the cancellation notice was based on false facts—UT-PSC had no intent to set up an encampment and did not ask protestors to conceal their identities. *Id.* UT administration ignored this communication and—together with Governor Abbott— called on a remarkably large, pre-positioned police presence to violently end a lawful protest. *Id.* But every single arrest for criminal trespass made in April at the behest of Governor Abbott and UT Austin officials—more than 130—has now been dismissed.[11] This simply underscores the necessity of an injunction that would prohibit Defendants from using ostensible rules violations as a pretext for enforcing the policy that GA-44 memorializes.

The same hysteria that drove Defendants to make more than 130 trespass arrests in April alone—each one subsequently dismissed—also led UTSA to adopt a phrase-specific rule without precedent. Not only does the Government admit in its declarations that UTSA believed that saying *from the river to the sea, Palestine will be free* violated GA-44, UTSA threatened to, and effectively did, enforce this rule. On April 23, Dean of Students LaTonya Robinson ordered students to take down a sign that had that specific phrase. Sutter Dec., Dkt. 21-6 (Declaration of Kira Sutter), at ¶ 8(a). On May 1st, Robinson approached Sutter and other DSA students and told the students they could not chant "From the River to the Sea, Palestine will be free." *Id.* at ¶ 8(b). And on May 3, not only did Robinson order Sutter and other DSA students not to use the phrase, she said that those that did would be [r]eferr[ed] to law enforcement." *Id.* at ¶8(c).

"[A]ctual threats of arrest made against a specific plaintiff are generally enough to support standing as long as circumstances haven't dramatically changed." *Seegars v. Gonzales*,

---

[11] Criminal trespass charges against 79 UT Austin protestors dismissed. Tan Radford, Fox 7 Austin (June 26, 2024) available at: https://www.fox7austin.com/news/ut-austin-palestine-protesters-criminal-trespassing.

396 F.3d 1248, 1252 (D.C. Cir. 2005) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Indeed, in *Steffel*, the Supreme Court made clear that pre-enforcement challenge is permitted

when an individual was "twice warned" to stop the protected behavior and once told that if

he does it again he is "likely to be prosecuted," *id.* which is exactly the facts here.

So what to make of the fact that, in a declaration, UTSA claims that students have

used the prohibited phrase and nobody was ever disciplined? Robinson Dec., Dkt. 32-8, at

¶7(p)-(t). The small handful of instances of supposed nonenforcement is irrelevant in light of

the actual prosecutorial threat made against the DSA students. *See Libertarian Party of Los

Angeles Cnty. v. Bowen,* 709 F.3d 867, 872 (9th Cir. 2013) (finding standing to challenge a policy

never enforced "in light of Plaintiffs' concrete plan and Defendant's specific threat of

enforcement"). That is particularly true here when all four of the supposed instances occurred

between April 23 and May 1, and UTSA's specific threat of criminal prosecution occurred on

May 3. Indeed, to this day, Plaintiff DSA understands the rule Ms. Robinson told them about

to remain in effect and is deterred from using the prohibited phrase as a result. Ex. B – Kira

Sutter Reply Declaration.

The declarations make clear that, amidst a hysteria, Defendants have lost sight of their

legal obligations. And by projecting onto Plaintiffs every bad thing that any likeminded

college student has said or done in the last year, Defendants demonstrate a viewpoint

consciousness that accounts for their preemptive and substantial use of police force in April

and May. It makes the threat of future enforcement sufficiently substantial to establish

standing.

    **c.  DSA Has Associational Standing because Advocating for Palestine is
       Germane to DSA's Purpose.**

Defendants challenge DSA's associational standing, arguing that organizing for Palestine is not "'germane'" to DSA's mission. Defendants arrive at this conclusion by imagining a standard for this element of standing that does not exist. The "germaneness requirement is 'undemanding…'" *Ass'n of Amer. Physicians & Surgeons, Inc.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quoting *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2nd Cir. 2006)). It simply requires "mere pertinence between the litigation at issue and the organization's purpose." *Id.* (internal citations omitted). DSA's interests in the lawsuit go far beyond a "mere pertinence," as demonstrated below.

Defendants cherry-pick the "About Us" page on DSA's website and conclude that DSA's only "mission" is "establishing an openly democratic socialist presence" in America. Defs.' MTD, Dkt 31 at 37. On the contrary, DSA's official policy platform references Palestine four times.[12] DSA "stands in solidarity with the Palestinian struggle against apartheid, colonialism, and military occupation…."[13] DSA advocates for "[d]iscontinue[d] US support of Israel's oppression of the Palestinian people…."[14] DSA "[s]upport[s] self-determination for the Palestinian people…."[15] DSA calls for "an end to discrimination against Palestinians within Israel…." DSA even conditions its endorsement of political candidates on the basis of their opposition to United States' funding of Israel.[16]

Beyond political platforms, DSA is actively involved in organizing for Palestine nationally, including through its YDSA chapters in Texas. See Dkt 21 at Ex. E. DSA offers a

---

[12] https://www.dsausa.org/dsa-political-platform-from-2021-convention/#international
[13] Id.
[14] Id.
[15] Id.
[16] "The [DSA] is committed to ensuring that all of our elected officials are unabashed in their support for Palestinian freedom." https://www.dsausa.org/statements/status-of-dsa-national-endorsement-for-rep-ocasio-cortez/

toolkit dedicated to instructing its members on organizing on the Palestinian issue[17]. DSA, its chapters, and its student members use the slogan GA-44 prohibits in its messaging on Israel's genocide in Gaza. *Id.* DSA specifically trains its YDSA chapters to campaign against using the IHRA definition of antisemitism that GA-44 demands University defendants to incorporate. *Id.*

DSA asserts far more than an "abstract social interest." Defs.' MTD, Dkt. 31 at 37 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Instead, DSA asserts the "concrete and demonstrable injury to the organization's activity" necessary for standing.

## III.    Defendants' decision to stop prohibiting Plaintiffs' from using their favorite slogan does not moot any of Plaintiffs' claims

The Government "do[es] not dispute that UTSA officials previously interpreted GA-44 to require UTSA to prohibit students on their campus from saying 'from the river to the sea, Palestine will be free." Defs. PI Opp, Dkt. 32 at 29-30, n. 202. It nevertheless asserts for the first time anywhere that "campus officials at UTSA have no demonstrated willingness to enforce a prior unwritten 'rule' (as Plaintiffs improperly call it) barring simple expression of Plaintiffs' preferred slogan." Opp. at 31.

Defendants do not cite any case about mootness, and Defendants' opposition does not even use the word or mention the voluntary cessation doctrine. That is a serious problem for Defendants, because "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The voluntary cessation of challenged conduct deprives a court of jurisdiction only where the defendant sustains its "formidable burden" of proving that "no reasonable expectation remains that it

---

[17] "Democratic Socialists of America Palestine Solidarity National Toolkit #NoMoneyForMassacres," https://docs.google.com/document/d/1tT13FBYr_TObdbeKf8OTViIo9Y8BVKGOl2Opvz9t3G4/preview

will return to its old ways." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 190 (2000)). Proving mootness is Defendants' burden, and their brief does not even make an attempt to meet it.

And what to make of UTSA's argument that it now thinks that GA-44 does not prohibit the phrase "From the River to the Sea, Palestine will be free," Robinson Dec. ¶¶ 8-9, even though (1) GA-44 specifically (and falsely) claims that the "antisemitic phrase" "from the river to the sea, Palestine will be free [] has long been used by Hamas supporters to call for the violent dismantling of the State of Israel and the destruction of the Jewish people who live there, and (2) GA-44's definition of antisemitism attaches this label to speech "[c]alling for … the killing or harming of Jews in the name of a radical ideology" as well as "[d]enying the Jewish people their right to self-determination?"

While not a mootness argument by itself, these are the facts a party might use to try to meet its burden. This is not, however, the Fifth Circuit's first case about a public university that "had a sudden change of heart, during litigation, about the overbreadth and vagueness of its speech code, and then advocated mootness under a relaxed standard." *Speech First*, 979 F.3d at 328. And as the Government's belated repudiation of its prior threats were not deemed sufficient in *Speech First* even when the Government there had repealed the challenge regulation, the repudiation here is likewise insufficient, for a number of reasons. Ultimately, Defendants have done even less than what the Fifth Circuit found insufficient in *Speech First*.

First, Defendants' cessation is insufficient because the repudiation merely comes from the "Senior Vice Provost for Student Affairs and Dean of Students." Robinson Decl. ¶ 4. But as the Policies of the Board of Regents, University of Texas make clear, at § 4.9, it is the President who has the authority to develop and administer the rules and regulations of the

University. *Compare with Speech First*, 979 F.3d at 329 ("There is no evidence here that Fenves controls whether the University will restore the challenged definitions during or after his tenure"). And because this is a First Amendment case, the fact that GA-44 led officials at UTSA to prohibit Plaintiffs' favorite slogan means that it can do the same at other times and places. Without a barrier to recurrence being erected by the president, Boards of Regents, or Governor Abbott, Defendants remains "free to return to [its] old ways" and the case is not moot. *U.S. v. W. T. Grant*, 345 U.S., 629, 632 (1953); see, e.g., *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2012) (case not moot because Missouri "could … revert" to a policy its Governor had publicly ended); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287-88 (2000) (case not moot because of the mere possibility that proprietor of shuttered nudedancing establishment "could again decide to operate" such an establishment); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538 (1978) (similar).

Second, UTSA has spoken out of both sides of its mouth in this case, rendering its carefully-worded disavowal barely worth the paper it is written on. Defendants admit that UTSA previously prohibited the phrase based on its actual interpretation of GA-44, but Robinson's declaration implausibly claims that she "only asked students to refrain from using the expression as a temporary measure while awaiting guidance from the University of Texas System on how we should revise campus policies in response to GA-44, as a plea for "civil discourse." Robinson Decl. ¶ 8. This lack of candor counts against Defendants' efforts to meet its mootness burden.

And Robinson does not even say that the phrase is no longer prohibited now in uncertain terms. Instead, it is merely UTSA's "understand[ing], that the "operative clauses" of GA-44 "do not instruct the public universities in Texas to prohibit the simple use of the

phrase, and do not themselves prohibit the simple use of the phrase." Likewise, Robinson claims that "UTSA's revised policies do not prohibit the simple use of the phrase '[f]rom the River to the Sea, Palestine will be free." *Id.* ¶ 9.

But that is because the revised policies (HOP 9.37) are too general to expressly prohibit a particular phrase. The question remains, however, as to whether the policy revisions Defendants made to be "consistent with Texas Government Code Section 448.001" can be read to similarly prohibit the phrase. Whether this includes "from the River to the Sea, Palestine will be free"—which though a call for mere Palestinian freedom was expressly labeled by GA-44 a call for the "violent … destruction of the Jewish people," is at best unclear. This lack of clarity is only made worse by the games the Government has played between what is prohibited and what is, for instance, merely a request. And the resulting lack of clarity cannot meet the Government's burden to make it "***absolutely*** clear that the wrongful behavior"—here, prohibiting the mere use of the phrase *from the river to the sea, Palestine will be free*—"could not be reasonably expected to recur," *Speech First*, 979 F.3d at 328 (emphasis original) (quoting *Aderand Constructors, Inc. v. Slater*, 528 U.S. 216, 2222 (2000)).

Third, and finally, the Government, like in *Speech First*, "continues to defend the original policies." *Id.* at 329. While repudiation is not always required to show mootness, what the repudiation shows "about its future conduct" is relevant. *Id.* And here, the Government asserts again that the phrase is "an antisemitic call to arms," Defs. PI Opp., Dkt 32 at 5, so that under *Tinker*, which supposedly requires the Court to consider the way that speech is viewed rather than how it is intended, it is unprotected. But if—as the Defendants continue to assert—the phrase is inherently antisemitic, then under *Tinker* the University has a duty to protect the perceived safety of its students, *see* Defs.' MTD, Dkt. 31 at 45-46, *see also*

*Fennell v. Marion Indep. Sch. Dist.,* 804 F.3d 398, 408 (5th Cir. 2015) (University has an obligation not to be deliberately indifferent to status-based harassment), and that under *Tinker,* GA-44, and presumably Title VI, allowing antisemitism makes its Jewish students unsafe, *see* Defs.' MTD, Dkt. 31 at 9 and 45, then Defendants of course would not only have the ability to ban the phrase "from the river to the sea, Palestine will be free," but the obligation to do so as well. So the lack of repudiation in this case flies in the face of any supposed assurance to Plaintiffs or others that they will no longer face discipline under GA-44 and the vague language Defendants adopted at the campus-level that can still be used to ban the political slogan "from the river to the sea, Palestine will be free."

And this court has made clear that the voluntary cessation exception does not require complete identity between the challenged conduct and the actions the defendant may take after a lawsuit is dismissed: The doctrine protects not merely against the recurrence of the "selfsame" conduct, but also new conduct that nonetheless "disadvantage[s]" a plaintiff "in the same fundamental way." *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Thus, once the Court applies the voluntary cessation exception to mootness to Plaintiffs' claims, it can issue an injunction that prohibits the viewpoint-based assault that account for the various injuries that gave rise to this case.

## IV. Defendants don't meaningfully reckon with the obvious content and viewpoint discrimination embraced by Defendants here

Defendants are arguing for the Court to apply *Tinker*'s standard, because they understand that their only hope here is for a permissive standard. But on public campuses, particularly ones in Texas, the First Amendment protections are at their apex. Our jurisprudence, to Defendants great detriment here, gives them no quarter.

### a. Tinker does not apply in the university setting.

25

Students attending state institutions possess First Amendment expressive rights coextensive with those of the public at large. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."). For students and faculty, our public universities serve as the quintessential "marketplace of ideas." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

The reason for this is clear. Speech restrictions applicable in the grade school context "raise very different questions" when applied to public university students. *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038, 2049 n.2 (2021) (Alito, J., concurring). "[P]ublic elementary and high school administrators, unlike their counterparts at public universities, have the unique responsibility to act in loco parentis." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010) (cleaned up), *cited by Fenves*, 979 F.3d at 338-39 n.17 ("we note the consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague") (other citations omitted). Public universities, where students are almost exclusively adults, play no such role. *Id.* While there may have been a past view that college students were effectively wards of their administrators, that understanding of the relationship between a university and its students has long since ceased to exist. *Id.*

Instead, colleges and universities are now marketplaces of ideas. The Supreme Court has made clear that this "essentiality of freedom" holds an important constitutional place in our civilization: "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957).

26

Public elementary and high school administrators "must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988). But once children graduate and become adults and go off to college, the incentives reverse: "A college education, on the other hand, deals more with challenging a student's ideas and concepts on a given subject matter. The college atmosphere enables students to rethink their views on various issues in an intellectual atmosphere which forces students to analyze their basic beliefs." *Martin v. Parrish*, 805 F.2d 583, 588 (5th Cir. 1986) (Hill, J., concurring).

Similarly, *Tinker* restrictions may be defended on the basis "that public elementary and high schools must be empowered to address the special needs of school discipline unique to those environs." *McCauley*, 618 F.3d at 245. At its most dark, "[m]aintaining order in the classroom can be a difficult task" due to "drug use and possession of weapons," so "an immediate response frequently is required not just to maintain an environment conducive to learning, but to protect the very safety of students and school personnel." *New Jersey v. T.L.O.*, 469 U.S. 325, 352-53 (1985) (Blackmun, J., concurring). In contrast, "public university students are given opportunities to acquit themselves as adults." *McCauley*, 618 F.3d at 246.

And finally, at least as to residential universities such as all defendants, university students live on campus. *Tinker* on its own terms limits its reach to the "schoolhouse gate," *Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 506 (1969). So "the idea that students may lose some aspects of their First Amendment right to freedom of speech while in

school, *id.* at 507, does not translate well to an environment where the student is constantly within the confines of the schoolhouse." *McCauley*, 618 F.3d at 247.

### b. Even if *Tinker* applied in the university setting, viewpoint-discriminatory speech code restrictions are unconstitutional.

Indeed, even if *Tinker*'s general instructions applied to the university setting, the result would be the same. *Tinker* "made clear" that "First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." *Healey v. James*, 408 U.S. 169, 180 (1972). And for all the reasons stated above, due in fact to the special characteristics of colleges, there is "no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.*

And even if *Tinker* did restrict the rights of university students in some fashion, the Supreme Court has made plain that schools cannot use that power in a manner that constitutes viewpoint discrimination. There is an "especially real" danger "in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition," of the chilling of individual thought and expression." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995). "For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836. So state universities are "forbidd[en] to exercise viewpoint discrimination, even when the limited

28

public forum is one of its own creation." *Id.* at 829; *compare with Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992) ("Viewpoint discrimination violates the First Amendment regardless of the forum's classification.").

### c. The Government's *Tinker*-based cases are inapplicable here.

The Government, for its part, simply assumes that (a) *Tinker* applies in the university setting, and that (b) once it does, any viewpoint or content discrimination is permissible so long as it can relate it back to some concern for disruption. Indeed, the Government goes so far to claim that any speech restriction is permissible so long as "*some* people view" the prohibited speech as discriminatory. Defs.' PI Opp, Dkt. 31 at 39 (emphasis original). Of course, the current political disputes over the culture war show that some people think that almost everything is discriminatory. This would allow the Government to impose practically any sort of speech restriction or code imaginable. *Contra Fenves*, 979 F.3d at 338-39. But thankfully, the Government's proposed standard is wrong.

The Government's standard primarily rests on its interpretation of two cases. *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224 (5th Cir. 2009), relying on *Tinker*, allowed high schools to ban displays of the confederate flag. This is because the government there made a persuasive argument that "the racially inflammatory meaning associated with the Confederate flag and the evidence of racial tension at BHS establish that defendants reasonably forecast that the proscribed speech might cause substantial disruption of school activities." *Id.* at 223. Here, in contrast, all the Government has shown is that some people might have their feelings upset by either the phrase "From the river to the sea, Palestine will be free," or by the contest of particularly strong criticism of Israel. There is no evidence that

suggests that the **content** of these messages might cause violence or disruption. *See Smith v. Tarrant Cnty. Coll. Dist.,* 694 F. Supp. 2d 610, 632 (N.D. Tex. 2010) (distinguishing *A.M.*); *cited by Fenves*, 979 F.3d at 338-39 n.17. And while the Government claims that other pro-Palestinian protests at their Universities and others may have caused disruptions and the risk of violence, the declarations they provide are all very clear that this disruption and risk of violence came from violations of content and viewpoint neutral time, place, and manner restrictions, such as limitations on encampments, locations where protests may and may not take place, and the improper use of sound amplifiers. And as a result, it is enforcement of appropriate time, place, and manner restrictions—which Plaintiffs do not challenge here—which is the constitutionally-appropriate response.

In *West v. Derby Unified Sch. Dist. No. 260,* the Tenth Circuit, expressly relying on *Tinker*, permitted a middle school to suspend a student for drawing a confederate flag under its "harassment and intimidation policy." 206 F.3d 1358, 1365 (2000) ("To be sure, T.W.'s display of the Confederate flag could well be considered a form of political speech to be afforded First Amendment protection outside the educational setting."). The analysis substantially mirrored that of *A.M. Id.* at 1366 ("policy enacted in response to this situation was clearly something more than a mere desire to avoid the discomfort and unpleasantness," as "history of racial tension in the district" made "concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable"). Even if middle schoolers and university students are to be treated with equal maturity, it is distinguishable for the same reason *A.M.* is. *Smith v. Tarrant Cnty. College Dist.*, 694 F. Supp. 2d 610, 632 (N.D. Tex. 2010).

Courts have consistently rejected the constitutionality of campus speech codes. *Speech First*, 979 F.3d at 338-39. It should do so here.

     **d.**   **Texas leaves out that a 2019 law defines the outdoor area of the State's public campuses as traditional public forums, with the only permissible speech restrictions being in furtherance of a "significant interest" Defendants do not possess**

In Texas, First Amendment protections are at their zenith on public campuses. That is because, in 2019, the State took the unusual step of passing a law to ensure that all "common outdoor areas" on all public campuses are treated as traditional public forums. Senate Bill 18, 86th Leg., Reg. Sess. (Tex. 2019)**.** The law allows "*all* persons [to] assemble peaceably…for expressive purposes" on campus, whether they are students or not. *Id.* And its protections explicitly allow "members of the university community to assemble or distribute written material *without* a permit or other permission from the institution." *Id.* Within this kind of public forum, all restrictions on expressive activity must be "narrowly tailored to promote a significant governmental interest." *Roberts v. Haragan*, 346 F. Supp. 2d 853, 869 (N.D. Tex. 2004).

This is a standard Defendants simply cannot meet. There is no "significant interest" in preventing Plaintiffs' speech because some people do not like it. Rather than ban students from using their favorite slogan, Defendants can permit it. Rather than crush protests with force and arrests because of an unfounded paranoia that Plaintiffs were working with shadowy national and international figures, Defendants can allow them. Other schools have

found ways to allow students to express themselves, maintain order, and do so without calling in hundreds of officers to make more than 130 arrests.[18] Defendants could have as well.

And once the Court sets aside the Government's out-of-bounds proposal to interpret out all of the constitutional defects of GA-44's definition of antisemitism, it is the inexecrable consequence of this definition that purely political speech becomes punishable under campus speech codes. And not in a viewpoint neutral way. At best, GA-44's definition of antisemitism is a kind of for-Israel-only, anti-disparagement clause. But precedent prohibits Defendants from punishing speech just because it is "offensive to a substantial percentage of the members of any group." *Matal v. Tam*, 582 U.S. 218, 243 (2017). Indeed, the "proudest boast of our free speech jurisprudence" is that the First Amendment protects "the freedom to express the thought that we hate." *Id.* at 246.

While it is true that the First Amendment protects even speech that "demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground," Defendants have narrower means at their disposal to deal with harassment. *Id.* If any harassment is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school," a school has not only the right but the duty to intervene. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d

---

[18] S*ee, e.g.,* Northwestern Reaches Agreement with Pro-Palestinian Demonstrators to End Tent Encampment on Campus, WGN-TV (Aug. 26, 2024), https://wgntv.com/evanston/northwestern-reaches-agreement-with-pro-palestinian-demonstrators-to-end-tent-encampment-on-campus; Encampment Agreement, Brown Univ. (Apr. 30, 2024), https://www.brown.edu/news/2024-04-30/encampment-agreement; Agreement to Peacefully End Encampment on Campus, Inside UCR (May 3, 2024), https://insideucr.ucr.edu/announcements/2024/05/03/agreement-peacefully-end-encampment-campus; Encampment Is Ending, Johns Hopkins Univ. (May 12, 2024), https://president.jhu.edu/messages/2024/05/12/encampment-is-ending; Update on Encampment in Harvard Yard, Harvard Univ. (May 12, 2024), https://www.harvard.edu/president/news/2024/update-on-encampment-in-harvard-yard/;

398, 408 (5th Cir. 2015) (citing *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

But speech restrictions must be careful to balance First Amendment rights with the rights of students not to suffer harassment. *Davis*, 526 U.S. 629 (Title IX standard gives Government the flexibility "to refrain from a form of disciplinary action that [2]would expose it to constitutional or statutory claims"). Indeed, even "some 'harassing' speech may be worthy of First Amendment protection. *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008) (university speech code), *cited by Fenves*, 979 F.3d at 338-39 n.17. In particular, "core political and religious speech," *id.* at 317, is given the highest protection. And since GA-44's definition of antisemitism does not distinguish between political speech and speech that objectively constitutes pervasive harassment, it is unconstitutionally overbroad. *Id.* at 316.

Plaintiffs' speech, however, is only even subjectively offensive or harassing when the words are misinterpreted. "From the river to the sea" serves as an important example here. Defendants repeatedly cite the phrase as a reason why some students feel unsafe on Texas campuses.[19] *See e.g.,* Seitz Dec., Dkt. 32-3; Fox. Dec., Dkt. 32-9.  But Plaintiffs have never used the phrase as a call to violence against anyone, and certainly not against their fellow Jewish students. *See* Dkt. 21. Plaintiffs' use of the phrase is consistent with the phrase's history, which traces its roots to before Hamas' existence. *See* Ex. D – Professor Colla Declaration. Put simply, it's a call for Palestinian liberation which necessarily includes Jewish people on the land, not a call to eliminate them. *See id.*

---

[19] Some affidavits also make claims about chants encouraging violence against Jewish people. Plaintiffs deny that any of this happened and note that in Defendants' mountains of exhibits which include dozens of pictures and video recordings, Defendants can cite to no evidence that any Plaintiff chanted to encourage violence against Jewish people.

**e.  The challenged policies are unconstitutional viewpoint discrimination.**

Absent extraordinarily compelling (strict scrutiny) reasons that the Government does not argue apply here, the Government may not discriminate against speech based on its content. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). When the speech occurs in a government-created limited public forum, some content restrictions may be permitted, but the Government cannot engage in viewpoint discrimination. *Id.* at 831-32; *Matal v. Tam*, 582 U.S. 218, 243 (2017). Even then, an anti-disparagement clause that prohibits speech "that is offensive to a substantial percentage of the members of any group" is viewpoint discrimination because "[g]iving offense is a viewpoint." *Id.*

**1.  The policies single out criticism of Israel to the exclusion of any other country.**

Defendants' speech restrictions here violate the law under any potentially applicable standard. Each of the University of Texas defendants have followed GA-44 in the same manner. They have each defined in the same way and have incorporated Section 448.001's "examples of antisemitism" as a result.[20] Each of them then go on to broadly and vaguely define speech as unpermitted if it is antisemitic, so long as it is "disrupt[ive]," with the punishment to be placed both on the speaker and their student group.[21]

The University of Houston similarly defines antisemitism and includes Section 448.001's "examples of antisemitism" as well. The term includes rhetorical and physical acts

---

[20] **UTDallas**: *See* UTDSP50001, § A.3.20 ; *available at* https://policy.utdallas.edu/utdsp5001; **UTAustin**: *See* UTAustin Rules § 13-206(a), *available at* https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly/#text ; **UTSA**: *See* HOP § 9.37(XIX)(B), *available at* https://www.utsa.edu/hop/chapter9/9-37.html.
[21] **UTDallas**: *See* UTDSP50001, §§ L.49.8-9; **UTAustin**: *See* UTAustin Rules §§ 13-206(b)(c); **UTSA**: *See* HOP §§ 9.37(IV)(B)-(C).

of antisemitism directed toward Jewish or nonJewish individuals or their property or toward Jewish community institutions and religious facilities." TEX. GOV'T CODE § 448.001(2)." Houston SAM 1.D.07 § 3.8 n.1[22] Houston goes on to broadly declare antisemitism both discrimination and harassment, § 5.1, and finding it against the rules unless it is deemed "[a] minor verbal and nonverbal slight, snub, annoyance, insult or isolated incident including, but not limited to a microaggression," § 5.1.D.

The language from both forms of antisemitism comes directly from Tex Gov't Code § 448.001(2), just as GA-44 required. That provision goes on to clarify that "Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016." These examples include "targeting of the state of Israel, conceived as a Jewish collectivity," unless it is "similar to that leveled against any other country," "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor," "Applying double standards [to Israel] by requiring of it a behavior not expected or demanded of any other democratic nation," and "Drawing comparisons of contemporary Israeli policy to that of the Nazis." *See* IHRA, *Working Definition of Antisemitism*, May 26, 2016 (available at: https://holocaustremembrance.com/resources/working-definition-antisemitism).

This is blatant targeting of Plaintiffs' political speech. On these facts, the Court must conclude that Defendants' targeting of political criticism of one country, Israel, constitutes unlawful viewpoint discrimination. The court should thus enjoin the enforcement of all acts

---

[22] University of Houston System, System Administrative Memorandum (SAM) 01.D.07 (Aug. 3, 2023), https://uhsystem.edu/resources/compliance-ethics/_docs/sam/01/1d71.pdf.

taken in furtherance of GA-44, including the adoption of Section § 448.001(2) into campus speech codes about Israel.

### 2. Prohibiting "from the river to the sea" is also viewpoint discrimination.

Likewise, any ban on the phrase *from the river to the Sea, Palestine will be free* also constitutes viewpoint discrimination. Supporters of no other country are prohibited from expressing an assertion that their country will be free. As the Declaration of Professor Colla explains in detail, the slogan, which contrary to GA-44's assertions predates Hamas, Colla Decl. ¶ 5, is not antisemitic but instead "a call to Palestinian freedom, one that invokes what scholars, activists, and analysts all call "the one-state solution," i.e., resolving the Israel-Palestine conflict by creating a single, pluralistic state where Muslims, Christians and Jews can live with equal rights." Colla Declaration ¶ 7. This is pure political speech associated with a particular viewpoint that Plaintiffs support, and the Court should decline Defendants' invitation to treat a call for everyone's freedom in an area of the world where all are suffering as the English language's greatest slur

### CONCLUSION

For the reasons explained above, this Court should enter Plaintiffs' proposed order and enjoin[23] Defendants from enforcing GA-44—including but not limited to by adopting and enforcing a ban against *from the river to the sea, Palestine will be free,* adopting and enforcing GA-44's definition of antisemitism, and engaging in viewpoint discrimination against Plaintiffs, their student leaders, and those who support their efforts.

---

[23] Defendants make arguments about Plaintiffs' claims within the framework of as-applied versus facial challenges. *See* Dkt. 31 at 43, 56. Here, Plaintiffs seek an injunction mapped against the conduct that causes their injuries. Whether the Court treats these claims as facial or as-applied, the full scope of relief Plaintiffs' propose remains available.

Dated: August 26, 2024                    Respectfully submitted,

                                          /s/Lena Masri
                                          Lena Masri
                                          Gadeir Abbas*
                                          Justin Sadowsky
                                          **CAIR LEGAL DEFENSE FUND**
                                          453 New Jersey Ave SE
                                          Washington, D.C. 20003
                                          T: (202) 488-8787
                                          ldf@cair.com
                                          *Licensed in VA; not in D.C., practice
                                          limited to federal matters

                                          **John T. Floyd Law Firm**
                                          By: /s/ John T Floyd
                                          Texas Bar No. 00790700

                                          /s/ Chris Choate
                                          Texas Bar No. 24045655

                                          River Oaks Tower
                                          3730 Kirby Dr., Suite 750
                                          Houston, TX 77098
                                          Tel: 713-224-0101
                                          Fax: 713-237-1511

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served on all counsel of record on August

26, 2024, using the Federal Court CM/ECF system.

*/s/ Lena Masri*
Lena Masri