IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE, AT THE UNIVERSITY OF HOUSTON, et al., | § § § § | |
| Plaintiffs, | § § | |
| | § | 1:24-CV-523-RP |
| v. | § § | |
| GREG ABBOTT, *in his official capacity only as the Governor of the State of Texas*, et al., | § § § | |
| Defendants. | § | |

## ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Dkt. 31) and Plaintiffs' Motion for Preliminary Injunction (Dkt. 21). Having considered the parties' briefs, the record, and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss and **DENIES** Plaintiffs' Motion for Preliminary Injunction.

## I. BACKGROUND

On March 27, 2024, Governor Abbott issued Executive Order GA-44, "relating to addressing acts of antisemitism in institutions of higher education." (Dkt. 21-1). GA-44 begins with a preamble detailing events of the Israel-Palestine conflict and related protests that had recently occurred on university campuses. (*Id.*) The preamble includes the provision:

> WHEREAS, multiple protests and walkouts have been staged by universities' student organizations, with students chanting antisemitic phrases such as "from the river to the sea, Palestine will be free," which has long been used by Hamas supporters to call for the violent dismantling of the State of Israel and the destruction of the Jewish people who live there;

(*Id.*) Then, GA-44 directs all Texas higher education institutions to do the following:

1

1. Review and update free speech policies to address the sharp rise in antisemitic speech and acts on university campuses and establish appropriate punishments, including expulsion from the institution.

2. Ensure that these policies are being enforced on campuses and that groups such as the Palestine Solidarity Committee and Students for Justice in Palestine are disciplined for violating these policies.

3. Include the definition of antisemitism, adopted by the State of Texas in Section 448.001 of the Texas Government Code, in university free speech policies to guide university personnel and students on what constitutes antisemitic speech.

(*Id.*) That definition of antisemitism in Section 448.001 of the Texas Government Code is:

> "Antisemitism" means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism" adopted on May 26, 2016.

Two of the "examples of antisemitism" included in the International Holocaust Remembrance Alliance's "Working Definition of Antisemitism," relevant here, are:

1. Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Isreal is a racist endeavor;

2. Drawing comparisons of contemporary Israeli policy to that of the Nazis.[1]

Here, Plaintiffs operate and have student members at the Texas Higher education institutions that GA-44 directed to make updates to their speech policies. Plaintiffs Students for Justice in Palestine, at the University of Houston ("SJP-UH"), Students for Justice in Palestine at the University of Texas at Dallas ("SJP-UTD"), and Palestine Solidarity Committee, at the University of Texas at Austin ("PSC-UT"), are all student groups at public universities in Texas. (Dkt. 20, at 3-4).

---

[1]International Holocaust Remembrance Alliance, *Working Definition of Antisemitism*, WORKING DEFINITIONS & CHARTERS (last visited Oct. 23, 2024), https://holocaustremembrance.com/resources/working-definition-antisemitism.

Plaintiff Democratic Socialists of America ("DSA") is a non-profit organization, with student chapters at the University of Texas in San Antonio ("UTSA"), University of North Texas ("UNT"), University of Houston ("UH"), Texas Tech University, Texas State University, and Texas A&M University. (*Id.*)

Throughout April and May, after Governor Abbott issued GA-44, additional protests about the Israel-Palestine conflict occurred on university campuses in Texas, as well as throughout the country. (Dkt. 31, at 10-16). Protests of various sizes and activity occurred on the UT Austin, UTSA, UT Dallas, and UH campuses. (*Id.*) In Austin, Dallas, and Houston, protesters were arrested when the universities brought in local law enforcement to end the protests. (*Id.*) Also in Austin, UT's Austin's President, Jay Hartzell, cancelled a walk-out organized by Plaintiff PSC-UT. (Dkt. 20, at 25). When PSC-UT proceeded with the walk-out as planned, Hartzell suspended PSC-UT. (*Id.*) In San Antonio, UTSA's Dean of Students instructed a student member of Plaintiff DSA not to say the phrase "from the river to the sea, Palestine will be free," referencing GA-44. (Dkt. 20, at 8; Dkt. 31, at 19).

Shortly after, the universities revised their speech policies to comply with GA-44. (Dkt. 31, at 17–18). UT Austin, UT Dallas, and UTSA all incorporated the definition of antisemitism found in Section 448.001 of the Texas Government Code, as well as the following provisions:

1. Incitement of violence, incitement of imminent violation of law, harassment, property damage, disruption of a university activity, or any other violations of state or federal law or university policy that was committed because of antisemitism or the offender's bias or prejudice against a group identified by race, color, disability, religion, national origin or ancestry, age, gender, or sexual preference will be subject to discipline, up to and including possible termination/expulsion.

2. Any registered student group that engages in incitement of violence, incitement of imminent violation of law, harassment, property damage, disruption of a university activity, or any other violation of state or federal law or university policy because of antisemitism or bias or prejudice against a group identified by race,

> color, disability, religion, national origin or ancestry, age, gender,
> or sexual preference, is subject to discipline, up to an including
> possible loss of recognized status for the registered student group.[2]

(Dkt. 31-1). The University of Houston's speech policy includes the following provision:

> The University recognizes that some constitutionally-protected speech
> may be considered offensive by some or all listeners. An Expressive
> Activity does not automatically rise to the level of denying
> constitutional, statutory, or legal rights of others, solely because a
> listener is offended by the argument or idea presented. However,
> expressive activities that interfere with the legal rights of others will
> not be tolerated, and will be disciplined according to appropriate
> University policies, including, but not limited to SAM 01.D.07 – *Anti-
> Discrimination Policy* (which among other things defines a Protected
> Class[1]), and SAM 01.D.08 – *Sexual-Misconduct Policy*.[3]

Then, at footnote 1, the University of Houston's policy includes the definition of antisemitism

found in Section 448.001 of the Texas Government Code.[4] (Dkt. 21-8). The same definition is

included in a footnote in the University of Houston's definition of "protected class."[5]

Plaintiffs brought this suit against Defendants Greg Abbott, in his official capacity as the

Governor of the State of Texas, UH, the members of the UH System Board of Regents in their

individual and official capacities (Tilman Feritta, Alonza Cantu, John A. McCall, Jr., Beth Madison,

Ricky Raven, Jack B. Moore, Tammy D. Murphy, Gregory C. King), the UH System Board of

Regents itself, the members of the UT System Board of Regents in their official capacities only

(Kevin P. Eltife, Janiece Longoria, James C. Weaver, Christina Melton Craine, Jodie Lee Jiles, Kelcy

---

[2]Sec. 13-206. *Antisemitic and other discriminatory conduct*, UNIVERSITY OF TEXAS CATALOG, (last visited Oct. 23, 2024), https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly/; UTDSP5001, Section L, Subsection 49(8), 49(9), UT DALLAS POLICY NAVIGATOR, (last visited Oct. 23, 2024), https://policy.utdallas.edu/utdsp5001; 9.37 (IV)(B), (IV)(C), UNIVERSITY OF TEXAS AT SAN ANTONIO HANDBOOK OF OPERATING PROCEDURES, (last visited Oct. 23, 2024), https://www.utsa.edu/hop/chapter9/9-37.html.
[3]01.05.01 *Freedom of Expression* (IX)(B), UH POLICIES MAPPs, (last visited Oct. 23, 2024), https://uh.edu/policies/mapps/01-general-information/010501/.
[4] *Id.*
[5]01.D.07- *Anti-Discrimination*, UH POLICIES MAPPs, (last visited Oct. 23, 2024), https://www.uhsystem.edu/resources/compliance-ethics/uhs-policies/sams/01-general-administration/01d07.

L. Warren, Nolan Perez, Stuart W. Stedman, Robert P. Gauntt), the UT Austin Board of Regents itself, Rene Khator "Khator"), in her individual and official capacity as the President of UH and the chancellor of the UH System, Taylor Eighmy ("Eighmy"), in his individual and official capacity as the President of UTSA, and Jay Hartzell ("Hartzell"), in his individual and official capacity as the President of UT Austin.

Plaintiffs present three claims, all arising under 42 U.S.C § 1983. (Dkt. 20, at 20-25). In Count I, which all Plaintiffs brought against all Defendants, Plaintiffs challenge GA-44 and Defendants' actions to update university speech policies in compliance with the order. (*Id.* at 20). Plaintiffs allege that the order mandates impermissible viewpoint discrimination and chills their speech, violating the First Amendment. (*Id.*) In Count II, between only Plaintiff DSA and Defendant Eighmy, DSA claims that UTSA's prohibition of the phrase "from the river to the sea, Palestine will be free," is impermissible viewpoint discrimination that violates the First Amendment. (*Id.* at 23–24). In Count III, between only Plaintiff PSC-UT and Defendant Hartzell, PSC-UT claims Hartzell's cancellation of PSC-UT's protest and the groups' suspension was pretext for impermissible viewpoint discrimination and violated the First Amendment. (*Id.* at 24–25).

Plaintiffs request compensatory and punitive damages, a declaratory judgment, and a preliminary and permanent injunction for all three counts. (Dkt. 21, at 25-27). Defendants have moved to dismiss all three counts, between all Plaintiffs and all Defendants. (Dkt. 31). Defendants argue grounds for dismissal under Rule 12(b)(1) and 12(b)(6). (*Id.*). Plaintiffs responded to Defendants' Motion to Dismiss Plaintiff's Amended Complaint, (Dkt. 50), and Plaintiffs replied, (Dkt. 56). Plaintiffs have also moved for a preliminary injunction. (Dkt. 21). Defendants filed a response in opposition, (Dkt. 31), Plaintiffs replied (Dkt. 38), and Defendants filed a surreply (Dkt. 51). Also before the Court are amicus briefs from the Louis D. Brandeis Center for Human Rights Under the Law (Dkt. 34), the National Jewish Advocacy Center and the Israeli-American Coalition for Action

(Dkt. 39), and The Middle East Forum (Dkt. 40). Because a preliminary injunction would apply only to viable claims between proper plaintiffs and defendants, the Court first rules on Defendants' Motion to Dismiss, then rules on Plaintiffs' Motion for Preliminary Injunction.

## II. MOTION TO DISMISS

### A. Legal Standards

#### 1. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

#### 2. Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area*

*Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted).

**B. Discussion**

1. Motion to Dismiss for Lack of Subject Matter Jurisdiction

When a Rule 12(b)(1) motion is filed in conjunction with other motions under Rule 12, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Thus, the Court will first address Defendants' contentions under 12(b)(1) that they are entitled to sovereign immunity and that Plaintiffs lack standing, then will address Defendants' arguments under 12(b)(6).

a. Sovereign Immunity

The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). However, under the *Ex parte Young* exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908). All Defendants in this case are state agencies or state officials, so in order for Plaintiffs' claims not to be barred by the Eleventh Amendment, the *Ex parte Young* exception must apply. "[T]here are three basic elements of an *Ex parte Young* lawsuit. The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020).

At the outset, UH, the UH System Board of Regents itself, and the UT Austin Board of Regents itself are not state officers, and therefore not subject to the *Ex parte Young* exception. *See Doe v. Harrell*, 841 F. App'x 663, 667 (5th Cir. 2021); *see also Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 479 (5th Cir. 2016). Claims against these Defendants are by barred by sovereign immunity. *See id.* Therefore, Plaintiffs' claim against these Defendants is dismissed for lack of subject matter jurisdiction.

As for the state-official Defendants, "[f]or the [*Ex parte Young*] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir.

2019) (quoting *Young*, 209 U.S. at 157); *see also In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) ("*Ex parte Young* allows suits for injunctive or declaratory relief against state officials, provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law."). Absent such a connection, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Id.*

Under these rules, Plaintiffs' claim against Governor Abbot is barred by sovereign immunity. The Fifth Circuit has held that a governor's power to issue an executive order is not a sufficient connection to enforcement to place him within the *Ex parte Young* exception. *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020); *see also Jackson v. Wright*, 82 F.4th 362, 367-68 (5th Cir. 2023). Therefore, Plaintiffs' claim against Governor Abbot is dismissed for lack of subject matter jurisdiction.

The remaining state-official Defendants, the members of the two Boards of Regents and the university presidents, must have "'some connection with the enforcement' of the challenged law or policy" in order to fall under the *Ex parte Young* exception to sovereign immunity. *Jackson*, 82 F.4th at 367. The Fifth Circuit has not precisely defined the connection required, but there are two "guideposts:" 1) the officials need only a mere "scintilla of enforcement" with respect to the challenged law and 2) the officials must have more than a "general duty" to see that the laws of the state are implemented. *Id.*

Here, the Court finds the members of the Boards of Regents and the university president Defendants have the required connection to the enforcement of the challenged policies. The Court finds Defendants' efforts to distinguish *Jackson* unpersuasive and instead finds *Jackson* instructive and binding. In *Jackson*, the Fifth Circuit held members of the Board of Regents of UNT fell into the *Ex Parte Young* exception because of their "direct supervisory authority over the UNT officials who took the actions at issue." *Jackson*, 82 F.4th at 368. This Court also followed *Jackson* in *Coalition for*

*Independent Technology Research v. Abbott,* which contained facts quite analogous to the case at hand. 706 F. Supp. 3d 673, 683 (W.D. Tex. 2023). In that case, Governor Abbott issued a directive for Texas state agencies to ban TikTok on government devices, and the UNT System promulgated policies responsive to Abbott's ban. *Id.* at 680. This Court found the UNT Board members had the requisite connection to enforcement because the Texas Education code vested in them "the organization, control, and management of the University of North Texas System." *Id.* at 683. Likewise, here, the Texas Education Code grants the Board of Regents of the UT System "the authority to promulgate and enforce such other rules for the operation, control, and management of the university system and component institutions thereof." Tex. Educ. Code Ann. § 65.31(c) (West). And the Code grants the Board of Regents of UH the power to "enact bylaws, rules, and regulations necessary for the successful management and government of the university." Tex. Educ. Code Ann. § 111.35 (West). Accordingly, this Court finds the members of the Boards of Regents have the requisite connection to enforcement of the challenged policies to fall into the *Ex Parte Young* exception. Therefore, Plaintiffs' claim against the members of the Boards of Regents in their official capacities is not barred by sovereign immunity.

Similarly, the university-president Defendants, Khator, Eighmy, and Hartzell, have the requisite connection to enforcement to fall into the *Ex parte Young* exception. UT Austin's speech policy vests in President Hartzell the ability to designate personnel who may "prevent imminently threated violations, or end ongoing violations" of the speech policy.[6] UTSA's speech policy vests the same power in President Eighmy.[7] UH's speech policy gives President Khator "authority to take such steps to prevent expressive activities that materially interfere with the educational mission of

---

[6]Sec. 13-1202(e). *Response to* Violations, UNIVERSITY OF TEXAS CATALOG, (last visited Oct. 23, 2024), https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly/.
[7]XVII(F), UNIVERSITY OF TEXAS AT SAN ANTONIO HANDBOOK OF OPERATING PROCEDURES, (last visited Oct. 23, 2024), https://www.utsa.edu/hop/chapter9/9-37.html.

the University."[8] The Court finds these powers rise above the scintilla of enforcement required to fall into the *Ex parte Young* exception, and Plaintiffs' claims against the president Defendants are not barred by sovereign immunity.

But, the *Ex parte Young* exception allows plaintiffs to seek only prospective relief. *Salinas v. Texas Workforce Comm'n*, 573 F. App'x 370 (5th Cir. 2014). So, Plaintiffs may seek only the declaratory and injunctive relief they request, (Dkt. 25-27), and Plaintiffs cannot obtain damages. Plaintiffs' claims for compensatory and punitive damages are dismissed.[9]

b. Standing

Defendants argue that Plaintiffs do not have standing to bring any of their claims against any of the Defendants. (Mot. Dismiss, Dkt. 31, at 5). Standing is a component of subject matter jurisdiction, and it is properly raised by a motion to dismiss under Rule 12(b)(1). *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016). Standing has three elements: (1) injury in fact, (2) causation, and (3) redressability. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). The injury cannot be merely "conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Causation requires that the injury "fairly can be traced to the challenged action of the defendant," rather than to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Redressability requires that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The party invoking federal

---

[8]01.05.01 *Freedom of Expression* (IX)(A), UH POLICIES MAPPs, (last visited Oct. 23, 2024), https://uh.edu/policies/mapps/01-general-information/010501/.
[9]Additionally and alternatively, Plaintiffs are also barred from recovering damages for any of their claims because of their associational standing. *Self-Ins. Inst. of Am., Inc. v. Korioth*, 53 F.3d 694, 695 (5th Cir. 1995) ("Though an association may have standing to seek 'a declaration, injunction, or some other form of prospective relief' on behalf of its members, it does not enjoy standing to seek damages for monetary injuries peculiar to individual members where the fact and extent of injury will require individualized proof.") (citing *Warth v. Seldin*, 422 U.S. 490 (1975)).

subject-matter jurisdiction bears the burden of establishing each element. *Ramming*, 281 F.3d at 161. Each element must be supported with the "manner and degree of evidence required at the successive stages of litigation." *Id.*

Defendants challenge Plaintiffs' standing in multiple ways. For all Plaintiffs and Count I, Defendants assert that 1) GA-44 does not arguably proscribe Plaintiffs' conduct, so there is no injury, 2) Plaintiffs' alleged injuries are not traceable to Defendants or GA-44 and 3) Plaintiffs' alleged injuries cannot be redressed by challenging GA-44. (Dkt. 31, at 24–25, 34–36).

### i. Count I

The Court finds Plaintiffs have sufficiently pled injury. The Court understands Count I of Plaintiffs' complaint as a pre-enforcement challenge to the revised university speech guidelines put in place to comply with GA-44.[10] Plaintiffs allege GA-44 chills their speech by labeling their activities antisemitic. (Dkt. 20, ¶ 89). The Fifth Circuit "has repeatedly held, in the pre-enforcement context, that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330-31 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (internal quotations omitted). A plaintiff has suffered such an injury if he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest (2) his intended future conduct is arguably ... proscribed by the policy in question and (3) the threat of future enforcement of the challenged policies is substantial. *Id.* at 330.

Defendants take issue with Plaintiffs' showing of the second element of this type of injury— arguing Plaintiffs' speech is not arguably proscribed by GA-44. (Dkt. 31, at 34-36). The Court disagrees and finds that Plaintiffs make a colorable argument that their intended future conduct is

---

[10] The Court has considered Defendants' briefing that alleges Plaintiffs do not characterize Count I as a pre-enforcement claim in their initial complaint. (Dkt. 51, at 9). The Court disagrees. The Court has also considered Defendants' arguments that GA-44 was not applied to Plaintiffs during the spring protests, but understanding Count I as a forward-looking claim, rather than a claim regarding actions taken during the protests in the past, the Court does not find these arguments relevant.

proscribed by the universities' compliance with GA-44. Plaintiffs plead they intend future speech such as "educat[ing] the campus community about why SJP-UH and so many others view Israel as an apartheid state," and "[using] forceful political rhetoric that calls Israel's conduct a genocide in Gaza and an apartheid system elsewhere." (Dkt. 20, at 12, 17). The revised university policies include the definition from and citation to Section 448.001 of the Texas Government Code. *Supra*, n. 2–5. That section of the Texas Government Code then references the International Holocaust Remembrance Alliance's ("IHRA")"Working Definition of Antisemitism." Tex. Gov't Code Ann. § 448.001 (West). The IHRA's working definition lists "contemporary examples of antisemitism," including "claiming the existence of a State of Israel is racist endeavor" and "drawing comparisons of contemporary Israeli policy to that of the Nazis."[11] Plaintiffs argue that IHRA's labeling of these examples as antisemitic arguably proscribes their similar criticisms of Israel, (Dkt. 20, at 10), because the IHRA examples are incorporated into the university policies by reference, (*id.*, at 8). The standard for this element of standing in a pre-enforcement challenge is that the Plaintiffs' conduct is "arguably" proscribed by the challenged policy, not "definitely" proscribed. *See Speech First,* 979 F.3d at 330. The Court finds the connections between these definitions sufficient at this stage to show Plaintiffs' planned conduct is arguably proscribed. And considering that "it is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech.," *id.*, the Court finds Plaintiffs have sufficiently pled this element of injury to sustain standing.

To establish standing for Count I, Plaintiffs must also plead facts sufficient to establish a causal connection, or in other words, establish that their injuries are fairly traceable to the Defendants. *See Simon*, 426 U.S. at 41–42. Defendants make much of Plaintiffs' focus on GA-44, rather than the new

---

[11]International Holocaust Remembrance Alliance, *Working Definition of Antisemitism*, WORKING DEFINITIONS & CHARTERS (last visited Oct. 23, 2024), https://holocaustremembrance.com/resources/working-definition-antisemitism.

university policies themselves, arguing that the chill to Plaintiffs' speech is caused by the policies, not by GA-44. (Dkt. 31, at 26–27, 34–36, 43–44). The Court finds this unpersuasive and not outcome determinative. First, Defendants attempt to sever the causal link between GA-44 and the chill to Plaintiffs' speech by placing the updates to the university policies in between, but this argument ignores that GA-44 was a mandate for the very updates that Plaintiffs allege chill their speech. Second, it is clear by Plaintiffs' request for relief, like declaratory and injunctive relief against the policies themselves, (Dkt. 20, at 26–27), that Plaintiffs are challenging the policies, not solely GA-44, as Defendants allege. Further, Plaintiffs' challenge to the policies is evident from Plaintiffs' choice of Defendants, and the chill of Plaintiffs' speech is surely traceable to those who revised the policies. Therefore, the Court finds Plaintiffs have sufficiently alleged the cause element of standing at this stage.

Similarly, Defendants argue that Plaintiffs' injuries under Count I are not redressable by a challenge to GA-44 alone. However, again, Plaintiffs' request for relief, (Dkt. 20, at 26–27), makes it clear they do not challenge GA-44 alone, but also the actions Defendants have taken to comply with the order. For example, Plaintiffs have requested an injunction to stop Defendants from updating their policies in accordance with GA-44 and from taking enforcement actions according to GA-44. (Dkt. 21, at 26). And where potential enforcement of challenged policies is causing a chilling effect, injury could be redressed by enjoining enforcement of these policies. *Speech First*, 979 F.3d at 338. The Court finds that Plaintiffs injuries under Count I are redressable with the requested relief. In conclusion, the Court finds Plaintiffs have standing to pursue Count I.

### ii. Count II

In contrast, the Court finds Plaintiff DSA does not have standing to bring Count II against Defendant Eighmy. "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement

only by demonstrating a continuing injury or threatened future injury." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). DSA alleges only past incidents of UTSA officials instructing students not to say, "from the river to the sea," (Dkt. 20, at 8, 17), and Plaintiffs do not establish a sufficient probability that the past harm will occur again. *See id.* ("Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future . . . ."). Plaintiffs refer to DSA's "rule" prohibiting the phrase, (Dkt. 20, at 23), but the phrase does not appear, nor is it incorporated by reference, into UTSA's updated speech policy.[12] Without more, DSA fails to establish a continuing injury or threatened future injury to sustain standing on this claim. Therefore, Count II is dismissed without prejudice for lack of subject matter jurisdiction.

### iii. Count III

The Court finds Plaintiff PSC-UT has sufficiently established standing to maintain Count III. Although the cancellation of the protest is in the past, and therefore not ongoing injury, PSC-UT's suspension is sufficient ongoing injury, traceable to Defendant Hartzell, and redressable by enjoining the suspension. Therefore, the Court declines to dismiss Count III for lack of subject matter jurisdiction.

### 2. Motion to Dismiss for Failure to State a Claim

Defendants argue that Plaintiffs have failed to sufficiently plead each of their claims. Having dismissed Count II, the Court addresses only Counts I and III under Defendants' 12(b)(6) arguments.

Both Counts I and III arise under 42 U.S.C. § 1983. To properly plead a Section 1983 claim, a plaintiff must allege a violation of a right secured by the Constitution or laws of the United States

---

[12] 9.37 (IV)(B), (IV)(C), UNIVERSITY OF TEXAS AT SAN ANTONIO HANDBOOK OF OPERATING PROCEDURES, (last visited Oct. 23, 2024), https://www.utsa.edu/hop/chapter9/9-37.html.

and demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013). The Court finds Plaintiffs have plausibly pled a Section 1983 claim for Counts I, because they plead university state officials are chilling the exercise of their First Amendment rights by promulgating and enforcing the speech policies in compliance with GA-44. (Dkt. 20, at 20-25). The Court finds the same for Count III, because they plead facts sufficient, if believed, to show President Hartzell suspended PSC-UT because of the group's expressed viewpoint. (*Id.* at 19–20). Defendants proffer a list of points Plaintiffs did not include in their complaint, (Dkt. 31, at 58), but Plaintiffs are not required to flesh out every fact and explanation to survive under 12(b)(6). *See Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). More, a motion to dismiss under 12(b)(6) "is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). Therefore, the court declines to dismiss Plaintiffs' claims for failure to state a claim.

Defendants also argue Plaintiffs' individual-capacity claims are barred by qualified immunity. (Dkt. 31, at 59). However, "qualified immunity protect[s] only *individuals* from claims for *damages*; [it does] not bar official-capacity claims or claims for injunctive relief." *Escobarrivera v. Whitaker*, 2022 WL 17352178, at *5 (5th Cir. Dec. 1, 2022) (emphasis in original) (citing *Singleton v. Cannizzaro*, 956 F.3d 773, n.3 (5th Cir. 2020)). Seeing that the Court has narrowed Plaintiffs' potential remedies to prospective relief, and dismissed any claims for damages, it is unnecessary to address Defendants' potential qualified immunity.

In conclusion, the Court grants Defendants' motion to dismiss as to Plaintiffs' claims under Count I against Governor Abbott, UH, the UH Board of Regents, and the UT Austin Board of Regents. The Court also grants Defendants' motion to dismiss Count II and dismisses Count II without prejudice for lack of subject matter jurisdiction. The Court denies Defendants' motion to

dismiss Plaintiffs' claims under Count I as against the individual members of the two Boards of Regents and against Presidents Khator, Eighmy, and Hartzell. The Court denies Defendants' motion to dismiss Count III. However, the available relief for Plaintiffs for both Count I and Count III is limited to prospective declaratory or injunctive relief.

### III. PRELIMINARY INJUNCTION

Now before the Court is Plaintiff's Motion for Preliminary Injunction, (Dkt. 21). Defendants responded, (Dkt. 32), Plaintiffs replied, (Dkt. 38), and Defendants filed a surreply (Dkt. 51). For the following reasons, the Court finds that Plaintiffs are likely to succeed in proving the GA-44-compliant university policies chill speech in violation of the First Amendment, but that the Court cannot issue the injunction Plaintiffs seek.

### A. Legal Standard

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A district court's decision to grant or deny a preliminary injunction is discretionary. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Here, the parties agree that the outcome of the preliminary injunction turns on Plaintiffs' likelihood of success on the merits. (Dkt. 21, at 5; Dkt. 32, at 29). That is because "loss of First Amendment freedoms, even for minimal periods of time, constitute irreparable injury," *Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996) (citing *Elrod v. Burns*, 427 U.S.

347 (1976)), injunctions against First Amendment violations are always in the public interest, *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013), and the public interest and balance of the equities merge when the government is the opposing party, *Nken v. Holder*, 556 U.S. 418 (2009).

## B. Discussion

### 1. Likelihood of Success on the Merits

To prove likelihood of success on the merits, Plaintiffs must prove they are likely to succeed in showing the GA-44-compliant university policies chill their speech in violation of the First Amendment. The parties disagree over the framework that should govern this analysis; in particular, they disagree over the applicability of *Tinker* to First Amendment cases at the university level. In *Tinker*, the Supreme Court held that students retained their free speech rights at school, and schools could prohibit particular expression only upon a showing that the expression would cause a "substantial disruption" of school actives. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 514 (1969). The students in *Tinker* were junior-high and high-school age students. *Id.* at 504. Defendants argue that *Tinker* applies to universities and governs here, so that even if GA-44 and the university policies constitute viewpoint discrimination, that discrimination is permissible under *Tinker*, because Defendants rightfully forecast the proscribed speech will be a substantial disruption. (Dkt. 32 at 37-41, 42-43). Plaintiffs argue *Tinker* does not apply to universities, so universities can limit speech only in content-neutral ways, and since GA-44 and the university policies are not content-neutral, they are impermissible viewpoint discrimination. (Dkt. 38, at 25-31).

The Court observes that neither the Fifth Circuit or Supreme Court has squarely held whether *Tinker* governs at the university level. Defendants cite several Fifth Circuit cases to support their argument that *Tinker* does govern, (Dkt. 31, at 46), however, only two of them were decided in

a university context. Of the two university cases, one is unpublished. *See Esfeller v. O'Keefe*, 391 F. App'x 337 (5th Cir. 2010). The other, *Shamloo v. Mississippi State Board of Trustees of Institutions of Higher Learning*, does address one issue in light of *Tinker*, but the case was ultimately decided on another issue. 620 F.2d 516, 523–24 (5th Cir. 1980). The Court also acknowledges *Healy v. James*, in which the Supreme Court cites *Tinker* in the university context, for the propositions that "[a]lso prohibitable are actions which 'materially and substantially disrupt the work and discipline of the school,'" and, "First Amendment rights must always be applied 'in light of the special characteristics of the environment' in the particular case." 408 U.S. 169, 189, 180 (1972) (internal punctuation omitted). Exercising caution and assuming that *Tinker* arguably applies to universities, the Court will apply *Tinker* here to determine Plaintiffs' likelihood of success on the merits.

But first, as a threshold issue, the Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination. In general, including the word "antisemitism" in speech policies, perhaps in the context of protecting students from discrimination and harassment, is not inherently a First Amendment violation. The Defendants wish to view the speech policies in this vacuum, claiming the revised policies do not in fact prohibit any specific expression. (Dkt. 31, at 35-36). But here, the speech policies do not leave "antisemitism" open to constitutional definitions and interpretations, because GA-44 mandated a specific definition. (Dkt. 21-1). That definition, by incorporation of the IHRA's examples, labels "calling the State of Israel a racist endeavor" and "drawing comparisons of contemporary Israeli policy to that of the Nazis" as antisemitic.[13] And students can be punished for antisemitic speech under the revised speech policies. *Supra,* n.2-5. Plaintiffs follow this thread, reasonably understand that their intended speech is now punishable under the revised policies, and hesitate to engage in such expression. (Dkt. 21, at 5). Because of this,

---

[13]Tex. Gov't Code Ann. § 448.001 (West); International Holocaust Remembrance Alliance, *Working Definition of Antisemitism*, WORKING DEFINITIONS & CHARTERS (last visited Oct. 23, 2024), https://holocaustremembrance.com/resources/working-definition-antisemitism.

Court finds the revised policies are intertwined with GA-44 and the IHRA examples, which identify content-specific expression—like that the State of Israel is a racist endeavor or drawing comparisons between Israel and Nazis. Through the connection to these examples, the policies make that speech punishable, thereby chilling it.

Now, *Tinker*'s framework does permit schools to prohibit certain expression of certain viewpoints, but only upon a showing that the expression would cause a "substantial disruption" of school actives. *Tinker*, 393 U.S. at 511, 514. The school official "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* Additionally, *Healy*, a First Amendment case at the university level, directs First Amendment analysis to be done "'in light of the special characteristics of the environment' in the particular case." *Healy*, 408 U.S. at 180. The Supreme Court in *Healy* found the need for this circumstance-specific inquiry was "made clear in *Tinker*." *Id.*

So, assessing what might be a "substantial disruption" in a university setting requires consideration of the "special characteristics of the environment." *See Tinker*, 393 U.S. at 511, 514; *see also Healy*, 408 U.S. at 180. In other words, because of the characteristics of each environment, what may be a substantial disruption in a secondary school environment may not be a substantial disruption in a university environment; what may disrupt a secondary school could even be fundamental to universities. *See Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016). The Supreme Court has long recognized that universities are "vital centers for the Nation's intellectual life," to the extent that "danger . . . from the chilling of individual thought and expression" "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995). Ultimately, "the precedents of [the Supreme Court] leave no room for the view that . . . First

20

Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180.

Here, the characteristic of universities as an environment for vigorous debate is outcome determinative. The revised university policies chill a kind of expression that is a hallmark of university activity, and even under *Tinker*, the Court finds the Defendants cannot show this expression sufficiently rises to the level of a "substantial disruption" at the university level. To the contrary, this type of passionate political debate is essential at universities, where students are forming their worldview as adults. Restrictions on speech at the secondary-school level are justified in part by schools acting in *loco parentis* to children, but universities do not serve that same function, and even perform a disservice to their mature students by prohibiting expression that some may find disagreeable. *See Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d at 627. Defendants emphasize the spring protests, arguing those events are evidence that this speech is a substantial disruption. (Dkt. 32 at 37–41, 42–43). But the Court disagrees, finding the prohibition of this expression more akin to "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *See Tinker*, 393 U.S. at 509. For example, a student could calmly express she finds Israel's policies similar to that of the Nazis while seated in a classroom with her hands folded in her lap, and it could hardly be said this expression is a *per se* substantial disruption. Yet under UT Austin's revised policy, for example, her expression is defined as antisemitism and could be punished as "harassment . . . committed because of antisemitism."[14] And while some may find her speech disagreeable, offensive, or even inflammatory, it is "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression

---

[14]Sec. 13-206. *Antisemitic and other discriminatory conduct*, UNIVERSITY OF TEXAS CATALOG, (last visited Oct. 23, 2024), https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly.

of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

If this viewpoint is expressed in a way that truly does rise to the level of a substantial disruption, the disruption can be addressed through content-neutral, time, manner, and place restrictions, such as those the Defendants vigorously argue they applied during the spring protests, (Dkt. 32, at 34), making the prohibition on this specific expression not only unconstitutional but unnecessary. As the Supreme Court said in *Healy*, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Healy*, 408 U.S. at 180-81.

In conclusion, the Court finds that Plaintiffs are likely to succeed on their claim, even under *Tinker*, that the GA-44-compliant university policies impose impermissible viewpoint discrimination that chills speech in violation of the First Amendment.

### 2. Relief

However, the Court is unable to grant the relief Plaintiffs request. Plaintiffs' proposed order asks the Court to enjoin Defendants from:

> enforcing GA-44 and any practices or policies adopted in furtherance of it, including but not limited to the creation of any rules or policies that:
> a. forbid students from using the phrase from the river to the sea, Palestine will be free;
> b. define as bigoted the typical criticisms and historical comparisons students make about foreign countries when those criticisms are made about Israel;
> c. single out for punishment Students for Justice in Palestine, Palestine Solidarity Committee, or any organization that is critical of Israel and supports the rights of Palestinians;

and to order that:

> Defendant Taylor Eighmy is hereby preliminarily enjoined from enforcing the school's policy forbidding students from chanting or displaying on signs the slogan from the river to the sea, Palestine will be free.

> Defendant Rene Khator is hereby preliminary enjoined from enforcing its new policies that seek to comport with GA-44, including the changes made to UH Systems' free expression policies by the Board of Regents on May 17th.

(Dkt. 21-10).

Rule 65 of the Federal Rules of Civil Procedure requires an order granting an injunction to "describe in reasonable detail . . .the act or acts restrained." Fed. R. Civ. P. 65(d)(1)(C). Further, the scope of the injunctive relief is dictated by the extent of the violation established, and the district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order. *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004). An injunction that is overbroad or vague does not meet this standard. *Id.*

Overall, the Court finds Plaintiffs' requested injunction overbroad. The Court acknowledges that if Plaintiffs ultimately succeed, the Court will need to grant relief. Appropriate relief will focus on eliminating the connection between the university policies, GA-44's definition of antisemitism, and the IHRA's examples of antisemitism, because it is that connection that chills Plaintiffs' speech. For example, particularly if evidence arises that the policies are being enforced in alignment with the IHRA's examples, appropriate relief may enjoin Defendants from punishing speech under the guidance of the IHRA's examples. The proposed injunction is not narrowly tailored to the specific definition and examples of antisemitism incorporated into the policies. For instance, UH's revised policy does not identify, even by reference, the phrase "from the river to the sea."[15] And, Plaintiffs could violate valid university policies in a manner that requires them to be "single[d] out for punishment." Because a preliminary injunction should be the exception rather than the rule, *Valley*, 118 F.3d at 1050, and the decision is discretionary, *Mississippi Power*, 760 F.2d at 621, the Court

---

[15] 01.05.01 *Freedom of Expression* (IX)(A), UH POLICIES MAPPs, (last visited Oct. 23, 2024), https://uh.edu/policies/mapps/01-general-information/010501/.

declines to exercise its discretion to fashion its own injunction at this time and does not wish to err by entering the proposed overbroad injunction.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' Motion to Dismiss, (Dkt. 31), is **GRANTED IN PART AND DENIED IN PART**. Specifically, Defendants' motion is **DENIED** with respect to the claims against Tilman Feritta, Alonza Cantu, John A. McCall, Jr., Beth Madison, Ricky Raven, Jack B. Moore, Tammy D. Murphy, Gregory C. King, Kevin P. Eltife, Janiece Longoria, James C. Weaver, Christina Melton Craine, Jodie Lee Jiles, Kelcy L. Warren, Nolan Perez, Stuart W. Stedman, Robert P. Gauntt, Rene Khator, Taylor Eighmy, and Jay Hartzell.

Defendants' motion is **GRANTED** with respect to the claims against Greg Abbott, the University of Houston, the University of Houston System Board of Regents, and the University of Texas at Austin Board of Regents. Plaintiffs' claims against Greg Abbott, the University of Houston, the University of Houston System Board of Regents, and the University of Texas at Austin Board of Regents are **DISMISSED**. Defendants' motion is **GRANTED** as to Count II. Count II, by DSA against Taylor Eighmy, is **DISMISSED**. Defendants' motion is **GRANTED** as to any claim for damages, and all claims for damages are **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (Dkt. 21), is **DENIED.**

**SIGNED** on October 28, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE