**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| DEMOCRATIC SOCIALISTS OF AMERICA, et al., | § § § § § § § § § § § § | No. 1:24-cv-523-RP |
| Plaintiffs, | | |
| v. | | |
| KEVIN P. ELTIFE, et al., | | |
| Defendants. | | |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

TODD A. DICKERSON
Attorney-in-Charge
Texas Bar No. 24118368
MELISSA B. HOSTICK
Texas Bar No. 24128832
Assistant Attorneys General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(737) 228-7289 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov
Melissa.Hostick@oag.texas.gov

**Attorneys for Defendants**

TABLE OF CONTENTS

Table of Contents ............................................................................................................................i

Table of Authorities......................................................................................................................iii

Introduction....................................................................................................................................1

Factual Background .......................................................................................................................3

    I.      The Rise Of Antisemitism On College Campuses And GA-44. ...............................3

    II.     GA-44's Approach To Combating Antisemitism Is Nothing New. ......................5

    III.    UTSA Did Not Adopt The IHRA's Examples When It Implemented GA-44's
            Directives. ..................................................................................................................6

    IV.    Discovery Has Severely Limited DSA's Claim.........................................................7

    V.     An Overview Of DSA's Claim. ..................................................................................9

Argument ........................................................................................................................................9

    I.      DSA Lacks Standing....................................................................................................9

        A.     DSA's Injury Turns On Its Use Of The Phrase "From The River To The Sea";
             This Court Previously Dismissed This Claim For Lack Of Standing..............................9

        B.     DSA Also Cannot Establish A Justiciable Pre-Enforcement Challenge To
             UTSA's Revised Policies. ........................................................................................10

        C.     DSA Lacks Associational And Organizational Standing: It Cannot Show That
             One Of Its Members Has Standing, Nor Was Its Mission Perceptibly
             Impaired....................................................................................................................13

        D.     *Trump v. CASA* Forecloses DSA's Request For Statewide Equitable Relief..................15

    II.     Sovereign Immunity Bars DSA's Lawsuit. ..............................................................18

    III.    DSA's Claim Fails On The Merits...........................................................................19

        A.     DSA Cannot Establish A Viable Facial Challenge. .............................................19

           1.    DSA Agrees With HOP 9.37's Definition Of Antisemitism And Its Anti-
                 Discrimination Provision...................................................................................20

           2.    DSA Cannot Sustain A Facial Challenge Based On The IHRA's Examples. ...............20

           3.    This Court's Prior Ruling Indicates That HOP 9.37 Is Constitutional............................21

           4.    The IHRA's Examples Would Have To Be Misapplied To Create A Potential
                 First Amendment Problem.................................................................................22

           5.    Schools Can Restrict Antisemitic Discrimination Without Necessarily
                 Violating The First Amendment.........................................................................23

        B.     DSA Did Not Assert An As-Applied Challenge, And Any Such Claim Would
             Fail As A Matter Of Law........................................................................................27

        C.     The Constitutional-Avoidance Canon Applies To Any Interpretation Of
             GA-44. ......................................................................................................................27

Conclusion ...........................................................................................................................28

Certificate of Service............................................................................................................29

TABLE OF AUTHORITIES

### Cases

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018)............................................................................................11

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
851 F.3d 507 (5th Cir. 2017)............................................................................................18

*Banks v. Gen. Motors, LLC*,
81 F.4th 242 (2d Cir. 2023)..............................................................................................26

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020)..........................................................................................................28

*Bell v. Itawamba Cnty. Sch. Bd.*,
799 F.3d 379 (5th Cir. 2015)............................................................................................23

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986)..........................................................................................................24

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024).............................................................................................11

*Brinsdon v. McAllen Indep. Sch. Dist.*,
863 F.3d 338 (5th Cir. 2017)............................................................................................24

*C.R. v. Eugene Sch. Dist. 4J*,
835 F.3d 1142 (9th Cir. 2016)..........................................................................................24

*California v. Tex.*,
593 U.S. 659 (2021) ................................................................................................... 19, 20

*Canel v. Art Inst. of Chicago*,
No. 23 CV 17064, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025)......................................26

*Consumer Data Indus. Ass'n v. Tex. through Paxton*,
No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023) ............................................11

*Croft v. Perry*,
624 F.3d 157 (5th Cir. 2010) ...........................................................................................12

*Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*,
429 F.3d 108 (5th Cir. 2005) ...........................................................................................27

*Deep S. Ctr. for Envtl. Justice v. United States Envtl. Prot. Agency*,
138 F.4th 310 (5th Cir. 2025)......................................................................................14, 15

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) ............................................................................................25

*Doe v. Valencia Coll.*,
903 F.3d 1220 (11th Cir. 2018)........................................................................................24

*El Paso Cnty., Tex. v. Trump*,
982 F.3d 332 (5th Cir. 2020)............................................................................................14

*Food & Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...............................................................................................................14

*Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Missouri,*
    923 F.3d 508 (8th Cir. 2019) .................................................................................................12

*Freedom Path, Inc. v. Internal Revenue Serv.,*
    913 F.3d 503 (5th Cir. 2019) .................................................................................................23

*Garrett v. City Univ. of New York,*
    No. 24-CV-9710 (VSB) (RWL), 2025 WL 3096550 (S.D.N.Y. Oct. 10, 2025).................26

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,*
    765 F. Supp. 3d 245 (S.D.N.Y. 2025)...................................................................................26

*Healthy Vision Ass'n v. Abbott,*
    138 F.4th 385 (5th Cir. 2025)................................................................................................18

*Healy v. James,*
    408 U.S. 169 (1972) .....................................................................................................24, 25, 26

*Hishon v. King & Spalding,*
    467 U.S. 69 (1984) .................................................................................................................24

*Jenkins v. Louisiana State Board of Education,*
    506 F.2d 992 (5th Cir. 1975) .................................................................................................25

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) .........................................................................................................27, 28

*Jurgens v. Columbia Cnty.,*
    No. 3:22-CV-00300-IM, 2025 WL 563769 (D. Or. Feb. 20, 2025) .....................................15

*Kowalski v. Berkeley Cnty. Sch.,*
    652 F.3d 565 (4th Cir. 2011)..................................................................................................24

*Landau v. Corp. of Haverford Coll.,*
    789 F. Supp. 3d 401 (E.D. Pa. 2025).....................................................................................26

*LIA Network v. City of Kerrville, Tex.,*
    163 F.4th 147 (5th Cir. 2025).................................................................................................13

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ...............................................................................................................27

*Mi Familia Vota v. Ogg,*
    105 F.4th 313 (5th Cir. 2024).................................................................................................18

*Miguel v. Abbott,*
    No. 22-50413, 2023 WL 5032480 (5th Cir. Aug. 8, 2023) ...................................................12

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ....................................................................................................20, 21, 27

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott,*
    647 F.3d 202 (5th Cir. 2011)..................................................................................................28

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024)...................................................................................... 18, 19

*Nat'l Shooting Sports Found. v. Attorney Gen. of New Jersey*,
    80 F.4th 215 (3d Cir. 2023) ..............................................................................................11

*Outdoor One Communications, LLC v. Charter Twp. of Canton*,
    No. 21-1323, 2021 WL 5974157 (6th Cir. Dec. 16, 2021)...........................................9

*Peterson v. Williams*,
    No. 20-4059, 2022 WL 1421959 (10th Cir. May 5, 2022) ..........................................9

*Quick v. City of Austin*,
    7 S.W.3d 109 (Tex. 1998) .................................................................................................28

*Radwan v. Manuel*,
    55 F.4th 101 (2d Cir. 2022) ............................................................................................25

*Samaritan Ministries Int'l v. Kane*,
    No. 24-2187, 2025 WL 2876772 (10th Cir. Oct. 9, 2025)........................................11

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ...................................................................................... 11, 13

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...........................................................................................................10

*Tenth St. Residential Ass'n v. City of Dallas, Tex.*,
    968 F.3d 492 (5th Cir. 2020) ...........................................................................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .................................................................................... 3, 23, 24, 25

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................................................................... 13, 15

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) .......................................................................................... 2, 15, 16, 17

*Umphress v. Hall*,
    133 F.4th 455 (5th Cir. 2025).........................................................................................12

*United States v. Armstrong*,
    517 U.S. 456 (1996) ...........................................................................................................11

*Van Overdam v. Tex. A&M Univ.*,
    No. 4:18-CV-02011, 2024 WL 115229 (S.D. Tex. Jan. 10, 2024) .........................15

*Wang v. Paxton*,
    161 F.4th 357 (5th Cir. 2025)..........................................................................................11

*Woodlands Pride v. Paxton*,
    No. 23-20480, 2026 WL 523811 (5th Cir. Feb. 25, 2026)......................................15

*Zherka v. DiFiore*,
    412 Fed. Appx. 345 (2d Cir. 2011)..................................................................................9

**Statutes**

20 U.S.C. § 1681(a) ............................................................................................................22

29 U.S.C. § 794(a) ..............................................................................................................22

42 U.S.C. § 12132...............................................................................................................22

42 U.S.C. § 1981.................................................................................................................22

42 U.S.C. § 2000d...............................................................................................................22

42 U.S.C. § 2000e-2(a) ................................................................................................. 3, 22

Tex. Gov't Code § 448.001(2) ....................................................................................... 4, 5, 6

**Other Authorities**

*About Us*, DSA.................................................................................................................15

*Adoptions and Endorsements of the IHRA Working Definition of Antisemitism*, COMBAT
    ANTISEMITISM MOVEMENT ......................................................................................6

*Definition of Antisemitism*, EUROPEAN COMMISSION .......................................................6

Exec. Order No. 13899, 84 FR 68779 (Dec. 11, 2019) ...............................................6

Executive Order GA-44 ...........................................................................................passim

Kenneth L. Marcus, *The Legally Binding Character of the International Holocaust
    Remembrance Alliance Working Definition of Anti-Semitism*, 27 Lewis & Clark L. Rev.
    1265 (2024) .................................................................................................................6

*What is Democratic Socialism*, DSA....................................................................................15

## INTRODUCTION

What started as the Democratic Socialists of America's ("DSA") broad viewpoint-based challenge to Governor Abbott's Executive Order GA-44, which directed Texas universities to take certain actions to address the rise of antisemitism in higher education, has been whittled to a nub during discovery.

For instance, DSA's designated representative testified that she has no issue with how the University of Texas at San Antonio ("UTSA") implemented GA-44's directives into its Handbook of Operating Procedure ("HOP") 9.37. Rather, DSA's representative (Kira Sutter) agreed: (1) with HOP 9.37's definition of antisemitism and unlawful discrimination;[1] (2) that UTSA can have a policy prohibiting harassment and disruptions based on antisemitism;[2] and (3) that UTSA can lawfully prohibit student groups from engaging in those same acts if motivated by antisemitism.[3] Sutter further confirmed that DSA and its members have continued to criticize Israel in the harshest of terms, publicly charging it with "genocide," calling it a "racist state," and so on.[4] Not only that, Sutter confessed that UTSA has not enforced or threatened to enforce HOP 9.37 against DSA or its members, despite their continued outspoken protests against Israel.[5]

So how do GA-44 and HOP 9.37 chill DSA's protected speech? Sutter's answer was that DSA merely stopped saying "from the river to the sea, Palestine will be free" following GA-44.[6] But DSA asserted this "from the river to the sea" claim as a separate count (Count II) in its lawsuit.[7] This Court previously dismissed Count II for lack of standing, reasoning that this "phrase does not appear, nor

---

[1] Ex. 7, 47:6–23, 48:11–49:14.
[2] Ex. 7, 51:2–20.
[3] Ex. 7, 51:24–52:8.
[4] Ex. 7, 62:13–63:16, 64:20–65:8; *see also id.* at 39:23–40:4, 42:1–15, 79:22–80:4, 88:25–89:10.
[5] Ex. 7, 42:1–15, 89:11–23.
[6] Ex. 7, 29:25–30:10.  The "river" is the Jordan River and the "sea" is the Mediterranean Sea, which form the borders of Israel. In other words, this chant calls for the destruction of the State of Israel.
[7] ECF 20, ¶¶ 98–114.

is it incorporated by reference, into UTSA's updated speech policy."[8]

Discovery has also taken this case far afield from this Court's original concerns about the connection between GA-44's definition of antisemitism, the International Holocaust Remembrance Alliance's ("IHRA") potentially overbroad examples of antisemitism, and a university's policy revisions to comply with GA-44's directives. Sworn testimony from UTSA officials, which DSA will not be able to dispute, shows that the school (1) *did not* adopt the IHRA's examples when it revised HOP 9.37 and (2) considers the IHRA's examples *irrelevant* to any analysis of the college's policies. There is no link to the IHRA's examples here, which this Court saw as the main source of a potential First Amendment violation. Put differently, discovery has snuffed out DSA's only remotely viable theory of First Amendment liability.

The issues above create a host of jurisdictional- and merits-based problems for DSA; problems that prove fatal to its lone remaining claim. Starting with jurisdiction, DSA tries to assert a chilled-speech injury. Yet neither this group nor its members have limited their speech due to GA-44 and HOP 9.37, save for the already-dismissed claim regarding "from the river to the sea." DSA wants to assert a credible threat of enforcement. But it admits that UTSA has not enforced, or threatened to enforce, HOP 9.37's antisemitism provisions. DSA requests a statewide injunction against GA-44. *Trump v. CASA* clearly bars such expansive relief.

DSA's claim looks no better on the merits. DSA agrees with HOP 9.37's definition of antisemitism and its restrictions on discriminatory speech motivated by antisemitism. That's the ball game: There are no HOP 9.37 provisions that DSA believes to be unlawful. At the least, it is hard to see how HOP 9.37 can be deemed facially invalid when its lone opponent concedes it is constitutionally sound.

And again, HOP 9.37 does not incorporate the IHRA's examples that this Court found to be

---

[8] ECF 62, 15.

problematic. Stripped bare of this link, all that remains is a policy banning discrimination motivated by antisemitism, which this Court found was "not inherently a First Amendment violation."[9] This makes sense. Congress has enacted many similar anti-discrimination laws over the last sixty years. None have been found to violate the First Amendment. All would be jeopardized if HOP 9.37's ban on antisemitic discrimination is deemed facially unconstitutional.

Indeed, GA-44 and HOP 9.37 stand on firmer ground than, for instance, Title VII's ban on discrimination in the employment context. This is because *Tinker* gives school officials more leeway to regulate substantively disruptive speech and speech that invades the rights of others than would be found outside the educational context. And Tinker applies in the university setting.

Put simply, DSA concedes that HOP 9.37 is constitutional, relies on a speech-related injury that this Court already rejected, and comes nowhere close to the high bar needed to establish GA-44's and HOP 9.37's facial invalidity. This Court should grant Defendants'[10] motion for summary judgment and dismiss this case in its entirety.

## FACTUAL BACKGROUND

### I. The Rise Of Antisemitism On College Campuses And GA-44.

On October 7, 2023, the terrorist organization Hamas attacked Israel. The resulting conflict sparked a series of protests and a rise in antisemitic acts across American college campuses. In March 2024, Governor Abbott issued GA-44 to address these antisemitic acts occurring in higher education.[11]

This was a perilous time for universities across the country, and Texas colleges specifically.

---

[9] *Id.* at 19.

[10] Following this Court's motion to dismiss decision and two voluntary dismissals, DSA is the lone leftover Plaintiff and the only remaining Defendants are: (1) UTSA's President Taylor Eighmy in his official capacity and (2) the members of the University of Texas System Board of Regents in their official capacities. *See* ECF 62; ECF 73–74; ECF 86–87.

[11] Ex. 25, 1, *available at* https://tinyurl.com/mr2ux8pr via the link titled "Executive Order GA-44 Relating to addressing acts of antisemitism in institutions of higher education."

These protests were often not mere peaceful demonstrations, but rather harassing and disruptive events that could shut down a school if left unchecked. The record bears this out, as it shows numerous instances of protestors (or others sharing their anti-Israel viewpoint) committing acts like: assaulting law enforcement officers;[12] erecting encampments;[13] blocking traffic and emergency vehicles;[14] slashing tires on law enforcement vehicles;[15] trespassing into a locked building;[16] defacing and vandalizing school property;[17] disrupting classes and other university operations;[18] blocking students' access to campus;[19] and telling Jewish students to "[g]o back to Germany" and calling them "dirty Jews," "cheap Jews," "kike[s]," or something similar.[20]

Governor Abbott issued GA-44 to help protect Jewish college students and Texas universities from this rising tide of hate and disruption. This order issued three directives to Texas universities:

(1) review and update their free speech policies to address the sharp increase in antisemitic speech and conduct;

(2) ensure that these policies are being properly enforced against the groups causing such issues; and

(3) include the definition of antisemitism adopted by Tex. Gov't Code § 448.001 in their policies.[21]

Regarding the third directive, the relevant statutory provision (Tex. Gov't Code § 448.001(2)) states as follows:

> "Antisemitism" means a certain perception of Jews that may be expressed as hatred toward Jews. The term includes rhetorical and physical acts of antisemitism directed toward Jewish or non-Jewish individuals or their property or toward Jewish community institutions and religious facilities. Examples of antisemitism are included with the International Holocaust Remembrance Alliance's "Working Definition of

---

[12] Ex. 12, ¶ 42; Ex. 14, ¶ 15; Ex. 16, ¶ 11; Ex. 19, ¶ 11.
[13] Ex. 12, ¶¶ 5–7; Ex. 13, ¶ 18; Ex. 16, ¶ 12; Ex. 17, ¶ 8; Ex. 19, ¶ 9; Ex. 20, ¶ 11.
[14] Ex. 12, ¶ 8; Ex. 13, ¶ 18.
[15] Ex. 17, ¶ 42.
[16] Ex. 21, ¶ 20.
[17] Ex. 18, ¶ 7(m); Ex. 20, ¶ 6.
[18] Ex. 13, ¶ 14; Ex. 14, ¶ 21; Ex. 17, ¶¶ 8, 33, 45; Ex. 19, ¶ 3.
[19] Ex. 19, ¶ 9.
[20] Ex. 14, ¶¶ 7, 16, 19; Ex. 18, ¶ 7(f), (h); Ex. 19, ¶ 11.
[21] Ex. 25, 2.

Antisemitism" adopted on May 26, 2016.

Tex. Gov't Code § 448.001(2) mirrors the IHRA's definition of antisemitism.[22] Both provisions include effectively the same working definition of "antisemitism" and refer to the same examples of antisemitism.[23]

The IHRA provides context for how to view its examples. The IHRA specifies that its examples are mere "illustrations" of potential acts of antisemitism.[24] The IHRA cautions that any analysis of its examples must "tak[e] into account the overall context" of the conduct or speech at issue.[25] The IHRA further states that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic."[26]

## II.    GA-44's Approach To Combating Antisemitism Is Nothing New.

DSA paints GA-44 as an overaction to the real and demonstrated issues concerning the anti-Israel protests occurring on college campuses around the time of the order's issuance.[27] This simply isn't true.

The Biden Administration's response to increasing antisemitism in the educational context mirrored that of GA-44. In 2022, before the October 7, 2023 Hamas attack on Israel, there were 219 antisemitic incidents in universities.[28] The Biden Administration classified this as a "nationwide rise in reports of antisemitic harassment" and ordered schools to "take immediate and appropriate action" to respond to this harassment.[29] GA-44 took the same approach: It required Texas colleges to take

---

[22] *Compare* Tex. Gov't Code § 448.001(2), *with* Ex. 4, 1–2.

[23] *Id.*

[24] Ex. 4, 1, *available at* https://tinyurl.com/5caza8fa via the "Download file" link following the statement "Download the full text of the IHRA's working definition of antisemitism."

[25] *Id.* at 2.

[26] *Id.* at 1.

[27] *See* ECF 21, 4 (stating that "with the signing of Executive Order GA-44, Governor Abbott has gone too far" and that this order "violate[s] the most basic commands of the First Amendment").

[28] Ex. 2, 5, *available at* https://tinyurl.com/eeda7zrx via the link titled "Download Resource."

[29] Ex. 1, *available at* https://tinyurl.com/y9mp9fwp via the link next to the phrase "OCR issued a Dear Colleague Letter (2023)."

appropriate action to address a surge of antisemitism in higher education.[30] The only notable difference is that, by 2024, the number of antisemitic incidents at universities had ballooned to 1,694—a nearly 700% increase since 2022.[31] Put simply, Governor Abbott was responding to a far more alarming situation than that faced by the Biden Administration.

GA-44's directive that universities adopt the IHRA's definition of antisemitism is also not novel. Both the Biden and Trump Administrations have embraced the IHRA's definition.[32] In fact, the Biden Administration called the IHRA's definition "[t]he most prominent . . . 'working definition' of antisemitism."[33] Rightly so, as over half the states in this country[34] and at least 47 national governments[35] have adopted or endorsed this definition.

## III.    UTSA Did Not Adopt The IHRA's Examples When It Implemented GA-44's Directives.

UTSA's HOP 9.37 contains the college's implementation of GA-44's directives.[36] The policy's definition of "antisemitism" is the most pertinent to this lawsuit. HOP 9.37 contains the same working definition of "antisemitism" as Tex. Gov't Code § 448.001(2).[37] The lone difference is that HOP 9.37 *does not* reference the IHRA's examples of antisemitism. And sworn statements from UTSA officials confirm that these examples have no bearing on UTSA's analysis of any potential antisemitic acts.[38]

---

[30] *See* Ex. 25, 2.

[31] Ex. 6, 2, *available at* https://tinyurl.com/4v27z7rw.

[32] *See* Ex. 5, 13; Exec. Order No. 13899, 84 FR 68779 (Dec. 11, 2019).

[33] Ex. 5, 13, *available at* https://tinyurl.com/4y2fd9k2 via the link titled "the U.S. National Strategy to Counter Antisemitism."

[34] Kenneth L. Marcus, *The Legally Binding Character of the International Holocaust Remembrance Alliance Working Definition of Anti-Semitism*, 27 Lewis & Clark L. Rev. 1265, 1274 (2024).

[35] *Adoptions and Endorsements of the IHRA Working Definition of Antisemitism*, COMBAT ANTISEMITISM MOVEMENT, https://ihra.combatantisemitism.org/; *see also Definition of Antisemitism*, EUROPEAN COMMISSION, https://tinyurl.com/5n95pb9j.

[36] Second Declaration of LaTonya Robinson ("Robinson Decl."), ¶ 4; Declaration of Suzanne Patrick ("Patrick Decl."), ¶ 5.

[37] *Compare* Ex. 24, § XIX(B), *with* Tex. Gov't Code § 448.001(2).

[38] Robinson Decl., ¶ 9; Patrick Decl., ¶ 11; *see also* Ex. 24, §§ IV, XIX(B).

Put differently, the IHRA's examples are irrelevant to any analysis of UTSA's policies.[39]

Following GA-44, UTSA also revised HOP 9.37 to state that students and student groups could be disciplined if they commit certain acts—like disruption of a university activity or harassment—because of antisemitism or a person's protected characteristic (race, religion, etc.).[40] HOP 9.01 predates GA-44, and it too restricts discriminatory and harassing acts committed due to a person's protected characteristic.[41]

Both HOP 9.37 and HOP 9.01 are relevant when UTSA officials assess a complaint about antisemitism.[42] The reviewer would look at both HOP 9.37's definition of antisemitism and HOP 9.01's definitions of discrimination and harassment to determine whether there is a policy violation.[43] The focus would be on HOP 9.01 if discrimination or harassment is at issue.[44]

## IV.    Discovery Has Severely Limited DSA's Claim.

The deposition of DSA's designated representative revealed that DSA's alleged speech injury is inextricably tied to its use of the phrase "from the river to the sea." During her deposition, Sutter testified that DSA's sole injury here is it stopped using this phrase following GA-44's enactment:

> Q. What has DSA had to do differently to comply with campus procedures as it relates to free expression since the revision to HOP 9.37, following GA-44?
>
> A. Since the revision, UTSA YDSA has refrained from the use of "from the river to the sea."
>
> Q. Anything else?
>
> A. No.
>
> Q. And when you say YDSA, has DSA had to do anything outside of UTSA to comply with HOP 9.37 since its revision, following GA-44?
>
> A. No.[45]

---

[39] *Id.*
[40] Ex. 24, § IV(B)–(C); Robinson Decl., ¶ 5; Patrick Decl., ¶ 6.
[41] Ex. 23, §§ I, VII(A)–(B); Patrick Decl., ¶ 7.
[42] Patrick Decl., ¶ 12.
[43] *Id.*; Ex. 23, § VII(A)–(B); Ex. 24, § XIX(B).
[44] Patrick Decl., ¶ 12.
[45] Ex. 7, 29:25–30:10.

Sutter's testimony regarding DSA's "chant sheet" reinforces that its claim is limited to "from the river to the sea." During discovery, DSA produced a document reflecting around 40 chants it uses on college campuses.[46] Sutter could not identify *a single chant*, other than "from the river to the sea," that she believes is prohibited by GA-44 or HOP 9.37.[47] And she admitted that DSA members have used and are free to use phrases clearly critical of Israel following the executive order and policy revisions in question. This includes chants such as "[o]ne, two, three, four, occupation no more. Five six, seven eight, Israel's a racist state"[48] and "Israel, you can't hide. We charge you with genocide."[49]

Along the same lines, Sutter admitted that DSA and its members have continued to publicly condemn Israel at UTSA following GA-44.[50] And she acknowledged that there was no language in HOP 9.37 that barred UTSA students and student groups from criticizing Israel and supporting the Palestinians.[51] She further confessed that UTSA has not enforced or threatened to enforce HOP 9.37's antisemitism provisions against DSA or its members, despite the group's continued vocal protests of Israel.[52]

Also notable, Sutter confirmed that DSA agrees: (1) with HOP 9.37's definition of antisemitism and unlawful discrimination;[53] (2) that UTSA can have a policy prohibiting harassment and disruptions based on antisemitism;[54] and (3) that UTSA can lawfully prohibit student groups from engaging in those same acts if motivated by antisemitism.[55]

---

[46] Ex. 3; Ex. 7, 58:14–69:22.

[47] *See* Ex. 7, 68:25–69:17; *see also id.* at 58:14–69:22.

[48] Ex. 7, 62:13–63:16.

[49] Ex. 7, 64:20–65:8.

[50] Ex. 7, 42:1–15.

[51] Ex. 7, 89:11–23.

[52] Ex. 7, 62:13–63:16, 64:20–65:8; *see also id.* at 39:23–40:4, 42:1–15, 79:22–80:4, 88:25–89:10.

[53] Ex. 7, 47:6–23, 48:11–49:14.

[54] Ex. 7, 51:2–20.

[55] Ex. 7, 51:24–52:8.

## V.      An Overview Of DSA's Claim.

DSA's lone remaining claim (Count I) is for viewpoint and content discrimination against GA-44 and UTSA's HOP 9.37.[56] DSA asserts this claim against (1) UTSA's President Taylor Eighmy in his official capacity and (2) the University of Texas System Board of Regents' members in their official capacities.[57] DSA seeks equitable relief in this lawsuit, including an injunction and declaratory judgment that would invalidate GA-44 on a statewide basis.[58]

### ARGUMENT

## I.      DSA Lacks Standing.

### A.      DSA's Injury Turns On Its Use Of The Phrase "From The River To The Sea"; This Court Previously Dismissed This Claim For Lack Of Standing.

DSA asserts a "chilled speech" injury.[59] Yet "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."[60] Thus, courts regularly deny standing in the First Amendment pre-enforcement context where the plaintiff has not shown that its speech was actually chilled.[61]

Here, DSA admitted that its sole change of behavior is that it stopped saying "from the river to the sea, Palestine will be free" at UTSA following GA-44.[62] DSA also acknowledged that HOP 9.37

---

[56] ECF 20, ¶¶ 81–97; *see also* ECF 87. To be clear, DSA's claim turns on alleged speech restrictions at UTSA, not any other university within the University of Texas System's authority. DSA's interrogatory responses make this point clear as they focus solely on UTSA. *See* Exs. 8–11; *see also* Ex. 22.

[57] ECF 87. The University of Texas System Board of Regents Members are as follows: Kevin Eltife, Janiece Longoria, James C. Weaver, Christina Melton Crain, Jodie Lee Jiles, Kelcy L. Warren, Nolan Perez, Stuart W. Stedman, and Robert P. Gauntt.

[58] ECF 20, pg. 26.

[59] *See id.* at ¶¶ 89, 96; ECF 38, 19; ECF 50, 13, 19.

[60] *Zherka v. DiFiore*, 412 Fed. Appx. 345, 348 (2d Cir. 2011) (quotations omitted).

[61] *See, e.g.*, *Peterson v. Williams*, No. 20-4059, 2022 WL 1421959, at *6 (10th Cir. May 5, 2022) (explaining that a plaintiff did not have standing as he did not allege that the challenged agreement "altered or deterred his speech") (quotations omitted); *Outdoor One Communications, LLC v. Charter Twp. of Canton*, No. 21-1323, 2021 WL 5974157, at *4 (6th Cir. Dec. 16, 2021) (finding standing lacking where the plaintiff did not self-censor); *Zherka*, 412 Fed. Appx. at 348 (denying standing when the plaintiffs continued to exercise their First Amendment rights and did not alter their behavior).

[62] *Supra*, 7–8.

9

contains no language prohibiting students or student groups from criticizing Israel or supporting the Palestinians and that DSA and its members have continued engaging in such speech following GA-44.[63]

Put simply, DSA's standing hinges on its use of the phrase "from the river to the sea." Yet this Court previously dismissed this *exact* claim for lack of standing.[64] In doing so, this Court found that DSA "alleges only past incidents of UTSA officials instructing students not to say, 'from the river to the sea'" and that DSA did not "establish a sufficient probability that the past harm will occur again."[65] This Court also noted that any unwritten rule regarding the use of this phrase "does not appear, nor is it incorporated by reference, into UTSA's updated speech policy."[66]

Thus, this Court has already found that DSA's sole claim to standing—the chilling of its use of the phrase "from the river to the sea"—is not viable. This Court should follow its prior decision and dismiss DSA's lawsuit for lack of jurisdiction.

## B.    DSA Also Cannot Establish A Justiciable Pre-Enforcement Challenge To UTSA's Revised Policies.

A three-part test governs a pre-enforcement challenge such as DSA's.[67] Under this test, a plaintiff must establish: (1) an intent to engage in a course of conduct arguably affected with a constitutional interest; (2) that conduct is proscribed by the challenged policies; and (3) there exists a credible threat of enforcement under those policies.[68] DSA will not be able to make these showings.

To prevail here, DSA needs to specify what speech it intends to use that is arguably proscribed by HOP 9.37. DSA cannot make this showing as (1) it admitted that its sole injury concerns its use of the phrase "from the river to the sea" and (2) this Court previously dismissed this claim for lack of

---

[63] Ex. 7, 42:1–15, 89:11–23.
[64] ECF 62, 14–15.
[65] *Id.* at 15.
[66] *Id.*; *see also* Robinson Decl., ¶¶ 7–8; Patrick Decl., ¶¶ 9–10; Ex. 24.
[67] ECF 62, 12.
[68] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–66 (2014).

10

standing. Further, DSA admits that HOP 9.37 does not prevent students from condemning Israel or supporting the Palestinians.[69]

DSA also cannot establish a credible threat of enforcement. Concerning DSA's use of the phrase "from the river to the sea," UTSA has disavowed enforcement of its policies against the use of this phrase.[70] Such disavowals weigh against a finding of a credible threat of enforcement.[71]

DSA may try to take refuge under the standing analysis applied to facial pre-enforcement challenges, but this will not work.[72] To be entitled to the presumption of enforcement under this test, the challenged policy must "facially restrict Plaintiffs' intended conduct."[73] Here, DSA admits that HOP 9.37 does not facially bar students from criticizing Israel or supporting the Palestinians.[74]

Further, UTSA is entitled to the "presumption of regularity"—basically, an assumption that UTSA is operating in good faith when it disavows enforcement of its policies against the phrase "from the river to the sea."[75] This presumption applies absent "clear evidence to the contrary."[76]

---

[69] Ex. 7, 53:7–21, 89:11–19; *see also id.* at 42:1–15, 58:14–69:22, 88:25–89:10.

[70] Robinson Decl., ¶¶ 7–8; Patrick Decl., ¶¶ 9–10.

[71] *See, e.g.*, *Consumer Data Indus. Ass'n v. Tex. through Paxton*, No. 21-51038, 2023 WL 4744918, at *4–5 (5th Cir. July 25, 2023) (finding that "a clear statement of intent regarding future enforcement" has "obvious materiality" to a pre-enforcement standing analysis); *Nat'l Shooting Sports Found. v. Attorney Gen. of New Jersey*, 80 F.4th 215, 221 (3d Cir. 2023) (finding standing lacking when the attorney general disavowed prosecuting "participati[on] in lawful commerce, which is all the Foundation has said it wants to do") (quotations omitted); *Abbott v. Pastides*, 900 F.3d 160, 177 (4th Cir. 2018) (finding no standing where plaintiffs received "written notice that neither investigation nor sanction was forthcoming").

[72] *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (explaining that for challenges to non-moribund statutes "that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence").

[73] *Book People, Inc. v. Wong*, 91 F.4th 318, 330 (5th Cir. 2024) (quotations and brackets omitted); *see also Samaritan Ministries Int'l v. Kane*, No. 24-2187, 2025 WL 2876772, at *3 (10th Cir. Oct. 9, 2025) ("The threat of prosecution is generally credible *where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage*, and the state has not disavowed any intention of invoking the provision against the plaintiff.") (quotations and brackets omitted).

[74] Ex. 7, 53:7–21, 89:11–19; *see also id.* at 42:1–15, 58:14–69:22, 88:25–89:10.

[75] *See Wang v. Paxton*, 161 F.4th 357, 363 (5th Cir. 2025) (citing cases establishing the "presumption of good faith" and the "presumption of regularity" for public officers).

[76] *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

DSA will not be able present evidence clearly showing that UTSA will enforce its policies against uses of the phrase "from the river to the sea," despite the sworn statements from UTSA officials stating otherwise. Indeed, DSA itself acknowledges that UTSA has not enforced or threatened to enforce HOP 9.37, even though DSA and its members have continued to condemn Israel.[77] The "presumption of regularity" supports a finding that standing is lacking here.

DSA may also try to assert that it brought an as-applied claim. This too should fail. There are two main reasons why.

First, DSA did not actually assert an as-applied claim. "To categorize a challenge as facial or as-applied we look to see whether the claim and the relief that would follow reach beyond the particular circumstances of the plaintiffs regardless of how the challenge is labeled by the plaintiff."[78] A plaintiff who requests relief extending beyond its own circumstances, such as to invalidate a law in its entirety, asserts a facial (not applied) type of challenge.[79]

DSA asserts a facial challenge as it seeks relief beyond its particular circumstances, such as a declaratory judgment that GA-44 violates the First Amendment and an injunction barring UTSA from enforcing its revised policy against anyone, not just DSA or its members.[80] The only relief specific to DSA is a request that it be provided "the normal and typical permissions and resources [Defendants] provide[] to student group[s]."[81] Yet it is unclear: (1) what this relates to; (2) how this alleged denial would amount to a cognizable injury; and (3) whether this denial is ongoing or sufficiently imminent to justify federal intervention. In other words, DSA will not be able to establish standing for its only

---

[77] Ex. 7, 62:13–63:16, 64:20–65:8; *see also id.* at 39:23–40:4, 42:1–15, 79:22–80:4, 88:25–89:10.

[78] *Umphress v. Hall*, 133 F.4th 455, 465 (5th Cir. 2025) (brackets and quotations omitted).

[79] *See, e.g.*, *Miguel v. Abbott*, No. 22-50413, 2023 WL 5032480, at *2 (5th Cir. Aug. 8, 2023); *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010); *Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Missouri*, 923 F.3d 508, 509 n.2 (8th Cir. 2019).

[80] ECF 20, pgs. 25–27.

[81] *Id.* at pg. 27.

remotely viable as-applied challenge.[82]

Second, "there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge."[83] Such evidence often includes (1) enforcement of the regulation at issue against a similarly-situated person and (2) whether the defendant disavowed enforcement against the plaintiff.[84] Here DSA will not be able to establish that HOP 9.37's antisemitism provisions were enforced against a similarly-situated person or organization.[85] And UTSA has disclaimed enforcement against the only speech DSA has identified with any particularity—its desire to say "from the river to the sea."[86] Thus, DSA does not have standing to assert an as-applied challenge to GA-44 or HOP 9.37.[87]

In sum, DSA lacks standing to pursue a pre-enforcement challenge to GA-44 and HOP 9.37. As shown below, DSA also cannot satisfy the requirements to pursue this lawsuit as an organization or on an associational basis.

### C. DSA Lacks Associational And Organizational Standing: It Cannot Show That One Of Its Members Has Standing, Nor Was Its Mission Perceptibly Impaired.

An entity like DSA "can establish the first standing element, injury-in-fact, under two theories: 'associational standing' or 'organizational standing.'"[88] Neither apply here.

"Associational standing requires that the individual members of the group each have standing and that the interest the association seeks to protect be germane to its purpose."[89] DSA cannot

---

[82] *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . .").

[83] *Speech First, Inc.*, 979 F.3d at 335 (quotations and brackets omitted).

[84] *LIA Network v. City of Kerrville, Tex.*, 163 F.4th 147, 158–59 (5th Cir. 2025).

[85] *See* Ex. 7, 62:13–63:16, 64:20–65:8; *see also id.* at 39:23–40:4, 42:1–15, 79:22–80:4, 88:25–89:10.

[86] Robinson Decl., ¶¶ 7–8; Patrick Decl., ¶¶ 9–10.

[87] Defendants previously stated that Plaintiffs challenged GA-44 both facially and as applied. ECF 32, 39–40. As the analysis above shows, that was an error, at least as far as that statement concerned Count I of DSA's claims.

[88] *Tenth St. Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020).

[89] *Id.* (quotations omitted).

establish that one of its members has standing to sue for the reasons given above.[90]  Thus, DSA lacks associational standing.

For organizational standing, "[a]n organization suffers an injury in fact if a defendant's actions perceptibly impair the organization's activities and consequently drain the organizations resources."[91] But "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."[92] And "[o]nly in the rarest cases can organizations demonstrate standing by showing a defendant's action interferes with their activities."[93] This is not such a case.

To start, DSA admitted that it was *only* HOP 9.37's provisions regulating amplified sound and student camping that impacted DSA's ability to pursue democratic socialism.[94] These provisions are separate from the parts of HOP 9.37 regulating antisemitic speech,[95] which is the focus of this lawsuit. DSA cannot establish organizational standing as its only organization-based injuries cannot be traced to either GA-44 or UTSA's implementation of this order's directives.

Further, organizational standing turns on the entity's "core" activities,[96] and neither supporting the Palestinians nor criticizing Israel are part of DSA's core mission. It should go without saying that the *Democratic Socialists of America* is focused on advancing *democratic socialism* in *America*, not protesting perceived injustices in the Middle East.

DSA's statements about its mission and purpose support this common-sense notion. DSA defines democratic socialism as a desire to "replace" capitalism with a system that places "key

---

[90] *Supra*, 9–13.

[91] *El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020) (quotations and brackets omitted).

[92] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

[93] *Deep S. Ctr. for Envtl. Justice v. United States Envtl. Prot. Agency*, 138 F.4th 310, 318 (5th Cir. 2025).

[94] Ex. 7, 27:19–29:15; *see also* Ex. 24, §§ V(H), VI.

[95] *See* Ex. 24, §§ IV, XIX(B).

[96] *Deep S. Ctr. for Envtl. Justice*, 138 F.4th at 319.

economic drivers" in the hands of the people.[97] Thus, DSA describes its mission as "establishing an openly democratic socialist presence in American communities and politics."[98] And DSA's constitution characterizes its purpose mainly in terms of rejecting the current "economic order" and replacing it with one based on "popular control of resources and production."[99]

At most, DSA can only assert an abstract social interest in the conflict between Israel and Hamas. Such an abstract interest cannot confer organizational standing under binding precedent.[100]

### D.    *Trump v. CASA* Forecloses DSA's Request For Statewide Equitable Relief.

To establish redressability, the plaintiff has to show that its injury "can be redressed by the court with a favorable decision."[101] The plaintiff must carry this burden "for each form of relief that [it] seek[s]."[102] Here, DSA requests statewide declaratory and injunctive relief designed to render GA-44 "null and void."[103] The Supreme Court's recent *Trump v. CASA* decision bars this Court from granting such relief. Thus, DSA cannot show that its request for statewide equitable relief against GA-44 can be redressed by an order of this Court.[104]

In *CASA*, the Supreme Court assessed the propriety of three district court injunctions that enjoined the implementation and enforcement of a Trump Administration executive order restricting

---

[97] *What is Democratic Socialism*, DSA, https://www.dsausa.org/about-us/what-is-democratic-socialism/ (last visited Feb. 27, 2026).

[98] *About Us*, DSA, https://www.dsausa.org/about-us/ (last visited Feb. 27, 2026).

[99] Ex. 26, Article II.

[100] *See Deep S. Ctr. for Envtl. Justice*, 138 F.4th at 318.

[101] *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021).

[102] *TransUnion LLC*, 594 U.S. at 431.

[103] ECF 20, pg. 26.

[104] *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (staying three district courts' nationwide injunctions against a federal executive order, reasoning that they were "broader than necessary to provide complete relief to each plaintiff with standing to sue"); *see also Van Overdam v. Tex. A&M Univ.*, No. 4:18-CV-02011, 2024 WL 115229, at *4 (S.D. Tex. Jan. 10, 2024) (finding that a Title IX plaintiff's request for emotional and reputational damages is not redressable due to a recent Supreme Court decision foreclosing such relief); *Jurgens v. Columbia Cnty.*, No. 3:22-CV-00300-IM, 2025 WL 563769, at *13 (D. Or. Feb. 20, 2025) (similar). To be clear, the lack of redressability also implicates an *Ex parte Young* analysis given the "significant overlap" between *Ex parte Young* and Article III standing. *See Woodlands Pride v. Paxton*, No. 23-20480, 2026 WL 523811, at *7 (5th Cir. Feb. 25, 2026).

birthright citizenship.[105] The Supreme Court granted the government's request to stay these injunctions, finding they were "broader than necessary to provide complete relief to each plaintiff with standing to sue."[106]

The core issue was whether Congress granted federal courts the authority to issue universal injunctions, which the Court defined as injunctions that "prohibit enforcement of a law or policy against *anyone*."[107] This contrasts with "traditional" injunctions, which bar "officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit."[108]

*CASA* looked to the Judiciary Act of 1789, which was the only potential source of congressional authority that could allow a federal court to issue a universal injunction.[109] This Act extends federal court jurisdiction to "equitable remedies traditionally accorded by courts of equity at our country's inception."[110] This begets a historical analysis, one that turns on whether "universal injunctions are sufficiently analogous to the relief issued by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act."[111]

*CASA* analyzed the founding-day jurisprudence and concluded that "[n]either the universal injunction nor any analogous form of relief was available in the High Court of Chancery in England at the time of the founding."[112] Rather, the Court found it "importan[t]" that "suits in equity were brought by and against individual parties."[113] And *CASA* noted that the Court has "consistently

---

[105] 606 U.S. at 837–38.

[106] *Id.* at 861.

[107] *Id.* at 837, 841.

[108] *Id.* at 837.

[109] *Id.* at 841. *CASA* suggested that its ruling limiting universal injunctions might not apply to a federal Administrative Procedure Act challenge and a class action brought under Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 847 n.10, 849–50. Neither situation is implicated here.

[110] *Id.* at 841 (quotations omitted).

[111] *Id.* at 841–42 (quotations omitted).

[112] *Id.* at 842.

[113] *Id.*

rebuffed requests for relief that extended beyond the parties."[114]

The points above doomed the universal injunctions against the executive order in question there: They were broader than necessary to give the plaintiff "complete relief."[115] Thus, the Court held that the injunctions were invalid to the extent of this overreach.[116]

*CASA's* holding extends to any equitable relief that stretches beyond what is needed to afford the parties complete relief, not just "universal" or nationwide injunctions. Per the Court, its analysis turned less on "*where* [the] injunction applies" and more on "*whom* [the injunction] protects."[117] Put differently, any equitable relief (declaratory judgments included) that bars the government "from enforcing the law against *anyone*"[118] is impermissible whenever it extends past what is necessary to "offer complete relief *to the plaintiffs before the court*."[119]

*CASA* applies here. DSA's claim is limited to alleged speech restrictions imposed on its organization and members at one university (UTSA).[120] Yet DSA seeks a declaratory judgment and injunction that would bar the enforcement of GA-44 against anyone*, anywhere*. These requests are far broader than necessary to afford DSA at UTSA complete relief in this lawsuit. *CASA* shows that this Court does not have authority to grant such relief.

Thus, DSA lacks standing to pursue claims for statewide equitable relief as this relief is not redressable by a favorable decision from this Court. These claims also fail on the merits, as they are clearly foreclosed by *CASA*. Put simply, whether the focus is on Article III standing or a federal court's authority under the Judiciary Act of 1789, the result is the same: DSA cannot obtain statewide

---

[114] *Id.* at 843.

[115] *Id.* at 852–53.

[116] *Id.* at 861–62.

[117] *Id.* at 837 n.1.

[118] *Id.*

[119] *Id.* at 852; *see also id.* at 844 (reasoning that the Court's "party-specific principles" cover requests for both declaratory and injunctive relief).

[120] *Supra*, 9.

equitable relief against GA-44.

## II.    Sovereign Immunity Bars DSA's Lawsuit.

DSA relies on the *Ex parte Young* exception to overcome Defendants' sovereign immunity. For this exception to apply: "(1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective."[121]

The standing analyses above show why *Ex parte Young* does not apply here. While standing and sovereign immunity are not identical,[122] the two concepts still "significant[ly] overlap."[123] Thus, it can be appropriate to "cross-reference[]" a standing analysis when deciding on sovereign immunity issues.[124] As detailed above, DSA: (1) has not alleged any chilled speech other than the "from the river to the sea" phrase that this Court previously dismissed; (2) admits that HOP 9.37 does not facially bar students from criticizing Israel or supporting the Palestinians; and (3) acknowledges that UTSA has not enforced or threatened to enforce HOP 9.37, despite DSA's members continued public criticisms of Israel.[125] In other words, the record shows that there is no "ongoing violation" of DSA's First Amendment rights.

Defendants' "demonstrated willingness" to enforce HOP 9.37 against DSA and its members is also lacking.[126] UTSA admits that its policy does not bar the phrase "from the river to the sea" and has disavowed enforcement of its policy against this saying.[127] As explained above, UTSA's statements

---

[121] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quotations omitted).

[122] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024).

[123] *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017).

[124] *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 400 (5th Cir. 2025).

[125] *Supra*, 7–8.

[126] *Mi Familia Vota*, 105 F.4th at 329 (explaining that the plaintiff must show that the defendant has a "demonstrated willingness" to enforce the challenged law to satisfy *Ex parte Young*).

[127] Robinson Decl., ¶¶ 7–8; Patrick Decl., ¶¶ 9–10; *see Mi Familia Vota*, 105 F.4th at 325 (finding "demonstrated willingness" lacking when the official agreed not to enforce the statute during the lawsuit).

on this point are entitled to the presumption of regularity, and DSA will not be able to carry its burden to present clear evidence showing that this presumption does not apply here.[128] Indeed, it is undisputed that there has been no actual or threatened enforcement of HOP 9.37 against DSA and its members, despite their continued criticisms of Israel.[129] This further solidifies the fact that Defendants lack the necessary "demonstrated willingness" to enforce HOP 9.37 against DSA and its members.

Sovereign immunity bars DSA's claim against GA-44 for similar reasons. DSA concedes that any future enforcement against it or its members would come through UTSA's policies, not GA-44.[130] Also, GA-44 can *only* be enforced via a college's policies given the order's nature.[131] Further, there is no actual or threatened enforcement of the relevant UTSA policy (HOP 9.37), as noted above. Under the circumstances, Defendants cannot be said to have a "demonstrated willingness" to enforce GA-44.[132]

Finally, Defendants believe they are not proper "enforcement officers" to GA-44. Defendants explained why in their motion to dismiss.[133] This Court rejected Defendants' argument.[134] Defendants reassert this point to preserve the issue for appeal.

## III.    DSA's Claim Fails On The Merits.

### A.    DSA Cannot Establish A Viable Facial Challenge.

A law is facially invalid under the First Amendment if its "unconstitutional applications

---

[128] *Supra*, 11–12.

[129] *Id.* at 8; *see Nat'l Press Photographers Ass'n*, 90 F.4th at 781 (finding that the plaintiffs had standing to assert their chilling injury yet ruling that sovereign immunity barred their claim against Director McCraw or Chief Mathis for lack of a demonstrated willingness to enforce the statute).

[130] Ex. 7, 46:12–16 ("Q. And you also agree with me that in so far as any rule was enforced against DSA or student members at UTSA, it was a policy adopted by UTSA and not GA-44 itself? A. Yes.").

[131] *See* Ex. 25.

[132] *Cf. California v. Tex.*, 593 U.S. 659, 669 (2021) (finding standing lacking when there was no means to enforce the challenged statutory provision).

[133] ECF 31, 39–43.

[134] ECF 62, 9–11.

substantially outweigh its constitutional ones."[135] As shown below, DSA does not assert a viable facial challenge. Thus, its claim fails on the merits.

1.    **DSA Agrees With HOP 9.37's Definition Of Antisemitism And Its Anti-Discrimination Provision.**

Again, DSA agrees: (1) with HOP 9.37's definition of antisemitism and unlawful discrimination;[136] (2) that UTSA can have a policy prohibiting harassment and disruptions based on antisemitism;[137] and (3) that UTSA can lawfully prohibit student groups from engaging in those same acts if motivated by antisemitism.[138]

As DSA concedes that HOP 9.37 is lawful, it cannot show that this policy's unconstitutional applications substantially outweigh its constitutional ones.[139] HOP 9.37's lawfulness also confirms that GA-44's directives can be harmonized with the First Amendment. Further, GA-44 can only be enforced against DSA and its members through HOP 9.37, given the order's nature and the fact that DSA's claim is limited to UTSA. So, if HOP 9.37 is constitutional, then DSA cannot fairly trace its alleged injuries to any "unlawful conduct."[140] Thus, DSA's facial challenge fails as a matter of law.

2.    **DSA Cannot Sustain A Facial Challenge Based On The IHRA's Examples.**

DSA's main theory of liability is that HOP 9.37 implicitly adopted the IHRA's potentially overbroad examples of antisemitism.[141] DSA cannot prevail on a facial challenge based on this theory.

To start, the evidence does not support DSA's argument. Rather, the record establishes that UTSA did not incorporate the IHRA's examples when it revised HOP 9.37 following GA-44, and it

---

[135] *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024).

[136] Ex. 7, 47:6–23, 48:11–49:14.

[137] Ex. 7, 51:2–20.

[138] Ex. 7, 51:24–52:8.

[139] *See Moody*, 603 U.S. at 724.

[140] *See California*, 593 U.S. at 668–69 ("A plaintiff has standing only if he can allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.") (quotations omitted).

[141] *See* ECF 62, 19–20, 23.

shows that these examples are irrelevant to UTSA's policies.[142] DSA also admits that neither it nor its members have been disciplined or punished by UTSA even though they have continued calling Israel a racist state, charging it with genocide, and otherwise criticizing Israel.[143] This further confirms that UTSA did not adopt the IHRA's examples, which list calling Israel "a racist endeavor" as a potentially antisemitic act.[144]

Further, UTSA, the only "enforcer" of GA-44 relevant to this case and the entity that adopted HOP 9.37, has confirmed that the IHRA's examples have no bearing on DSA's speech or conduct at its university. This is strong evidence that DSA's facial challenge should fail on the merits.

### 3. This Court's Prior Ruling Indicates That HOP 9.37 Is Constitutional.

This Court's prior ruling supports a finding that HOP 9.37 does not facially violate the First Amendment. This Court previously acknowledged that "[i]n general, including the word 'antisemitism' in speech policies, perhaps in the context of protecting students from discrimination and harassment, is not inherently a First Amendment violation."[145] Per this Court, it was HOP 9.37's implicit connection to the IHRA's examples that created a potential First Amendment issue.[146]

But the record now confirms that the IHRA's examples have no bearing on UTSA's policies.[147] Stripped bare of any connection to the IHRA's examples, HOP 9.37 merely carries the ban on antisemitic discrimination that this Court found is "not inherently a First Amendment violation."[148] An inherently constitutional policy cannot, almost by definition, be considered facially invalid.[149]

Further, divorced of any connection to the IHRA's examples, HOP 9.37's antisemitism

---

[142] *See* Ex. 24, §§ IV, XIX; Robinson Decl., ¶ 9; Patrick Decl., ¶ 11.
[143] Ex. 7, 39:23–40:4, 42:1–15, 62:13–63:16, 64:20–65:8, 79:22–80:4, 88:25–89:10.
[144] Ex. 4, 2.
[145] ECF 62, 19.
[146] *Id.* at 19–20.
[147] *See* Ex. 24, §§ IV, XIX; Robinson Decl., ¶ 9; Patrick Decl., ¶ 11.
[148] ECF 62, 19.
[149] *See Moody*, 603 U.S. at 723.

provisions are akin to the discrimination bans seen in Title II,[150] Title VI,[151] Title VII,[152] Title IX,[153] the Rehabilitation Act,[154] and 42 U.S.C. § 1981. These laws have been in place for decades (or longer, in the case of § 1981) without being overturned on First Amendment grounds. Put differently, if HOP 9.37 and GA-44 are found to be facially unconstitutional, it would jeopardize the edifice of our country's federal anti-discrimination laws. This is especially so now that DSA cannot trace a speech injury to the IHRA's examples, as it tried to do during this case's earlier stages.[155]

### 4.     The IHRA's Examples Would Have To Be Misapplied To Create A Potential First Amendment Problem.

DSA appears to think the IHRA's examples are mandatory; that the IHRA labels any efforts to call Israel racist or any attempts to connect Israel's policies to those of Germany in World War II as antisemitic.[156] But this is not what the IHRA actually says.

The IHRA's examples are not bright-line rules to be blindly followed. Rather, the IHRA states that its examples are instances where antisemitism "*could*" be found.[157] The IHRA also stresses that

---

[150] 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

[151] 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

[152] 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .").

[153] 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .").

[154] 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

[155] *See* ECF 20, ¶¶ 39–40; ECF 21, 7, 13–14; ECF 38, 18–19, 39.

[156] *See* ECF 20, ¶ 40.

[157] Ex. 4, 2 (emphasis added).

any evaluation on this point must "tak[e] into account the overall context."[158] Further, the IHRA cautions that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic."[159] It is hard to see how the listing of *potential* examples of antisemitism can run afoul of the First Amendment.

At this point, it helps to step back. DSA is concerned that UTSA will *misapply* the IHRA's examples that *do not appear* in HOP 9.37 and that UTSA considers to be *irrelevant*.[160] DSA's claim is leagues away from a proper facial challenge, which is usually limited to the disputed law's text.[161]

### 5.    Schools Can Restrict Antisemitic Discrimination Without Necessarily Violating The First Amendment.

The Supreme Court's seminal decision in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.* gives schools leeway to restrict speech that is "materially disrupt[ive]" or "inva[des] . . . the rights of others" without violating the First Amendment.[162] There are numerous instances here of anti-Israel protestors causing significant disturbances: assaulting law enforcement officers, trespassing into buildings, vandalizing school property, hurling antisemitic slurs at Jewish students, and so on.[163] It was not unlawful for Governor Abbott to ensure that universities enforce their policies against such materially disruptive acts, just like it would not be unlawful for a school to protect its students and operations from such mayhem.[164]

That said, *Tinker's* "invasion of others" prong is perhaps a more natural fit for this case, particularly as antisemitic discriminatory speech is concerned. Per *Tinker*, the First Amendment does

---

[158] *Id.* at 2.

[159] *Id.* at 1.

[160] *See* Ex. 24, §§ IV, XIX; Robinson Decl., ¶ 9; Patrick Decl., ¶ 11.

[161] *See Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 507–08 (5th Cir. 2019).

[162] 393 U.S. 503, 513 (1969); *see also Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015) (explaining that *Tinker* does not require an *actual* disruption, just that school officials could have *reasonably forecasted* that a substantial disruption would occur).

[163] *Supra*, 3–4.

[164] *See, e.g., Tinker*, 393 U.S. at 513–14; *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 222–24 (5th Cir. 2009).

not protect speech at school that "invad[es] . . . the rights of others."[165] Thus, courts have found that speech intertwined with the bullying or sexual harassment of a student can be properly restricted under *Tinker*.[166] And the Supreme Court has acknowledged that schools must have "latitude" to regulate speech that is "highly offensive or highly sensitive to others," reasoning that "schools must teach by example the shared values of a civilized social order."[167]

The principle is simple. Discriminatory speech will often invade the victim's rights, whether it be the right to be secure, to be safe, or simply to pursue an education in this country without having to face vicious harassment due to the victim's protected characteristic. *Tinker* gives schools more breathing room than would be found outside the educational context to ban such discrimination without violating the First Amendment.[168] Thus, GA-44's and HOP 9.37's restrictions on discriminatory speech motivated by antisemitism have many constitutional applications.

DSA may try to circumvent the analysis above by arguing that *Tinker* does not apply to higher education. But the Supreme Court applied *Tinker* to a public university in *Healy v. James*. There, a state college denied official recognition to a group of students who wanted to form a local chapter of the Students for a Democratic Society ("SDS").[169] The plaintiffs sued, asserting a denial of their First

---

[165] 393 U.S. at 513; *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("[I]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.") (quotations omitted); *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 351–52 (5th Cir. 2017) (citing *Tinker's* "rights of other" language to justify a school's speech restriction, without performing a "substantial disruption" analysis); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1230 (11th Cir. 2018) ("We take it as given that when the Supreme Court stated that conduct involving an 'invasion of the rights of others' is not constitutionally protected, it meant that conduct invading the rights of others is not constitutionally protected."); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152 (9th Cir. 2016) ("*Tinker* permits schools to restrict student speech in two broad sets of circumstances: if the speech might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities, or, alternatively, if the speech collides with the rights of other students to be secure and to be let alone.") (quotations omitted).

[166] *See C.R.*, 835 F.3d at 1152; *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565, 572–73 (4th Cir. 2011).

[167] *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682–83 (1986).

[168] *See id.*

[169] *Healy v. James*, 408 U.S. 169, 170 (1972).

Amendment rights.[170] The college's president justified the nonrecognition decision by claiming that the SDS chapter would be a "disruptive influence" to the college.[171]

*Healy* held that the college's "disruptive influence" rationale could have been a lawful basis for its decision not to recognize SDS if it had been based on the organization's activities and factually supported by the record.[172] The Court cited *Tinker* as one of the main cases supporting this conclusion and explained that "actions which 'materially and substantially disrupt the work and discipline of the school'" can be lawfully prohibited.[173] The Court also stated that "if there were an evidential basis to support the conclusion that [the local] SDS posed a substantial threat of material disruption . . . the President's decision should be affirmed."[174]

Further, in *Jenkins v. Louisiana State Board of Education*, six Grambling College students were suspended for their alleged participation in certain campus disturbances.[175] The students challenged their suspensions on First Amendment grounds.[176] The Fifth Circuit found that *Tinker* established "[t]he controlling rule to be applied" to the students' First Amendment claims,[177] and it found that the students' actions "resulted in a material disruption of the campus and of the rights of others."[178] Thus, the Court held that the students' conduct "[was] not protected by the First Amendment."[179]

To be sure, some courts have found that university officials should have "less leeway in regulating student speech than . . . public elementary or high school administrators."[180] Perhaps this

---

[170] *Id.* at 177.

[171] *Id.* at 188.

[172] *Id.*

[173] *Id.* at 189 (quoting *Tinker*, 393 U.S. at 513).

[174] *Id.*

[175] 506 F.2d 992, 994 (5th Cir. 1975).

[176] *Id.*

[177] *Id.* at 1002.

[178] *Id.* at 1003.

[179] *Id.*

[180] *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008); *see also Radwan v. Manuel*, 55 F.4th 101, 117 (2d Cir. 2022).

makes sense. Universities play a crucial role in advancing the "marketplace of ideas."[181] And *Healy* teaches that "First Amendment rights must always be applied in light of the special characteristics of the environment in the particular case."[182]

But discriminatory speech does not always further the public debate. Just the opposite in fact. "[A]busive speech, no less than abusive conduct can . . . seal the schoolhouse gates" to those facing discrimination, just like it can "slam shut the doors to the workplace."[183]

Some courts have recently found that the First Amendment allows schools to regulate offensive speech that targets and harasses a particular person, but schools cannot restrict speech "on a matter of public concern, directed to the college community."[184] Under this approach, there are many constitutional applications of GA-44 and HOP 9.37—namely, when these policies are applied to prevent or punish antisemitic speech directly and personally targeting other students. On top of that, HOP 9.01 only bars discrimination that is "directed at a specific individual or a group of identifiable individuals" and harassment "that is directed at an individual or group" due to a protected characteristic.[185] That UTSA only limits "directed" discrimination strengthens the conclusion that its challenged policy is facially lawful.[186]

In sum, there are many ways in which GA-44 and HOP 9.37 can be constitutionally applied. Thus, it cannot be said that these provisions' "unconstitutional applications substantially outweigh

---

[181] *See Healy*, 408 U.S. at 180.

[182] *Id.*

[183] *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 263 (S.D.N.Y. 2025); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) ("[P]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet . . . .") (quotations omitted).

[184] *See id.* at 265–66; *see also Garrett v. City Univ. of New York*, No. 24-CV-9710 (VSB) (RWL), 2025 WL 3096550, at *7, 10 (S.D.N.Y. Oct. 10, 2025); *Canel v. Art Inst. of Chicago*, No. 23 CV 17064, 2025 WL 564504, at *9–10 (N.D. Ill. Feb. 20, 2025); *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401, 412–13, 420 (E.D. Pa. 2025).

[185] Ex. 23, § VII; Patrick Decl., ¶¶ 12–13.

[186] *See Gartenberg*, at 265–66; *Garrett*, 2025 WL 3096550, at *7, 10; *Canel*, 2025 WL 564504, at *9–10; *Landau*, 789 F. Supp. 3d at 412–13, 420.

[their] constitutional ones."[187]

### B.    DSA Did Not Assert An As-Applied Challenge, And Any Such Claim Would Fail As A Matter Of Law.

DSA cannot sustain an as-applied challenge to GA-44 and HOP 9.37 as it did not assert such a claim in its complaint.[188] Regardless, any such claim would fail on the merits, given the lack of evidence showing that GA-44 or HOP 9.37 will be enforced against DSA or its members to restrict their speech.[189]

### C.    The Constitutional-Avoidance Canon Applies To Any Interpretation Of GA-44.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."[190]

This cannon applies most obviously to GA-44's provision regarding Tex. Gov't Code. § 448.001's definition of antisemitism.[191] GA-44 need not be read as *requiring* universities to incorporate the IHRA's examples of antisemitism into their policies or to apply these examples when assessing whether a student's speech or conduct is antisemitic if doing so creates a First Amendment problem. This is especially true as UTSA has not interpreted GA-44 in this fashion,[192] which shows there is a viable reading of GA-44 that would avoid any constitutional issues. Per the constitutional-avoidance canon, UTSA's reasonable and lawful reading of GA-44 should be adopted, and any interpretation

---

[187] *See Moody*, 603 U.S. at 724.

[188] *See supra*, 12–13; *see also Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

[189] *See supra*, 7–13; *see also McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) (finding that "an uncontroversial principle of constitutional adjudication" is that "a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him").

[190] *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

[191] Ex. 25, 2.

[192] *See* Robinson Decl., ¶ 9; Patrick Decl., ¶ 11; *see also* Ex. 24, §§ IV, XIX(B).

that raises "serious constitutional doubts" as to the order's validity must be avoided.[193]

Further, to invalidate GA-44 in its entirety, DSA will need to show that either (1) *all* of this order's directives are unconstitutional or (2) the directive found to be unconstitutional is inseverable from the order's valid provisions.[194] While tough to analyze in the abstract, DSA will be hard pressed to make the showing needed to render GA-44 "null and void," as it requests in its amended complaint.[195]

## CONCLUSION

For the reasons above, this Court should grant Defendants' motion for summary judgment and dismiss this lawsuit in its entirety.

Dated: April 2, 2026

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ *Todd Dickerson*
TODD DICKERSON
Attorney-in-charge
Texas Bar No. 24118368

---

[193] *See Jennings*, 583 U.S. at 286.

[194] *See Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998) (explaining that under Texas law, "if any provision of the statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions"); *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (explaining that severance is a matter of state law); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 625 (2020) (recognizing a "strong presumption of severability").

[195] ECF 20, pg. 26.

MELISSA B. HOSTICK
Texas Bar No. 24128832
Office of the Attorney General
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(737) 228-7289 | FAX: (512) 320-0667
Todd.Dickerson@oag.texas.gov
Melissa.Hostick@oag.texas.gov
**Attorneys for Defendants**

### CERTIFICATE OF SERVICE

I certify that on April 2, 2026, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel.

/s/ *Todd Dickerson*

29