**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| **DEMOCRATIC SOCIALISTS OF AMERICA**, <br><br> *Plaintiff*, <br><br> v. <br><br> **KEVIN P. ELTIFE**, *et al.*, <br><br> *Defendants*. | No. 1:24-cv-523-RP |

_____

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____

1

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................... **4**

**FACTS** ................................................................................................ **2**

**ARGUMENT** ....................................................................................... **4**

    I.    YDSA has standing. ...................................................................5

        a.   YDSA has organizational and associational standing...........................6

        b.   YDSA satisfies the Driehaus factors for a pre-enforcement challenge..................7

           i.    Just as it has in the past, YDSA intends to keep speaking out for Palestine and against Israel. ...............................................................7

           ii.   YDSA's political expressions are "arguably proscribed" by UTSA's revised speech policies ......................................................................8

           iii.  Because YDSA's conduct and speech are GA-44's targets, the credible threat of enforcement is presumed and no evidence exists to rebut that presumption. .......11

    II.   The Court should stand by its prior holding that the incorporation of the IHRA definition is unlawful viewpoint discrimination. .......................................................12

**CONCLUSION** .....................................................................................**14**

**TABLE OF AUTHORITIES**

Cases

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547 (5th Cir. 2010) ......... 5

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979) ............................................................. 6

*Bldg & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138 (2d Cir. 2006) ... 5

*Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024)............................... 9

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979)..................................................... 3

*Inst. for Free Speech v. Johnson*, 148 F.4th 318 (5th Cir. 2025)............................................6, 10

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014)..................................................................... 6

*Laird v. Tatum*, 408 U.S. 1, 11 (1972)........................................................................................ 7

*Lujan v. Def's of Wildlife*, 504 U.S. 555 (1992).................................................................3, 4, 5

*Moody v. Netchoice, LLC*, 603 U.S. 707 (2024) ..................................................................... 3, 4

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017).................................................... 5

*Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819 (1995).............................. 12

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ..... 7, 10, 11

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)...........................................................6

*Tanzin v. Tanvir*, 592 U.S. 43 (2020) ......................................................................................... 8

*Turtle Island Foods, S.P.C. v. Strain,* 65 F.4th 211 (5th Cir. 2023)........................................... 7

*United States v. Hansen*, 599 U.S. 762 (2023) ......................................................................... 4

*Woodlands Pride v. Paxton,* 168 F.4th 293 (5th Cir. 2026)....................................................... 7

**INTRODUCTION**

When Governor Abbott directed campus officials throughout Texas to incorporate a definition of antisemitism into its speech policies, he knew what he was doing. He was trying to suppress pro-Palestine voices from speaking out. It is why the definition considers the common and typical criticisms students make against Israel—that it is a racist state and comparable to Nazi Germany in some ways—antisemitic.

In response, no campus officials anywhere in Texas did or said anything against Governor Abbott's order. All fully complied. Each campus adopted the International Holocaust Remembrance Alliance's definition of antisemitism. That is the undisputed evidence here.

Now, when the Young Democratic Socialists of America express pro-Palestine views at University of Texas at San Antonio, campus rules expose their speech to punishment. Indeed, prior to the lawsuit, Dean Robinson was demanding that YDSA not use perhaps the most famous political slogan associated with the pro-Palestine view: *from the river to the sea, Palestine will be free.* She even threatened to call the police if they did not agree to her demand.

And while campus officials have not taken further enforcement action against YDSA or other campus groups for their pro-Palestine speech, Plaintiff's preenforcement challenge does not require a list of enforcement actions to prevail. This challenge is based on the chill Defendants have caused by complying with GA-44. For such claims, it is enough that the viewpoint conscious definition of antisemitism continues to be a part of Defendants' speech policies.

## FACTS

1. Governor Abbott issued an executive order, GA-44, that directed University of Texas at San Antonio and other public campuses in the state to regulate speech and expressions about Israel. Exhibit A – Executive Order GA-44 (UTSYSTEM_BOR_000206-208); Exhibit B – Letter to Regents Regarding GA-44 (UTSYSTEM_BOR_000309); Exhibit C – Email Correspondence Regarding Required Antisemitism Definition (UTSYSTEM_BOR_0000291-297); Exhibit D – September 12, 2024 Abbott Letter to School Systems Regarding GA-44 (UTSA_001945) (reminding school systems of their obligations, under GA-44, to "include the statutory definition of antisemitism that I signed into law.").

2. The order directed UTSA campus officials to "address the sharp rise of antisemitic speech" by imposing punishment on such expressions and specifically labeled the pro-Palestine political slogan *from the river to the sea, Palestine will be free* as antisemitic. Ex. A.

3. In response to Governor Abbott's executive order, interpreting GA-44 to require it, UTSA officials attempted to stop students from using the political slogan *from the river to the sea, Palestine will be free*. *See* Exhibit E - Robinson Transcript at 163:12-164:11; Exhibit F – Robinson Video (showing UTSA official directing students to stop using "From the River to the Sea because of GA-44) (CAIR_DSATEXASEXEC_0099); Exhibit O – Robinson Email (stating that GA-44 "requires higher education institutions to not allow the use of phrases like "From the River to the Sea").

4. YDSA stopped the use of that political slogan in response to the demands of UTSA officials. To this day, YDSA refrains from using the political slogan because they believe it is expressly prohibited by GA-44. Exhibit G - Pl. Resp. to Interrog. at No. 24 ("These Speech restrictions have and continue to prevent YDSA students from expressing their advocacy for

Palestine in each of their events and protests, whether the expression be written or oral."); *id.* at No. 13 (showing examples of chilled speech).

5. In response to Governor Abbott's executive order, GA-44, UTSA adopted the International Holocaust Remembrance Alliance's definition of antisemitism, making certain expressions about Israel subject to punishment. That definition is incorporated in UTSA's policies. *See* Exhibit H - Jimenez Deposition Transcript at 61:21-62:1 (UTSA incorporated definition of antisemitism because of GA-44), 14:23-15:13 (same), 52:3-5 (no antisemitism definition before GA-44); Ex. E at 166:8-15 ("We updated our policies overall based on the executive order."); Exhibit. I – Internal UTSA Email Correspondence (UTSA_002626-27) (confirming "HOP. 9.37 fully complies with the Governor's Order" in the context of Discussing GA-44); *see also* Exhibit J – HOP 9.37 (CAIR_DSATEXASEXEC_0047) (updated HOP definition of antisemitism); Exhibit N – UTSA Expressive Activity PPT (UTSA_003437-62) (identifying GA-44 as a "key polic[y]" for "Protecting and Regulating Speech").

6. This definition of antisemitism includes the common and typical criticisms of Israel made by YDSA and other pro-Palestine groups and individuals, including calling Israel a racist state or comparing its leaders and policies to Nazi Germany. Exhibit K – Patrick 30(b)(6) Designee Deposition Transcript at 52:6-19 (acknowledging that Hop 9.37 was revised to comply with GA-44, and that it included the IHRA definition of antisemitism), 53:8-16 ("intention was to include it as it was in the Texas Government code" with no intention to deviate.), 44:8-45:10 (acknowledging that the Texas code references the examples of antisemitism from the IHRA); see Exhibit L – IHRA Working Definition of Antisemitism (CAIR_DSATEXASEXEC_0051).

7.  YDSA has expressed itself in ways that, through UTSA's definition of antisemitism, the university now proscribes. YDSA plans to continue doing so. *See* Ex. F; Ex. G at No. 11 (describing events where YDSA used phrases or discussed things proscribed y antisemitism examples, including calling war in Gaza a genocide, calling Zionism colonialism, and advocating for BDS); *see, e.g.,* Ex. M – YDSA Social Media Posts (CAIR_DSATEXASEXEC_0373-378).

### ARGUMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, a plaintiff must set forth "specific facts" that must be "supported adequately by the evidence adduced at trial" to support their claims. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 561 (1992); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114 (1979).

Here, YDSA seeks summary judgment on its facial pre-enforcement challenge to Defendants' adoption of a definition of antisemitism that the Court has explained embeds viewpoint discrimination into campus speech policies. Dkt. 62 at 19 ("[T]he Court finds the incorporation of this specific definition of antisemitism is viewpoint discrimination"). Because the facial challenge regards the First Amendment, it is subject to "a less demanding though still rigorous standard" in order to "'provide [] breathing room for free expression.'" *Moody v. Netchoice, LLC*, 603 U.S. 707, 723 (2024) (citing *United States v. Hansen*, 599 U.S. 762, 769 (2023)). To succeed, Plaintiff must show that UTSA's implementation of GA-44's "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723–24.

Because Defendants have incorporated a definition of antisemitism that applies to pure

4

speech and makes common and typical criticisms of Israel punishable under campus rules, it constitutes viewpoint discrimination and lacks *any* constitutional application, an aspect of this case the Court has already assessed. *See* Dkt. 62 at 22 ("If this viewpoint is expressed in a way that truly does rise to the level of a substantial disruption, the disruption can be addressed through content-neutral, time, manner, and place restrictions…making the prohibition on this specific expression not only unconstitutional but unnecessary"). Thus, there is no constitutional application of the definition.

## I.    YDSA has Standing.

YDSA is "an object of the action" at issue and in such situations "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* 504 U.S. at 561–62. For years, YDSA has participated in the debate about Israel and Palestine. At its events, its members and fellow students speak in ways Defendants' definition considers antisemitic, rendering such expressions punishable. See Ex. G at No. 8; Ex. F (Dean of Students instructing YDSA to refrain from using certain language banned by the executive order). Indeed, it is YDSA (alongside similarly oriented groups) that GA-44 calls out by deed for engaging in "multiple protests and walkouts…with students chanting antisemitic phrases such as *from the river to the sea, Palestine will be free.*" Ex. A at 2 (executive order).

*Lujan's* truism holds here. Being an "object of the action" at issue simplifies the analysis, and these few facts confirm YDSA's standing—as an organization and on the basis of the *Driehaus* pre-enforcement factors YDSA satisfies. *See Lujan,* 504 U.S. at 561–62

5

### a. YDSA has organizational and associational standing.

Organizations like YDSA can establish standing "through either of two theories," associational standing or organizational standing. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Through its March 25, 2026 decision denying Defendants' Motion for Judgment on the Pleadings, the Court resolved these entity standing issues decisively in YDSA's favor. Dkt. 105.

With regards to associational standing, Defendants will likely rehash their argument that matters of foreign policy are not "germane to the [organization's] purpose," which is a requirement but an "undemanding" one that requires "mere pertinence between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n. 2 (5th Cir. 2010) (citing *Bldg & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006)). The Court should reject this argument for the same reasons it denied Defendants' Motion for Judgment on the Pleadings.

To assess germaneness, the Court looked to YDSA's "repeated, real-world actions" rather than "abstract arguments about what is or could be meant by the organization's mission statement." Dkt. 105 at 11–12. The Court held that "DSA's allegations that it has repeatedly organized protests and other activities related to Palestine" were enough to establish that issues regarding Palestine and Israel were within "the nature and scope of DSA's purpose as an organization." *Id.* at 9. Those facts are now confirmed by evidence and thus YDSA has associational standing. *See generally* Statement of Fact #7; Ex. F; Ex. G at No. 11, and Exhibit M

For similar reasons, YDSA also has organizational standing. An organization has standing if it can show "direct interference" with its activities. Dkt. 105 at 12. As the Court

explained in its March 2026 decision, YDSA is alleging that "its activities—organizing protests and other events through its members and campus groups—are directly impacted by GA-44 and the resulting policies." *Id.* That is because the definition of antisemitism UTSA adopted to implement GA-44 makes YDSA's expressions about Palestine and Israel punishable. With an intention to keep making those expressions, Defendants have directly interfered with YDSA, conferring upon them organizational standing to challenge that interference.

**b.  YDSA satisfies the *Driehaus* factors for a pre-enforcement challenge**

To sustain its pre-enforcement challenge, YDSA must satisfy the test established by *Driehaus. Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014). Plaintiffs must prove three things: (1) an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that the planned conduct is "arguably ... proscribed" by the challenged policy, and (3) the threat of future enforcement is "substantial." *Speech First*, 979 F.3d at 330–31.

**i.  *Just as it has in the past, YDSA intends to keep speaking out for Palestine and against Israel.***

YDSA may demonstrate an "'intention to engage in a course of conduct arguably affected with a constitutional interest'" in a number of ways. *Driehaus*, 573 U.S. at 159 (citing *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). One way is to identify expressions that the student group would make "but refrained from doing so out of fear that their comments would violate the University's speech policies." *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 327 (5th Cir. 2025). The other way is to show evidence of "past enthusiastic participation" in free speech campus activities. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014).

YDSA has shown both. On one hand, since Dean Robinson's April 23, 2024 threat to refer them to law enforcement for allowing attendees at a YDSA event to use the political slogan *from the river to the sea, Palestine will be free*, YDSA has not used the phrase. *See* Exhibit F (asking students to refrain from using the phrase); Dkt 106-1, DSA 30(b)(6) Deposition Transcript at 29:22-30:4. In the absence of such a rule, YDSA would be using the political slogan. With Defendants' implementation of GA-44, YDSA does not. *See* Exhibit G - Pl. Resp. to Interrog. at No. 24.

On the other hand, YDSA has continued to hold events that criticize Israel as a racist endeavor. *See, e.g.*, Ex. M. YDSA has held die-in's, protests, film screenings, and workshops. Accusing Israel of committing a genocide and being an apartheid state are common messages at all these events. *See* Ex. G at No. 8. And the evidence shows that YDSA made such expressions regularly, during the 2023-2024 school year, the 2024-2025 school year, as well as the current school year. *Id.*; Ex. M. Because YDSA has in the past made political expressions critical of Israel and intends to do so again in the future, the student group satisfies this first prong.

### ii. YDSA's political expressions are "arguably proscribed" by UTSA's revised speech policies

To satisfy the arguably proscribed prong, Plaintiff need not show that the expressions they plan to make are prohibited explicitly. To be "arguably proscribed," a restriction "does not require that the plaintiff's interpretation of the challenged law be the *best* interpretation." *Woodlands Pride v. Paxton,* 168 F.4th 293, 305 (5th Cir. 2026). Indeed, so long as Plaintiff's "reading is *arguable*, it satisfies this prong." *Turtle Island Foods, S.P.C. v. Strain,* 65 F.4th 211, 218 (5th Cir. 2023). So, while "a direct prohibition against the exercise of First Amendment rights" is not required, such an explicit proscription would most clearly satisfy this prong.

*Speech First*, 979 F.3d at 332 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

Here, Defendants' implementation of GA-44, via the adoption of the IHRA definition of antisemitism creates an explicit prohibition against certain criticisms of Israel. Ex.  A. As this Court previously explained, the definition "labels calling the State of Israel a racist endeavor and "drawing comparisons of contemporary Israeli policy to that of the Nazis as antisemitic." Dkt. 62. at 19. And because Defendants have adopted a specific definition of antisemitism, their speech policies "do not leave 'antisemitism' open to constitutional definitions and interpretations." *Id.* Defendants are stuck with the IHRA definition and its particular meaning.

Defendants may argue that the word-for-word adoption of the IHRA definition in UTSA's speech policies somehow leaves out the specific examples of antisemitism that definition is meant to include. But, in training its officials in how to implement its new speech policies, Defendants have not disavowed the IHRA definition's examples of antisemitism; rather, they have affirmed the relevance of those examples. *See* Ex. K at 52:6-19 (acknowledging that HOP 9.37 was updated to comply with GA-44, and that it included the IHRA definition of antisemitism); 8:2-22 (discussing training regarding the IHRA definition and examples of antisemitism).

At the beginning of this school year, long after litigation commenced, Defendants still identified GA-44 as a "Key Polic[y]" governing their regulation of campus expressive activity. Ex. N. And GA-44 is explicit that it is directing UTSA to use the definition of antisemitism found in "Section 448.001 of the Texas Government Code." Ex. A. That definition makes clear that the "[e]xamples of antisemitism" that IHRA includes are within the scope of the definition UTSA adopted. *See Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) ("When a statute

9

includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning"); Ex. L (IHRA Working Definition of antisemitism and examples).

Whatever Defendants argue, their failure to disavow GA-44 decisively tilts the analysis on this prong in favor of YDSA. Dean Robinson's decision, for example, to direct YDSA to stop using a disfavored political slogan shows how campus officials will inevitably use GA-44. *See* Ex. O (explaining that GA-44 "requires higher education institutions to not allow the use of phrases like 'From the to the Sea'"); *see* Ex. E at 163:12-164:11; Ex. F  (showing UTSA official directing students to stop using "From the River to the Sea" because of GA-44). UTSA expects its officials to be familiar with the contents of Governor Abbott's executive order, *see* Ex. K at 46:8-12, and it was on the basis of UTSA's interpretation of GA-44 that Dean Robinson stopped YDSA from using a political slogan she believed GA-44 required her to prohibit. Ex. O; Ex. F. Defendants' own officials have interpreted their speech policies to require them to prohibit political expressions YDSA would like to make. *Id.* This is dispositive evidence that the meaning YDSA assigns to Defendants' speech policies is "a *plausible* interpretation" and thus "arguably proscribed." *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024)

Defendants have not disavowed any part of the executive order.  Ex. H at 15:3-5 (Anne Jimenez identifying that UTSA complied with the executive order); *see* Ex. I (confirming "HOP. 9.37 fully complies with the Governor's Order" in the context of discussing GA-44). Campus officials will continue to read UTSA's speech policies in light of the IHRA examples and GA-44's direction "to address the sharp rise in antisemitic speech and acts" and conclude that it is a license to punish YDSA's protected speech. *See* Ex. A (Executive Order); *see* Ex. F. This is exactly what the Court previously held in its preliminary injunction decision. *See* Dkt.

10

62 (finding that, under the revised policies, an "expression [comparing Israel to Nazi Germany] is defined as antisemitism and could be punished as "harassment . . . committed because of antisemitism). *See also* Ex. J ("harassment…because of antisemitism…will be subject to discipline, up to and including possible termination/expulsion").

> ### iii.  Because YDSA's conduct and speech are GA-44's targets, the credible threat of enforcement is presumed and no evidence exists to rebut that presumption.

Other than the demand Dean Robinson made on April 23, 2024 to stop the use of the phrase *from the river to the sea, Palestine will be free* and the concurrent threat she made to report YDSA to law enforcement, Ex. F, UTSA has not otherwise disciplined the student group or others for their speech. But, to establish a credible threat of enforcement, YDSA need not prove past enforcement, although Dean Robinson's demand and threat constitute past enforcement. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ("a lack of past enforcement does not alone doom a claim of standing").

Rather, with YDSA and other pro-Palestine groups being the target of the policy change, this prong is presumed to be satisfied. *See* Ex. A. The incorporation of the IHRA definition of antisemitism into Defendants' speech policies creates a presumption of a credible threat of enforcement in two ways. First, when it comes to "preenforcement First Amendment challenges" made against laws that are "non-moribund," the credible threat of prosecution is "assume[d]" unless Defendants are able to muster "compelling contrary evidence." *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (cleaned up). Here, UTSA acknowledges that its speech policy revisions were made in order to implement GA-44, Ex. I (confirming "HOP. 9.37 fully complies with the Governor's Order"), and that GA-44 requires UTSA to use the definition of antisemitism and the examples it refers to in Section 448.001

of the Texas State Code. Ex. K at 43:15-44:7. Indeed, UTSA acknowledges that it has fully complied with GA-44 and that it is obligated to adhere to the policy henceforth. Ex. I. Given the recent history of these speech policies and its undeniable political salience, the speech policies YDSA challenges are "non-moribund." The Court can presume a credible threat of enforcement.

Second, as a pro-Palestine student group, YDSA is in the "class arguably facially restricted by the University policies." *Speech First*, 979 F.3d at 335. GA-44 makes clear that it is aimed at the student groups that, like YDSA, organized "multiple protests and walkouts…with students chanting" a pro-Palestine political slogan. *See* Ex. A at 2. And the definition of antisemitism adopted by Defendants has, within its meaning, many specific pro-Palestine expressions YDSA and its members make, including that Israel is a racist state and that its policies and leaders are similar to Nazi Germany's. *Compare* Ex. J (definition of antisemitism in HOP 9.37) *with* CAIR_DSA_TEXASEXEC_0051-0059 (IHRA Definition of antisemitism).

Just like in *Speech First*, the incorporation of a new definition into UTSA's policies would lead any "reasonable observer [to deduce] that the University meant to expand its regulatory authority beyond the First Amendment." *Speech First*, 979 F.3d at 337. Thus, a reasonable student "must act on the same assumption and self-censor her speech in accord with the perceived policies." *Id.*

II.     **The Court should stand by its prior holding that the incorporation of the IHRA definition is unlawful viewpoint discrimination.**

When this Court denied Defendants' motion to dismiss, it held that UTSA's "incorporation of this specific definition of antisemitism is viewpoint discrimination." Dkt.

62 at 19. This Court explained that the definition, "by incorporation of the IHRA's examples," labels as antisemitic the expressions that YDSA and other pro-Palestine groups regularly make. As the Court noted, "students can be punished for antisemitic speech under the revised speech policies." *Id.* Because "antisemitism" is defined in a manner that includes protected political speech and renders it punishable, *see* Exs. A and J, UTSA's use of the definition is classic viewpoint discrimination. And since that decision, UTSA has kept the definition and trained their officials to treat GA-44 as a "Key Polic[y]." Ex. N. The Court has no need to revisit its prior decision that the IHRA definition of antisemitism is viewpoint discrimination. *See* Dkt. 62.

UTSA will attempt to distance itself from IHRA's examples of antisemitism. But UTSA has never disavowed those examples and continues to defend the propriety of their use as well as their authority to prohibit antisemitic speech. *See* Dkt.. 106 at 24 (explaining that UTSA is justified in prohibiting "[d]iscriminatory speech" because of the effect it has on the classroom); *Id.* at 22 (explaining that the use of IHRA's examples does not establish "bright-line rules to be blindly followed" and requires instead for UTSA to "take into account the overall context"). This Court previously rejected Defendants attempt to justify its suppression of expressions considered antisemitic under the IHRA definition, holding that Defendants' desire to prohibit such expressions "akin to a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Dkt. 62 at 21.

Furthermore, as this Court noted, UTSA's revised policies are "intertwined with GA-44 and the IHRA examples." *Id.* at 19-20. This conclusion is dictated by GA-44's direction to UTSA to incorporate the definition of antisemitism "adopted by the State of Texas in Section 448.001 of the Texas Government Code." Ex. A. Section 448.001 explicitly refers to the

13

IHRA definition of antisemitism as well as the "[e]xamples of antisemitism [that] are included with the International Holocaust Remembrance Alliance's Working Definition of Antisemitism adopted on May 26, 2016." This is classic viewpoint discrimination and is illegal even if the Court applies *Tinker. See also Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 835 (1995). *See also* Doc. 62 at 21 (universities "perform a disservice to their mature students by prohibiting expression that some may find disagreeable").

**CONCLUSION**

For the reasons above, this Court should GRANT Plaintiff's summary judgment motion and enter the Proposed Order, or any relief the Court deems appropriate.

Dated: April 3, 2026

Respectfully submitted,

/s/Lena Masri
Lena Masri
Gadeir Abbas*
Catherine Keck

CAIR LEGAL DEFENSE FUND
453 New Jersey Ave SE
Washington, D.C. 20003
T: (202) 742-6420
ldf@cair.com

*Licensed in VA; not in D.C., practice
 limited to federal matters

14